1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE RACKABLE SYSTEMS, INC.
SECURITIES LITIGATION

_____/

No. C 09-0222 CW

ORDER GRANTING
DEFENDANTS' MOTION
TO DISMISS

This is a securities fraud class action brought on behalf of purchasers of Rackable Systems, Inc.'s securities between October 30, 2006 and April 4, 2007. Defendants Rackable, Thomas Barton, Madhu Ranganathan and Todd Ford are alleged to have defrauded investors by failing to disclose materially adverse conditions of Rackable Systems. Defendants have filed a motion to dismiss Plaintiffs' Amended Complaint. Lead Plaintiff Elroy Whittaker opposes the motion. The motion was heard on November 19, 2009. Having considered all of the parties' papers and oral argument on the motion, the Court grants Defendants' motion.

BACKGROUND[1]

Defendant Rackable designs, manufactures and implements computer servers and storage systems. Its customers include over 300 companies worldwide in the internet, semiconductor design,

---

[1]All facts are taken from Lead Plaintiffs' Amended Complaint and from judicially noticeable documents and are assumed to be true for purposes of this motion.

enterprise software, entertainment, financial services, oil and gas exploration and biotechnology industries and the federal government.  Rackable was founded in 1999 and conducted its initial public offering in June, 2005.  In May, 2009, Rackable acquired Silicon Graphics, Inc.  The combined entity now carries the name of the newly acquired company.  Defendant Barton is the former Chief Executive Officer; Defendant Ranganathan is the former Chief Financial Officer and Principal Finance and Accounting Officer; and Defendant Ford is the former Executive President of Operations.

Lead Plaintiff Elroy Whittaker purports to represent a class of persons and entities that bought common stock of Rackable between October 30, 2006 and April 4, 2007 (Class Period).

In Rackable's first annual report as a public company, it noted several factors that could affect its ability to stay profitable.  It stated that it relies on a relatively small number of customers for a significant portion of its revenue.  In 2005, Microsoft, Yahoo! and Amazon accounted for fourteen percent, twenty-two percent and twenty-four percent of Rackable's revenue respectively.

Rackable maintains a build-to-order business model, which, as it disclosed to its investors, requires it to purchase components and materials for its products in spot markets.  Thus, it noted that its costs are sensitive to market price volatility.  Rackable also specifically disclosed that historically prices for DRAM[2] have been volatile and it was becoming an increasingly larger percentage of Rackable's bill of materials.

---

[2]DRAM is a type of computer memory used in Rackable's products.

United States District Court
For the Northern District of California

On February 22, 2006, Rackable disclosed that in December, 2005 it had identified "potential state sales and use tax liabilities relating to certain of our product sales to customers outside of California," which it estimated to be $1.2 million. Request for Judicial Notice, Exh. 1 at 27.  Rackable stated that, if it could not recover the sales tax from its customers, it would have to record an additional charge to its operating results and pay the sales tax out of its own funds.  Id.

On October 30, 2006, Rackable announced that its total revenue for the first three quarters was $254.5 million, up ninety-two percent from $131.9 million for the same period in 2005. Rackable's non-GAAP[3] gross margin of 22.6 percent for the third quarter was within its projection of twenty-two to twenty-four percent.  Rackable projected that its 2006 fourth quarter revenue would be between $100 and $110 million, non-GAAP gross margins would be between twenty-three and twenty-four percent, and non-GAAP net income would be between $0.25 and $0.75 per share.

Rackable missed these projections.  On January 16, 2007, Rackable announced that its revenue for the fourth quarter would be between $105.5 and $106.8 million, non-GAAP gross margins would be

_____

[3]SEC Regulation G regulates the use of financial measures that are not prepared in accordance with generally accepted accounting principles (GAAP).  These are commonly referred to as "non-GAAP financial measures."  The non-GAAP gross margin and net income excludes stock-based compensation expenses.  Rackable excludes from its non-GAAP gross margin and non-GAAP net income "certain nonrecurring items to facilitate its review of the comparability of the company's core operating performance on a period to period basis because such times are not related to the company's ongoing core operating performance as viewed by management."  RJN, Exh. 9. Rackable notes that "these non-GAAP financial measures have limitations as an analytical tool, and are not intended to be an alternative to financial measures prepared in accordance with GAAP."  Id.

between 19.2 and 19.7 percent and non-GAAP net income would be between $0.17 and $0.18 per share.  It stated that the "primary factors" for the miscalculation were (1) DRAM pricing higher than anticipated, (2) intense competitive conditions that caused the company to price contracts more aggressively in order to maintain and expand its customer base and (3) lower than expected sales of a new product, "RapidScale."  RJN, Exh. 9.  The next day, Rackable's stock price fell from $32.42 per share to $19.98 per share.

On February 1, 2007, Rackable announced its final financial results for the fourth quarter and full year of 2006.  The final figures announced for the 2006 fourth quarter were total revenue of $106.9 million, non-GAAP gross margins of 19.8% and non-GAAP net income of $0.19 per share.  Defendant Barton explained that this shortfall was due to (1) unexpectedly high prices of DRAM, (2) intentional business decisions to maintain market share and win business in the face of aggressive competition, (3) lower than anticipated sales of RapidScale products and (4) revenue production that was "backend loaded" for the quarter.  Id., Exh. 24.  The next day, Rackable's stock fell to $16.60 per share.

On February 28, 2007, Rackable disclosed that it had increased its reserve for potential sales and use tax liability to $6.5 million.  On April 4, 2007, Rackable announced that it expected revenue for the first quarter to fall within previous projections of $70 to $75 million, but that its GAAP and non-GAAP gross margins would be thirty percent lower than expected.  Barton stated, "Intense competitive conditions for business at our largest customers continued throughout the first quarter of 2007, which negatively impacted our gross margin and bottom line."  After this

announcement, Rackable's stock price fell to $14.25 per share.

On April 26, 2007, Rackable released its final results for the first quarter of 2007. Its total revenue was within the projected range, but it experienced a GAAP net loss of $10.2 million. Defendant Barton announced that, to address the increased competition, "we have also come to the conclusion that we need to accelerate a shift in our overall business model, specifically to increase the level of standardization in our product line, and to move from a pure build-to-order model to a configure-to order model." Id., Ex. 26 at 3. The next day, Rackable's stock price fell to $11.27 per share.

On January 16, 2009, Plaintiffs filed this shareholder class action, alleging that Defendants engaged in a fraudulent scheme to inflate Rackable's value by misrepresenting its true financial condition. Specifically, Plaintiffs assert that Rackable's 2006 fourth quarter projections were false when made and that Rackable's stock price fell from January 16, 2007 to April 26, 2007 as a result of the "truth" regarding Defendants' alleged misrepresentations reaching the market.

LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). In considering whether the complaint is sufficient to state a claim,

5

the court will take all material allegations as true and construe them in the light most favorable to the plaintiff.  NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).  However, this principle is inapplicable to legal conclusions; "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not taken as true.  Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 1949-50 (2009) (citing Twombly, 550 U.S. at 555).

Although the court is generally confined to consideration of the allegations in the pleadings, when the complaint is accompanied by attached documents, such documents are deemed part of the complaint and may be considered in evaluating the merits of a Rule 12(b)(6) motion.  Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir. 1987).

When granting a motion to dismiss, the court is generally required to grant the plaintiff leave to amend, even if no request to amend the pleading was made, unless amendment would be futile.  Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911 F.2d 242, 246-47 (9th Cir. 1990).  In determining whether amendment would be futile, the court examines whether the complaint could be amended to cure the defect requiring dismissal "without contradicting any of the allegations of [the] original complaint." Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990).

REQUESTS FOR JUDICIAL NOTICE

Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Even

where judicial notice is not appropriate, courts may also properly consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleadings."  <u>Branch v. Tunnell</u>, 14 F.3d 449, 454 (9th Cir. 1994).

The Court grants Plaintiffs' request for judicial notice of Exhibits 1 through 20 of the request, 2 through 4 to the Rosen declaration and grants Defendants' request because SEC filings may be judicially noticed.  <u>See Dreiling v. American Exp. Co.</u>, 458 F.3d 942, 946 (9th Cir. 2006).  The Court also grants Plaintiffs' requests as to Exhibits 21 through 45, conference call statements, Rackable's press releases, analyst reports and news articles, but not for the truth of their contents.

I.   Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b); <u>see also</u> 17 C.F.R. § 240.10b-5 (Rule 10b-5).  To state a claim under § 10(b), a plaintiff must allege: "(1) a misrepresentation or omission of material fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss."  <u>In re Gilead Sciences Securities Litig.</u>, 536 F.3d 1049, 1055 (9th Cir. 2008).

Some forms of recklessness are sufficient to satisfy the element of scienter in a § 10(b) action.  <u>See Nelson v. Serwold</u>, 576 F.2d 1332, 1337 (9th Cir. 1978).  Within the context of § 10(b)

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

claims, the Ninth Circuit defines "recklessness" as

> a highly unreasonable omission [or misrepresentation], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc) (quoting Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir. 1977)).  As explained by the Ninth Circuit in In re Silicon Graphics Inc. Securities Litig., 183 F.3d 970 (9th Cir. 1999), recklessness, as defined by Hollinger, is a form of intentional conduct, not merely an extreme form of negligence.  See Silicon Graphics, 183 F.3d at 976-77.  Thus, although § 10(b) claims can be based on reckless conduct, the recklessness must "reflect[] some degree of intentional or conscious misconduct."  See id. at 977.  The Silicon Graphics court refers to this subspecies of recklessness as "deliberate recklessness."  See id. at 977.

Plaintiffs must plead any allegations of fraud with particularity, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure.  In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1543 (9th Cir. 1994) (en banc).  Pursuant to the requirements of the PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Further, pursuant to the requirements of the PSLRA, a

complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The PSLRA thus requires that a plaintiff plead with particularity "facts giving rise to a strong inference that the defendant acted with," at a minimum, deliberate recklessness. <u>See</u> 15 U.S.C. § 78u-4(b)(2); <u>Silicon Graphics</u>, 183 F.3d at 977. Facts that establish a motive and opportunity, or circumstantial evidence of "simple recklessness," are not sufficient to create a strong inference of deliberate recklessness. <u>See Silicon Graphics</u>, 183 F.3d at 979. To satisfy the heightened pleading requirement of the PSLRA for scienter, plaintiffs "must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." <u>Id.</u>

    A.   Misrepresentation or Omission of a Material Fact

To state a claim pursuant to § 10(b) of the Exchange Act, Plaintiffs must allege, among other things, a misrepresentation or omission of a material fact. Plaintiffs assert that Defendants made false and misleading statements about Rackable's (1) gross margin and earnings per share (EPS) projections for the fourth quarter of 2006, (2) collection of sales and use taxes from its customers, (3) inventory procurement system, (4) ERP system,[4] (5) relationship with its top three customers and (6) projected sales of RapidScale products. The Court addresses each of these allegations in turn.

      1.   Gross Margin and Earnings Per Share Projections

Plaintiffs allege that Rackable's gross margin and EPS

---

   [4]ERP is an electronic resource planning system designed by Oracle to better track Rackable's costs and revenues.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

projections were false when made because Defendants knew that its profitability during the quarter would be negatively affected by the billing of sales and use tax to its customers, increased inventory costs and the discounting of a contract with one of its customers.  Complaint ¶¶ 85, 87-88.  However, Plaintiffs fail to allege contemporaneous facts that show that Defendants did not have a reasonable basis for these projections when they were made. Plaintiffs assert that, because risks materialized later in the quarter, risks which caused Rackable to fall short of its projections, Defendants must have known that the projections were false at the time that they made them.  Yet, Plaintiffs cannot simply rely on a "fraud by hindsight" theory to demonstrate falsity.  In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1084-85 (9th Cir. 2002) ("The purpose of [the PSLRA's] heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading 'fraud by hindsight.'"); In re Sytex Corp. Sec. Litig., 95 F.3d 922, 934 (9th Cir. 1996) ("Because Defendants' predictions proved to be wrong in hindsight does not render the statements untrue when made.").  Plaintiffs must plead specific facts from which a reasonable inference can be made that Defendants knew their projections about their gross margin and EPS were false at the time that they made them.  Plaintiffs have not done so here.

       2.   Sales and Use Tax

Plaintiffs claim that Rackable's financial statements and projections were false and misleading because Defendants understated its sales and use tax liability.  Plaintiffs allege that Defendants should have disclosed the uncollected taxes and

United States District Court
For the Northern District of California

related penalties with the SEC earlier in the class period. However, Rackable did not settle its outstanding sales and use tax liability to the state of California until after the second quarter of 2007. Complaint ¶ 24; RJN, Exh. 19 at 24. Rackable could not have recorded the amount of this settlement as an expense before it was determined through the settlement process.

Plaintiffs also allege that Defendants should have disclosed, in advance, that Rackable would begin charging sales and use taxes to its California customers in the fourth quarter of 2006. Plaintiffs argue that this tax prevented Rackable from pricing its products competitively and that failing to disclose this information misled investors. However, the Complaint does not contain any allegations demonstrating that sales tax charges impacted Rackable's gross margins at any time during the Class Period. Moreover, Rackable first notified the market of its potential sales and use tax liability in February, 2006. Rackable continued to disclose information about its tax liability and the risk that it might not be able to collect unpaid sales tax from its customers. Thus, Plaintiffs have not adequately alleged with particularity that any statements regarding Rackable's sales and use tax liability were false or misleading.

                    3.   Inventory Procurement System

The complaint alleges that Rackable's financial statements and projections were false and misleading because it failed to account properly for excess and obsolete inventory. Specifically, Plaintiffs allege that, by December 31, 2006, Defendants knew, but failed to disclose, that Rackable's customers would not purchase its products above their listed prices, and, therefore, Rackable

should have written off this inventory as a loss.  Plaintiffs
support this allegation with statements from confidential witnesses
(CW) 1 and 2.  These CWs allege that "Rackable appeared to have a
lot of excess inventory."  Complaint ¶ 264.  However, such vague
assertions do not establish that Rackable failed to account
properly for excess or obsolete inventory or that the decision to
write off inventory should have been made earlier.  Moreover, as
alleged in the Complaint, on several occasions Defendants warned
investors that Rackable was holding its inventory of memory chips
for anticipated customer orders, but that if the "technology shift
happen[s] sooner than anticipated, a write off would be required."
See Complaint ¶¶ 151, 175, 177.

Further, when Rackable wrote down its inventory in the second
quarter of 2007, it disclosed the following reasons for its
decision: (1) a "significant reduction in our forecasted usage for
the next twelve months," (2) a "customer driven, technology
platform shift from AMD to Intel" and (3) "lower than expected
revenue from 2007 and a shift in customer preference to next
generation power supplies created an excess in power supplies on
hand."  RJN, Exh. 18 at 20-21.  Plaintiffs have not alleged with
particularity any facts to refute these explanations.

4.   ERP System

Plaintiffs assert that Defendants misrepresented that
Rackable's ERP System failed adequately to track Rackable's
inventory and other costs to support its financial statements and
projections.  However, Plaintiffs do not allege that Defendants
were aware of any alleged deficiencies in the ERP System when
financial statements and projections were made.  Plaintiffs rely on

United States District Court
For the Northern District of California

12

Rackable's internal recommendations to improve the system, but these recommendations were made well after the Class Period and do not prove that Defendants misrepresented the ERP System's effectiveness.

　　　　5.　Relationship with Top Customers

　　　Plaintiffs allege that Defendants Barton and Ranganthan made false and misleading statements during an October 30, 2006 earnings conference call when they stated that Rackable's relationship with its top three customers remained "pretty strong" and "solid." Complaint ¶¶ 94, 104.　To support their allegation, Plaintiffs rely on the fact that four months after this statement was made, Rackable provided a large discount to one of its top three customers in order to prevent that customer from going to a competitor.　Giving a customer a discount does not mean that a relationship with that customer is not "pretty strong" and "solid." Moreover, Plaintiffs have failed to allege how this statement was false or misleading at the time that it was made.　Defendants' general statements of optimism are not actionable under securities laws.　See Glen Holly Entertainment, Inc. v. Tektronix, Inc., 352 F.3d 367, 379 (9th Cir. 2003); Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998) ("No matter how untrue a statement may be, it is not actionable if it is not the type of statement that would significantly alter the total mix of information available to investors.") (quotation marks and citation omitted); In re VeriFone Sec. Litig., 784 F. Supp. 1471, 1481 (N.D. Cal. 1992), aff'd, 11 F.3d 865 (9th Cir. 1993) ("Professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives, who have a personal stake in the

1    future success of the Company.").

2            6.   Rapidscale Products

3        Plaintiffs allege that Defendants misled investors by

4    projecting $20 million in sales of RapidScale products in 2007.

5    Midway through 2007, newly appointed CEO Mark Barrenechea stated

6    that "the execution wasn't there to support [the $20 million]

7    projection."  However, failing to meet a projection does not make

8    the projection a misrepresentation.  As with many of the

9    allegations above, Plaintiffs fail to allege contemporaneous facts

10   inconsistent with the projection.

11       B.   Forward-Looking Statements

12        Defendants' projections and forward-looking statements are

13   inactionable under the PSLRA's safe harbor and the "bespeaks

14   caution" doctrine.  Forward-looking statements are not actionable

15   if they are accompanied by meaningful cautionary language.

16   Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v.

17   Clorox Co., 353 F.3d 1125, 1133-34 (9th Cir. 2004).  Defendants'

18   projections about the fourth quarter of 2006 and the 2007 fiscal

19   year easily meet the definition of a forward-looking statement

20   because they are statements containing a "projection of revenues,

21   income (including income loss), earnings (including earnings loss)

22   per share, capital expenditures, dividends, capital structure, or

23   other financial items."  15 U.S.C. § 78-u5i(i)(1)(A).  And, these

24   forward-looking statements were consistently accompanied by such

25   cautionary language.  See RJN Exs. 5, 6, 9, 10-12, 23-24.

26        Even if unaccompanied by cautionary language, forward-looking

27   statements cannot support liability unless they are made with

28   actual knowledge of their falsity.  See 15 U.S.C.

United States District Court
For the Northern District of California

                                 14

§ 78u-5(c)(1)(A)(i).  As described below, Plaintiffs have not plead with particularity Defendants' actual knowledge of falsity.

C.   Requisite Mental State

A complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  When evaluating the strength of an inference, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 325 (2007).  "The inference of scienter must be more than merely 'reasonable' or 'permissible' -- it must be cogent and compelling, thus strong in light of other explanations." Id. at 324.  A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. However, "the inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" Id.

Plaintiffs allege that there is a strong inference that Defendants acted with scienter because of Defendants' (1) interactions with CWs, (2) motive to commit fraud, (3) departures from Rackable and (4) involvement in Rackable's core operations.

1.   Confidential Witnesses

The six confidential witnesses described in the complaint fail to support an inference of scienter.  Four of the confidential witnesses -- CW1, CW3, CW5 and CW6 -- were not employed at Rackable during the Class Period, which makes it unlikely that they had

15

United States District Court

For the Northern District of California

personal knowledge of Defendants' relevant state of mind.  <u>See</u>
<u>Zucco Partners v. Digimarc</u>, 552 F.3d 981, 996 (9th Cir. 2009);
<u>Brodsky v. Yahoo!, Inc.</u>, 2009 WL 176002, at *10 (N.D. Cal.).  The
two remaining CWs who were employed by Rackable during the Class
Period are not alleged "to have had any interaction or
communication with any of the defendants, or to have provided any
defendant with information, or to have heard or read any statement
by any defendant, that contradicted or even cast doubt on a public
statement made during the class period."  <u>McCasland v. FormFactor,</u>
<u>Inc.</u>, 2008 WL 2951275, at *8 (N.D. Cal.).

Further, the CWs only provide vague assertions about the
financial conditions at Rackable.  For instance, CW1, CW2 and CW3
allege that Rackable had excess inventory and lacked certain
components necessary to meet customer demand, but they do not state
how these observations lead to the inference that Defendants acted
deliberately recklessly or with fraudulent intent.  CW 4 alleges
that, in June, 2006, he was aware of purchase orders in which sales
tax was not being charged to customers.  But, there are no
indications in the complaint of how large these purchase orders
were or any allegations showing that such purchases were not
accounted for in Rackable's reserve for unpaid sales and use tax.

        2.   Motive

Plaintiffs allege that Defendants were highly motivated to
conceal adverse facts about Rackable from the public.
Specifically, Plaintiffs allege that Defendants' insider sales of
stocks since the IPO support an inference of scienter.  However,
only one Defendant, Ford, is alleged to have sold any stock during
the Class Period; and he sold more stock before the Class Period

United States District Court
For the Northern District of California

than during the Class Period.  In re Apple Computer Sec. Litig., 886 F.2d 1109, 1117 (9th Cir. 1989) ("Large sales of stock before the class period are inconsistent with plaintiffs' theory that defendants attempted to drive up the price of Apple stock during the class period.") (emphasis in original).  Insider stock sales become suspicious "only when the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." In re Vantive Corporation Securities Litig., 283 F.3d at 1092. Ford sold 55,000 shares between October 30, 2006 and January 16, 2007 at $33.85 to $34.50 per share.  This is when Plaintiffs allege that the fraud began to be revealed to the market.  However, Defendant Ford sold almost as many shares, 52,000, from January 17, 2007 through the end of the Class Period, at prices ranging from $18.20 to $13.00.  These sales do not reflect an intention to maximize profits from an artificially inflated stock price. Further, the fact that Defendants Barton and Ranganathan did not sell any stock during the Class Period further undermines deriving an inference of scienter from stock sales.

     Plaintiffs assert that stock sales of Rackable's former general counsel, William Garvey, create the inference of scienter. However, Mr. Garvey is not a defendant in this case and is not alleged to have made any false statements.  Plaintiffs have not alleged how these sales impute scienter to Defendants.

     Plaintiffs also argue that Defendants' compensation packages support an inference of scienter because they were "extraordinary by any measure."  Opposition at 14.  Plaintiffs allege that Defendants were motivated to commit fraud to obtain additional

compensation from Rackable and to sell their company stock at inflated prices.  Compared to the industry norms, there is nothing remarkable about the type or amount of compensation paid to Defendants.

Plaintiffs lastly argue that Defendants' motive to commit fraud is reflected in their compliance with Rackable's loan covenants under its line of credit.  Plaintiffs allege that Defendants inflated Rackable's financial results so that it did not have to draw down on its line of credit.  However, Plaintiffs do not cite any case law to support their assertion that the existence of a loan covenant supports an inference of scienter.

3.   Departures from Rackable

The Ninth Circuit has stated that "resignations, terminations, and other allegations of corporate reshuffling may in some circumstances be indicative of scienter . . . ."  Zucco Partners, 552 F.3d at 1002.  However, these factors are not indicative of scienter unless accompanied by allegations that they are related to wrongdoing during the Class Period.  See In re Cornerstone Propane Partners, L.P. Sec. Litig., 355 F. Supp. 2d 1069, 1093 (N.D. Cal. 2005) ("[N]otable departures are not in and of themselves evidence of scienter.  Most major stock losses are often accompanied by management departures, and it would be unwise for courts to penalize directors for these decisions."); In re U.S. Aggregates, Inc. Sec. Litig., 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002) ("after a restatement of earnings and a subsequent loan default, it is unremarkable that the Company would seek to change its management team").  Here, Plaintiffs do not allege that Defendants' resignations were related to any findings of misconduct.

United States District Court
For the Northern District of California

18

United States District Court
For the Northern District of California

1        4.   Core Operations

2        Allegations regarding management's role in a company "may be

3   used in any form along with other allegations that, when read

4   together, raise an inference that is 'cogent and compelling, thus

5   strong in light of other explanations.'"   South Ferry LP v.

6   Killinger, 542 F.3d 776, 785 (9th Cir. 2008) (quoting Tellabs, 551

7   U.S. at 324); Zucco, 522 F.3d at 1001, 1007.   These allegations may

8   conceivably satisfy the PSLRA standard "without accompanying

9   particularized allegations, in rare circumstances where the nature

10  of the relevant fact is of such prominence that it would be

11  'absurd' to suggest that management was without knowledge of the

12  matter."   South Ferry, 542 F.3d at 786.

13       The Ninth Circuit described such a "rare circumstance" in

14  Berson v. Applied Signal Technology, Inc., 527 F.3d 982 (9th Cir.

15  2008).   There, the plaintiffs alleged facts which contradicted the

16  defendants' statements about the company's revenue stream.   The

17  company had received four stop-work orders that had a "devastating

18  effect" on the company's revenue.   Id. at 987.   The court permitted

19  an inference of scienter from the defendants' involvement in the

20  company's core operations because these facts were of such

21  prominence "that it would be 'absurd to suggest' that top

22  management was unaware of them."   Id. at 989.

23       Here, Plaintiffs fail to plead any similar facts of such

24  magnitude that it would be absurd to suggest that Defendants were

25  unaware of them.   At most, Plaintiffs allege that "management" held

26  "daily management meetings" and reviewed "ERP reports;" but these

27  assertions do not contain the required specificity to establish

28  scienter.   Complaint ¶ 273.

D.   Loss Causation

"Loss causation is the causal connection between the [defendant's] material misrepresentation and the [plaintiff's] loss." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342 (2005). "The complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses." Metzler Investment v. Corinthian Colleges, 540 F.3d 1049, 1063 (9th Cir. 2008). The complaint must allege that the company's "share price fell significantly after the truth became known." Dura Pharms, 544 U.S. at 347. "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." In re Gilead Sciences Securities Litig., 536 F.3d 1049, 1057 (9th Cir. 2008). The loss causation element "'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' loss causation." Id. (quoting Bell Atl., 550 U.S. at 556).

All of Defendants' statements that allegedly reveal the "truth" of the fraud Defendants committed upon the market disclose negative news about Rackable's financial condition, its future prospects or about the competition in the computer server industry in general. However, these statements do not reveal the necessary causal link between the alleged fraud and the drop in Rackable's stock price. Instead, they rely on a correlation between Rackable's announcement of financial results and a decrease in stock price. Such allegations do not plead loss causation: "So long as there is a drop in a stock's price, a plaintiff will always be able to contend that the market 'understood' a defendant's

United States District Court
For the Northern District of California

statement precipitating a loss as a coded message revealing the fraud. Enabling a plaintiff to proceed on such a theory would effectively resurrect what <u>Dura</u> discredited . . . ." <u>Metzler</u>, 540 F.3d at 1064. Accordingly, Plaintiffs have not adequately plead loss causation.

II. Section 20(a) of the Exchange Act

Plaintiffs allege control person liability against Defendants based on Section 20(a) of the Exchange Act, which states,

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

To prove a prima facie case under Section 20(a), a plaintiff must prove: (1) "a primary violation of federal securities law" and (2) "that the defendant exercised actual power or control over the primary violator." <u>Howard v. Everex Sys., Inc.</u>, 228 F.3d 1057, 1065 (9th Cir. 2000). "[I]n order to make out a prima facie case, it is not necessary to show actual participation or the exercise of power; however, a defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation." <u>Id.</u> Because Plaintiffs failed to plead a primary securities violation, Plaintiffs have also failed to plead a violation of Section 20(a).

CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss Plaintiffs' Complaint (Docket No. 17), and grants leave

United States District Court
For the Northern District of California

to amend in accordance with this order.  Plaintiffs shall serve and file their second amended complaint, and Defendants will respond, in accordance with the schedule outlined in the stipulation filed on December 28, 2009 (Docket No. 45).  Any motion to dismiss will be decided on the papers unless the Court sets it for a hearing.  A case management conference will be held on May 11, 2010.

    IT IS SO ORDERED.

Dated: 01/13/10

_____
CLAUDIA WILKEN
United States District Judge