1  GLANCY BINKOW & GOLDBERG LLP
2  LIONEL Z. GLANCY (S.B.#134180)
   MICHAEL GOLDBERG (S.B.#196382)
3  1801 Avenue of the Stars, Suite 311
   Los Angeles, California 90067
4  Telephone: (310) 201-9150
   Facsimile:   (310) 201-9160
5  E-mail: info@glancylaw.com
6

7  *Lead Counsel for Lead Plaintiff*

8

9              **UNITED STATES DISTRICT COURT**

10             **NORTHERN DISTRICT CALIFORNIA**

11  _____
                                      )
12  IN RE RACKABLE SYSTEMS, INC.      )    Case No.  C-09-0222-CW
    SECURITIES LITIGATION             )
13  _____)    CLASS ACTION
                                      )
14                                    )
    THIS DOCUMENT RELATES TO:         )    **SECOND AMENDED COMPLAINT FOR**
15  ALL ACTIONS                       )    **VIOLATIONS OF THE FEDERAL**
                                      )    **SECURITIES LAWS**
16  _____)

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs (defined further below), by and through their attorneys ("Lead Counsel"), allege the following upon information and belief, except as to those allegations concerning plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based upon, among other things, the investigation of Lead Counsel, which includes without limitation: (a) review and analysis of regulatory filings made by Rackable Systems, Inc. ("Rackable" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases, media reports, analyst reports and quarterly Rackable Conference calls; (c) interviews with former employees and others; and (d) consultations with an accounting expert. Plaintiffs believe that further substantial evidentiary support exists for the allegations set forth below and will be identified after a reasonable opportunity for discovery.

## NATURE OF ACTION

1.     This is a class action brought on behalf of purchasers of Rackable's securities between October 30, 2006 and April 4, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") against defendants that include Rackable[1], and its Chief Executive Officer, Chief Financial Officer and President (collectively, the "defendants") during the Class Period.

2.     During the Class Period, Rackable was a designer, manufacturer and implementer of computer servers and storage systems. In the server market, Rackable competed against much larger providers, such as Hewlett-Packard, Dell and Sun Microsystems, by carving out a niche of build-to-order, open architecture, high-density systems which took up less space and generated less heat. Once Rackable's ability to attract clients such as Yahoo!, Amazon, and Microsoft caught the attention of its larger competitors, the latter increasingly sought to make inroads into the Company's business, primarily by means of price competition.

---

[1] In connection with the Company's acquisition of substantially all of the assets and liabilities of Silicon Graphics, Inc., on May 18, 2009, Defendant Rackable changed its name to Silicon Graphics International Corp.

3.      This posed a problem to Rackable because, as confidential witnesses [2] confirmed, sales to the three marquee customers were often done at small or occasionally negative margins, to fend off underbidding by larger competitors.  (CW1, CW4, CW12, CW 14, CW17).   Consequently, Rackable relied upon achieving a competitive advantage by not charging its customers various sales and use taxes.  With the competition breathing down its neck, Rackable conducted its initial public offering in or about June 2005 (the "IPO") and two secondary offerings shortly thereafter.   While the offerings did provide the Company with capital to fund its growth, as one analyst observed: "In its short life as a public company, insiders and management have sold over $450 million worth of stock."  The author pointed out that insiders received 35%, 68%, and 56% of the proceeds of the IPO and the December 2005 and March 2006 secondary offerings.  Nowhere in any of the registration materials provided to investors in conjunction with each of these offerings did Rackable ever inform potential shareholders of a critical fact other companies knew needed to be disclosed -- that Rackable (as a collection agent for taxing authorities) did not charge its customers sales and use taxes. [3] There is no doubt that defendants knew about this issue, as Rackable registered with the State of Washington in early 2005, and included a "Sales Tax" payable line on its IPO balance sheet.

---

[2] Each confidential witness ("CW") is referred to herein as being feminine in gender, and is described in detail in ¶¶56-77 below.

[3] In stark contrast, one of Rackable's biggest customers, Amazon.com, clearly informed investors of this very point in the risk warnings provided in its Form 10-K for 2005, at 18: "[A] successful assertion by one or more states or foreign countries that we should collect sales taxes on the sale of merchandise or services could result in substantial tax liabilities for past sales, decrease our ability to compete with traditional retailers, and otherwise harm our business."  Whereas Rackable did not engage in Internet sales (as did Amazon, the tax status for which was evolving at the time – with states passing so-called "Amazon taxes" to require that company to collect and remit sales taxes for online sales --, there was no excuse for Rackable not to either collect taxes or to inform investors it was not doing so.  In fact unlike Amazon, Rackable admitted having a sufficient nexus with many of the jurisdictions to which it owed back taxes.

*See* Form S-1/A, filed June 9, 2005, at F-3.  Thus, investors were led to believe that Rackable charged all applicable taxes.[4]

4.    Consequently, as Rackable's sales volume grew by leaps and bounds, two distinct risks loomed with respect to taxes:  First, Rackable's competitive edge would begin to evaporate and its gross margins would substantially dissipate once it started charging sales tax.  Second, various jurisdictions would hold Rackable liable for both the sales and use taxes it did not collect from customers and accrued penalties thereon.  Thus, CEO Thomas K. Barton ("Barton") and former CFO and Executive VP Todd R. Ford ("Ford"), among others, sold a substantial amount of stock while hiding one of the keys to Rackable's David versus Goliath success.

5.    Another main business advantage -- that Rackable made built-to-order servers using components specified by each customer -- placed a premium on Rackable's ability to purchase various parts at competitive prices.  While Rackable warned investors that it procured parts as needed in the spot market and kept low inventories (*see* 2005 Form 10-K, filed February 21, 2006, at 21), this "warning" was legally insufficient to hide truths known to employees at Rackable for years:  (a) woefully deficient systems to track and account for inventory -- both physically and on a cost accounting basis -- along with minimum purchase requirements, led to perennial shortages of needed parts while *tens of millions of dollars* of useless excess inventory piled up; and (b) Rackable's promised turnaround time from purchase order to shipment was patently unrealistic, given the lead times necessary to order and receive parts.  Thus, in addition to paying potentially higher prices for necessary materials, undisclosed fees and charges cut into Rackable's profit margins -- *e.g.*, excess inventory purchases, expedited shipping costs, production floor time, overtime, etc.

---

[4] Just prior to the March 2006 offering, Rackable filed its 2005 Form 10-K, where, at 27, the Company inaccurately warned about a discrete issue relating to sales taxes on some earlier sales, describing it as a "potential liability" of $1.2 million, first discovered in December 2005, pertaining to past sales to "several of our customers."  This narrow disclosure in no way informed investors that no taxes had ever been charged to any customer and that, currently, none were being charged.

6.   With Rackable's sales volume increasing every quarter and boasting high profile customers such as Amazon, Yahoo, and Microsoft, Rackable's share price soared from an IPO price of $12 per share to more than $50 per share in the month following the March 2006 secondary offering.  However, Rackable's stock price nose-dived in the summer of 2006, when after achieving record revenues of $88.6 million and earnings per share ("EPS") of 18 cents (28 cents, excluding stock-based compensation) in the second quarter of 2006 ("Q2 2006"), the Company guided to a modest reduction for Q3 2006, to revenues of $80-85 million and EPS of 18 to 21 cents.

7.   During Q3 2006, with sales slowing and margins compressing (and the need to start charging sales tax a looming issue), Rackable made a play to expand further into the storage market.   In late August, the Company announced the purchase of Terrascale Technologies, Inc. and made plans to sell its product under the "Rapid Scale" name. Throughout the Class Period, defendants maintained that high-margin Rapid Scale sales would contribute $20 million to FY 2007 revenues.  While this might have appeared possible, based upon CEO Barton's statement, at the rollout conference call on August 28, 2006, that Terrascale revenues "for 2006 to date are in the single-digit millions,"  by June 30, 2006, Terrascale had only reported year-to-date revenues of under $300,000.  (Indeed, during the two years Rackable sold Rapid Scale, revenues barely topped $4 million in total.) Also in Q3 2006, the Company deployed a new Oracle Enterprise Resource Planning ("ERP") system, which defendants claimed provided them with infrastructure necessary to support the Company's growth.

8.   Thus, entering the Class Period, which commences with the conference call discussing Rackable's operating results for Q3 2006, defendants needed to reassure investors that its business model was still viable in the competitive landscape.  On October 30, 2006, defendants reported the Company's results for Q3 2006 ended September 30, 2006.  By achieving $80.5 million in revenue and non-GAAP EPS of 19 cents (Rackable actually suffered a GAAP loss, due to Terrascale-related costs and stock-based compensation charges) -- both within guidance -- defendants were able to calm investors' nerves.  Moreover, in

explaining the reasons for the lackluster results, defendants expressly reassured doubting analysts that the causes of the less-than-stellar results for Q3 2006 had been identified, were "one-time" in nature and the potential adverse conditions, both internal and market, had been anticipated, corrected if need be, and baked into the revised Q4 2006 forecasts.

9.      The primary adverse conditions defendants reported were: (a) competitive pricing pressures on Rackable's "big three" customers (*i.e.,* Amazon, Microsoft and Yahoo) from major and much larger companies such as Dell; (b) low pipe-line "visibility" over cost of sales, as over 70% of the revenues were recognized in the last month of the quarter; and (c) increased DRAM (digital random access memory) component prices due to, among other things, transitioning technology and short supply.  In addition, a large sale slipped from Q3 2006 to Q4 2006.

10.      During the October 30, 2006, conference call with analysts, defendants exuded confidence.  Defendants raised projections of revenues, gross margins, and EPS for Q4 2006.  Forecasted revenues were increased substantially from the initial forecasted range of $91-101 million[5] to $100 to $110 million.  Projected earnings were now at EPS of $0.10 to $0.12.  Finally, the gross margin range, initially forecast at between 22% and 24% was fine tuned upward, to between 23% and 24%.

11.      Addressing the ability of the Company to meet these upwardly-revised forecasted figures, defendants responded to several analysts' concerns regarding whether the conditions purportedly responsible for Q3 2006 results would repeat themselves in Q4 2006.  Defendants reassured analysts that (a) DRAM prices were falling; (b) competitive pressures were under control; and (c) there would be no "backend loaded" quarter repeat, with most sales falling into the last month of the quarter.  Defendants stated repeatedly that because of Rackable's newly-implemented Oracle ERP system and other internal control enhancements, they had "a high degree of visibility into revenue, gross margin and EPS outlook for Q4."  To further reassure the market, defendants stated that there would be increased "operating expense

---

[5] Full-year projections of $345-355 million were made at the Q2 2006 conference call.  By the end of Q3 2006, Rackable had achieved revenues of $254 million.

leverage," because "one-time professional fees incurred" "relating to first year Sarbanes-Oxley ["SOX"] compliance as well as ERP implementation," were in the past.

12.     However, as defendants were aware at the time they made these statements, they had absolutely no reasonable basis for the pinpoint precision of the 23-24% gross margin projection.  As numerous confidential witnesses explained, numerous undisclosed material adverse conditions, some of which plagued Rackable for years, and others which were relatively new but were known by October 30, 2006, had come home to roost in Q4 2006:

(a)    Contrary to both CEO Barton's and CFO Ranganathan's confident statements, Rackable did not have adequate bookings to predict a banner quarter in Q4 2006. CW15, whose supervisor shared an office with then Sales VP Thomas Gallivan, recalled being told that Rackable was having a terrible quarter.  During Q4 2006, CW4 indicated that management made a huge push for sales, to meet the Company's revenue target and appeared desperate.  Contrary to Company policy, CW4 even recalled that she had provided a customer with a purchase order and later found out that the order had been pre-built, *i.e.,* before the purchase order was executed and returned.  CW4 remembered telling her supervisor, that she was not sure when she would get the purchase order back from the customer.  CW4 later found out from the supervisor that defendant Ford had approved the pre-build.  CW4 recalled that the order had been shipped to the customer early, and that it might have been done in exchange for a 10% discount and extended payment terms because the customer did not need the order until the next quarter.  CW15 confirmed this unusual (*i.e.* pre-build) sale, worth more than $2 million, was to Shopzilla; the servers were shipped to a co-location facility and, according to CW15, not installed until several months later (in Downtown Los Angeles).  Amidst these desperate efforts, Gallivan abruptly left the Company, and Ford and Barton assumed control of domestic and international sales in December.  CW9 indicated Gallivan was fired for failing to bring in sufficient revenues.  Thus, while Rackable achieved its revenue projection, coming in at $106.5 million for Q4 2006, it did so at the expense of profit margins.  In fact, CW9 confirmed, defendants' first concern was hitting the revenue targets, consideration of margin came after;

(b)  As only revealed for the first time in Rackable's Form 10-K, filed February 28, 2007, buried at page 75, during Q4 2006, the Company "started billing sales tax to its customers."  This was a sea change for a company that had not charged sales and use tax at rates, of up to 9%, on products since at least 2003.  Several confidential witnesses, CW9 and CW17, confirmed that the failure to charge such taxes had previously provided Rackable a distinct competitive advantage.  Indeed, as 2007 approached, and Barton warned that increased competition could erode gross margins, defendants were aware that the added price concessions requested by customers suddenly having to pay sales taxes would cause further price erosion.  In fact, Rackable's average sales price dropped by $400 (more than 10%) in 2007.

(c)  Defendants failed to adequately supervise both procurement and cost accounting for inventory for quite some time and could not accurately track Rackable's inventory or its costs.[6]  Contrary to stated policies (just-in-time purchases, low inventory) this reckless lack of supervision consistently led to excessive and unnecessary inventory overpurchases, in general (CW1, CW2, CW10, CW11, CW19) and especially in Q4 2006, as Rackable scrambled to make its sales projections.[7]  In fact, Rackable's inventory increased by more than $20 million between Q3 2006 and Q4 2006 -- from $47.3 million to $68.1 million.  Attempting to hide the severity of the problem, defendants completely omitted any discussion of inventory reserve from the 2006 Form 10-K, filed in February 2007.    A number of witnesses (CW 8, CW9 and CW16) – including one who explained that earlier excess and obsolete reports were predicated upon an unreasonable method which understated the correct

---

[6]  Inventory controls were so poor that the Company did not realize for years that it had shipped expensive demonstration units to customers that had never been returned.  (CW2)

[7]  *E.g*, CW 21 indicated that there was a double order of AC power supplies in Q4 2006. This was confirmed by CW7, who remembered new Sales VP Carl Boisvert urging the sales force in early 2007 to make deals to sell 10,000 AC power supplies and CW10, who also recalled the power supply build up.  CW9 recalled that lack of supervision over procurement caused Rackable to make an excess purchase of DDR1 memory. This was confirmed by CW 11 and CW16.  CW17 indicated that Rackable's budgeting model exacerbated the problem by requiring excessive purchases at a volume discount to meet a budgeted price point.

figures (CW 21) -- confirmed that upon his arrival, after the Class Period, new CEO Barrenechea cleaned house of excess and obsolete inventory to start from a clean slate. Rackable wrote off $20.6 million of inventory in Q2 2007 consisting mostly of DDR1 memory and power supplies;[8]

        (d)    Rackable's impossible promises to customers to turnaround a system built within as little as two weeks of receipt of an order could never be fulfilled.  As defendants later stated, "improved materials planning" could have avoided production from slipping to the end of Q4 2006 and increasing the Company's costs by a purported $300,000.  However, this problem was clearly not one-time in nature as not only would the problem get worse as sales volume increased, but the same exact problem had occurred at the end of Q3 2006:

        (i)    CW15, a field engineer, indicated that the average time from purchase order to build was five weeks.  However, according to CW2 and CW3, Rackable told its sales force to quote unreasonable two-week turnarounds;

        (ii)    Witnesses provided two reasons for not being able to achieve promised turnaround times:  dropping everything on other jobs to cater to an order from one of Rackable's three largest customers (CW2, CW7), and not having the necessary materials in stock.  (CW1, CW2, CW3, CW4);

        (iii)    Because of these two recurring problems, witnesses recalled that Rackable was constantly behind schedule to ship products out to the customers.  (*E.g.,* CW2, CW6).  In turn, build out and testing was rushed (CW3), products got shipped to the wrong place (CW4),  products did not incorporate specified parts, which had to be later corrected on-

---

[8] The DDR1 memory purchase proved particularly costly as CW4 did not recall customers specifying DDR1.  Indeed, CW11 recalled purchases of memory and other products in excess at the end of their life cycles.  Consequently, until the massive write off in Q2 2007, Rackable admittedly carried this memory inventory at prices as high as 40% above market during the Class Period.  Defendants knew that the overpriced DRAM inventory: (a) could not be passed along to customers at market prices because of competitive pricing pressures; (b) essentially was obsolete because of the transition from DDR1 to DDR2 memory and related product changes; and (c) the inventory could not be disposed of in the open market to recoup costs, as market prices were much below those at which Rackable purchased the inventory.  Accordingly, Rackable's financial results, including gross margins, Q4 and fiscal 2006 and Q1 2007 were materially overstated.

---

site at the customer's place of business (CW4), customers cancelled orders after parts had been ordered (CW4) and products were often returned as defective (CW1, CW2);

(iv)   In addition to the foregoing results of unrealistic production commitments, Rackable incurred substantial financial costs in order to get products out the door as soon as possible.  Although investors were warned about potentially higher materials prices on the spot market, the following recurring *undisclosed* expenses were incurred: Rackable had to enter into minimum purchase contracts and agree to purchase more materials than needed (CW1, CW6); rush shipments of materials carried extremely high freight costs (CW1); factory time booked for assembly (at $20,000 per week) went unused and had to be repurchased when the parts finally arrived (CW1).  In addition, defendants later admitted that this led to employee overtime costs as well (*see* ¶126 ), as build and test teams sat idle until all the materials arrived (CW3).  CW1 indicated that costs of this nature ran approximately $200,000 per quarter;

(e)   Although defendants adopted Oracle systems to be SOX compliant, due to insufficient testing and staffing, it was not being used properly in the second half of 2006, causing errors which led to significant additional system improvements, particularly with respect to inventory tracking and costs, after the Class Period (CW5, CW8, CW9, CW12, CW16, CW17, CW22). Sales personnel also complained that the system did not work well, particularly in generating customer quotes (CW4, CW7, CW13); and

(f)   Witnesses were hard-pressed to recall virtually any meaningful sales of Rapid Scale products during the roughly two years the Company owned the technology, after purchasing it for more than $38 million in August 2006 (plus an additional $9 million for technology patents).  Although training occurred on several occasions, Rackable's sales force was never able to articulate why its product was technically superior to less expensive and formidable competitive products already in the market.  (CW4, CW7, CW11, CW15).  During 2007, the product eventually proved to be a failure and was soon ready to be written off. (CW17).  At the start of the Class Period, defendants had confirmed their projection of $20 million of Rapid Scale revenue (at 60% gross margin) for FY 2007, but left the impression that

RapidScale had not been factored into Rackable's increased gross margin projections for Q4 2006. Nevertheless, defendants subsequently blamed insufficient higher-margin sales of Rapid Scale products for Rackable's failure to achieve projected margins in Q4 2006, despite the fact that just after the purchase of the product line, there was no reasonable basis for the projections.

13.     Several witnesses suggested that defendants were well aware of these problems and their true impact on margins by October 30, 2006 – and were not caught off-guard as claimed during conference calls in February and April of 2007:

(a)     As explained by CW1 and CW3, failure of communication between the sales staff and the supply chain department with respect to unrealistic shipment commitments were supposed to be addressed at regular production meetings attended by VP of Manufacturing Jack Randall. CW1 attributed the continuation of the problems to the sales staff trying to make deals at the end of the quarter to achieve revenue targets. CW3 concurred that solutions were discussed at management meetings, but never implemented;

(b)     CW1 indicated that the excess costs incurred as a result of falling behind promised delivery schedules were accumulated in a separate account, which he referred to as a "slush" account, rather than in costs of goods sold. In particular, CW1 was responsible for calculating the cost of goods to prepare the Supply Chain Department's budget. CW1's costs of goods reports were provided to Randall who used them, along with sales activity reports to submit margin earnings to then-CFO Ford. Upon realizing that the company had achieved negative margins, CW1 took this information first to Randall, who dismissed it, then to Ford. An outside auditor was hired to investigate, but CW1 did not know the ultimate outcome of the investigation. CW1 indicated that others who similarly expressed concerns over margins were ignored. CW21 appears to confirm the manipulation of costs of goods sold, indicating that in the year prior to CW21's arrival (2006) the Company had been "protecting" its gross margins. CW6 confirmed that higher, expedited costs were not passed on to customers;

(c)     Defendants were aware or were reckless in not knowing that lack of internal controls made determination of margins from computer system data virtually impossible.  Manipulations appear to have been the order of the day:

(i)  When customers complained about pricing in the initial quotes which were calculated by the ERP, the figures were later adjusted downward to make the sale. Although several witnesses said that Rackable was subject to vendor premiums because of its relatively smaller and/or last-minute orders (CW2, CW6), when CW4 was suddenly authorized to match the price the customer sought, CW4 was told that that supply chain personnel were able to "renegotiate" a better price;

(ii)  CW15 did not attribute the ability to meet customer price demands to "renegotiation."  CW15 believed the parts were purchased at a better price and the more expensive materials remained in inventory;

(iii)  CW6 similarly described commodity price quotes from the system being ignored to make a sale, causing negative margins – a problem that was reported but which went ignored;

(iv)   Until mid-2009, extremely loose inventory policies, procedures and supervision over inventory tracking on Rackable's Oracle systems (CW5), led to completely unreliable tracking of inventory location and cost from 2006 through 2008.  Thus, problems arising from manual entries by numerous persons (CW8, CW9 and CW16) and other manipulations – including by CFO Ranganathan in early 2008, circumventing SOX protocol and resulting in a restatement (CW17) – caused the computer system to not accurately reflect Rackable's prices (CW12);[9] and

(d)        CW15 indicated that completion of a deal at less than 18% gross margin required George Reitz to obtain approval from CEO Barton.

---

[9] Rackable later reported that the much-touted ERP system did not function effectively for the Company without implementation of necessary fixes to its "inventory module" and acquisition of the companion Oracle CRM (customer relations management) system.  The costs of these belated, but necessary improvements, also increased G&A expenses after the Class Period, and thus, further impugned defendants' 2007 forecasts.

14.     For all of the above undisclosed reasons, while Rackable met its revised revenue forecast for Q4 2006, the Company fell severely short of both revised earnings and margin forecasts.  (Not only were the reported actual earnings and gross margins below the initial forecasts, but moreover, they were still inflated for knowing or reckless disregard of charges of approximately $20.6 million for obsolete and excess inventories and at least $2 million for state sales and use taxes collectible from customers on purchases made by customers since 2003.)

15.     Specifically, late in the trading day on January 16, 2007, defendants announced that revenues "broke the $100 million quarterly revenue mark" for Q4 2006, but both preliminary estimates of gross margins and earnings goals were not "achieved for the quarter." The Company reported Q4 2006 preliminary results of $105.5 million to $106.8 million in revenues, "non-GAAP" gross margins of between 19.2% and 19.7% and Generally Accepted Accounting Principles ("GAAP") net income (loss) of between $(683,000) to $194,000 or $(0.2) - $0.01 per share.  Defendants stated the reasons for the adverse gross margin impact were:   (a) higher costs associated with component computer memory pricing for the Company's products; (b) "intense competitive conditions that caused the Company to price contracts more aggressively;" and (c) lower than expected sales from the Company's "Rapid Scale products."

16.     Given defendants' extreme confidence on October 30, 2006 – one month into Q4 2006 and with the benefit of a large sale that had already slipped into the quarter -- one analyst, Thomas Weisel Partners (an underwriter of the 2005 initial public offering ("IPO") and Rackable's representative on the Rapid Scale deal in Q3 2006) cast severe doubt on the veracity of defendants' excuse for the margin miss.  In a report issued the same day, Kevin Hunt wrote:

> **Something does not compute**:  Management is not talking, which is cause for concern, and the stated reasons do not add up.  The company is citing (1) lower storage revenue, but storage is too small to have a big margin impact; (2) *higher DRAM pricing, which is not consistent with our checks that indicate declining DRAM*; and (3) aggressive pricing, which is also not consistent with our checks or management's commentary throughout the quarter.

(Emphasis added).

17.     Hunt was correct.  Given the relatively small amount storage contributed to overall sales (16% in Q3 2006, per conference call) and the fact that the sales force was not up and running with a winning sales pitch for Rapid Scale, there could not have been any reasonable reliance upon storage sales to affect margins that significantly in Q4 2006.  Next, not only did defendants claim to have anticipated aggressive pricing by Dell when increasing revenues, margins and EPS projections during the conference call, but Hunt earlier reported, on December 20, 2006, that Dell had backed off ("less aggressive pricing (based on our checks)"). Moreover, as reported by analysts, the price of both DDR1 and DDR2 had declined during the quarter.  (*E.g.,* Caris & Co., January 17, 2007; Thomas Weisel Partners, December 20, 2006 – suggesting that 23-24% projection was thus "conservative").

18.     On this news, which was not accompanied by a press conference to explain the matters which did not "compute" to those who followed the stock, the price of the Company's stock plummeted, falling $12.44 per share or almost 38% from its closing price on January 16, 2007 of $32.42 per share to close at $19.98 per share on January 17, 2007 on exceedingly high trading volume of greater than 30 million shares.  (However, the Company's stock would fall even further as materialization of concealed risks and\or further corrective disclosures were made on at least the following dates: February 1, 2007, February 28, 2007, April 4 and 5, 2007, and April 26, 2007. )

19.     Although the January 16, 2007 announcement disclosed preliminary 2006 fourth quarter revenues, non-GAAP gross margins, and GAAP net income or loss and EPS, it said little else besides listing the three factors above that defendants attributed to the misses. Not until two weeks later did defendants provide further explanation for the 2006 fourth quarter misses.

20.     On February 1, 2007, defendants released Q4 2006 and annual "final" results and conducted a conference call with analysts concerning same.  The "final" figures announced for the Q4 2006 were: GAAP gross margins of 18.8%; "Non-GAAP" Gross margins of 19.8%;

and net income of $536,000 and EPS of $0.02 per share.   Defendants provided additional reasons for the shortfall.   Most of these reasons were precisely the ones defendants assured analysts that would not reoccur at the beginning of the Class Period – and the ones already called into question by analysts weeks earlier:

>            (a)   Revenue was "backend loaded" with 74% of the revenues in the last month of the quarter;

>            (b)   "Subsequent" to the October 30, 2006 conference call, DDR1 memory prices "unexpectedly" spiked 20 to 30%. Rackable may have to take "large excess and obsolete charges in the future" for the high-priced DDR1 inventory that it is carrying on its books;[10]

>            (c)   "Since pricing had been locked in with most of our customers we were not able to pass the memory price increases through to our end [user] customers;"

>            (d)   Rackable went below minimum margin contract pricing terms with at least one of its customers to meet or beat a competitor's price;

>            (e)   "Power supplies" shortages due to "poor planning" caused increased costs of sales; and, among other things.

>            (f)   "We have taken immediate action to improve the visibility in our new ERP system[.]"

As a result of the foregoing, defendants announced that Rackable would no longer issue quarterly forecasts.  (Nonetheless, as they had in January, in February (and twice in April of 2007), defendants reported on Rapid Scale's slower than expected sales ramp up but repeatedly affirmed the $20 million projection for FY 2007, touting substantial interest, demand, and backlog. Nevertheless, new CEO Barrenechea, admitted during the Q2 2007 conference call that projected $20 million of Rapid Scale revenue for FY 2007 was entirely baseless (which was corroborated by several confidential witnesses).  Indeed, Rackable never even came close

---

[10] This representation cannot be reconciled with Caris & Co.'s statement on January 17th:  "We thought that the company could manage its way through the memory problem as we heard that memory price declines picked up later in the quarter."

to the $20 million projection.  Rackable's revenue from Rapid Scale was only $800,000 in 2006, $2.5 million in 2007, and $730,000 in 2008 – then Rackable threw in the towel and recorded the impairment charges CW17 had urged for quite some time.

21.    Analysts were unforgiving.  On February 2, 2007, Caris & Co. downgraded Rackable because of "structural issues":  Due to pricing pressure from H-P and Dell, "RACK has decided to maintain its share and sacrifice margins and profitability to protect its share … the company appears to be losing visibility …"  On this news, the price of the Company's stock fell further.  On February 2, 2007, the price fell from its previous day's close of $20.34 per share by $3.65 or 17%, to close at $16.60 per share on unusually high trading volume of over 19 million shares traded.

22.    On February 28, 2007, Rackable's Form 10-K for the year ended December 31, 2006 was filed with the SEC [the "2006 Form 10-K"] which disclosed additional information about the Company's sales tax issues, specifically, that only in Q4 2006 did Rackable start charging its customers sales tax.  This admission likely came as a surprise to investors who would have reasonably assumed, when reading the 2005 Form 10-K's narrow disclosure about certain uncollected back taxes, that taxes were in fact being charged on a current basis.[11]  Finally, despite having discussed potential write offs for obsolete inventory, there was no discussion of reserves as there had been in the 2005 Form 10-K.

23.    Shortly after the filing of the 2007 10-K, the price of the Company's stock fell once again. Between February 28, 2007 and March 2, 2007, the price declined to close at $16.50 per share on March 2, 2007, from its close of $17.41 per share on February 28, 2007.

24.    On April 4, 2007, the Company issued an "update" to the Q1 2007 results forecasts.  The release stated, among other things, that "[t]he company now expects GAAP and non-GAAP gross margins for the [2007] first quarter to be approximately 30% lower than previously communicated expectations.  The primary factor reported an impacting gross

---

[11]  On the back taxes issue, the receivable from customers for past uncollected sales and use taxes was up to $6.5 million.  However, the "accruals" (or "reserves") for "interest and uncollectiblity" were only at 11.2% of the receivable, whereas at year ended December 31, 2005, the "accrual" was at 37% of the only $1.2 million receivable.

margin in the first quarter was "the intensity of competition in the company's largest accounts."  The Company also reported that it expected G&A or operating expenses to be higher "than expected" because of "additional charges relating to sales and use tax exposures from past sales to various customers."  Finally, the Company reported that because of the foregoing and other items, it would report a loss for the quarter.   Eventually defendants reported that the Company breached its loan covenants for the latter, and had to obtain a waiver from the lender for same.

25.     On the following day, April 5, 2007, defendants conducted a conference call with analysts.  After the call, at least one analyst concluded in a report that competitors could sell products at lower prices than Rackable as they carried less expensive DRAM inventory, because DRAM prices fell "roughly 40%" and Rackable could not pass the more expensive inventory it was holding onto its customers by increasing product prices.  The same analyst stated that Rackable's "business model" was "flawed." Another analyst at the conference call implied that it was misleading for defendants to keep touting $20 million in projected Rapid Scale revenues for 2007 with its purported 60% gross margins as a significant factor to increase overall margins, as such amount was only "4-5%" of the Company's quarterly revenues.  As the analyst pointed out, "You are not going to be attaining your 20% or higher levels anytime soon with that analysis."

26.     Defendants also discussed during the call that "the Company had [nexus] in several states where we were required to charge sales taxes going back to years 2003, 2004 and 2005 and we had not charged sales taxes appropriately in those states . . . We did have an ERP system limitation."  However, confidential witnesses indicated that defendants had consciously chosen not to charge sales tax (CW17) and only blamed non-existent computer programming limitations on Rackable's earlier failure to do so (CW8).

27.     Between April 4, 2007 and April 9, 2007, the first trading day after the April 5, 2007 conference call, the price of the Company's stock plummeted once again.  From its April 4, 2007 close of $16.88 per share, the stock fell to close at $14.24 per share on trading volume

of greater than $18.3 million shares.  On April 9, 2007, the stock price drifted lower on heavy trading volume to close even lower at $13.35 per share.

28.     On April 26, 2007, the Company announced final Q1 2007.  Gross margin was a dismal 12.5%.  Net loss for the quarter was $10.2 million or ($0.13) per share.  The Company also conducted a conference call on that same day.  Therein, it was reported that competitive "intensity in our largest account" continued.  The Company announced that the $1.0 million charge discussed at the April 5, 2007 conference call was now doubled to approximately $2.0 million "related to prior year's sales and use tax exposures."

29.     Shortly after the April 26, 2007 conference call, two of the three individual defendants, CEO Barton and EVP Ford, left Rackable.  Shortly after the settlement with California, the general counsel of the Company left.  At the Q4 2007 conference call it was announced that the defendant CFO Ranganathan was leaving Rackable.

30.     Finally and belatedly, the Company wrote off its "excess and obsolete" memory and other inventory in Q2 2007 resulting in "negative" gross margins of approximately 8.4% for that quarter.  The charge was approximately $20.6 million or almost equal to the increase in the reported inventory in Q4 2006.   Inventory at September 30, 2006 was reported at $47.3 million. At December 31, 2006, it was up to $68.1 million.  After the 2007 second quarter write-off, inventory was back down to $43.3 million.

31.     The steep declines in the market price of the Company's stock between January 17, 2007, and April 5, 2007, were the direct result of the loss of credibility by analysts and other market participants in defendants' statements and their ability to make reasonable forecasts. As a result of the misstatements and omissions particularized below, plaintiffs and the Class suffered damages as alleged herein.

## JURISDICTION AND VENUE

32.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 U.S.C. §240.10b-5).

33.   This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

34.   Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. 1391(b).   Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.   Rackable is a Delaware corporation with its principal executive offices located within this District.

35.   In connection with the acts, conduct and other wrongs alleged in this Second Amended   Complaint (the "Complaint"), defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

36.   Lead Plaintiff Elroy Whittaker, as set forth in the Certificate of Named Plaintiff filed in connection with his Lead Plaintiff motion (Docket No. 10, Attachment 1, Exhibit B), and incorporated by reference herein, purchased Rackable common stock during the Class Period and was damaged thereby.[12]

37.   Plaintiff Gerald Dull, as set forth in the Certificate of Named Plaintiff filed in connection with the filing of the initial complaint on January 16, 2009 (Dkt. No. 1, Exhibit), and incorporated by reference herein, purchased Rackable common stock during the Class Period and was damaged thereby.

38.   Plaintiff Vincent Fusco, in the Certificate of Named Plaintiff already on file with the Court and incorporated by reference herein, purchased Rackable's stock during the class period and was damaged thereby.

39.   Defendant Rackable Systems, Inc., is a Delaware corporation with its principal executive offices located at 46600 Landing Parkway in Fremont, California 94538.   The

---

[12] Concurrent with the filing of the instant Second Amended Complaint Lead Plaintiff Whittaker is moving to withdraw as Lead Plaintiff and requesting that Gerald Dull and Vincent Fusco be substituted as Lead Plaintiffs.

Company was founded in 1999, and conducted its initial public offering in or about June 2005. The Company designs, manufactures, and implements computer servers and storage systems in the United States. It offers technology solutions focusing on power management and power distribution, as well as hardware- and firmware-based remote management. Rackable sells its products to customers in Internet businesses and companies in vertical markets, including semiconductor design, enterprise software, federal government, entertainment, financial services, oil and gas exploration, biotechnology, and pharmaceuticals.

40.     As of December 31, 2005, Rackable had 174 full-time employees, consisting of 59 in manufacturing, 32 in service and support, 46 in sales and marketing, 19 in general and administrative functions, and 18 in research and development. The Company reported that as of December 31, 2006, it had 286 full-time employees, consisting of 71 in manufacturing, 55 in service and support, 73 in sales and marketing, 34 in general and administrative functions, and 53 in research and development. As of April 2, 2007, Rackable had issued and outstanding 28,600,951 shares of common stock, which traded on the NASDAQ securities market. In or about May 2009, the Company acquired Silicon Graphics, Inc. ("SGI"). The combined entity now carries the name of Silicon Graphics, Inc. Prior to the acquisition, the Company's stock traded under the symbol "RACK," and maintained a website at www.rackable.com, where it published financial information. The Company's stock now trades under the symbol "SGI."

41.     Defendant Thomas K. Barton ("Barton") was the Company's Chief Executive Officer ("CEO") during the Class Period. Barton joined Rackable in December 2002 as the President, Chief Executive Officer ("CEO") and a member of the Company's Board of Directors. From June 2002 to December 2002, Barton provided consulting services to the Company as a consultant at Callero Partners. During the Class Period, defendant Barton spoke at conference calls and signed the false and misleading SEC filings, as particularized below. On April 28, 2007, defendant Barton resigned as a member of the board of directors, and on April 29, 2007, the Board terminated Barton's CEO position.

42.     Defendant Madhu Ranganathan ("Ranganathan") was the Company's Chief Financial Officer (the "CFO") and Principal Finance and Accounting Officer during the Class

Period.  Ranganathan joined Rackable in December 2005 as the Vice President of Finance and became the CFO in April 2006.  From August 2002 to November 2005, Ranganathan served as the Vice President and Corporate Controller at Redback Networks, a publicly traded company providing telecommunication networking equipment.  From January 2000 to August 2002, Ranganathan served as Vice President of Finance at Jamcracker, Inc., an application services provider.   From November 1996 to December 1999, Ranganathan served as Director of Finance for BackWeb Technologies, an Internet software company.  Ranganathan is a Certified Public Accountant in California and a Chartered Accountant from India. During the Class Period, defendant Ranganathan spoke at conference calls and signed the false and misleading SEC filings, as particularized below.   At the Q4 2007 conference call with analysts, it was announced that defendant Ranganathan was leaving the Company.   Ranganathan's employment with the Company ended in or about April 2008.  According to CW17, *see* ¶72(a) on at least one occasion, Defendant Ranganathan willfully violated Rackable's Sarbanes-Oxley Act ("SOX") internal controls over financial reporting by improperly circumventing the Company's processes to unilaterally alter figures in a SEC.

43.     Defendant Todd R. Ford ("Ford") joined Rackable in December 2002 as the CFO and he became the Company's Executive Vice President of Operations in December 2003.  From June 2002 to December 2002, Ford provided consulting services to Rackable as a consultant at Callero Partners.  From June 2000 to March 2002, Ford served as CFO at Noosh, Inc., a print management software company, and served as Director of Finance at Noosh from March 1999 to June 2000.  Previously, Ford worked at Ernst & Young LLP, the Company's former auditors, and Arthur Andersen.  Ford is a Certified Public Accountant.  As of March 16, 2006, the 2006 Proxy reported that Ford was the beneficial owner of 321,043 shares of the Company's stock.  As of March 16, 2007, the 2007 Proxy reported that Ford was the beneficial owner of 287,195 shares of the Company's stock.   During the Class Period, Ford spoke at conference calls and signed the false and misleading SEC filings, as particularized below.  Ford also disposed of over 100,000 shares of the Company's common stock at inflated prices

during the Class Period.  On May 23, 2007, the employment of Ford with the Company was terminated.

44.     Defendants Barton, Ford, and Ranganathan, are collectively referred to herein as the "Individual Defendants."

45.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements and markets *via* access to internal corporate documents (including the Company's operating plans, budgets, forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and *via* reports and other information provided to them in connection therewith.

46.      It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of the Company, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein; were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company; and approved or ratified these statements, in violation of the federal securities laws.

47.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful

information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management and earnings, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

48.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Rackable, each of the Individual Defendants had access to the adverse undisclosed information about Rackable's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Rackable and its business, which were issued or adopted by the Company, were materially false and misleading.

49.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.   Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein, and are therefore primarily liable for the representations contained therein.

50.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Rackable common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Rackable's business,

operations, management and the intrinsic value of Rackable's common stock; (ii) caused plaintiffs and other members of the Class to purchase Rackable's common stock at artificially inflated prices, and (iii) thus, sustaining damages upon the materialization of concealed risks and\or corrective disclosures occurred.

## SUBSTANTIVE ALLEGATIONS

## I.   BACKGROUND

51.     Rackable began its business in or about 1999, a small limited liability company earning a small profit on approximately $4 million of revenue per quarter.  After a spate of various acquisitions, reorganizations and/or recapitalizations, in or about December 2002, the Company incorporated in the State of Delaware, and received initial financing of $21 million from an affiliate named Parthenon Capital ("Parthenon") for an approximate 64% interest in the Company.  Shortly after Parthenon's investment, defendants Barton and Ford were hired as "consultants" for the Company.   Before the IPO, in or about June 2005, defendant Barton became the Company's CEO, and defendant Ford became its CFO.  Within less than a year, Parthenon sold off most of its stake in Rackable.

52.     During 2006, Rackable was a leading provider of high-density computer servers and high capacity storage systems.  The Company's proprietary design permits greater density of servers, as they take less space.  Rackable's products power websites for Amazon, Microsoft and Yahoo, the Company's largest customers during the Class Period, accounting for at least 60% of its revenues.   During the same time frame, in addition to the "big three," Rackable had over 200 customers, including Deutsche Bank, Oracle, and Sony Computer Entertainment. [Forbes.com, May 22, 2006, "Rack 'Em Up"].

53.     Rackable outsources some of its production to manufacturers.  Almost all of its revenue comes from the United States, with some overseas sales.   As Rackable elaborated in its  Form 10-K filed with the SEC on February 22, 2006 for the year ended December 31, 2005:

> Our operational strategy is to provide our customers with built-to-order, high-quality turnkey solutions. Our operations are based on a hybrid manufacturing model that maintains control of key processes, including procurement, product configuration validation, quality assurance and testing, while leveraging the

labor resources of our contract manufacturers. As a result, we are able to maintain the flexibility to scale operations as needed while minimizing capital expenditures and fixed operating costs.

Personnel in our Milpitas, California facility manage procurement, validation of product configuration, assembly and testing. ***In order to control and monitor quality and inventory levels, we use a just-in-time procurement strategy.*** We have established relationships with key technology vendors and distributors for the supply of our core components and sub-assemblies, including chassis metal fabrication, memory, processors, hard disk drives, printed circuit boards, fans and power supplies. We generally use multiple vendors on commodity products in order to obtain competitive pricing.

As part of our hybrid manufacturing model, we maintain in-house capabilities that we typically use to fulfill urgent orders, smaller orders and prototype system production. . . None of our contract manufacturers is the sole manufacturer of any one of our products. We maintain staff at each of the manufacturing facilities to ensure that we have adequate control over the manufacturing process and quality control.

We perform final testing, cabling and packaging onsite at our contract manufacturers' facilities, as well as in our Milpitas facility. . .

54.     "Just-in-time procurement strategy," was more precisely understood to mean that Rackable generally did not seek to acquire necessary inventory components to meet specific customer configurations until the purchase order, stating quantities and costs, was approved by the customer.

## II.    **CONFIDENTIAL WITNESSES**

55.     Plaintiffs' investigators interviewed the following former Rackable employees and independent contractors from before, during, and after the Class Period and obtained the following information.

56.     CW1 was employed by Rackable from in or about 2003 through in or about the beginning of 2006 as a supply chain manager. CW1 reported to the Vice President of Manufacturing and the Chief Procurement officer, both of which were two of the Company's three founders.[13]  CW1 had staff reporting to him\her, including buyers, warehouse managers and a supply chain manager.  CW1's responsibilities included inventory management, cost

---

[13] The Company's founders were reported to be Jack Randall, Nikolai Gallo, and Giovanni Coglitore.

reduction, metrics management, and cost negotiations for software, sheet metal, electronic manufacturing services, and electromechanical commodities for IT servers, storage and software.   CW1 assisted with managing the annual budget in her department. CW1 also assisted with manufacturing, engineering, and sales operations.   According to CW1:

(a) Despite the Company's stated policy of not purchasing materials until a customer order was placed, beginning not later than mid to late 2005, Rackable built up and ordered excess less-expensive component parts, inventory, memory (which was more expensive), and "power supply."   In particular, "extra memory" was ordered based on forecasted orders not customer purchase orders;

(b) Power supply materials are ordered and allocated to specific customer orders to be used during the manufacturing and/or build process and had to be compatible with the respective order's specifications.   However, because the power supply materials were pre-ordered based on forecasted customer orders, the power supply materials frequently were not compatible with actual order requirements.   This led to both a shortage and excess power supply when actual orders were placed, resulting in delayed manufacturing completion and shipments.   (*See* CW7, 10, and 21, below concerning double order of power supply in Q4 2006).

(c)  When materials shortages occurred, employees were instructed to purchase the necessary supplies "at any cost," *e.g.*, a rush shipment of sheet metal could carry an air delivery cost of $10,000 to $15,000.   Approximately $200,000 per quarter in excess costs could be attributed to power, overtime, materials, labor, etc.   CW1 believed that "expedite" fees for materials, lost fees for factory time booked ($20,000 or more per week) during the period where the parts had not yet arrived to be assembled, or to pay overtime to meet a deadline once the parts were finally obtained -- were segregated in a separate account;

(d) In addition, as another witness (CW6) opined, as described below, certain of Rackable's suppliers had minimum purchase commitments.   Thus, Rackable had excess inventory resulting from purchasing more component parts from certain vendors than needed. On the other hand, because of (i) purchasing in advance without the benefit of a customer's

specific requirements, as explained above, and (ii) then being required to purchase a different component part when the order was actually received, Rackable was at the mercy of supply shortages and price increases, which, according to CW1, frequently occurred and was still the normal state of affairs in 2006;

(e) CW1 also was responsible for conducting inventory counts and submitting resultant reports to her superior, a co-founder of the Company. CW1 stated that inventory counts for more expensive supplies such as memory and drives were conducted every 1-3 months, while the remainder of the inventory was counted once a year. During the counts, CW1 observed that excess materials ordered from suppliers "never moved from their stocking location," and sat in warehouses "year after year;"

(f) CW1 was also responsible for calculating and reviewing the annual budget for the Supply Chain Department, specifically by calculating the "cost of goods." CW1 calculated the cost of manufactured products by compiling and allocating the bill of materials, labor and overhead. The "cost of goods report" was sent to Randall, the Vice President of Manufacturing, who used those reports as well as "sales activity reports" to submit margin earnings to the then CFO, defendant Ford. Not later than the beginning of November 2005, CW1 observed that the cost of many manufactured products exceeded the prices at which the products were being sold to customers, *i.e.* Rackable was achieving negative margins. One of the customers that CW1 identified was Yahoo!, one of Rackable's largest customers. CW1 reported this state of affairs, as well as the aforementioned supply chain issues, directly to Randall. When Randall dismissed CW1's concerns, CW1 went directly to Ford. Ford met with Randall to discuss supply chain issues and the cost of goods. Thereafter, an outside auditor was hired to investigate the costs associated with manufacturing products. CW1 provided the auditor with information, including bills for materials and inventory counts. Although CW1 believes an audit report was provided to senior management, CW1 never saw the results of any purported investigation, nor would Randall and Ford speak to CW1 again about the issue. CW1 indicated that other employees voiced similar concerns about the "cost" issue with management but that they were ignored;

(g) CW1 stated that the Company's tracking of returns for sold products was poor, as well. Not only were returns high ("they were eating up the Company"), but Rackable did not maintain "return material authorizations" or track customer returns. Disassembled components were recycled for reuse without being tested to determine if there were defects; and

(h) As did other CWs, CW1 opined that much of the aforementioned issues stemmed from a lack of communication between the different departments at the Company, *e.g.*, the Sales department failed to communicate with Supply Chain and Manufacturing department caused the former to promise delivery dates which could not be met because Sales did not take into account the time it took to obtain supplies not on hand and to manufacture the product. Production meetings attended by Randall and CW3, among others, did not solve the problem. CW1 attributes this to Sales trying to make deals at the end of the quarter to achieve revenue targets.

57.     CW2 was employed at Rackable from December 2001 through in or about May 2007 as a shipping supervisor. During CW2's tenure at Rackable, she also was responsible for tracking stock room inventory until these responsibilities were spun off to a separate department in or about 2003 or 2004. During CW2's initial employment period she reported to Randall, the Vice President of Manufacturing. From in or about 2003 to 2007, CW2 reported to the Global Director of Sales and Shipping Operations. In this later position, CW2 was responsible for managing the Company's shipping. As such, CW2 was responsible for communicating delivery schedules, especially delayed shipments, to the Sales Department. During this time, CW2 also worked closely with the Finance Department to ensure that all shipments were recorded timely.

(a) CW2 stated that the manufacturing department frequently was awaiting necessary component materials to complete builds. As a result, shipments were constantly delayed and there was always a "rush" to "get product out the door." Customers called daily, complaining that orders were not received by the promised delivery date. CW2 stated that this was caused, in part, by the fact that the Company's three largest customers, Amazon, Yahoo!

and Microsoft, received build and shipping priorities over other customers;

(b) Echoing CW1's recollection, CW2 also stated that she thought there was a high rate of returned products given the number of units shipped.

(c) CW2 stated that the Company much earlier than 2006 had shipped "evaluation units" to customers or potential customers. The evaluation units were, in actuality, full scale completed products and thus, expensive to build and ship. CW2 was told in "late 2006" to "locate" and "get back" the evaluation units, which were "on loan" to potential customers since as far back as 2001. Most of the evaluation units either could not be located or if returned were found to be obsolete or near obsolescence.

(d) CW2's initial responsibility was to manage the inventory stock room. As stated by other confidential witnesses, over CW2's six years at the Company, CW2 observed that Rackable appeared to have the same excess inventory and inventory shortages the entire time – Rackable had a lot of excess inventory that was not needed or required by the manufacturing department yet was always short of necessary components required to conform to current orders.

58. CW3 was the Director of Manufacturing at Rackable from its inception in 1999 until the beginning of 2006. CW3 was responsible for running the day-to-day manufacturing operations, including product assembly, build and testing. CW3 reported to Ford, who at the time was Executive Vice President of Operations and Chief Financial Officer. CW3 also reported to the Vice President of Manufacturing Operations. According to CW3, Rackable's chain of production responsibility was as follows: A sales associate entered a purchase order into the computer system; the Supply Chain/Commodities department was responsible for obtaining materials, with the Procurement Officer negotiating to obtain the best possible prices; the Manufacturing department assembled and built to customer specifications; products were tested to determine whether they met specifications; products were shipped. The turnaround time goal for these steps was, ideally, two weeks, two to six weeks for a large order (depending upon material availability). Although Rackable's business model was a "built to order" one, some materials, *e.g.* sheet metal, could be purchased ahead of customer orders and larger

customers were encouraged to forecast yearly needs.  Due to Rackable's model, however, problems often arose.  According to CW3:

(a) Because CW3 was constantly battling materials shortages and materials rarely arrived on time, assembly was delayed.  (The department was competing against impossible customer shipment deadlines.)  In turn, to perform proper testing, shipment was delayed.  One of the components not purchased until a specific order was received by a customer was memory.  CW3 stated that shortage of DDR memory supplies was a recurring problem at the Company.  CW3 stated that if suppliers encountered shortages, they would cater to Rackable's larger competitors first, as they tended to order more than Rackable.  Rackable then was at the mercy of shortages and market price changes;

(b) CW3 stated that there were daily management meetings at which management discussed the status of customer orders.  CW3 would provide updates to anticipated delivery dates.  CW3 stated that "management" also had access to "ERP Reports," which provided details as to the (i) the date the customer order was placed, (ii) the sales price of the order, (iii) expected delivery date, (iv) materials needed to build the product, (v) materials allocated to build the product, (vi) materials ordered for the product, (vii) any delays from suppliers, (viii) the status of customer orders, builds, (ix) delivery dates, and (x) any delivery delays.  Because of both the regular meetings and the ERP reports, management had good visibility concerning the production status of the products ordered;

(c) CW3 stated that manufacturing operational efficiency suffered because, *inter alia,* component materials always arrived late.  Although critical issues, such as material delays, were discussed at the management meetings, possible solutions were discussed but not implemented and the problem of late shipments was never resolved; and

(d)  As did CW2, CW3 indicated that in CW2's six years with the Company, materials shortages and shipment delays were recurring issues.  As did CW1, CW3 attributed this problem, in part, to a failure of communication between departments exacerbated by a lack of policies and procedures.  Additionally, the build-to-order model left assembly, build and test teams idle until materials were received.  (CW1 discussed the extra costs incurred as a result.)

59.     CW4 was a former Rackable account executive (sales agent) employed at the Company from in or about September 2005 until in or about October 2007.  CW4 reported directly to George Reitz, the Vice President of Sales Operations.  CW4 recalled the following:

(a) When a current or potential customer requested a quote, CW4 obtained build specifications for the customer's order.   CW4 forwarded the details to "internal sales representatives," who were responsible for assessing the build and its costs, together with product design engineer(s).   Because products were customized, the process of getting quotes was "cumbersome" and "painful."   CW4 relayed the quote in purchase order format to the customer in writing.   If the customer decided to accept the order, the customer transmitted the approval and the quote to Rackable's headquarters.   The quotes included "line item details" and charges for factory build, materials, deployment, and boxing and\or freight charges.   Once orders were accepted by the customers, only then did Rackable usually order supply materials;

(b) CW4 was required to submit to CW4's supervisor forecast reports, weekly or bi-monthly, to track future orders from existing customers.   The purpose of these reports was to assist management with respect to ordering materials;

(c)   CW4 recalled that the Company's three biggest customers, Amazon, Yahoo! and Microsoft were being courted by competitors, especially Dell.   To maintain the business, products were often sold to these three customers "at cost," thereby squeezing the gross margins achieved by sales to other customers.   This problem was ongoing and common knowledge at the Company during CW4's tenure, *e.g.*, CW1 identified Yahoo! as a customer sold at or near cost.

(d) CW4 recalled that customers were not charged sales and use tax.   CW4 provided examples of specific purchase orders:  October 2005, order for $87,000 to a purchaser in Arizona; March 2006, two orders, totaling $9.1 million (one purchaser in California); June 2006 order to a customer in Arizona; one order (date unknown) to a customer in Nevada. Indeed, CW4 stated that he\she recalled one customer inquiring why sales tax was not added to the customer quote.   CW4 forwarded the request to the internal sales representative (responsible for computing the quote) and was told that Rackable did not charge sales tax.

CW4 also stated that he\she was never asked to recover sales tax from customers, who had previously placed orders and were not charged sales tax.

(e)   CW4 recalled that there constantly were memory shortages that delayed customer orders.  Also with respect to memory, while certain big customers specified DDR2 once that part became available, at the time of the transition from DDR1 to DDR2, CW4 did not recall any customers specifically requesting the old (DDR1) parts for their products;

(f)   CW4 also stated that "commodity items," including memory, were quoted to customers at close to double market prices.  CW4 stated that the internal sales representatives, upon customer inquiries and complaints concerning same, would then adjust the cost to the customer at market price.  Upon further inquiry, CW4 was told that after the customer complaint was relayed through her, supply chain personnel "renegotiated" better prices;

(g)   Although CW4 was told to quote customers a two-week lead time from order to delivery (the target mentioned by CW3), CW4 realized that would never be met and instead quoted at least a four-week turnaround time; even then, some orders took up to seven weeks to deliver.  On occasion, customers cancelled orders that had been delayed too long.  CW4 did not know how management accounted for the materials received to build the cancelled product;

(h)   Customers constantly complained that their custom-built products were, in fact, not built to specifications.  CW4 recalled that engineers sometimes were deployed following delivery to fix the problems.  On one occasion, CW4 recalled having to fix a problem where the cabling was not assembled in accordance with the Statement of Work.  Other times, customer-specified components were not used because Rackable tried to get rid of parts it had on hand, *e.g.*, Seagate instead of Western Digital; the customers would notice and demand a fix.  Such problems cost Rackable time and resources.

(i)   Products were often shipped to the wrong location, further extending delivery delays;

(j)   During Q4 2006, CW4 indicated that management made a huge push to try and get sales to meet the Company's revenue target and appeared desperate.  Contrary to

Company policy, CW4 even recalled that he had provided a customer with a purchase order and later found out that the order had been pre-built, *i.e.,* before the purchase order was executed. CW4 remembered telling CW4's supervisor, George Reitz, that he was not sure when he would get the purchase order back from the client yet and that, CW4 later found out from Reitz that Ford had gone ahead and approved the pre-build. CW4 recalled that the order had been shipped to the customer early and CW4 recalls that it might have been done in exchange for a 10% discount and extended payment terms because the customer did not need the order until the next quarter. CW4 believes the product was built in December 2006 and shipped before the end of the quarter. CW4 indicated the order was for $2.1-2.2 million;

(l)   The sales staff was trained to sell Rapid Scale storage products on three separate occasions before management realized that it did not know what to do with the product. (In August 2008, Rackable announced it would sell off this segment of the business, two years after its purchase.) Not only was there no demand for the product, because it could not compete with what was in the marketplace, but the technology was complex, making it difficult to pitch – salespersons could not articulate what was in it for the customer. As a result, the sales staff did not try to sell products they did not themselves understand.

60.   CW5 was employed by the Company through a contract agency in January 2009 and ceased her employment in or about April 2009. CW5 was hired as a "Senior Cost Accountant and Business Systems Analyst" for the Oracle ERP System in Rackable's cost accounting department. CW5 recalled the following:

(a) CW5 was hired to work on several uncompleted projects to resolve SOX compliance issues. CW5 was responsible for (i) reviewing, analyzing and making recommendations for Rackable's operating system, Oracle; and (ii) assisting in an inventory reconciliation project.[14] CW5 reported to Ralph Inman, cost accounting manager, and Don Pelecchi, controller, cost accounting group. For a brief period, CW5 also reported to Jonathan

---

[14]  Prior to CW5's engagement, Rackable had reported the existence of a material weakness over internal controls with respect to inventory valuation in 2007, which also caused Rackable to restate results for Q1 2008.

J. Skoglund, the Company's Vice President, Corporate Controller and Principal Accounting Officer;

(b) CW5 found that Rackable had not implemented its Oracle "modules" correctly. Thus, manual reconciliations and adjusting entries had to be made to agree subsidiary inventory records, among others, to general ledgers, which formed the basis for reported financial figures. CW5's recommendations for improvement included: (i) review or re-implement Oracle, including the inventory module(s); (ii) inventory must be reconciled to ensure compliance with SOX; (iii) create an "aging report" for scrap materials; (iv) put in place an approval system, including policies and procedures for modifications to the Oracle system; (v) hire persons with a cross-set of skills to include Oracle and Finance experience for the Cost Accounting Department;

(c) CW5 opined that the Oracle inventory modules (when implemented properly) should include inventory "sub-locations," such as materials received\inspection required, raw materials, finished goods, return(s) material authorizations, *etc.* By creating and maintaining inventory module with sub-locations, a company can accurately track the lifecycle of inventory. Specifically, a company can track when and what inventory is: (i) ordered; (ii) inspected; (iii) added to raw materials or finished goods inventory; (iv) returned for credit or replacement after inspection; (v) used for work orders (*i.e.,* work-in-process); and (vi) shipped. In addition, a company will know what inventory has not been used for work orders and remains in inventory. CW5 stated that to successfully track inventory, the Oracle inventory module and sublocations need to be set up accurately so that all inventory-related expenditures are recorded in the proper module. Thus, according to CW5, once implemented correctly, Oracle increases inventory "visibility" at month-end to accurately report and, if necessary, "write-down" excess inventory;

(d) Preparing for the 2008 year-end audit, CW5 found that Rackable had not properly set-up the inventory module sub-location for "materials received/inspection required." Accordingly, CW5 stated that she could not reconcile the reported inventory account because

CW5 was lacking support for recorded inventory figures.  As a result, CW5 was required to manually reconcile inventory *back to and including 2006*;

(e) CW5 found that in general, employees did not track inventory received, inspected, rejected and consumed consistently.  As a result, it was difficult or impossible to determine inventory shrinkage (*i.e.,* lost, stolen or consumed);

(f) Further, CW5 found that there were deficient communications with buyers to keep them informed as to inventory shortages. Similarly, CW5 found that it was unclear as to whether materials received were tested by Company engineers. If they were tested, CW5 was unable to determine the outcome of such testing and\or the disposition of the materials;

(g) CW5 stated that there was not an aging report for inventory.  As CW5 opined, aging reports particularly are helpful for tracking obsolete and outdated inventory.  In particular, if the price per unit drops on unused inventory, the excess price should be marked down or written off.  Upon completion of CW5's inventory reconciliation, he\she determined that there was "a lot" of unused inventory in the warehouse which had not yet been marked down or written off;

(h) In short, CW5 concluded that Rackable had extremely "loose" inventory policies and procedures and recommended that Rackable implement new formal operating policies and procedures relating to inventory.   Additionally,  there were no procedures governing changes made in the Oracle system.  As a result, the Director of Information Technology made changes to the system at anyone's request without informing the Cost Accounting Department and obtaining its authorization.  Moreover, the Director of Information Technology was resistant to change and did not want to implement changes CW5 suggested.

61.    CW6 was employed by the Company at the beginning of 2008 through in or about January 2009.  CW6 had more than a generation of experience in supply chain and/or inventory procurement positions.   CW6 was a Supply Chain\Commodities Manager while employed at Rackable.  As such, she was responsible for managing and ordering supplies required to build customer orders.  CW6 reported to the Director of Supply Chain, who in turn reported to the Vice President of Operations.

(a) CW6 stated that upon receipt of a customer order, a "master scheduler" was responsible for inputting the order and creating a "Materials Requirement for Production" or an "MRP" request.  Based on the MRP, CW6 would attempt to order the required quantities from suppliers.

(b) CW6 stated that her supervisor conducted weekly order and supply status meetings with supply chain associates.  If supplies were short, the supervisor simply instructed the associates to "get the materials in the door and worry about costs later."

(c) As noted by other CWs, certain suppliers had minimum purchase requirements.  Thus, Rackable was left with ordering more materials than required.  The Company then attempted to delay delivery of and payment for the excess materials until the end of the year;

(d) Rackable refused to pay sales tax on materials purchased and received. When the issue arose, the matter was forwarded to CW6's supervisor, who told the supplier that Rackable would not pay sales tax;

(e) Even though CW6 updated commodity price variances into the computer system, sales associates were quoting prices to customers which were so low that it was costing Rackable money to produce the product.  Despite CW6 bringing the problem to the supervisor's attention, it was never resolved;

(f) Sales associates always quoted unreasonable delivery dates, not taking into account the time it took to receive materials from suppliers.  As a result, shipments were always behind schedule;

(g) Finally, CW6 stated that because of materials inventory shortages costs to build were higher.  However, these higher expedited costs were not passed on to the customers.

62.   CW7 was a Regional Sales Manager employed by Rackable from 2006 until early 2009.  CW7 reported to George Reitz and, like CW4, worked closely with CW15.

(a) Like CW4, CW7 recalled that because each part was specified in the Company's build to order model, it took a long time to obtain a quote from the ERP system, sometimes more than a week;

(b)   Like other witnesses, CW7 indicated that most of Rackable's resources were allocated to the big three customers, Yahoo!, Amazon and Microsoft;

(c)   Even though CW7 exclusively sold DC power supplies,[15] which are less expensive for the customer to operate, at a sales meeting in Freemont, California, in or around March 2007, Carl Boisvert, the Vice President of Worldwide sales and marketing, informed the sales staff that Rackable had purchased 10,000 AC power supplies and that deals should be made to sell the AC power supplies;

(d)   CW7 described Rapid Scale as a "joke".  CW7 did not recall a single sale in 2007 or 2008, despite being given training and working with engineers in sales teams.

63.   CW8 was a General Accounting Manager from May 2007 until May 2008. CW8 reported to John Miller, Vice President of Finance.

(a)   CW8 recalls that having resolved its sales tax liability in California, Rackable was trying to rectify the situation in 18 states by voluntarily self-reporting, providing three years of data and paying the taxes owed.  Defendant Ranganathan spent a few hours each week for several quarters attempting to rectify the problem and collect the taxes, including onsite visits to Yahoo!  Ranganathan claimed that a limitation on the Oracles system prevented Rackable from being able to determine state taxes.  However, CW8 indicated that an add-on Vertex product was available to calculate state taxes and that periodic updates were provided to enable companies to pay state taxes.

(c)   Like CW5, CW8 noted that Rackable was not using "a lot" of the functionality of its Oracle system, *e.g.,* auto accruals, tracking data in multiple countries. Thus, it was easy to make mistakes.  For example, requisition forms were manually entered and there was poor control over purchase orders.  As a result, there were duplicate orders and excess inventory.  CW8 had disagreements with Ranganathan concerning the Oracle system. Also, like CW5, CW8 encountered resistance from the officer in charge of IT regarding what could be done;

[15]   In a November 6, 2006, article, among the positive notes for Q3 2006, commentator Trey Wasser indicated the DC power option accounted for more than 50% of Rackables's sales.

(d)  With respect to the write-off of tens of millions of dollars of inventory in Q2 2007, there were team meetings to discuss tighter control of inventory.  CW8 was of the impression that new CEO Mark Barranechea wanted to "get it out of the way so that it could not be blamed on him;"

(d)  Eventually, the Cost Accounting Manager, Raj Patil, was fired and Gary Chochon, an Operations Controller responsible for cost of sales, was demoted.

64.  CW 9 was a Cost Accounting and Financial Operations Manager employed by Rackable from 2004 through early 2008.

(a)  Although Rackable's investor confidence was predicated upon retaining Yahoo!, Microsoft and Amazon as customers, sales to Yahoo! were at negative margins.  According to CW9, who was constantly in meetings with CEO Barton and EVP Ford, the Company's challenge was to offset that by sales to other customers.   In 2006, senior management sought to do that in two ways, by achieving higher margin sales with the Rapid Scale product line and by establishing a stable, worldwide sales force to expand the customer base.   After spending more than three times the amount budgeted, Vice President of Worldwide Sales, Thomas Gallivan, was fired for failing to increase revenues.

(b)  Regarding sales and use taxes, CW9 explained until the Company went public in 2005, the issue was not on anyone's radar.  As the Company's sales grew in volume so quickly, the amount owed rapidly increased.   CW9 indicated that Rackable had a competitive advantage by not charging sales tax.  This allowed the Company to achieve better gross margins.  Like CW8, CW9 recalled that Yahoo!, a very large volume customer, was not paying sales tax;

(c)  Regarding inventory, CW9 recalled that a big problem occurred right after the implementation of the Oracle system in Q3 2006.  Data entry was manual and, as explained by CW8, mistakes were easily made.  Because the IT department head failed to assign anyone to do so, no one was checking the system to determine whether it was operating properly.   In particular, no one was monitoring purchases.  As a result, human error in data entry, lack of experience in operating Oracle's ERP, and lack of senior executive oversight over procurement

led to "a lot of out of control purchases."  Just as CW7 recalled the excess purchase of power supply, CW9 recalled the excess purchase of DDR1 memory.  As was CW8's impression, once CEO Barranechea came to the Company, he took the opportunity to clean house of as much of the excess inventory as he could, $25 million worth.  These write offs were discussed in meetings attended by CW9, Ranganathan, John Miller and Barranechea; and

        (d)   Defendants would first focus upon achieving revenue figures and then worry about margins.

65.   CW10 was a Senior Commodity Buyer at Rackable from mid-2006 until early 2008.   CW10 was involved with sheet metal, boards, racks and power supplies.  Although Rackable claimed to have a build-to-order business model where materials were purchased on an as-needed basis, CW10 noticed that inventory was rising as business was slowing down.  In particular, excess power supplies built up and CFO Ranganathan was aware of this fact.

66.   CW11 was an account executive from late 2005 until early 2009.  CW11 recalled the following:

        (a)   Although CW11 received training on the Rapid Scale product, CW11 did not sell it.  The product roll out was not well executed and Rackable's customers were not the correct market for the product;

        (b)   CW11 thought that the supply chain and inventory were not closely managed.   Often when advance purchases could be made of materials the Company knew it would need, ahead of a price increase, this did not occur.  Instead, Rackable bought excesses of products at the end of their life cycle, *e.g.,* memory, or purchased products it expected to sell but did not, *e.g.* networking hardware.

67.   CW12 worked in the field from mid-2005 until early 2009.   A regional manager, CW12 reported to Sales Engineering Manager Greg Hansen.

        (a)   CW12 was aware of competition from Dell, and that Rackable had to cut its price on a large deal with Yahoo! to win the project;

        (b)   Inside sales staff as well as Hansen told CW12 that there were problems with the ERP system, which caused it not to accurately reflect Rackable's prices.

68.     CW13 was an inside sales manager from early 2003 to mid-2009.

(a)     Although CW13's team, which did not handle the three largest accounts, delivered good gross margins, only in CW13's last year at Rackable was the team given a gross margin goal to achieve;

(b)     Resellers were not charged taxes.  Taxes would appear on CW13's quotes because the quotes needed to match the customer's purchase order (*see* CW4 comment that a customer sought a quote that included sales tax);

(c)     The company transitioned to Oracle to be SOX compliant at the time of the IPO but the system was not ready.  As a result, as noted by CW4 and CW7, CW13 indicated that it was very difficult to obtain a quote from the ERP system.

69.     CW14 was an invoicing coordinator in order management from 2006 until 2009.  CW14 reported to Director of Global Sales Operations Deborah Silberman and Jo Jackson.

(a)     CW14, who worked with the sales staff, indicated that the Company's five major customers had master purchase agreements with Rackable that granted them special pricing.  Initially, customers were sent quotes and returned purchase orders to Rackable; later, customers could simply execute the quote and it would become a valid purchase order;

(b)     Although CW14 indicated that taxes were included on invoices CW14 prepared, CW14 became aware in late 2007 that Rackable had not charged customers with state taxes.  Rackable was attempting to collect back taxes from customers at that time.

70.     CW15 was a field sales engineer from late 2005 until early 2009.  CW15 reported to Greg Hansen and worked closely with CW4 and CW7 (in sales).

(a)     When customers complained that particular components were being quoted above market price, Rackable would give the customer the requested price break, buy the cheaper product at market and keep the more expensive parts in inventory;

(b)     Rackable moved to the Oracle system to be SOX compliant.  However, it had lots of "tentacles" and the system needed to be brought on line in stages.  CW15

understood there was not enough staff on board to do the change, so it was an evolving process;

(c)   CW15 did not know of any sales people who ever landed a deal.   CEO Barton thought the purchase was an easy way to expand Rackable's market into storage, but Rackable could not compete with more mature products already in that arena, that were better and less expensive;

(d)   As did CW9, CW15 recalled that Vice President Gallivan was fired for not bringing in sufficient revenues.   CW15 recalled there was a lot of pressure to meet the sales target of $90 million.   (This was the midpoint of the original guidance, according to one analyst.  *See* ¶98, below.  However, in on October 30, 2006, that figure was raised to $100-110 million.)  CW15 recalled the pre-build described by CW4 as being orchestrated by Gallivan so that the equipment could be shipped by the end of the year.  CW15 indicated that the servers were sent to co-location in Downtown Los Angeles for the customer, Shopzilla, and that they were installed in Los Angeles at much later dates.  CW15 heard from Gallivan's office mate, Jeff Stillwell, that Rackable was having a bad quarter in Q4 2006; and

(e)  In order to complete a deal at less than a gross margin of 18%, George Reitz had to obtain approval from CEO Barton.

(f)  Contrary to the (unattainable) two-week target mentioned by other CWs, the average turnaround time from purchase order to build was five weeks.

71.   CW16 served as Rackable's controller from March 2006 until July 2007.  CW16 reported to Ranganathan and was responsible for corporate taxes, aspects of SEC filings and SOX compliance.

(a)   CW16 had no experience with cost accounting when CW16 joined Rackable.   Operations Controller/Finance Director Doug Lindvig was responsible for cost accounting.   Thus, Lindvig and Ranganathan were knowledgeable about gross margins.  Ranganathan made the revenue projections;

(b) When CW16 was hired, CW16 heard there was a problem with taxes that Lindsey Snyder – a friend of Ranganathan and an expert in state tax issues -- was hired to

address.  However, CW16 was drawn into the problem because CW16 could not reconcile the books.  Eventually, the outside auditors were brought in to address the issue.  CW16 understood that the tax issue had been going on for years and stemmed from the fact that customer invoices had not been flagged to charge state taxes.  CW16 was aware that Yahoo! owed a huge amount of taxes;

(c)  CW16 was told by Ranganathan that implementation of the Oracle system "was almost done" when it was not.  With the exception of inventory, CW16 was responsible for putting the accounting data into the system, an overwhelming task given the state of the system.  Even though there were a lot of internal control problems with the prior system because everyone had access to the data, Ranganthan made the decision to make the live transition to Oracle because Rackable would not have otherwise been SOX compliant; and

(d)  CW16 heard about the memory inventory issue just before leaving Rackable.  CW16 learned about the problem as it was explained to the auditors and was appalled that no one told him/her of the problem earlier.

72.  CW17 was the Senior Director of Accounting and External Reporting from late 2007 until the fall of 2008.

(a)  CW17 was the person authorized to make any changes to the figures on the financial reports to be filed with the SEC.  In Q1 2008, Ranganathan circumvented SOX procedure and unilaterally altered figures before they were sent to the printer.  These changes were later corrected in the restatement.  The error had to do with inventory valuations, the same subject as the material weakness finding by the outside auditors at the end of fiscal 2007;

(b)  Regarding past due state and use taxes, defendant Ranganathan knew that $5-6 million was due from one of Rackable's three largest customers, which refused to pay. The problem arose before CW17 arrived at Rackable, but was ongoing during CW17's tenure. The amounts due were recorded as accounts receivable.  That customer, in particular, put a lot of pricing pressure on the Company, while some other customers paid re-invoiced amounts. The biggest problems were in Washington, New York and Texas.  Ten other states were

audited as well. (Rackable's sales in 17 other states were not very significant.) CW16 and CW8 were assigned to clean up the mess, and it took awhile;

(c) Regarding charging of sales and use taxes, CEO Barton and CFO Ranganathan had approved of the positions taken by Jony Hartono ("Hartono") that taxes need not be charge where the bill went to one state but the equipment was shipped to another. CW17 indicated that not billing sales tax was a huge competitive advantage for Rackable that resulted in higher margins;

(d) With respect to the Oracle system implemented in 2006, Jony Hartono convinced management to configure it with fund accounting, although that model was only used by the government, and maybe a handful of companies anywhere in the world. The implementation was too fast and the Company went live without running Oracle parallel to the old system for awhile to ensure it was producing similar results;

(e) One of the reasons for inventory write offs was a problem with the cost model dictating purchase volume, causing Rackable to over-order parts in order to get the volume discount associated with the budgeted cost per unit;

(f) As late at Q2 2008, Rackable was still making unprofitable deals with Yahoo! to retain the revenue from this customer. Although the quote was 5-6% below margin, it grew to 14% below margin because the large size of the order and its fast turnaround required expensive purchases in the spot market and fees to expedite. Although margins were hurt by the sale, the order represented a significant percentage of revenue that quarter. The relationship was very one-sided, Yahoo! never came to Rackable to do a deal; it was always the other way around.

(g) Rapid Scale was headquartered in Canada and after Rackable got rid of the prior owner, there was limited visibility for the product. There was a small service element associated with the company and provision of service on products sold to the military was one of the reasons Rackable acquired the company. However, sales were never pushed beyond that point and that there was no basis to make the $9 million payment for additional intellectual property rights when the product had already failed. When CW17 pushed for an impairment

charge for 2007, Barranechea wanted to wait until a year had passed.  Charges were taken in Q1 2008 and Q3 2008 in connection with cessation of operations.

73.   CW18 was a Vice President for Business Development who was employed by Rackable from 2002 to early 2008 to manage a team handling the Microsoft and Yahoo! accounts.  CW18 indicated that there were no long-term contracts with either company and that Rackable had to compete for every opportunity.  Once a contract was entered into, Rackable could not renegotiate price.

74.   CW19 was an accountant who worked for Rackable in the areas of fixed assets, bank reconciliation and depreciation from November 2006 until early 2008.  CW19 recalled the big inventory write down right after Barranechea replaced Barton as CEO.  He indicated that there was no use for all of the material that the Company had kept buying and buying without planning.

75.   CW20 briefly served as Vice President of Worldwide Sales after Thomas Gallivan left Rackable.  Although not with the Company for long, CW20 characterized it as "inept" and "no better than a start up."  Specifically, CW20 was referring to the fact that no operating policies and procedures, no organization and a lack of communication.  CW20 stated that the accounting department was not "on their game."

76.   CW21 was the Company's Operations Controller from May 2007 until early 2009.   After initially reporting to John Miller, CW21 eventually reported directly to Ranganathan – whom CW21 did not think knew what she was doing.   Until January 2008, CW21 was responsible for making sure the books form net revenue to gross margins were correct, focusing on the cost of goods sold.

(a)  Ranganathan, Lindsey Snyder, Jony Hartono and the auditors handled the sales and use taxes issues;

(b)  CW21 was responsible for preparing the report of excess and obsolete inventory.  Because the prior method was faulty, and not reasonable for a company like Rackable, she devised a new method – that resulted in showing a lot more excess and obsolete inventory.  Rackable was not using "just in time" purchasing for its materials in inventory.

Ernst & Young and senior management did not entirely agree with him, although the Company wrote off a large amount of inventory.  The year prior to CW21's arrival, the Company had been "protecting" the gross margin;

   (c) CW21 was told that in Q4 2006, the Company made a double order of AC power supplies.

  77. CW22 was an Oracle systems consultant who worked on contract for Rackable at various times during 2006, 2007 and 2008.  CW22 duties included fixing defects in the system and adding enhancements.  CW22 worked with the head of Rackable's IT Department, Dominic Martinelli, and other IT employees.  CW22 recalled building a facility to test the database.  CW22 worked on the Oracle Configurator and the inventory module.  CW 22 never saw an aging report.

## III.   GRAPHIC REPRESENTATION OF THE TIMING OF DEFENDANTS FALSE AND/OR MISLEADING STATEMENTS DURING THE CLASS PERIOD



## IV.   DEFENDANTS FALSE AND/OR MISLEADING STATEMENTS DURING THE CLASS PERIOD

78.    On October 30, 2006, the beginning of the Class Period, the defendants caused Rackable to issue the following press release, which also was filed with the SEC on Form 8-K and signed by defendant Ford.  The release was entitled, "Rackable Systems, Inc. Announces

Third Quarter 2006 Results . . . Company Raises Fourth Quarter Outlook and Expects Strong Growth in 2007." The release contained the following statements, among others:

> [G]AAP gross margin for the third quarter was 21.4% compared to 24.1% in the same period a year ago. Non-GAAP gross margin for the third quarter was 22.6% compared to 24.2% in the same period a year ago. Third quarter gross margin was negatively impacted by rapid price increases in component pricing, specifically DDR memory. *The company expects gross margins to improve in the fourth quarter and for the full year 2007.*
>
>               *             *             *
>
> *Rackable systems has increased its financial projections for the fourth quarter ending December 31, 2006.*
>
> •     Revenue is projected in the range of $100 - $110 million
>
> •     GAAP net income per diluted share is projected to be $0.10-$0.12 per share
>
> •     Non-GAAP net income per diluted share is projected to be $0.25 - $0.27 per share
>
>               *             *             *
>
> [Defendant] Barton concluded, *"The momentum we are experiencing in the back half of the year, and specifically bookings in the past 60 days, give us the confidence to increase projections for the fourth quarter.* Market and customer demand for our product set appears strong and we anticipate this will continue through 2007. *Despite increasing competitive intensity in the X86 server markets, we expect to achieve gross and operating margin leverage in 2007* as we begin to recognize benefits from the Terascale acquisition *and the investments we have made in our infrastructure during 2006."*

      79.     Defendants knew and/or were deliberately reckless in not knowing, that the statements referenced in ¶78, above, were materially false and/or misleading because, *inter alia*:

      (a)   Rackable's reported 21.4% GAAP gross margin for Q3 2006 was materially inflated by the fact that during the Q3 2006 the Company was not charging its customers sales tax and thus could command higher prices for its products. As the Company later admitted, *see infra* ¶145, starting in the Q4 2006, which started on October 1, 2006 (*i.e.*, prior to

Defendants' October 30, 2006, statements), the Company started charging sales tax to its customers. (CW4 confirmed that the Company was not charging sales tax throughout much of 2006 and identified specific invoices dated prior to the 2006 fourth quarter, which contained no line item, as required, for sales taxes. *See* ¶59(d) (indeed, on one instance CW4 recalled where a particular customer, after observing there was no sales tax indicated on her preliminary purchase order, requested that the order be resubmitted with a charge for sales tax)). As set forth above in ¶64(b), CW9 explained that by not charging sales tax to its customers, Rackable had a competitive advantage. CW17, Rackable's later and now former Senior Director of Accounting and External Reporting, also opined that this practice was a huge competitive advantage for Rackable. *See* ¶72(c).

(b) The Defendants were without any good faith or reasonable basis to project, let alone increase projections for gross margins and earnings as, among others:

(i) Contrary to Defendants confident statements, Rackable did not have adequate bookings to predict the stellar quarter in Q4 2006. As set forth in ¶70(d), CW15, whose supervisor shared an office with then Sales VP Thomas Gallivan, recalled being told that Rackable was having a terrible quarter. According to CW4, see ¶59(j)-(k), during Q4 2006, management made a huge push for sales to meet the Company's increased revenue target and appeared desperate. Contrary to Company policy, CW4 even recalled that she had provided a customer with a purchase order and later found out that the order had been pre-built, *i.e.,* before the purchase order was executed and returned. CW4 remembered telling her supervisor, that she was not sure when she would get the purchase order back from the customer. CW4 later found out from the supervisor that Ford had approved the pre-build. CW4 recalled that the order had been shipped to the customer early and CW4 recalls that it might have been done in exchange for a 10% discount and extended payment terms because the customer did not need the order until the next quarter. CW15, as set forth in ¶70(d), confirmed this unusual (*i.e.* pre-build) sale, worth more than $2 million, was to Shopzilla, the servers were shipped to a co-location facility and, according to CW15, not installed until several months later (in Los Angeles). Amidst these desperate efforts, Gallivan abruptly left

the Company in December.  *Id.*  CW9 indicated Gallivan was fired for failing to bring in sufficient revenues.  *See* ¶64(a).  Thus, while Rackable achieved its revenue projection, coming in at $106.5 million for Q4 2006, it did so at the expense of profit margins.  As confirmed by CW9, Defendants' first concern was hitting the revenue targets, consideration of margin came after.

    (ii) Unbeknownst to Plaintiffs and the Class, as early as October 1, 2006, the first day of Q4 2006, Rackable had started charging its customers sales tax, which the Company previously had not been doing and which had allowed Rackable command a higher price for its products thus providing Rackable with a huge competitive advantage over its competitors.  As set forth below, *see infra* ¶145, the Company admitted that it did not start charging sales tax to its customers until Q4 2006 (CW4 confirmed that the Company was not charging sales tax throughout much of 2006 and identified specific invoices dated prior to the 2006 fourth quarter, which contained no line item, as required, for sales taxes. *See* ¶59(d) (indeed, on one instance CW4 recalled where a particular customer, after observing there was no sales tax indicated on her preliminary purchase order, requested that the order be resubmitted with a charge for sales tax).  The effect of charging sales tax would be the foreseeable downward pressure on sales prices by at least the amount of the sales tax billed dependent on the jurisdiction, which would range anywhere between 1.5% and 9% of the sales price.  This competitive advantage was confirmed by both CW9 and CW17.

    (iii) As the Company later acknowledged during a conference call with investors to discuss the Company's Q4 2006 financial results, *see infra* ¶122, Rackable's practice was to defend and maintain its business and market share with its top three customers (Yahoo, Amazon, and Microsoft) at all costs by emphasizing revenue attainment at the expense of near-term gross margins -- *i.e.*, taking deals at or below Rackable's cost – while trying to salvage the Company's gross margins through offsetting higher margin sales to other customers.  Indeed, as set forth in ¶56(f), according to CW1, who was formerly in charge of calculating the Company's "cost of goods," this practice had been occurring since as far back as November 2005.  CW1 observed that the cost of many manufactured products exceeded the

prices at which the products were being sold to customers (*i.e.*, Rackable was achieving negative margins) and CW1 brought this to Defendant Ford's attention. According to CW1, one such customer was Yahoo. CW1's account is corroborated by, among others, specifically the accounts provided by CW4, CW6, CW9, and CW17. According to CW4, *see* ¶59(c) the Company's three biggest customers, Amazon, Yahoo! and Microsoft were being courted by competitors, especially Dell. To maintain the business, products were often sold to these three customers "at cost," thereby squeezing the gross margins achieved by sales to other customers. *Id*. This problem was ongoing and common knowledge at the Company during CW4's tenure and CW1 identified Yahoo, as a customer sold at or near cost. *Id*. As also recounted by CW9, *see* ¶64(a), although Rackable's investor confidence was predicated upon retaining Yahoo, Microsoft, and Amazon as customers, Rackable's sales to Yahoo were often at negative margins. According to CW9, who was constantly in meetings with Defendants Barton and Ford, the Company's challenge was to offset that by sales to other customers. *Id*. In 2006, senior management sought to do that in two ways, by achieving higher margin sales with the Rapid Scale product line and by establishing a stable, worldwide sales force to expand the customer base. *Id*. According to CW17, *see* ¶72(f), this practice continued as late as Q2 2008. CW17 recalls a deal from that quarter where although the quote was 5-6% below margin, it grew to 14% below margin because the large size of the order and its fast turnaround required expensive purchases in the spot market and fees to expedite. *Id*. Although margins were hurt by the sale, CW17 recalls that the order represented a significant percentage of revenue that quarter. *Id*. CW17 indicated that the relationship was very one-sided, Yahoo never came to Rackable to do a deal; it was always the other way around. *Id*.

(iv) Although the Terrascale purchase was in late August 2006, and no accretive financial impact in Q4 2006 was projected, defendants later claimed that they had expected sales of Rapid Scale products to buoy the Company's gross margins in Q4 2006 and FY 2007. (Rackable – which had acquired Rapid Scale in August 2006 for $38 million -- touted Rapid Scale as its source of gross margin salvation for FY 2007 and firmly projected $20 million in revenue and addition of $12 million to gross margin for FY 2007.) Prior to the

Class Period, on August 29, 2006, the Company also held a conference call to discuss the acquisition of Rapid Scale.  Defendants Barton and Ranganathan were present, along with Gautham Sastri, the then President and CEO of Terrascale.  Both Defendant Ranganathan and Barton provided FY 2007 Rapid Scale revenue projections of $20 million. During the Call, in relevant part, defendant Barton made the following statement: "Terrascale was founded in November 2002 and it's been generating revenues since the second quarter of 2005. Standalone revenues for 2006 to date are in the single-digit millions, and gross margins for the first half of the year are approximately 60%."   Defendant Barton's statement was knowingly and/or deliberately recklessly false and misleading when made. Contrary to Defendant Barton's statement that Terrascale's **Standalone revenues for 2006 to date are in the single-digit millions,**" Terrascale did not even have $1 million in total revenues during all of 2006.  As later admitted by Rackable in its 2006 Form 10-K, filed with the SEC on February 28, 2007, "Revenues from our RapidScale storage appliances was $0.7 million in fiscal 2006." Moreover, according to Rackable's 2008 Form 10-K filed with the SEC on March 18, 2009 -- which accounts for Rapid Scale in discontinued operations as a result of the Company's decision to abandon Rapid Scale and separately provides its  consolidated statements of operations for FY 2006, FY 2007, and FY 2008 – Rapid Scale revenue for FY 2006 was approximately "$807,000."

              (v) Defendants claimed that DDR1 was in short supply for Rackable customers in Q4 2006, as it was being replaced with new technology, DDR2.  Specifically, as set forth below, *see infra* ¶142, defendant Ford claimed in a conference call with analysts on February 1, 2007, to discuss the Company's financial results for Q4 2006, "[t]he only thing with DDR1 in the levels that [Rackable's] customers require, [the Company] can't get it on the spot market at least in those quantities" and "since many memory suppliers have turned their supply or their production lines over to DDR2 and Fully Buffered DIMM that you literally need to place the orders months in advance to have adequate supply."   Not only was this the exact same problem Rackable had experienced in Q3 2006, but, according to CW3, *see* ¶158(a), shortage of DDR memory supplies was a recurring problem at the Company; CW3

confirmed that because of the Company's small comparative position amongst competitors such as Dell and Hewlett Packard, Rackable was at the mercy of vendors, as they would fill the competitors' orders before they would fill Rackable's, making predictability of supply and price essentially impossible.  CW4 who was at Rackable from 2005 - 2007, as set forth in ¶159(e), likewise indicated that there was constantly memory shortages that delayed customer orders.  Although the details surrounding the timing of the Q4 2006 purchase are unclear and inconsistently reported by defendants in response to grilling by analysts during conference calls (¶¶130, 133, 135, 141-142), plaintiffs are informed and believe, and based thereon allege, that despite the fact that DDR1 and DDR2 prices fell during Q4 2006, **and** on October 30, 2006, defendants predicted better gross margins because of this fact, several witnesses recounted a large overpurchase of DDR1 memory which Rackable did not need in Q4 2006 and which the Company could not unload thereafter – leading to a massive inventory write off in Q2 2007;

              (vi)     As later acknowledged by the Company, Rackable was experiencing power supply shortages due to delayed supply deliveries which were delaying production.  As set forth below, *see infra* ¶126, defendant Ford later acknowledged in a conference call with analysts on February 1, 2007, to discuss the Company's financial results for Q4 2006, "much of the production of [the Company's] backlog was pushed into December [2006] due to power supply shortages that were caused by delayed supply deliveries that could have been mitigated with improved materials planning."  As set forth in ¶156(a)-(c), according to CW1, not later than mid to late 2005, Rackable had built up and ordered excess less-expensive component parts, inventory, memory (which was more expensive), and "power supply."  CW1 recounted that while power supply materials were ordered and allocated to specific customer orders to be used during the manufacturing and/or build process and had to be compatible with the respective order's specifications, because the power supply materials were pre-ordered based on forecasted customer orders, the power supply materials frequently were not compatible with actual order requirements.  *Id*.  CW1 indicated that this would lead to both a shortage and excess power supply when actual orders were placed because power

supply ordered based on forecasts using other than approved purchase orders could not be used; yet power supply actually required was not in stock, resulting in delayed manufacturing completion and shipments. *Id*. CW1 recalled that, in such situations when materials shortages occurred, employees were instructed to purchase the necessary supplies "at any cost." *Id*. Consistent with CW1's account, as set forth in ¶76(c), CW21 was told that in December 2006, the Company made a double order of AC power supplies. Indeed, as set forth in ¶62(c), even though CW7 exclusively sold DC power supplies, which are less expensive for the customer to operate (in fact, one analyst praised Rackable for achieving greater than 50% DC power sales in Q3 2006), at a sales meeting in Freemont, California, in or around March 2007, Carl Boisvert, the Vice President of Worldwide sales and marketing, informed the sales staff that Rackable had recently purchased 10,000 AC power supplies and that deals should be made to sell the AC power supplies.

(vii)  As set forth below, *see infra* ¶126, margins would not be positively affected by infrastructure improvements because defendants knew that the new ERP system was not fully implemented leaving much room for errors in the procurement process. As defendant Ford later expressly acknowledged in a conference call with analysts on February 1, 2007, discussing the Company's financial results for Q4 2006, that "[a]dmittedly, [defendants] should have realized [the, *inter alia*, aforementioned issues] earlier in the quarter" and "have taken immediate action to improve the visibility of our new ERP system and are in the process of up leveling our procurement and materials planning organization." Indeed, only a few months after the end of the Class Period (around June 2007), the Company purchased the necessary Oracle components to its Customer Relations Management ("CRM") - ERP sales and inventory cost forecasting system (¶175) which still was being implemented and integrated in 2009 according to CW5 (¶60(a)-(d)). Indeed, as set forth in ¶71(c), CW16 (who was Rackable's former controller before, during, and after, the Class Period) was told by Ranganathan that implementation of the Oracle system "was almost done" when it was not. According to CW16, with the exception of inventory, CW16 was responsible for putting the accounting data into the system, an overwhelming task given the state of the system. *Id*. Even

though there were a lot of internal control problems with the prior system because everyone had access to the data, Defendant Ranganthan had made the decision to make the live transition to Oracle because Rackable would not have otherwise been SOX compliant. *Id*. CW15 also indicated Rackable had moved to the Oracle system to be SOX compliant, however, that it had lots of "tentacles" and the system needed to be brought on line in stages and as CW15 understood, there was not enough staff on board to do the change, so it was an evolving process, *see* ¶70(b). CW17 indicated that the implementation was too fast and the Company went live without running Oracle parallel to the old system for awhile to ensure it was producing similar results, *see* ¶72(d). According to CW8, *see* ¶63(c), Rackable was not using "a lot" of the functionality of its Oracle system, *e.g.,* auto accruals, tracking data in multiple countries, and thus, it was easy to make mistakes (*e.g.*, requisition forms were manually entered and there was poor control over purchase orders). As set forth in ¶64(c), CW9 recalled that a big problem occurred right after the implementation of the Oracle system in Q3 2006. Data entry was manual and, as also explained by CW8, mistakes were easily made. Because the IT department head failed to assign anyone to do so, no one was checking the system to determine whether it was operating properly. *Id*. In particular, no one was monitoring purchases and as a result, human error in data entry, lack of experience in operating Oracle's ERP, and lack of senior executive oversight over procurement led to "a lot of out of control purchases." *Id*. CW9 recalled the excess purchase of DDR1 memory.

> (viii) Rackable made impossible promises to its customers -- to turnaround a system build within as little as two weeks of receipt of an order that could never be fulfilled -- which along with recurring problems with materials planning, would inevitably result in delayed production and shipments and cause so called "back-end-loaded." Rackable, at great cost, would rush to get most of its shipments out in the last month of the quarter. However, this problem was not one-time in nature and only got worse as sales volume increased. As set forth in ¶70(f), according to CW15, a longtime field sales engineer with the Company for more than three years, the average time from purchase order to build was five weeks. However, according to CW2 and CW3, *see* ¶¶57(g), 58(f), Rackable told its sales force to quote

unreasonable two-week turnarounds. Confidential Witnesses explained that promised turnaround times would not be achieved because either, according to CW2 and CW7, the Company would provide priority build and shipping to its three largest customers and essentially drop everything on other jobs to cater to an order from one of Rackable's three largest customers, *see* ¶¶58(a), 62(b), or as CW1, CW2, CW3, CW4 opined, Rackable would not have the necessary materials in stock, *see* ¶¶56(b), 57(a), 58(a), 59(e). Witnesses recalled that these two recurring problems would constantly result in Rackable being behind schedule on shipping products out to customers. (*E.g.,* CW2, CW6). In turn, as CW3 recounted build out and testing was rushed, see ¶58 (a), and CW4 recalled, see ¶59(e)-(i), that products would often be shipped to the wrong place, products did not incorporate specified parts and had to be later corrected on-site at the customer's place of business, and/or orders would get can cancelled after parts had been ordered. According to CW1 and CW2, products were often returned as defective. ¶¶56(g),57(b). As a result of the foregoing, Rackable faced recurring and *undisclosed* expenses each quarter simply trying to get products out the door as soon as possible and prior to the end of the quarter. When materials shortages occurred, as explained by CW1, *see* ¶56(c), employees were instructed to purchase the necessary supplies "at any cost," *e.g.*, a rush shipment of sheet metal could carry an air delivery cost of $10,000 to $15,000. Approximately $200,000 per quarter in excess costs  could be attributed to power, overtime, materials, labor, *etc*. CW1 believed that "expedite" fees for materials, lost fees for factory time booked ($20,000 or more per week) during the period where the parts had not yet arrived to be assembled, or to pay overtime to meet a deadline once the parts were finally obtained -- were segregated in a separate account. Indeed, CW1's account is corroborated by the Company's subsequent admission that this led to employee overtime costs, *see infra* ¶56, and CW3 who indicated that build and test teams would sit idle until materials were received, *see* ¶58(d). CW21 also indicated that in 2006 Rackable was "protecting" its gross margins. Compounding these problems, as set forth in ¶76(d), CW1 indicated that Rackable had to enter into minimum purchase contracts and agree to purchase more materials than needed (as corroborated by CW6, *see* ¶61(c)).

(ix)  Information regarding margins from Rackable's computer data system was virtually unreliable due to the readily apparent lack of internal controls that practically invited manipulation.  When customers complained about pricing in the initial quotes which were calculated by the ERP, the figures were later adjusted downward to make the sale.  Although several witnesses said that Rackable was subject to vendor premiums because of its relatively smaller and/or last-minute orders (CW2, CW6), as set forth in ¶59(f), when CW4 was suddenly authorized to match the price the customer sought, CW4 was told that that supply chain personnel were able to "renegotiate" a better price.  According to CW15, as set forth in ¶70(a), she did not attribute the ability to meet customer price demands to "renegotiation,"  but rather the parts were purchased at a better price and the more expensive materials remained in inventory.  Likewise, as set forth in ¶61(f), even though CW6 updated commodity price variances into the computer system, the sales associates were quoting prices to customers which were so low that it was costing Rackable money to produce the product, *i.e.*, causing negative margins, but even after CW6 brought the problem to the supervisor's attention, it nevertheless went unresolved.  Moreover, as set forth in ¶60(a)-(h), according to CW5, until mid-2009, extremely loose inventory policies, procedures and supervision over inventory tracking on Rackable's Oracle systems, led to completely unreliable tracking of inventory location and cost from 2006 through 2008.  Thus, problems arising from manual entries by numerous persons (as corroborated by CW8 (*see* ¶63(b)), CW9 (*see* ¶64(c)),  and CW16 (*see* ¶71(c)),  and other manipulations – including by CFO Ranganathan in early 2008, circumventing SOX protocol and resulting in a restatement (as recounted by CW17 (see ¶72(a)) – caused the computer system to not accurately reflect Rackable's prices.  (CW12 (see ¶67(b)).  As set forth in ¶70(e), CW15 indicated that any deal with a gross margin below 18% required George Reitz had to obtain approval from Defendant Barton.

80.   The October 30, 2006 press release was also materially false and/or misleading as it failed to disclose other factors that could materially affect gross margins and earnings besides the ones mentioned in the release, such as sales "momentum," "bookings,"

"competition," and "infrastructure."  The material undisclosed factors, which Defendants knew and/or were deliberately reckless in not knowing, included:

(a) As alleged above in ¶79(b)(ii), the material risk to the Company's financial performance that Rackable commenced billing its customers sales tax in Q4 2006 which had been a competitive advantage to the Company which had helped it stave off increasing competition and report higher/inflated gross margins.

(b) As alleged above in ¶79(b)(iii) the fact that the Company could be forced by its big three customers (CW14, CW18) to make and sell product at or near cost at the expense of near term gross margins.

(c) As alleged above in ¶79(b)(iv) defendants had no basis to rely upon sales of its newly-acquired Rapid Scale products to buoy the Company's gross margins in Q4 2006.

(d) As alleged above in ¶79(b)(vi)the fact that delays in receipt of required materials that resulted in "power supply shortages."

(e) Defendants could not reasonably predict production costs because Rackable lacked supervision and/or oversight of its procurement and cost accounting for inventory, which essentially made it impossible for the Company to accurately track inventory or costs, and contrary to Rackable's stated "just-in-time" procurement policy, as recounted by numerous confidential witnesses, the Company did not adhere to this policy which unsurprisingly resulted in excess and obsolete inventory.  According to CW1, as set forth in ¶56 (a)-(h), beginning not later than mid to late 2005, Rackable built up and ordered excess less-expensive component parts, inventory, memory (which was more expensive), and "power supply," and in particular, "extra memory" was ordered based on forecasted orders and not based upon customer purchase orders.  However, according to CW1, because the power supply materials were pre-ordered based on forecasted customer orders, the power supply materials frequently were not compatible with actual order requirements resulting in both a shortage and excess as new power supply orders had to be placed.  CW1 further indicated that certain of Rackable's suppliers had minimum purchase commitments, resulting in excess inventory from purchasing more component parts from certain vendors than needed.  CW1 also was responsible for

conducting inventory counts and submitting resultant reports for more expensive supplies such as memory and drives every 1-3 months, while the remainder of the inventory was counted once a year, during which time CW1 observed that excess materials ordered from suppliers "never moved from their stocking location," and sat in warehouses "year after year." Similarly, CW2 who managed the inventory stock room, as set forth in ¶57(d), stated that during her six years at the Company, CW2 observed that Rackable appeared to have the same excess inventory and inventory shortages the entire time and that the Company had a lot of excess inventory that was not needed or required by the manufacturing department yet was always was short of necessary components required to conform to current orders. As set forth in ¶65, CW10, who was involved with sheet metal, boards, racks and power supplies, similarly stated that although Rackable claimed to have a build-to-order business model where materials were purchased on an as-needed basis, she noticed that inventory was rising as business was slowing down. In particular, CW10 noted excess power supplies built up and CFO Ranganathan was aware of this fact. According to CW11, as set forth in ¶66(b), often when advance purchases could be made of materials the Company knew it would need, ahead of a price increase, this did not occur, but instead, Rackable bought excesses of products at the end of their life cycle, *e.g.,* memory, or purchased products it expected to sell but did not, *e.g.* networking hardware.

81.     On the same day, October 30, 2006, the Individual Defendants conducted a conference call with analysts concerning the third quarter results and the forecast for the fourth quarter and full year 2006. During the conference call, Defendant Barton, in relevant part, made the following statements:

> [B]efore I provide the detail on the quarter's results, I want to talk a bit about the factors driving us to increase Q4 and full-year 2006 expectations. We told you last quarter that we had a delay in [an] order that we initially expected for Q3. I am happy to report that we have secured this order and it was somewhat larger than originally anticipated. ***We have also seen very strong general bookings momentum in the last 60 days and we see enough clearly identified demand that we're increasing Q4 estimates*** to the point where our full-year 2006 estimates are higher than those we provided on our last call. The momentum we're experiencing in the back half of the year and specifically bookings in the past 60 days gives us the confidence to provide initial projections for 2007.

*[W]e also told you on our last call that we expected a challenging component pricing environment, particularly in the case of DDR memory. It was difficult, but our procurement team was able to help mitigate what we believe were temporary adverse conditions in the component markets* such that we were able to deliver non-GAAP gross margins of 22.6%, which was within our 22 to 24% projections . . . .

*              *              *

[O]ur top three customers represented 58% of our revenues in Q3 as compared to approximately 67% in Q2.  Overall, we had two customers that each accounted for 10% or more of our revenues. . . .

*              *              *

Now, I would like to provide more detail on our outlook for Q4 and for full-year 2007.  Recent bookings activity [has] been very strong and in fact October was one of our largest booking months on record.  *We currently have a very solid revenue and backlog position.  We also have a high degree of visibility on additional pipeline for Q4 revenue production and therefore a high degree of visibility into our revenue, gross margin and EPS outlook for Q4.*  We're projecting Q4 revenues at 100 million to $110 million, and we believe [we] have a real possibility of exceeding the midpoint of that range.  *The gross margin outlook is also improved.  Going forward, we are projecting Q4 non-GAAP gross margins to be between 23% and 24% with a high degree of confidence.  These figures are based on an analysis of current backlog and pending opportunities,* our likelihood of achieving economies of scale in Q4 versus Q3, and our belief that *the DRAM markets are softening.*  These figures also factor in our beliefs about the expected pricing and competitive intensity for Q4.  From an EPS standpoint, we expect to see substantial increases based on a rebound in gross margins *as well as operating expense leverage.*  We believe that non-GAAP EPS will be approximately 0.25 to $0.27 for Q4.

I would like to make some remarks regarding the general competitive environment.  *There is no question that the x86 server marketplace is very competitive and that Dell in particular will be more competitive than it has been in recent quarters given its adoption of leading-edge Intel, AMD platforms.*  As a result of this, we are forecasting some degradation in server product gross margins in 2007.

Based on our preliminary visibilities for 2007, we are projecting annual revenues to be in the $475 million to $525 million range . . . overall company gross margins in the range of 23 to 24%.

82.     Defendant Barton knew and/or was deliberately reckless in not knowing, that the statements referenced in ¶81, above, were materially false and/or misleading for the same reasons set forth in ¶79(b)(i)-(ix), above.  Additionally, the preceding statements made by Defendant Barton were knowingly and/or deliberately reckless when made, among others, because by employing the word(s) or phrases such as:  "we have seen very strong general bookings momentum in the last 60 days and we see enough clearly identified demand;" and "We currently have a very solid revenue and backlog position.  We also have a ***high degree of visibility*** on additional pipeline for Q4 revenue production and therefore a ***high degree of visibility into our*** revenue, ***gross margin and EPS outlook for Q4;***" Defendants left the clear impression that not only was demand solid, but defendants' information systems considered pricing, and thus gross margin with a "high degree" of pinpoint accuracy, which as alleged above in ¶¶79(b)(vii), 79(b(ix), 80(e), this was not the case.  Specifically:

(a) defendants could not reasonably predict production costs, and thus, margins and earnings:

(i)   As alleged above in ¶ 80(e) lacked supervision and/or oversight of its procurement and cost accounting for inventory, which essentially made it impossible for the Company to accurately track inventory or costs, and contrary to Rackable's stated "just-in-time" procurement policy, as recounted by numerous confidential witnesses, the Company did not adhere to this policy and certain of its suppliers maintained minimum purchase requirements, which unsurprisingly resulted in excess and obsolete inventory.

(ii)   As alleged above in ¶79(b)(vi), the fact that delays in receipt of required materials that resulted in "power supply shortages

(b) This condition, as well as other material weaknesses in internal controls, often precluded defendants from accurately pricing products:

(i)   As alleged in ¶¶79(b)(vii), 126, and later admitted, Rackable's CRM-ERP systems were not integrated, and thus could not reasonably estimate the component costs for a particular customer.  The acquisition of the Oracle CRM system to be integrated with the Oracle ERP system did not take place until in or about June 2007.  ¶175.

(ii)   As alleged in ¶79(b)(ix), information regarding margins from Rackable's computer data system was virtually unreliable due to the readily apparent lack of internal controls that practically invited manipulation.

83.   Moreover, the above-quoted opening remarks by Defendant Barton also were false and/or misleading as he failed to disclose the other factors referenced in ¶80, above, that could materially affect gross margins and earnings besides the ones mentioned by Defendant Barton, such as sales "momentum," "bookings," "competition," and "infrastructure."

84.   Defendant Ford continued with the opening remarks and made the following statements, among others on October 30, 2006:

> [S]ome high-level comments before we address the specific details of Q3.  Q3 was a transitional quarter for us, as we made several important investments to position ourselves for 2007 and beyond.
>
> ***Operationally, we materially completed the buildout of our internal infrastructure*** to support the company's next stage of growth.  ***We successfully transitioned to Oracle as our ERP system,*** completed the acquisition of Terrascale, and realized a material improvement in our pipleine as a result of our focused hiring within the sales organization.
>
> *                *                *
>
> Now turning to margins, non-GAAP gross margins for the second quarter were 22.6% compared to 23.7% last quarter, but was in the range we expected.  While our projections anticipated pricing pressure for potentially increased competitive intensity from Dell and Sun, we did not see a material change in the level of competitive intensity during Q3.  ***However, we did see lower gross margins related to transitions in the component ecosystem, most notably with respect to DDR memory.  DDR memory was in scarce supply during Q3 and we saw rapid price increases*** as a result for one [major] deal in particular at quarter end, margins were significantly impacted.  ***Additionally, due to the fact that our quarter was back end loaded in terms of revenue production, we incurred overtime charges from our contract manufacturers, which negatively impacted gross margin.***

85.   Defendant Ford knew and/or was deliberately reckless in not knowing, that the statements referenced in ¶84, above, were materially false and/or misleading for the same reasons set forth in ¶¶80(a)-(e), above.   Additionally, the preceding statements made by

Defendant Ford were knowingly and/or deliberately reckless when made for at least the following reasons:

(a) When read in conjunction with the October 30, 2006 press release and defendant Barton's opening remarks at the October 30, 2006 conference call, defendants clearly left the impression that although several adverse conditions caused the slump in Q3 2006, Rackable considered and/or corrected the issues in making its Q4 2006 estimates of gross margins and earnings;

(b) As alleged in ¶79(b)(ix), defendants' internal controls over accounting, inventory, and procurement were grossly deficient.

(c) As alleged in ¶¶(b)(vii), Rackable's Oracle system was not yet fully functional and was thus highly unreliable, and was not backed up by proper supervision over the procurement process. Additionally, the Company did not acquire and implement the Oracle CRM system with the ERP system until in or about June 2007, see ¶¶175, and did not begin correctly to integrate the ERP system with "inventory modules," until well after the end of the Class Period. ¶60, supra ¶ 87(c).

86. Finally, Defendant Ranganathan made the following introductory comments, among others on October 30, 2006:

> [Defendant] Ranganathan: [O]ur raw materials were 39.8 million, up slightly from 38.9 million in Q2. *As a reminder, the bulk of raw material inventories are associated with booked orders and near-term visibility, although we may from time to time make decision [sic] to make longer-term [purchases] to take advantages of pricing as well as mitigate lead time constraints.* The inventory reserves were 5 million, up from 4.7 million in Q2.
>
> *As mentioned earlier, we completed the implementation of all financial modules of Oracle ERP during the third quarter.* And now turning to our business outlook, as mentioned in our press release, we're increasing our Q4 outlook and providing you with 2007 projections. Our methodology for projecting Q4 remains constant with prior quarters and is based on the most recent current visibility into our existing and new customer account[s]. We continue to see strong demand for our computer storage products. *We believe our standing in top three customers remain solid* and our expanded sales force is taking us into new large accounts in the Internet and non-Internet verticals. . .

With respect to gross margin, as mentioned earlier, we believe our gross margins will improve slightly during the fourth quarter compared to the third quarter due to scale economies and improved outlook in the components market. ***Hence, we are projecting Q4 gross margins in the range of 23 to 24%.*** Our projected non-GAAP net income for Q4 is 7.4 to $8.2 million or $0.25 to $0.27 per share using a projected fully diluted share [amount] of approximately 29.8 to 30 million shares. Given year-to-date performance and our increased fourth quarter projections, ***we are now expecting our full-year 2006 EPS to range between $1.02 and $1.04 per share.***

And now turning to annual 2007 projection[s.] [O]ur 2007 projections are based on a bottoms up rollout of identified accounts including our top three and non-top three accounts, and Internet and non-Internet verticals. ***These projections also include our previously announced target of achieving $20 million in Terrascale related revenues in 2007. . .*** And with respect to gross margins, as Tom [Barton] stated, we do see increased competitive intensity in the [indiscernible] server marketplace, which could negatively impact server product gross margin. ***However, we believe we can achieve slight overall gross margin expansion in 2007 based on accretion of scales of economies and a higher proportion of higher gross margin Terrascale related storage sale [sic].*** We are projecting 2007 gross margins between 23 and 24%. ***Given our projections for increased 2007 revenues and gross margins, we also expect to see some leverage in operating expenses.***

***During the current year 2006, we materially completed the buildout of our internal infrastructure to support the company's growth in 2007*** . . . From a G&A perspective, we're projecting 30 to 40% lower spend[ing] on one-time professional fees incurred during 2006 relating to first year Sarbanes-Oxley compliance as well as ERP implementation. ***As a net result, we believe [we] will see significant operating leverage in 2007. . .***

87.     Defendant Ranganathan knew and/or was deliberately reckless in not knowing, that the statements referenced in ¶86, above, were materially false and/or misleading for the same reasons set forth in ¶¶79(b)(i), 79(b)(iii)-(vi), 79(b)(viii), 80(e), above. Additionally, the preceding statements made by Defendant Ranganathan were knowingly and/or deliberately reckless when made because:

(a) As alleged in ¶¶79(b)(vii), 60(d), Rackable's Oracle system was not yet fully functional and was thus highly unreliable and not backed up by proper supervision over the procurement process. Additionally, the Company did not acquire and implement the Oracle CRM system with the ERP system until in or about June 2007, see ¶¶175, and did not begin

correctly to integrate the ERP system with "inventory modules," until well after the end of the Class Period.  ¶60(d).

(b)   As alleged in ¶79(b)(ix), above, information regarding margins from Rackable's computer data system was virtually unreliable due to the readily apparent lack of internal controls that practically invited manipulation.

(c)   As later revealed, *see infra* ¶182, defendants' auditors issued a material inadequacy letter concerning internal control deficiencies over inventory accounting for fiscal 2007.  In connection with remedial actions over such, as set forth in ¶60(d), CW5, an outside "SOX" consultant, stated that he\she was required to reconcile inventory back to 2006 in connection with his\her SOX assignment and found that the Company had several internal control weaknesses over inventory accounting and reporting.  According to CW5, Rackable had not implemented its Oracle "modules" correctly. Thus, an inventory was not properly tracked (e.g., received, inspected, rejected, consumed, etc.) or timely written down, there was no proper documentation for inventory values.  Manual reconciliations and adjusting entries had to be made to agree subsidiary inventory records, among others, to general ledgers, which formed the basis for reported financial figures.

88.   The following exchanges took place between the Individual Defendants and analysts at the October 30, 2006 conference call:

Kevin Hunt, Thomas Weisel Partners:  [A]nd then also, you're guiding to some slower earnings growth than top line growth.  So, if you could talk about the dynamics there, *it sounded like everything you said was sort of leveraging expenses.* So, how is that getting to I guess lower earnings growth?

[Defendant] Ford:  From a net revenue perspective, Kevin, we basically follow the same methodologies we have historically. . .

[Defendant] Ranganathan:  Hi, Kevin.  This is Madhu. *With respect to the EPS, in terms of OpEx spending as I outlined in the call, we will gain significant leverage on* the sales and marketing line and *the G&A line. . .*

Kevin Hunt:  [C]an you also comment on how much of Terrascale you might be looking after Q4 and [indiscernible] []20 million still for next year's expectation?

[Defendant] Barton: *[S]o, first comment I wish to make is that we were successful in integrating the company.*  So, they are now part of us.  As, I

mentioned on the call, just given the timing of the close date, we didn't take significant revenues to the P&L in Q3.   Overall, our customer traction has actually been quite strong.  ***They exceeded their goals for bookings in Q3.  I'm not going to give you a data point as far as Q4 yet, because we just don't have enough operating history with their forecasting methodology and so forth to give you point estimate[s] right now or even a range.  But, . . .we are reiterating our 2007 revenue guidance of $20 million and 60% gross margin for Terrascale.***

89.   The preceding statements made by the Individual Defendants were knowingly or deliberately recklessly false and/or misleading when made for at least the following reasons:

(a)   Defendant Barton's statements created the materially false and/or misleading impression that neither Rapid Scale's revenue nor margins were factored into the Company's Q4 2006 guidance.  To the contrary, Defendant Barton's statements created the opposite impression that Rapid Scale was only factored into the Company's FY 2007 guidance.  However, as alleged above, the Defendants later attributed the gross margins miss to the inability to achieve significant high-margin Rapid Scale sales in Q4 2006.

(b) As alleged in 79(b)(iv), above, there was no good faith or reasonable basis for "reiterating" the 2007 revenue guidance of $20 million for Terrascale.  Additionally:

(c) Further, Rangathan knew or recklessly disregarded that operating expenses would increase dramatically in 2007, by millions of dollars, for back sales and use taxes that had not been collected from customers since 2003 but would have to be paid to numerous states in which Rackable did business.  See ¶¶186-206.  Almost $2.0 million of this charge was delayed until Q1 2007.  Rackable's "accruals" for non-collection of the "current" $4.4 million receivable from customers for such taxes, only $551,000 at September 30, 2006, was knowingly or recklessly materially deficient also for the reasons alleged.  Finally, the Company abruptly ceased increasing the receivable from customers for delinquent sales and use taxes after December 31, 2006; and ceased discussing it in the 2007 10-K.  *See infra* 205.

90.   The October 30, 2006 conference call continued with the following statements being made in response to analysts' questions:

Tom Curlin, RBC Capital:  [I] think you guided gross margin for Q4 that sort of the 22 to 24 range roughly, little bit higher this time.  ***Is that just a function of***

*better memory or is it also maybe a function of Terrascale traction or some other gross margin benefit?*

[Defendant] Ford:  Sure, you are right Tom, usually we have been guiding 22% to 24%.  The reason that we decided to go forth with 23% to 24%, *it's really a function of the visibility that we have on the specific opportunities that are in – what we refer to as our in the bag number, which is a combination of the revenues we have produced quarter-to-date as well as our current backlog position, and then also to some extent due to our belief that the DRAM markets are softening.* That's really what's driving the conviction [sic] on 23%.

           *            *            *

Tom Curlin:  You guys, generally inventory – and maybe I'm wrong, it is somewhat of an indicator of shippable backlog, *just given the increase visibility and on higher revenue, right, what's the story, if you will, on the flat sequential trend [in] inventory?*

[Defendant] Ford:  It's really a function of high October booking.  So, very strong bookings in the early part of the quarter.  *So, some of the raw materials required to ship the revenues [sic] in Q4 were not purchased and so after the start of the quarter.*

91.    Defendant Ford's statements referenced in ¶90, left uncorrected by the other Individual Defendants, were knowingly and/or deliberately recklessly false and misleading when made for reasons alleged at ¶¶79(b)(i), 79(b)(iii)-(vi), 80(e), as defendant Ford's statements formed the false impression that:

(a)    Rackable's "visibility," and accounting, reporting and, thus forecasting systems were so exacting that defendants were able to predict and modify with pinpoint precision gross margin percentages within 1 percentage point from 22-24% to 23-24%;

(b)    That the increased projection for Q4 2006 gross margins were based on Rackable's "in the bag number," composed of revenues produced quarter-to-date, current backlog , and to a limited extent the belief that the DRAM markets would soften.

(c)    Since the start of the quarter, sufficient raw materials and inventory had already been and/or would be procured shortly without pricing and/or quantity issues, including any related to "DRAM," necessary to recognize gross margins and earnings within the range provided for Q4 2006 and that such purchases would not add to inventories; and

(d) That it was strong bookings and memory pricing that was behind the projections rather than an unreasonable – and undisclosed – reliance on Rapid Scale sales for resulting margin improvements.

92.   The October 30, 2006, conference call continued with the following statements, among others, being made by defendant Barton:

> Louis Misciosicia, Cowen & Company:  [I] guess the first question I wanted to ask is about linearity, it seems like this quarter was very backend loaded – but then you mentioned that it sounds like there was a little bit of a backlog in October, so *would you expect that the December quarter is going to have the same toughest linearity that you saw or do you think linearity might moderate here?*

> [Defendant] Barton:  *We definitely think that linearity is going to moderate in Q4, and that's really just a function of the purchasing patterns of our largest customers[.]* [S]ome quarters are front-end loaded, some are backend loaded . . .

93.   Defendant Barton's statements referenced in ¶92, and left uncorrected by the other Individual Defendants, were knowingly or deliberately recklessly false and misleading as alleged in ¶79(b)(vi)-(viii), 80(e).   Additionally, Defendant Barton's statements were knowingly or deliberately recklessly false and misleading when made because, specifically:

(a) As alleged above in ¶79(b)(i), contrary to Defendants confident statements, Rackable did not have adequate bookings to predict the stellar quarter in Q4 2006 and was desperately cutting prices and agreeing to delayed payment to pull sales into Q4 2006 from later quarters.

(b) as alleged in ¶80(e), 79(b)(v), above, due to both Rackable's "just-in-time" inventory procurement practices and vendors' minimum purchase requirements, defendants could not predict with any reasonable accuracy that the cost of sales would not exceed those forecasted.

(c) As alleged above in ¶79(b)(v), delays in receipt of required materials that resulted in "power supply shortages."

94.   The October 30, 2006 conference call concluded with the following statements being made in response to analyst questions by defendant Barton:

Ryan Hutchinson, WR Hambrecht: [A]nd then in terms of the cost of goods sold here, in terms of billed materials, what percentage is DRAM related?

[Defendant] Barton: What was publicly stated is that DRAM is typically 23% of our billed materials, range configurations and some – configurations of more memories specific or intensive, but on average, it's about 25%.

95. Defendant Barton's statements referenced above, were knowingly or deliberately recklessly false and misleading when made for the reasons, set forth in ¶80, above.

96. Given the quelling of analysts' concerns with the causes of the lackluster Q3 2006 results, the possible impact such causes might have continued to have had on the bullish Q4 2006 and FY 2007 estimates, it was not surprising that analysts immediately issued glowing reports on the heels of the October 30, 2006 conference call.

97. For example, on October 30, 2006, the following statements were contained in an analyst report entitled, "3Q Pause as Expected; Very Strong Guidance Confirms Long-Term Growth Story," authored by Kevin Hunt at Thomas Weisel Partners:

> Strong guidance for 4Q and 2007; raising estimates: Rackable's outlook was very strong and well above Street expectations for both 4Q06 and 2007. The company noted that October was its best bookings month ever and it announced three new customers: AOL, Youtube and Facebook. We expect to see strength from the existing top three customers and roll out from new Internet customers as well as a small contribution from some customers in new verticals during 4Q. For 2007, the company raised revenue guidance to $475-525mn compared to our prior estimate of $461mn and to EPS of $1.28-1.40 compared to our previous estimate of $1.29. We note that the low end of guidance represents expected business from current pipeline customers and that there are a number of new customers out there that could drive things toward the higher end of the range. The company has noted increased interest from the government, education and financial verticals, and is still only assuming $20mn from its Terrascale product family, so we believe there is strong possibility of continued upside as we move through 2007. On the earnings side, we expect higher R&D spending associated with Terrascale during 2007, but increased leverage on other expenses, and believe that upside to revenue is likely to achieve even higher EPS leverage than we are modeling.

[Thomas Weisel Partners Report at 2.]

98. Similarly, on October 31, 2006, the following statements were contained in a report entitled "RACK: THE RACK IS BACK ON TRACK: IMPROVED VISIBILITY

LEADS TO HIGHER THAN EXPECTED GUIDANCE; REITERATING BUY RATING," authored by Ryan Hutchinson at WR Hambrecht & Co:

> *[I]ncreased Visibility Drives Guidance Higher.* Management cited strong visibility into the deal and revenue pipeline going into Q4:06 and 2007 stemming from strong channel bookings momentum during the quarter. Based on this, we believe that *management was able to provide detailed guidance* for both Q4:06 and 2007. *For Q4:06, management issued guidance of $100-110M (significantly higher than previous implied guidance of $85-95M) and $0.25-0.27 EPS. Management expects gross margins to expand from Q3:06 levels to 23-24% based on stabilization in DRAM pricing, increased uptake of higher margin storage products, and economies of scale.* Operating leverage should begin to emerge *as the Company resumes more regular spending on operating expenses following the significant investments made* and the recently closed Terrascale acquisition. Management's guidance for 2007 is $475-525M in revenue and $1.28-1.40 EPS. Bottom line estimates are based on gross margins of 23-24% and increased operating leverage.

[WR Hambrecht & Co. Report at 2]

99.     On October 31, 2006, the price of the Company's stock climbed as high as $33.65 per share and closed at $31.01, up $2.12 per share or 7% from its previous day's close of $28.89, and up $2.71 per share or 9% from its close on October 27, 2006, the immediately preceding trading day before the beginning of the Class Period. Trading volume was exceedingly high on October 31, 2006, with 10,250,100 shares traded. Trading volume was above average on October 30, 2006, with 5,204,000 shares traded.

100.     On November 13, 2006, the Individual Defendants caused Rackable to file its 10-Q for the period ended September 30, 2006 (the "Q3 2006 Form 10-Q" or "2006 3Q-10Q)"). The 2006 3Q-10Q contained the following statements:

Accrued expenses consist of the following (in thousands):

|  | September 30, 2006 | December 31, 2005 |
|---|---|---|
| Accrued commissions | $1,247 | $1,204 |
| Accrued payroll and related expenses | 2,685 | 2,802 |
| Accrued warranty | 860 | 726 |
| Accrued sales and use tax | 4,430 | 1,150 |
| Other accrued expenses | 2,219 | 1,552 |

Total accrued expenses                    $ 11,441          $ 7,434

*In December 2005, we identified potential state sales and use tax liabilities relating to certain of our product sales to customers outside of California.* We estimated the gross tax liability to the states identified to be $1.15 million which was recorded in accrued sales and use tax as of December 31, 2005. We also quantified the exposure relating to interest and estimated collection exposures and, accordingly, recorded a $426,000 charge to general and administrative expense in the fourth quarter of 2005 with an offsetting increase to other accrued expenses as of December 31, 2005. For the nine months ended September 30, 2006, we increased our estimated gross tax liability by $3.3 million to $4.4 million which was recorded in accrued sales and use tax. The increase in the estimated gross tax liability was a result of additional information received during the quarter relating to customers and their self assessment process. The Company also recorded a $125,000 charge to general and administrative expense in the third quarter of 2006 with an offsetting increase to other accrued expenses as of September 30, 2006, increasing the balance included in other accrued expenses to $551,000. *We believe that we will recover the sales tax from these customers, and accordingly have recorded a receivable for $4.4 million which is included in other current assets as of September 30, 2006.*

[3Q 2006 Form 10-Q at 17-18].

101.   The foregoing quoted statements contained in the Q3 2006 Form 10-Q were knowingly or deliberately recklessly false and misleading when made for at least the following reasons:

(a) The Company had no reasonable or good faith basis to believe that it would recover sales and use taxes from 2003 through September 30, 2006 transactions, when it had not even commenced billing sales and use tax until the Q4 2006.

(b) The foregoing statements also left the false impression that the Company with its customers were only voluntarily "self-assessing" by failing to disclose that California notified Rackable of a sales and use tax audit of the Company in 2006.

(c) As much later disclosed, the Company purportedly accrued amounts for the California audit as of December 31, 2006 [Q3 2007 Form 10-Q at 10]. Because of the reasons alleged at ¶¶199-206, the reported "accruals" and/or charges to G&A expenses incurred to date (*i.e.,* September 20, 2006) were severely deficient and in violation of GAAP. While it may be true that a "settlement" for less than what was owed was ultimately reached, that fact did not

absolve Rackable from taking proper accruals based upon amounts actually owed and overdue which were calculable at that point in time.

102.    In addition, the 2006 3Q-10Q contained the following false and misleading "risk warnings" concerning sales and use taxes from "past sales" to "several of our customers:"

**If we are not able to recover sales and use taxes from past sales to several of our customers, we may have to pay those taxes out of our funds and record an additional charge to our operating results.**

In December 2005, we identified potential state sales and use tax liabilities relating to certain of our product sales to customers outside of California. We estimated the gross tax liability to the states identified to be $1.15 million which was recorded in accrued sales and use tax as of December 31, 2005. We also quantified the exposure relating to interest and estimated collection exposures and, accordingly, recorded a $426,000 charge to general and administrative expense in the fourth quarter of 2005 with an offsetting increase to other accrued expenses as of December 31, 2005. For the nine months ended September 30, 2006, we increased our estimated gross tax liability by $3.3 million to $4.4 million which was recorded [] in accrued sales and use tax. The increase in the estimated gross tax liability was a result of additional information received during the quarter relating to customers and their self assessment process. The Company also recorded $125,000 charge to general and administrative expense in the third quarter of 2006 with an offsetting increase to other accrued expenses as of September 30, 2006, increasing the balance in other accrued expenses to $551,000. ***Although we believe that we will recover the sales tax from these customers, and accordingly have recorded a receivable for $4.4 million (included in other current assets), if we are not able to recover these sales taxes from these customers, we will record an additional charge to our operating results and need to pay these taxes out of our funds.***

[2006 3Q-10Q at 36-7 (Emphasis added)].

103.    The foregoing quoted statements were knowingly or deliberately recklessly false and misleadingly incomplete when made for at least the following undisclosed reasons alleged in above in ¶101(a)-(c), infra ¶¶199-206 above.

104.    Between November 6, 2006 and December 6, 2006, defendant Ford, unloaded shares of common stock at inflated price, selling 55,000 shares of stock at prices between $33.85 and $34.98 per share to yield gross proceeds of $1,873,900.

105.    On December 11, 2006, Rackable filed a Current Report with the SEC on Form 8-K.   Therein, the Company, in relevant part, indicated that on December 7, 2006, the

Company's Vice President of Worldwide Sales, Thomas Gallivan, was resigning from the Company, effective January 5, 2007.  Additionally, therein, the Company indicated, until a replacement could be found, "in the meantime, responsibility for the Company's domestic sales activities shall be transitioned to [Defendant] Ford" and that Defendant Barton would "oversee the Company's international sales activities."

106.    On December 20, 2006, the following statements were contained in a report entitled "Expect Another Strong Quarter; Bumping Up Estimates Above Street; Continue to Like the Long-Term Story" authored by Kevin Hunt at Thomas Weisel Partners:

**We expect another strong quarter; bumping up estimates and continue to like long-term story:** We are raising our estimates above the Street based on strong checks during the quarter and a rough bottom-up analysis of Rackable's customer base. We are raising our revenue estimate for the December quarter to $107mn from $105mn and our EPS estimate to $0.27 from $0.26. We are expecting storage contribution to be about 13-14% to the total revenue. We expect at least two of Rackable's top three customers to be up sequentially in the quarter and believe traction with other mid-tier customers has also been strong on a sequential basis. We note that we expect a back-end loaded shipment pattern this quarter (despite front-end loaded bookings) due to the large nature of some of this quarter's deals, and thus, there is always risk of a shipment problem pushing an order into 1Q, but we believe such risk is minimal. Looking forward, Rackable has indicated that it expects additional business from 3-7 new $30-50mn type customers in 2007 with 1 customer expected to be in defense, 2-3 new customers in the financial vertical, and at least 1 sizable storage deal with the new clustered file system storage products. We note that roll-out of new customers could be very lumpy, thus, quarterly results are likely to be somewhat volatile and hard to predict. With increased traction of its products and penetration in new verticals likely going forward (financial, energy and government), we believe that Rackable could be a $1-2bn company in the next 3-5 years, with 10%-plus share of the low-end server market complemented by a healthy high margin storage business.

**Gross margin should improve over last quarter:** We believe that gross margin should fall into the higher end of guidance range mainly due to following three reasons:

1. *We note that DRAM contributes about 20-30% to the total cost of a server. Our checks during the quarter indicate that on average DDR2 prices were down about 6% q/q while DDR prices were down more than 25% q/q. We, therefore, believe that Rackable will see a benefit to gross margins compared to the previous quarter when the DRAM prices were up 30-40% q/q.*

---

2. In addition, our checks indicate that HDD prices (which contribute another 20-30% to the COGS) were down 3% q/q in line with our initial estimate, but slightly more stable than last quarter, thus, a neutral to mild negative from a gross margin perspective.

3. During the last earnings call, management cautioned against aggressive pricing from Dell and that was part of the reason for conservative guidance with gross margins between 22- 24%. ***With apparent less aggressive pricing (based on our checks), there should be some upside to margins from ASP as well, thus, it would appear that a margin in the higher end of the target range seems like a likely outcome for the quarter***.

**Customer acquisition key to the story—increased visibility should lead to strong guidance:** We remain very confident in our increased estimates for 2007 ($505mn in revenue, up 40% y/y and $1.40 in EPS, up 35% y/y), as we believe Rackable has the potential to add several very significant new customers (3-7) over the next 12 months, as well as a number of more mid-size customers. The company has doubled its sales force over the past nine months in an attempt to add more "mid-sized" customers capable of generating $3-10mn of revenue per quarter. In 2007, we expect at least $120-150mn in revenue from the new 10% type customers, about $240-260mn revenue from the current Big 3 (Yahoo, MSN and Amazon), and well over $100mn from mid-sized and smaller customers. In addition, we believe at least one of the new large customers will be a storage customer, which would be beneficial to gross margin.

**Resignation of VP of worldwide sales—non-event, in our view:** Rackable recently announced the resignation of Thomas Gallivan, VP who was responsible for the worldwide sales, effective January 5, 2007. The company has started a process to identify Mr. Gallivan's replacement. ***In the meantime, responsibility for the company's domestic sales activities will be transitioned to Todd Ford, while Thomas Barton, CEO will oversee the international sales activities. Rackable did not provide any other details. Our take is that Mr. Gallivan was not that critical to Rackable's success over the past several years (Tom Barton and Todd Ford have always played a critical role in sales-related efforts from the executive level)*** and that Rackable now has an opportunity to upgrade that position as it looks forward to breaking the $500mn sales barrier in 2007 and beyond. In terms of timing, the Street has clearly taken this announcement as a negative reflection on current business trends, but we have the exact opposite view. We believe current business is strong (as noted above) and the pipeline for new business is also better than we have seen in the past year (also noted above), thus, this would seem to be a very opportune time to make such a transition.

[Thomas Weisel Partners report at 2-3 (emphasis in added).]

107.     Specifically, the December 20, 2006, Thomas Weisel Partners report referenced in ¶106, issued approximately eleven days prior to the end of Rackable's Q4 2006, highlighted

---

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS
No. 09-0222-CW
72

the fact that "checks during the quarter indicate that on average DDR2 prices were down about 6% [quarter-over-quarter] while DDR prices were down more than 25% [quarter-over-quarter]." As a result, the analyst stated that "therefore, [he] believe[d] that Rackable [would] see a benefit to gross margins compared to the previous quarter when the DRAM prices were up 30-40% [quarter-over-quarter]."

108.   Included in the December 20, 2006, Thomas Weisel Partners report was the following chart based on information from Inspectrum and reflected a clear decline in the prices of DDR and DDR2 during the quarter:



Source: Inspectrum and Thomas Weisel Partners LLC

///

///

109.    Other data sources also demonstrate a clear decline in the prices of DDR1 and DDR2 during that time.  The following charts, based on information from Bloomberg and DRAMeXchange, reflect the prices of DDR1 and DDR2 during that time consistent with the data in the December 20, 2006, Thomas Weisel Partners report:





110.    The assessment of DDR prices contained in the December 20, 2006, Thomas Weisel Partners report referenced in ¶106, above, was consistent with Defendants statements from October 30, 2006, that "the gross margin outlook [had] improved" and Defendants increased gross margin projections were due, in part, to "[Defendants] belief that the DRAM markets are softening."   Accordingly, based on the steep decline in DRAM prices over the course of Q4 2006 in conjunction with the strong booking reported on October 30, 2006, Rackable's prospects for the quarter did not look anything less than stellar.

## V.   **THE TRUTH GRADUALLY EMERGES**

111.   On January 16, 2007, the Company issued a press release entitled, "Rackable Systems Announces Preliminary Fourth Quarter 2006 Results."  While at the top of the press release the Company proudly declared, "Record Revenue of $105.5 - $106.8M" the rest of the press release was contained very little for Rackable to be proud about.  Therein, the Company stated, *inter alia*:

> Rackable Systems, Inc., (NASDAQ: RACK) today announced preliminary results for the fourth quarter ended December 30, 2006. Total revenue for the fourth quarter of 2006 is expected to be in the range of $105.5 to $106.8 million. GAAP net income (loss) for the period is expected to range from a net loss of $(683,000) to net income of $194,000 or $(0.02) to $0.01 per diluted share. Non-GAAP net income is expected to be in the range of $4.8 to $5.3 million or $0.17 to $0.18 per diluted share. ***Non-GAAP gross margin is expected to be between 19.2% and 19.7%.***

> "We are pleased that revenue for the fourth quarter came in toward the high-end of our forecast, and that we broke the $100 million quarterly revenue mark for the first time in the company's history. ***However, we are disappointed that we did not achieve our gross margin and EPS goals for the quarter***," stated Tom Barton, Chief Executive Officer of Rackable Systems. He continued, "***Although it took us longer than expected to roll out our new Rapid Scale line of products, early customer feedback has been positive and we remain enthusiastic about the long-term opportunities for this business***."

> Barton further stated, "***We have scheduled our regular quarterly conference call to be held on February 1, 2007. At that time, we will provide a full update of fourth quarter and full year fiscal 2006 financial results, as well as an updated business outlook for 2007***."

> The primary factors that impacted gross margin for the quarter included:

> • DDR memory pricing that was higher than anticipated by the company at the start of the quarter.

> • Intense competitive conditions that caused the company to price contracts more aggressively in order to maintain and expand relationships with its customer base.

> • Lower than expected sales of the company's Rapid Scale products.

(Emphasis added).

112.    As a result of the January 16, 2007, press release referenced in the preceding paragraph, the relevant truth began to be disclosed.   In particular Defendants' statements partially disclosed:

(a)  Defendants' statements a little over two months earlier regarding the prospect for improving gross margins, as well as the reasons related thereto, were false when made or made with no reasonable basis;

(b) That although Defendants had created the impression that they did not expect Rapid Scale to help margins until 2007, Defendants suddenly claimed, after the fact, to have counted on and factored Rapid Scale into its Q4 2006 gross margin guidance.  Further, contrary to Defendants' prior statements, Rapid Scale integration, sales prospects, and performance were not advancing at the pace previously reported and was taking longer than previously indicated.

113.    Additionally, the press release called Defendants' credibility into question with respect to the real reasons for the large margin miss.  The market took note that the Company's statement that gross margins had been impacted by "DDR memory pricing that was higher than anticipated by the company at the start of the quarter" was substantially inconsistent with, as set forth above in ¶81 ("Going forward, we are projecting Q4 non-GAAP gross margins to be between 23% and 24% with a high degree of confidence…based on…the DRAM markets are softening", Defendants' prior statements regarding favorable memory pricing trends in Q4 2006 and the information provided in the December 20, 2006, analyst report that confirmed that, in fact, during Q4 2006, DDR memory pricing during the quarter appeared to have declined significantly which should have resulted in improved gross margins for Rackable. Not surprisingly, analysts quickly challenged the stated reasons for the preliminary Q4 2006 gross margin figures that were substantially below what the Company had projected and quite publicly challenged some of Defendants' excuses which did not "add up."

114.    For example, on January 16, 2007, the following statements were contained in a report entitled "Rackable Pre-Announces Weak EPS but In-Line Revenue; Gross Margin" authored by Kevin Hunt at Thomas Weisel Partners:

*Rackable pre-announces EPS miss, revenue in line:* Revenue for 4Q is expected to be in the range of $105.5mn to $106.8mn, which is roughly in line with our previous estimate of $107mn and the Street estimate of $105.9mn. Pro forma EPS (excluding $359K in amortization of patents/customer list, $7.8mn in options expense and $553K in amortization of intangibles related to the Terrascale acquisition) is expected to be between $0.17 and $0.18, well below both our previous and the Street estimate of $0.27.

• **Gross margin shortfall is the culprit:** *The company indicated very weak gross margins of 19.2–19.7% (excluding options expense and other charges) versus our estimate of 23.5%.*

• **Something does not compute:** *Management is not talking, which is cause for concern, and the stated reasons for the miss do not add up. The company is citing (1) lower storage revenue, but storage is too small to have a big margin impact; (2) higher DRAM pricing, which is not consistent with our checks that indicate declining DRAM; and (3) aggressive pricing, which is also not consistent with our checks or management's commentary throughout the quarter.*

• **Our possible explanations:** The reasons we can come up with for a 400bp gross margin shortfall are: (1) shipment delays in the quarter triggered price re-negotiations that were unfavorable for RACK (especially given that DRAM pricing may have been locked in at high levels early in the quarter); and *(2) the year-end audit flagged some accounting accrual "true ups" that are depressing 4Q margins.*

• **Reducing estimates, but maintaining Overweight rating**: We are reducing estimates as noted in the data box due entirely to lower gross margin assumptions, which could end up proving conservative. *Management will clearly have a credibility issue near term*, but valuation of 28.3x our 2007E EPS of $1.15 represents just a 0.8x PEG rate, well below the peer group average PEG of 1.4x. Thus, the valuation continues to appear attractive given growth prospects and we maintain our Overweight rating.

**INVESTMENT SUMMARY**

We maintain an Overweight rating on Rackable Systems, *despite a negative EPS preannouncement that is likely to cause investors to question management's credibility for some time. The EPS miss was all gross margin related, and we do not have a lot of credible answers as to why the miss may have occurred, which is reason for some concern.*

[Thomas Weisel Partners report at 1-2 (emphasis added).]

115.    On January 17, 2007, an analyst report published by Trey Wasser, President and Director of Research of Pilot Point Partners LLC, entitled "Rackable Systems: Winter Storm Warning" similarly questioned the Defendants' explanation for margin compression:

> *[I]t appears that DDR prices were really pretty steady in Q4.* Rapid Scale products, from their recent Terrascale acquisition, *were not really expected to help margins until 2007.* So it appears that Q4 margin declines may be mostly from competing with the likes of HP (HPQ), DELL (DELL), Sun Microsystems (SUNW) and a host of foreign companies. *Obviously volume is not the answer as RACK is just "buying" business.* Low-end servers have become a commodity business.
>
> Despite the cascading margins, the increased sales will allow the Company to cover its stock-based compensation charges for another quarter. So at least someone is profiting.
>
> The stock is currently trading at $21, down from a close of $32. The "Rackable Advantage" certainly does not apply to shareholders.

[Emphasis added.]

116.    Yet again, on January 17, 2007, the following statements were contained in an analyst reported entitled, "Rackable Systems – Margins Getting Squeezed – Downgrade to 3*/Average," authored by Shebly Seyrafi at Caris & Company:

> • **Memory, competition, mix hurt GM.** The company states in its press release that the following factors hurt GM: 1.) Higher than expected DDR memory pricing (25-30% of its BOM) at the start of the quarter, 2.) Intense competitive conditions that hurt pricing, and 3.) Lower than expected sales of the company's Rapid Scale (storage) products (note that storage products have had a slightly higher GM than the corporate average). We thought that the company could manage its way through the memory problem as *we heard that memory price declines picked up later in the quarter*.
>
> *               *               *
>
> • **We are now much more concerned about the trend.** *We are now much more concerned about Rackable's story for the following reasons: 1.) it is blaming three insidious factors - pricing, cost (DRAM), and mix – on its results, and it is staying silent for now about reasons why these factors may mitigate over the coming quarters*, and 2.) DRAM pricing, although not rising as much as a few months ago, could be supported by Vista and DRAM-NAND conversions over the course of the coming year.

---

[Caris & Company report at 1.]

117.    On Rackable's news and the market's disbelief of the excuses given for the gross margins miss, the Company's stock price plummeted, falling from its closing price on January 16, 2007 of $32.42 per share to close at $19.98 per share on January 17, 2007 on unusually high trading volume of 30,330,050 shares traded.  However, the Company's stock price would fall even further after more materialization of the concealed risks and/or partial disclosures concerning:

(a)  The charging of sales and use taxes Q4 2006;

(b)  The extent of the difficulties Rackable was experiencing with Rapid Scale;

(c)  The expenses associated with both calculating and paying the sales and use taxes owed to many states for several years worth of sales;

(d)  $20 million in excess and obsolete inventories that need to be written-down.

118.    Although the January 16, 2007 disclosure relayed essentially negative news to the market, the press release continued to be knowingly or deliberately recklessly false and misleading when made for at least the following reasons:

(a)  As alleged in ¶¶80(3), 79(b)(v)-(vi), the release failed to disclose that DDR memory pricing was not higher, either exclusively or, as the result of general price increases, but rather because of the Company's policy of procuring inventory "just in time" combined with Rackable's undisclosed suppliers' minimum purchase requirements, thus resulting in unpredictable pricing and excess inventory.  Defendants later claimed that during Q4 2006, the Company took on a huge position of excess DDR1 despite the fact the then transition away from DDR1 to DDR2.  Moreover, problems with the ERP appeared to have exacerbated procurement excesses.  As set forth in ¶64(c), CW9, recalled that a big problem resulted in an excess memory purchase after the implementation of the Oracle system in Q3 2006.  Data entry was manual and, as explained by CW8, mistakes were easily made and no one was assigned to monitor purchases.  As a result, human error in data entry, lack of experience in operating Oracle's ERP, budgeting price points (CW17), and lack of senior executive oversight over procurement led to "a lot of out of control purchases."  (CW9)

(b) In addition, as detailed above in ¶¶79(b)(vi), 87(a)-(c), 82(b), defendants also gradually disclosed shortly thereafter that Rackable's much touted ERP information systems used for forecasting, raw materials procurement and costing were materially deficient. ¶¶122, 126, 177

(c) As alleged in ¶79(b)(iv), above, CEO Barton expressly refused to include Rapid Scale revenues and margins in Q4 2006 projections, but suddenly it was blamed as a culprit for the miss.  Even if the Company had an undisclosed intention to rely on such sales to boost margins, as CEO Barton admitted, Defendants had no reasonable or good faith basis to estimate Rapid Scale product sales (¶88:  "we just don't have enough operating history with their forecasting methodology and so forth to give you pint estimate[s] right now or even a range.")  The confidential witnesses all tell the same story of Rapid Scale's complete lack of sales, demand, revenue, or any practical value to the Company, which corroborates Barrenchea's straightforward admission that the execution never existed to meet Rapid Scale's FY 2007 revenue projection of $20 million.  CW4 was a former Rackable account executive (sales agent) employed at the Company from in or about September 2005 until in or about October 2007. CW4 reported directly to George Reitz, the Vice President of Sales Operations. CW4 indicated that the sales staff was trained to sell Rapid Scale storage products on three separate occasions before management realized that it did not know what to do with the product.  (In August 2008, Rackable announced it would sell off this segment of the business, two years after its purchase.)  Not only was there no demand for the product, because it could not compete with what was in the marketplace, but the technology was complex, making it difficult to pitch – salespersons could not articulate what was in it for the customer.  As a result, the sales staff did not try to sell products they did not themselves understand.  Similarly, CW7 was a Regional Sales Manager employed by Rackable from 2006 until early 2009.  CW7 described Rapid Scale as a "joke".  CW7 did not recall a single sale in 2007 or 2008, despite being given training and working with engineers in sales teams.  CW 9, a Cost Accounting and Financial Operations Manager employed by Rackable from 2004 through early 2008 indicated that although Rackable's investor confidence was predicated upon retaining Yahoo!, Microsoft

and Amazon as customers, sales to Yahoo! were at negative margins.  According to CW9, who was constantly in meetings with CEO Barton and EVP Ford, the Company's challenge was to offset that by sales to other customers.  In 2006, senior management sought to do that in two ways, one of which was by achieving higher margin sales with the Rapid Scale product.  CW11 was an account executive from late 2005 until early 2009.  Although CW11 received training on the Rapid Scale product, CW11 did not sell it.  The product roll out was not well executed and Rackables's customers were not the correct market for the product.

(d) As alleged in ¶80(a), the Company had failed to disclose that it was losing the competitive advantage – *i.e.*, not charging its customers sales tax -- which had allowed Rackable to stave off competition.  Moreover, as alleged in ¶199-206, additional accruals for failure to collect delinquent sales and use taxes and the California sales and use tax audit also were not disclosed.

(e) As alleged above in ¶79(b)(iii), the fact that the Company would price sales to its largest three customers at or near cost at the expense of near term gross margin.

(f) As alleged above in ¶, that the Company had pulled revenues from Q1 2007 into Q4 2006; and

(g) As alleged in above, additional accruals for failure to collect delinquent sales and use taxes and the California sales and use tax audit also were not disclosed.

119.   On February 1, 2007, the Company issued another release, also filed on Form 8-K, which reported in greater detail on Q4 2006 and FY 2006 results and on the reasons for the dismal gross margins for the respective periods.

> "[H]owever, as we noted in our press release on January 16th, during the fourth quarter we faced several unexpected challenges that negatively impacted our gross margin and earnings per share.  The gross margin pressure we experienced this quarter was primarily due to increasingly competitive conditions and an unanticipated increase in DDR memory pricing.  Despite these difficulties, we were able to retain and expand key customer relationships during the quarter.  Additionally, while sales of our higher-margin Rapid Scale (™) products were impacted by a longer than expected product rollout, we remain optimistic about long-term prospects for this business."  [quoting defendant Barton]

\*                    \*                    \*

[G]AAP gross margin for the fourth quarter of 2006 was 18.8% compared to 24.9% in the same period a year ago.  Non-GAAP gross margin for the fourth quarter was 19.8% compared to 24.9% in the same period a year ago.

\*          \*          \*

[D]uring 2006, the company recorded stock-based compensation charges of $20.8 million, amortization of patents and customer list of $1.4 million, write-off of acquired in-process R&D of $2.8 million and amortization of intangibles in connection with the Terrascale acquisition of $690,000, resulting in GAAP net income for the twelve months of 2006 of $11.5 million or $0.40 per diluted share, compared to $8.5 million or $0.47 per diluted share in the same period a year ago. Non-GAAP net income for 2006 was $27.0 million or $0.94 per diluted share, compared to $15.0 million or $0.83 per diluted share in the same period a year ago.

GAAP gross margins for 2006 was 21.4% compared to 23.1% in the same period a year ago. Non-GAAP gross margin for 2006 was 22.4% compared to 23.1% in the same period a year ago.

Business Outlook

Rackable Systems is providing the following projections for the full fiscal year ending December 31, 2007:

-- Revenue is projected to be in the range of $ 450 - $ 525 million

-- GAAP diluted net income (loss) per share is projected to be $ (0.10) - $ 0.20 per share

-- Non-GAAP diluted net income per share is projected to be $ 0.75 - $ 1.05 per share

-- GAAP gross margin is projected to be in the range of 16.8% - 21.0%

-- Non-GAAP gross margin is projected to be in the range of 18.0% - 22.

120.    As a result of the February 1, 2007, press release, the relevant truth was further partially disclosed.  In particular Defendants' statements partially disclosed that Rapid Scale sales were impacted "by a longer than expected product rollout."

121.    Again, although the preceding statements relayed essentially negative news to the market, the release continued to be knowingly or deliberately recklessly false and

misleading when made for reasons stated at ¶¶ 118(a)-118(g).  Additionally, continued to be knowingly or deliberately recklessly false and misleading when made because:

(a) As alleged in ¶118(a), below, gross margins and earnings were still inflated by the failure to write-down excess and obsolete inventories by at least $20 million, primarily for DDR1 memory components acquired at prices that defendants knew or were deliberately reckless in not knowing that Rackable would be unable to pass along to its customers.

(b) As alleged above, Defendant Barton's statement that "we remain optimistic about long-term prospects for [the Rapid Scale] business," was knowingly false and/or misleading because it lacked any good faith or reasonable basis as alleged above.

122.   On the same day, Defendants held a conference call with analysts and made the following statements, among others by Defendant Barton:

> [W]e achieved non-GAAP gross margins of 19.8%, which was well below our initial expectations for the quarter.  On our last conference call we projected the Q4 non-GAAP gross margin would be in the range of 23 to 24%.  At our actual Q4 revenue performance of 106.9 million, this would have translated to absolute gross margin dollars of 25.1 million from an absolute dollar standpoint.
>
> I will now characterize and add color to the factors that led to the gross margin shortfall during the quarter.  *First, approximately $1.8 million of the shortfall was associated with having to procure DDR memory at unexpectedly high prices.  Second, approximately $1.2 million shortfall was due to intentional business decisions we made to maintain market share and win business in the [face of] extremely aggressive competition.*  Third, approximately $600,000 of the gross margin shortfall was due to lower than anticipated sales of our Rapid Scale product line.
>
> We had visibility to all of the deals required to make our Rapid Scale number for Q4, but unfortunately one large opportunity did not close during the quarter.  However, we believe this deal will close in Q1.  Customer feedback for Rapid Scale has been extremely positive and in fact we are conducting evaluation in some of our competitors' largest accounts.
>
> We remain extremely enthusiastic about the potential for Rapid Scale to fundamentally improve our gross margin structure over time.   Fourth, approximately $300,000 of the shortfall was due to the fact that *we were once again backend loaded in our revenue production.*

*             *             *

[W]e will vigorously defend and maintain our share position in our install base, while we will attempt to maintain gross margin levels wherever possible, we will emphasize revenue attainment and market share performance over near-term gross margins.

[Feb. 1, 2007 Bloomberg Conf. Call at 1-3, quoting defendant Barton's opening statements]

123.    As a result of the statements referenced in ¶122, above, the relevant truth was further partially disclosed.  In addition to assigning dollar values to the three reasons earlier given for the gross margin miss, Defendants also partially disclosed that Rackable's gross margins for Q4 2006 were lower because the quarter was backend loaded.

124.    The preceding statements made by Defendant Barton were knowingly or deliberately false and misleading when made for the same reasons set forth above, relating to the January 16, 2007 and February 1, 2007 press releases.

125.    Ford made the following opening statements at the February 1, 2007 conference call:

[A]t the time [of] our last earnings call in October, based on market checks we expected the memory market to flatten or possibly soften in the November, December timeframe.   Subsequent to the call, DDR1 memory prices unexpectedly spiked 20 to 30%.  We believe the volatility in the memory market was driven by the uncertainty in demand for DDR1 due to the transition in DDR2 and fully buffered [sic] them based upon new platforms introduced by AMD and Intel.  *Since pricing [had] been locked in with most of our customers we were not able to pass the memory price increases through to our end customers.*

As Tom mentioned previously, we estimated that our cost of goods sold was approximately $1.8 million higher than expected due to higher than expected memory costs.  Further, due to scarce supply [of] DDR1 in Q4, long lead-time and the unknown timing of the transition to DDR2 fully buffered [sic] them we drove demand for and received significant memory at the end of Q4 for expected utilization in 2007.   We're continuing to monitor the transition closely.  *If customers [are] to switch platforms more rapidly than forecasted we could incur a large excess and obsolete charges in the future related to DDR1.*

*Gross margin was also negatively impacted by increased competitive intensity particularly in one of our top three accounts.  Margin compression was not expected in this particular account in Q4 due to our contractual commitments with the customer.  However, due to predatory pricing tactics we were required*

*to deviate from the terms of our contract for one specific large Q4 order with this customer.* Since then, we have received additional orders from this customer with gross margins that are compliant with historical terms of our contract.

Gross margin was further impacted by the backend loaded nature of the quarter. Approximately 74% of our quarterly revenue was recognized in the last month of the quarter. At the time of our Q3 earnings call we did not expect Q4 to be as backend loaded given the significant backlog and visibility we had that the time of the call. *Much of our production was pushed into December due to power supply shortages that were caused by delayed supply deliveries that could have been mitigated with improved materials planning.*

Consequently, overhead costs including freight, overtime, contractor, manufacturer charges were higher than anticipated by approximately $300,000. While these issues were not known at the time of the Q3 earnings call we [did] not become aware of the impact to our financial results until late in the quarter particularly given the backend loaded nature of the quarter. *Admittedly, we should have realized the impact of these issues earlier in the quarter. In response, we have taken immediate action to improve the visibility in our new ERP system and are in the process of up leveling our procurement and materials planning organization.*

[Feb. 1, 2007 Bloomberg Conf. Call at 3-4, quoting Ford's opening statements].

126. With respect to materials procurement and the production cycle, although the preceding statements admitted that:

(a) as alleged above, the Company's much touted information systems were woefully inadequate and needed "immediate action to improve the visibility in our new ERP system";

(b) as alleged above, defendants were "in the process of up leveling our procurement and materials planning organization," and;

(c) as alleged above, the purported power supply shortages were mishandled such that CW7, CW10 and CW21 recalled that excess AC power supply inventory was ordered in Q4 2006 and Defendants needed to get rid of it or write it off in 2007, the preceding statements made by Defendant Ford were knowingly or deliberately recklessly false and misleading when made for at least the same reasons as were the January 16, 2007 and February 1, 2007 releases. ¶¶

127.    Finally, at the same February 1, 2007 conference call, defendant Ranganathan made the following introductory statements:

> [O]ur tax rate on a non-GAAP basis of approximately 39.7%, was lower tha[n] the tax rate in [the] prior three quarters of 2006 because in those quarters we projected higher Q4 net income than we ultimately achieved.
>
> Our non-GAAP earnings per share for Q4 were $0.19, which was below our initial projection of $0.25 to $0.27.  Virtually all of the shortfall was due to the gross margin issues previously described at length in this call.  Our headcount at the end of December was 286 compared to 254 at the end of September.  Total headcount was comprised of 126 in Operations and Services, 53 in R&D, and 73 in Sales and Marketing, and 34 in G&A.
>
> \*                        \*                        \*
>
> **[W]e also increased our raw material inventory, as Todd mentioned earlier, specific to the DDR Memory items. . . [a]pproximately 30% of the raw materials [inventory] was DDR1 Memory as Todd previously discussed**.
>
> \*                        \*                        \*
>
> This is to [sic] the change from our previous projections of 475 million to 525 million provided during our Q3 earnings call.  We continue to forecast **Rapid Scale revenue at 20 million for 2007 with an expected gross margin of 60**%.  Given the increased competitive intensity and related factors outlined in this call our updated expectations is that we will achieve annual non-GAAP gross margin in the range of 18 to 22%.  Our expected operating expenses in the aggregate are not materially different from the amounts projected during our October call . . .
>
> We expect higher litigation expenses to be offset primarily by an approximately 20% reduction in G&A spending on audit, on Sarbanes-Oxley compliance and Oracle consulting fees as compared to 2006 levels and through smaller planned increases in engineering and services expenses.  . . .

[Feb. 1, 2007 Conf. Call at 4-5, defendant Ranganathan's opening statements].

128.    Defendant Ranganathan's statements referenced above, were knowingly or deliberately false and/or misleading when made for at least the same reasons as the January 16, 2007 and February 1, 2007 press releases. In addition the statements were knowingly or deliberately false and/or misleading when made because:

(a) Defendants had no good faith or reasonable basis to forecast $20 million in revenue from Rapid Scale and $12 million in gross margin.

(b) DDR memory costs were not higher, either exclusively or as the result of significant price spikes, but rather because of the Company's policy of procuring inventory "just in time" combined with Rackable's undisclosed suppliers' minimum purchase requirements, thus resulting in unpredictable pricing and excess inventory.   Defendants claimed that during Q4 2006 the Company took on a huge position of excess DDR1 despite the fact the then transition away from DDR1 to DDR2.  (Indeed, CW4 did not recall any customer specifying DDR1 as opposed to DDR2.)  Rackable had not obtained the excess DD1 memory to avoid supply constraints but rather, problems with the new ERP system appeared to have exacerbated procurement excesses.  As set forth in ¶80(e), CW9 recalled that a big problem resulted in an excess memory purchase after the implementation of the Oracle system in Q3 2006.  Data entry was manual and, as explained by CW8, mistakes were easily made and no one was assigned to monitor purchases.  As a result, human error in data entry, lack of experience in operating Oracle's ERP, budgeting price points (CW17), and lack of senior executive oversight over procurement led to "a lot of out of control purchases."  (CW9); and.

(c) Defendants knew or were deliberately reckless in not knowing, as shortly revealed, the Company would be spending more on professional fees and uncollectiblity charges related to the sales and use tax audit  and implementation of Oracle's CRM system.

129.    At the same conference call held on February 1, 2007, defendants attempted to explain further the causes of the margin and earnings misses.

Louis Misheal, Cowen & Co:  [I] guess maybe if you can go into explain a little bit more about the DRAM pricing.  . .

[Defendant] Barton:  Right[,] our triple goal historical inventory policy is not to purchase the commodity items such as memory motherboard, CPU's etc. until we have the deals in hand, and *based upon our preliminary market checks in beginning of Q4 we did expect memory prices to soften or decline.*  So historically we have not speculated in the memory market and then by the time we went to acquire the memory for the deals in hand it literally had spiked to the tune of 20 to 30% and *once we have accepted a customer PO it is virtually impossible for us to go back and re[price] that deal.*

130.    The above statements partially or tacitly admitted and only partially disclosed that Defendants Ranganathan's and Ford's earlier statements made at the October 30, 2006 conference call indeed falsely gave the impression upon analyst inquiry that procurement of DRAM memory was underway at lower prices at the beginning of the 2006 fourth quarter than those experienced in the Q4 2006 third quarter to fulfill fourth quarter needs (Defendant Ranganathan: "[O]ur raw materials were 39.8 million, up slightly from 38.9 million in Q2.  As a reminder, the bulk of raw material inventories are associated with booked orders and near-term visibility, although we may from time to time make decision [sic] to make longer-term [purchases] to take advantages of pricing as well as mitigate lead time constraints;") ¶___(Defendant Ford: "It's really a function of high October booking.  So, very strong bookings in the early part of the quarter.  So, some of the raw materials required to ship the revenues [sic] in Q4 were not purchased and so after the start of the quarter.")).

131.    However, the preceding statements by Defendant Barton, continued to be knowingly and/or deliberately reckless when made, as Defendants continued to fail to disclose that:

(a)    As alleged above in high priced DRAM inventory and other components were also, the result of Rackable's "just-in-time" inventory procurement practice combined with vendors' minimum purchase requirements resulting in excess and\or obsolete inventories.  Indeed, in Q2 2007, Rackable was forced to write down tens of millions of dollars worth of excess inventory consisting of largely DDR1 and power supplies.  Contrary to Defendants assertions otherwise, the inventory was neither acquired in Q4 2006 to reduce lead times nor expected to be used up by customers ordinary demand.  CW21 was told that in Q4 2006, the Company made a double order of AC power supplies.  Similarly, CW9 recalled that a big problem occurred right after the implementation of the Oracle system in Q3 2006.  Data entry was manual and, as explained by CW8, mistakes were easily made.  Because the IT department head failed to assign anyone to do so, no one was checking the system to determine whether it was operating properly.  In particular, no one was monitoring purchases.  As a result, human error in data entry, lack of experience in operating Oracle's ERP, and lack of

senior executive oversight over procurement led to "a lot of out of control purchases."  Just as CW7 recalled the excess purchase of power supply, CW9 recalled the excess purchase of DDR1 memory.  CW19 recalled the big inventory write down right after Barranechea replaced Barton as CEO in 2Q 2007 and CW19 indicated that there was no use for all of the material that the Company had kept buying and buying without planning.

(b) As alleged in ¶79(b)(ii), above, pricing in the Q4 2006 would foreseeably be adversely affected by the Company commencing the billing of sales and use tax; and

(c) While it was true that Rackable could not reprice a deal after acceptance of a purchase order to pass along additional costs, it was also true customers would demand to pay market prices even if it would cause Rackable to go below minimum margin contract terms;

132.   The following exchange made it was clear that analysts doubted the credibility of defendants' responses concerning the lack of visibility, particularly after strong visibility was touted at the October 30, 2006 conference call.  As was revealed, the typical customer approval and build cycle was fairly short and should not have resulted in such material misses on margins:

> Louis Misheal, Cowen & Company:  How many days or weeks were there between I guess the price in the PO and then the customer actual signing [-] Just trying to [understand the gap]:
>
> *                    *                    *
>
> [Defendant] Barton:  It depends on a deal-by-deal basis, in some cases it can be five days for some [of] our larger deals will procure the memory as we needed for sometimes, **build cycle** can be four to six weeks.  ***But typically it is probably in the one to three weeks timeframe.***

133.   Defendant Barton's response was knowingly and/or recklessly false and misleading when made, as it failed to disclose that, as alleged above, the primary reasons for high cost inventory were that the Company's just-in-time inventory procurement coupled, with supplier's minimum purchase requirements resulting in unpredictable pricing and excess

and\or obsolete inventory, and inadequate controls over procurement, cost, and inventory controls, resulted in excessive and obsolete inventory.

134.   In the following exchange at the February 1, 2007 conference call, analysts were attempting to understand more fully the reasons for the unexpected downward pressure on pricing of Rackable's products in the Q4 2006:

> Louis Misheal, Cowen & Company: [A]nd then you mentioned obviously, a more competitive situation out there.  Was it either Dell or HP or Sun or all of the above, and do you think that[s] how they actually [are going] to market in '07 is going to ease up or [indiscernible] even more competitive?

> [Defendant] Barton:  I do think that there is much more competitive intensity from Dell and HP than we've experienced in the past. . .

135.   Defendant Barton's immediately preceding response was knowingly or deliberately reckless when made, as he failed to disclose that the commencement of charging sales and use tax in the fourth quarter and beyond *also* could and did have an adverse impact on the Company's ability maintain profitable prices.

136.   The following exchange also took place at the February 1, 2007 conference call:

> Cheverly Czerniawsk, Carris and Company [sic]:  [O]kay.  ***And then on the inventory side you had said that just in order to try to lock up DDR, you bought ahead of time, that's why raw materials had increased so dramatically?***

> [Defendant Ford]:  ***That's right. . .***

> Cheverly Czerniawsk, Carris and Company [sic]:  [C]ould you just maybe give a little bit more color, Tom, around what you saw or in your opinion was the large spike in DDR? ***I mean you kind of went from [] saying it being flat to spiking 20 to 30%. . .***

> [Defendant] Barton:  ***Yes, so with the transition of DDR to DDR2 based upon AMD's new soak it up technology and Intel's new technology.  A lot of memory suppliers as Samsungs of the world, etc. have for the most part switched over their production lines to DDR2*** and fully buffered DIMM memory.  And since there is just uncertainty in the ecosystem of where people are going to be procuring, they've actually switched their lines to almost all DDR2 and FB DIMM.  ***And going forward they are only building DDR1 to the exten[t] that it's been forecasted by individual companies requiring it. So, the availability on the spot market is significant.***

137.   Defendant Barton's immediately preceding response was knowingly or deliberately reckless when made for the reasons set forth in ¶¶118(a), 128(b), above.

138.   The following exchange also took place at the February 1, 2007 conference call:

Kevin Hunt, Thomas Weisal Partners:  [T]odd mentioned that there is a supply chain problems.  Is that in any way connected to your ERP implementation?  . . .

[Defendant Ford]:  No, I wouldn't say that was the case.  With ERP system, we ruled that out in August and certainly we've made a lot of refinements to improve visibility and reporting, etcetera.  ***The specific issue I related to you on the supply chain side, which related to power supplies, and part of that was due to switching power supply manufacturers and to just poor planning on a materials planning group, quite frankly.***  And that's one of the things that we focused on and we are actually making improvements and changes in that group currently to address that.  So, I won't say it was so much related to the ERP system, as it was to changes in supply vendors and also delayed schedules from our supply vendor.  So, it wasn't 100% on our end, but it was something we could have mitigated which had our planning.

139.   The immediately preceding statements made by Sefendant Ford were knowingly or deliberately recklessly false and misleading when made for the following reasons, although Defendants admitted that there was "poor planning on [by] the materials planning group," Defendants failed to disclose that the costing, quantities, and pricing of inventories, including power supplies, was unpredictable, as Rackable vendors had minimum purchase commitments resulting in excess and obsolete inventories.  Relatedly, sales persons had impaired "visibility" as to required inventory and its pricing, because of the internal control weakness admitted and/or explained concerning Rackable's ERP and CRM systems.

140.   The following exchange also took place at the February 1, 2007 conference call, which revealed more information concerning (a) pricing below stated minimum margin contract terms to maintain market share, as well as (b) the 2006 fourth quarter revenues being "backend loaded:"

Kevin Hunt:  ***[I] mean, you talked about a lot of big order flow on your conference call on October.  So, clearly a lot of that had to be pushed out pretty late in the quarter. . . Was there some renegotiations[that] had to go on?  Is that why you're pressured on price on this one major customer you're talking about?***

[Defendant] Ford:  *[O]n the one large customer – and we do have a contract with them that has pre-negotiated margin rates, etcetera,* and we had one our large competitors come in for this one specific deal *and the margin pricing that renegotiated after our conference call.* So, we were aware of the deal, it was factored into Q4, but the pricing discussion got real bent [sic] based upon the what I call predatory pricing pressure from one of the top-three competitors that we face.

Kevin Hunt:  *[S]o that is you are carrying very high price[d] DDR on your balance sheet is that fair to say?*

[Defendant] Ranganathan:  *Yes Kevin this is Madu.*  So the way we did procure DDR at kind of the market price entering the fourth quarter price.  *And as Todd said memory prices may be flat-to-down at this point of time.*

\*                            \*                            \*

Ryan Hutchinson, HR Hambrecht:  *[A]nd then, in the prior quarter, you gave a percentage of total revenue down in the third month.  How much back-end loaded was the quarter?

[Defendant] Ranganathan:  *I think Todd shared in the call about 74% of the revenue or $79 million was in the third month of the quarter.*

141.  The following exchange also took place at the February 1, 2007 conference call where Defendants continued to try to explain the reason for the purported overpriced memory purchase:

[Defendant] Ranganathan: [W]e projected usage of the DDR1 we are carrying at the December over the next sort of several quarters.  And Todd made a comment should the technology shift happen[] sooner than anticipated or differently we may end up taking it right off down the road . . . *In terms of the question on what we are carrying the value at, we are carrying it at cost and we procured it recently as in the last couple of months* and that is the cost that will be flushed through the P&L in the next few quarters.  And Todd, do you have anything to add?

[Defendant Ford]:  I think that is correct.  The only thing with DDR1 in the levels that our customers require, we can't get it on the spot market at least in those quantities.  So, part of the reason for taking that position is since many of the memory suppliers have turned their supply or their production lines over to

DDR2 and Fully Buffered DIMM that you literally need to place the orders months in advance to have adequate supply. . .

142.   The preceding statements made by defendants Ranganathan and Ford, which were left uncorrected by defendant Barton were knowingly or deliberately recklessly false and misleading when made, as they failed to disclose that Rackable's woeful inventory tracking and procurement processes, as set forth above, not an unanticipated shift to DDR2, was the cause of the write downs that Rackable did indeed take in Q2 2007.

143.   As a result of the partial disclosures of the truth set forth in On February 2, 2007, the next trading day, the price of the Company's stock fell precipitously from its previous day's closing price of $20.34, by $3.65 or 17%, to close at $16.60 per share on unusually high trading volume of 19,723,500 shares traded.

144.   On February 28, 2007, Rackable filed its Form 10-K for the year ended December 31, 2006, which was signed by Defendants Barton and Ranganathan.  The 10-K, which contained the following statements, among others, in the notes on the audited financial statements thereto:

> *In December 2005, the Company identified potential state sales and use tax liabilities relating to certain of its product sales to customers outside of California.  The Company estimated the gross tax liability to the states identified to be $1.2 million which is included in accrued sales and use tax as of December 31, 2005.*  The Company also quantified the exposure relating to interest and estimated collection exposures and, accordingly, recorded a $0.4 million charge to general and administrative expense in the fourth quarter of 2005 with an offsetting increase to other accrued expenses as of December 31, 2005.  *For the year ended December 31, 2006, the Company increased its estimated gross tax liability by $5.3 million to $6.5 million which was included in accrued sales and use tax.*  The increase in the estimated gross tax liability was a result of additional information received during the year relating to customers and their self-assessment process.  The Company also recorded a $0.3 million charge to general and administrative expense during the year ended December 31, 2006 with an offsetting increase to other accrued expenses as of December 31, 2006, increasing the balance included in other accrued expenses to $0.7 million.  The Company believes that it will recover the sales tax from these customers, and accordingly has recorded a receivable for $6.5 million included in other current assets as of December 31, 2006.  *In the last quarter, the Company started billing sales tax to its customers.  The Company had accrued*

*$0.9 million as of December 31, 2005 for sales tax relating to taxes in California for that period's sales.*

[2006 Form 10-K at 75 (Emphasis added)].

145.    However, the preceding statements were still knowingly or deliberately reckless when made, for at least the following reasons:

(a) Defendants failed to disclose that included in the Q4 2006  accruals were amounts from a California sales and use tax audit that the Company was notified of in 2006 [2007 Q3 Form 10-Q at 10];

(b) Because of the foregoing and the reasons stated Rackable's accrual" for uncollectible amounts and related interest was severely deficient, and;

(c) Indeed, defendant Ranganathan stated at the February 1, 2007 conference call that reserves for collections from customers would increase by $1 million in the first quarter of 2007, and that upon the release of the March 31, 2007 results, this amount would double to $2.0 million.

146.    Following is a comparison of inventory reporting contained in the 2006 10-K and the 2006 3Q-10Q:

|  | December 31, 2006 | September 30, 2006 | Increase/ (Decrease) |
|---|---|---|---|
|  |  | (in Thousands) | Change |
| Finished Goods | $ 4,129 | $ 6,882 | ($ 2,753) |
| Evaluation Units | 1,758 | 1,341 | 417 |
| Work in Progress | 10,894 | 4,352 | 6,542 |
| Raw Materials | 51,356 | 39,807 | 11,549 |
| Reserves | Not Reported | (5,035) | 5,035 |
| Total | $ 68,137 | $ 47,347 | $ 20,790 |

[2006 10-K at 75; 2006 3Q-10Q at 17].

147.    Defendants stated that approximately 30% of the December 31, 2006 raw materials inventory (or approximately $15.4 million) was represented by DDR1 Memory. [Feb. 1, 2007 Conf. Call at 4-5].

148.    The 2006 10-K also made the following representations concerning "Inventories:"

> [I]nventories, consisting primarily of server chasses, hard drives, microprocessors, memory chips, cooling fans and other equipment used in the manufacture of networking servers, are stated at the lower of first-in, first-out cost or market. Cost components include materials, labor and manufacturing overhead costs.

> Consideration is given to obsolescence, excessive levels based on estimated future demand, deterioration and other factors in evaluating net realizable value. . .

149.    In contrast to the 2006 10-K disclosures, the 2005 10-K disclosures reported inventory write-downs as follows:

> Consideration is given to obsolescence, excessive levels based on estimated future demand, deterioration and other factors in evaluating net realizable value. Inventory write-downs totaled $451,000, $212,000, and $3,124,000 for the years ended December 31, 2003, 2004 and 2005, respectively. . .

[*Cf.* 2005 10-K at 69 *with* 2006 10-K at 75].

150.    Also in contrast to the 2005 10-K and the 2007 10-Qs, the 2006 10-K did not report on "inventory reserves," which were stated to be at $3.9 million as of December 31, 2005 and $5 million as of September 30, 2006. *Cf.* 2006 10-K at n. 6, pp. 73-4 *with* 2005 10-K at n. 5, p. 77.

151.    The disclosures concerning inventory as quoted in the immediately preceding three paragraphs were knowingly or deliberately recklessly false and misleading when made for at least the following reasons:

(a) In violation of several basic GAAP reporting requirements, including, but not limited to "consistency" between reporting periods, defendants failed to disclose, as they had done in the past (i) inventory valuation reserves, and (ii) inventory valuation write-offs.

(b) In addition, in contrast to defendants' statements, inventory was not carried at lower of cost or market, as:

(i) Current DRAM market prices were admittedly between 20 to 40% below carrying costs;

(ii) DDR1 inventory, which comprised most of the overpriced inventory, already was obsolete or in less demand due to the DDR2 technology. Defendants also overpurchased AC power supplies during Q4 2006 at a time when Rackable's sales trend was towards the use of DC power supplies;

(iii) Even for those Rackable customers who purportedly still required DDR1 memory, given the competitive pricing environment exacerbated further now that defendants were charging sales and use taxes, defendants knew or were deliberately reckless in not knowing that such costs would not be absorbed by Rackable's customers; and

(iv) Indeed, CW4 stated that when customers saw component prices on purchase orders that were above market price, they insisted upon and were granted the lower market prices and renegotiated the purchase order before accepting it.

152. In addition, the first note to the December 31, 2006 financial statements contained in the 2006 10-K stated the following: "[T]he preparation of [these] financial statements [are] in conformity with accounting principles generally accepted in the United States of America . . ." [2006 10-K at 60].

153. For at least the reasons stated in the foregoing paragraphs, the preceding statement was knowingly or deliberately recklessly false and misleading when made.

154. Between February 28, 2007, and a few days later, March 2, 2007, the price of the Company's stock drifted lower, falling from its close on February 28, 2007 of $17.41 per share to close at $16.50 per share on March 2, 2007 on substantial trading volume.

155. On April 4, 2007, the end of the Class Period, the Company issued a press release, which also was filed on Form 8-K as an exhibit on the same day. The release, entitled "Rackable Systems Provides Update on First Quarter 2007 Outlook," contained the following revelations:

[Rackable] today provided an update on its expected results for the first quarter ended March 31, 2007. Total revenue for the first quarter of 2007 is expected to be in the range of its previous projections of $70 – 75 million. However, the company now expects GAAP and non-GAAP gross margin for the first quarter to be approximately 30% lower than previously communicated expectations. The primary factor impacting gross margin in the first quarter was the intensity of competition in the company's largest accounts.

The company also expects operating expenses in the first quarter to be higher than previously anticipated due to one time charges associated with the cancellation of an order from one customer, severance charges related to an internal reorganization completed in January, and additional charges relating to sales and use tax exposures from past sales to various customers.

As a result of lower than expected gross margin and operating income, the company anticipates a net loss for the first quarter of 2007, on both a GAAP and non-GAAP basis.

156.    The release also attached the Company's comparative financial statements for the quarter ended March 31, 2007. Following is a comparison of inventory reporting contained in the 2006 10-K and the 2006 3Q-10Q:

|  | (in Thousands) | | Change |
|---|---|---|---|
|  | December 31, 2006 | March 31, 2007 | Increase/ (Decrease) |
| Finished Goods | $ 4,129 | $ 4,251 | $ 122 |
| Evaluation Units | 1,758 | 1,527 | (231) |
| Work in Progress | 10,894 | 11,712 | 818 |
| Raw Materials | 51,356 | 51,372 | 16 |
| Reserves | Not Reported | Not Reported | N/A |
| Total | $ 68,137 | $ 68,862 | $   725 |

157.    After the release of this news and the related conference call held on April 5, 2007 (discussed immediately below), the price of the Company's stock fell precipitously again, this time falling from its closing price on April 4, 2007 of $16.88 per share to close on April 5, 2007 at $14.24 per share on heavy trading volume of more than 18.3 million shares.

158.   On the heels of the April 4th Release, analysts issued "Sell" and other downgrades. For example, Canaccord-Adams issued the following report dated April 5, 2007, before the Individual Defendants conducted their conference call on the same day.  The report entitled, "Winter Not Over:  Tough Sledding Ahead," contained the following statements:

> Rackable provided an update on its Q1 results.  Revenue is expected to be in line with previous guidance of $70-75 million, while gross margins are expected to be as much as 30% lower than expected. . . ***The company also expects operating expenses to be much higher*** than anticipated due to one-time charges associated with cancellations of an order from one customer, an internal reorganization, ***and sales and use tax exposures.***

> [O]nce again competition made a sizable impact on Rackable's business model, bringing down gross margins to their lowest level in the history of the company. We believe that competition was not the only contributor to the preannouncement, and in this note we cite other reasons for Rackable's struggles.

> [A]lthough the stock has already taken a large swing downward, we continue to believe that Rackable's business model is flawed and reiterate our SELL rating on the stock.

>                    *                    *                    *

> [I]n the December quarter the company suffered gross margin erosion due to a large ill-timed purchase of DRAM components.  DRAM typically accounts for 20-30% of the COGS of a Rackable server, ***and the company purchased significant DRAM inventory at the beginning of the fourth quarter.***  As DRAM prices fell, server prices from competitors fell, and Rackable was forced to chase the lower pricing with higher-priced DRAM components.  Exiting the December quarter, Rackable still maintained a very large inventory of high-priced DRAM. Unfortunately for the company, DRAM pricing has collapsed over the last three months, falling roughly 40%.  ***We believe this drove Rackable's gross margins significantly lower in the March quarter, as it had to keep pace with pricing from Dell and HP.***

>                    *                    *                    *

> [W]e continue to believe the competitive advantage of Rackable, which was based on its position as the best AMD-based server platform, dissipated when Dell Computer moved to AMD processors and Intel introduced greatly improved processors. With HP and Dell now attacking Rackable's key customers (Amazon, Microsoft, and Yahoo!) with extremely aggressive pricing, we believe the company has limited room to maneuver. . .

---

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS
No. 09-0222-CW
98

## VI.   POST-CLASS PERIOD STATEMENTS AND EVENTS

159.   On April 5, 2007, the Individual Defendants conducted an analyst conference call at 5 a.m. Pacific time.  The following statements, among others, were made therein:

> [Defendant] Barton:  As you know we issued a press release yesterday afternoon that we expect to be materially below expectations regarding our gross margins and operating margins.  .  . As most of you know, our three largest customers represent a large percentage of our business typically approximately 60%. . . The erosion of gross margin in our largest three accounts is the top business issue impacting our total Company financial performance.  . .
>
> [I] would like to point out that our gross margin attainment in non top three accounts is materially higher than it is in our top three customers  .  .  .
>
> Third, we are expanding our efforts to market and develop higher value, higher gross margin offerings leveraging our core Rapid Scale technology and our high-performance computing capabilities.  We are extremely pleased with the traction in our Rapid Scale line and given our solid pipeline and visibility, we are explicitly reaffirming our commitment to our previously issued projections of $20 million in Rapid Scale revenues at gross margins of 60% or better for 2007.
>
> The second significant issue we disclosed in our press release was related to one-time charges.  .  . First, we are taking a charge associated with a customer cancellation of an order.   Depending on how we ultimately dispose[] the associated product inventory, we will likely take a Q1 charge somewhere between $600,000 and $1.3 million.
>
> Second, [sic] we recorded severance charges of approximately $400,000 related to a minor reorganization completed in January.  *We reorganized several functions to improve accountability and eliminate duplicative activities*.  This was not a general layoff and in fact we are actively recruiting to fill open positions and newly created ones. *Finally, we are likely to record charges of up to $1 million relating to sales and use tax exposures from past sales to various customers.*
>
> I would also like to address a topic that we raised during our last conference call.  *We indicated that we had a significant position of DDR inventory associated with our desire to continue to supply AMD Rev E technology to current customers and the fact that memory vendors are end of life-ing [sic] DDR technology.*  We saw significant usage of DDR in quarter.  At the present time we do not see a need to take a write-down to this inventory but we expect to accumulate more information on this topic between now and the time of our earnings call. It is simply too early to tell whether a write-off might be required.

*             *             *

> *[W]e saw a doubling of our pipeline for Rapid Scale opportunities, a significant increase in bookings, and a significant backlog position of Rapid Scale orders moving into Q2.* We continue to win deals at high gross margins in competitive situations.

160.    As later revealed, defendants had no good faith or reasonable basis for the belief that Rapid Scale would be a significant positive influence on gross margins and sales for the 2007 second quarter, as within only a few months, Rackable's new CEO, Barrenechea revealed "[W]hen you look at the $20 million earlier projection, the execution wasn't there to support those projections" because the product (a) "needed a second release" and (b) "subject matter experts" to assist the "general sales force" to "sell" Rapid Scale.  [July 26, 2007 Conf. Call]. And finally, as surmised by an analyst on this very same conference call (as quoted below at ¶177), projected Rapid Scale revenues of $20 million with purported 60% revenues were only 4-5% of the Company's overall quarterly revenues, and thus would have no significant impact on overall gross margins.  Saying otherwise was misleading.

161.    The April 5, 2007 conference continued with the exchanges taking place between defendants and analysts:

> Brent Bracelin, Pacific Crest: My last question really is specific to the quarter as you look at your mix of AMD, DDR1 versus Intel and kind of DDR2, is there any sort of gross margin difference between those two specific products?
>
> [Defendant] Barton: In general there is no longer a gross margin difference between what we achieve on the AMD platform or the Intel platform from a competitive pricing standpoint.
>
> *           *           *
>
> [Defendant] Barton: We think it's possible that some of our competitors are pricing below cost.  We think it is a very material number so discounts from our customers that appear to be 30% below where they would traditionally price in another accounts . . .
>
> *           *           *

[Defendant] Ranganathan:  [W]e do believe they are onetime as Tom outlined as a cancellation of a customer order which we have not had historically in the past. And the consolidation of functions we did [] result in the severance charges and the sales tax charges we are planning to take, it really comes from the past years.

*        *        *

Tom Curlin, RBC Capital Markets:  Then also with the canceled – the charge on the cancellation, can you tell us if that was related to an order from a top three or four customer?

[Defendant] Barton:  It was not related to an order from a top three or four customer.

*        *        *

Louis Miscoiscia, Cowen & Co:  [C]an you maybe go in and explain the one-time charge that relates to I guess sales and use tax exposure?  I wasn't sure if I really understood that one?

[Defendant] Ranganathan:  Sure and Louis, we have disclosed this in our past 10-Ks and Qs.  Essentially the issue was uncovered I would say late 2005, *the Company had [nexus] in several states where we were required to charge sales taxes going back to years 2003, 2004 and 2005 and we had not charges sales taxes appropriately in those states.  So as we undertook the project in 2006, we re-established registration with those states.  We did have an ERP system limitation.*  Our previous (technical difficulty) allow us to get back on track very quickly and with the rollout of Oracle ERP in August we were able to do that.
So what this really reflects is we have gone back to those customers and with put [sic] these taxes in front of them and just to be clear, *we have gotten back in good standing with those representative states and in a majority of instances, we have paid those states what Rackable owes them.  This charge really reflects a provision that allows us to – it gives us some room in case we're not able to recover the taxes we already paid to those states from our customers.*

Louis Miscoiscia, Cowen & Co:  And with this you are all caught up and you think you are okay with this issue?

[Defendant] Ranganthan:  It is the best estimate we have at this point.

*        *        *

Shelby Seyrafi, Caris & Co:  You also talked about fully buffered DIMM pricing being down to stabilizing.  That is related to your Intel business – but Intel is what – 15% to 20% of units – relatively small right?

[Defendant] Barton:  It is actually climbing as a percentage.   I don't have a specific figure for your but we will report on what we saw in Q1 and what our expectations are for Q2.

Shelby Seyrafi, Caris & Co: Right, and **Rapid Scale as well is about 4 – 5% of revenues so it seems to me that the gross margin swing factors that you alluded to are relatively small compared to your overall business.  And when you say that you expect gross margins to improve meaningfully without providing guidance, it seems like it is a relatively small balance** off of the 13 level.  **You are not going to be attaining your 20% or higher levels any time soon with that analysis. Any color on that?**

[Defendant] Barton:  **No specific color.**  We can give you some color on that on April 26th.

Shelby Seyrafi, Caris & Co: Okay and your headcount, you're continuing to build headcount in spite of the fact that you[] are now losing money.  Might you change your strategy on building out headcount?

Shelby Seyrafi, Caris & Co:  [W]hat I can tell you is all of that will be rolled out into the projections that we provide for full year when we talk to you again on April 26th.

*          *          *

Tom Curlin, RBC Capital Markets:  [T]he DRAM inventory you have, you commented that you may still write down some of that DRAM inventory that you used a substantial piece of it but there may be a write down to come on some of the remainder.  Is that a function of bids in process . . .?

*          *          *

[Defendant] Barton:  [I]t's really a question as to whether customers move platforms associated with those bids.

*          *          *

Louis Miscioscia, Cowen & Co:  I know you commented briefly but just about the pricing of DRAM but **can you mention just what you think DRAM did I guess in the March quarter on a quarter to quarter basis?**  And as you look forward to the June quarter, what do you think – what might happen in pricing there?

[Defendant] Barton:  **I think it was approximately a 25% price reduction** for certain SKUs in the fully buffered DIMM arena.

---

Louis Miscioscia, Cowen & Co:  How about the projection for where you think it is going forward in the June quarter?

[Defendant] Barton: You know it is all real-time information right now but there was a period of time when I would characterize the fully buffered DIMM prices as being in freefall over the last several weeks.  And it just seems to me that freefall has stabilized and the quotes that we are getting from vendors in the DRAM ecosystem are kind of flattening.

[April 5, 2007 Bloomberg Tr.]

162.    On April 9, 2007, the next trading day after the April 5, 2007 conference call, the price of the common stock of Rackable drifted even lower to close at $13.35, down $0.89, or another 6% from its April 5, 2007 closing price of $14.24 per share with 854,000 shares traded.

163.    Still unrevealed however, were the following adverse facts and conditions:

(a) As alleged above, the continuing adverse affect on the 2007 first and second quarters that the overvalued DRAM inventory would have on margins and earnings and such charges should have been taken by not later than the fourth quarter of 2006 when the excess DDR1 had built up and the excess AC power supplies were purchased;

(b) The doubling of charges to G&A expense for uncollectible sales and use taxes and related interest and penalties as a result and the California sales and use tax audit assessments.

164.    Accordingly, not until after the final 2007 first quarter results were released and discussed at the April 26, 2007 conference call, did the price of Rackable stock lose most of the remainder of the inflation caused by defendants' false and misleading statements and omissions concerning the 2006 fourth and 2007 first quarter results, financial condition and future prospects.

165.    On April 25, 2007, the Board of Directors of Rackable made the following management changes:  (a) Mr. Gautham Sastri became Chief Operating Officer ("COO"); (b) defendant Barton assumed the role of President in addition to his title of CEO; and (c) Ford lost his position as President, and was made an Executive Vice President ("EVP").

166.    On April 26, 2007, the Company announced final 2007 first quarter results in a press release also filed on Form 8-K, and filed on the same day.  The Individual Defendants and Mr. Sastri conducted a conference call with analysts concerning the results.  Defendant Ford was absent from the call.  The following statements were contained in the April 26, 2007 release:

> [G]AAP gross margin for the first quarter was 12.5% compared to 23.1% in the same period a year ago.  GAAP net loss for the first quarter was $10.2 million or ($0.13) per share . . .

> "While our first quarter revenue was within the range we provided on our fourth quarter 2006 earnings call, we experienced a challenging quarter from a margin and bottom-line perspective," said [defendant] Barton, Chief Executive Officer of Rackable Systems.

> *              *              *

> Effective immediately, the company has promoted Gautham Sastri, the founder and former CEO of Terrascale, which the company acquired in September 2006, to Chief Operating Officer.  Mr. Sastri will be primarily responsible for overseeing the company's engineering, operations and quality organizations.  Todd Ford will be assuming the title of [EVP] and will be responsible for a variety of strategic initiatives.  Mr. Ford will remain with the company until the end of the year.  [Defendant] Barton will re-assume the additional role and title of President.

167.    The following discussions took place at the April 26, 2007 conference call:

> [Defendant] Barton:  [I want to close my introductory remarks with an update on our management team.  There are two significant changes that I would like to mention.  First, Todd Ford, our President will be transitioning out of the company.  **.  . Gautham will be investing in people and infrastructure in both engineering and operations arenas, and he is charged with implementing the overall changes in our business model** that I have articulated.

> Gautham:    [O]ur main goal [] is to[] shorten product development cycles, improve overall operational efficiency, and accelerate the delivery of highly differentiated products to our customers.

> [Defendant] Ranganathan:  Our top three customers had 52% of revenue, each representing over 10% of revenue.  Our top 10 customers represented 80% of our revenue.
>
> *              *              *

---

Our gross margin for Q1 was 13.5% [non-GAAP].  As indicated in our pre-announcement the lower gross margins in Q1 that primarily due to intensity of competition in our largest account.  In addition, the decline in gross margins between fourth quarter of 2006 and Q1 was driven by lower volume and inability to gain economies of scale of in our overhead absorption.

*            *            *

*[A]pproximately $1.9 million of charge is related to prior year's sales and use tax exposures.  On our April [5]th call, we anticipated that this charge will be $1 million.  .  . And second higher professional service fees relating to assessment of sales and use tax exposures . . .*

*            *            *

[W]e are continuing to monitor our inventory positions closely.  At the end of Q4, we noted a potentially large inventory exposure related to DDR memory.  While we consumed a significant amount of DDR memory in Q1, and did not take any DDR write-downs in Q1 due to expected future consumption, if our current customers on DDR, AMD revenue platform transition to next-generation DDR2 or [indiscernible] technology sooner than expected, we could incur a significant write-off of DDR memory in subsequent quarters.  This will remain an item that we will continue to watch very closely.

[April 26, 2007 Bloomberg Transcript]

168.    Thus, defendants further or first revealed: (a) significant senior management changes; and (b) continuing foreseeable problems with (i) competition, (ii) imminent excess and obsolete inventory write-offs, (iii) the adverse consequences to the state sales and use taxes, which were more severe than previously conveyed resulting in doubling of "accruals" and\or charges to G&A and professional fee increases due to the state sales and use tax problems, (iv) internal controls over inventory overhead costing, and (v) substantial new executive management time devoted to correcting such and other operational efficiency problems.

169.    Following the April 26, 2007 conference call, the price of the Company's stock fell again on unusually high trading volume of greater than 8,522,000 shares trading on April 27, 2007 to close at $11.27 per share, down $1.31 per share, or 10%, from its close of $12.58 per share on April 26, 2007.

170.    On April 28, 2007, defendant Barton resigned as a member of the Company's Board of Directors.   On April 29, 2007, the Board terminated defendant Barton from his positions as CEO and President of the Company and replaced him with Barrenechea, who had been a member of the Company's Board since November 2006 and prior to that was a "consultant" for the Company.   From June 2003 to June 2006, Barrenechea held the positions of Senior Vice President of Product Development and Executive Vice President, Product Development at Computer Associates, "an enterprise software company."  From June 1997 to June 2003, Barrenechea "served in a variety of positions including Senior Vice President, Applications Development, and as a member of the Executive Management Committee at Oracle Corporation, an enterprise software company."  April 10, 2007 Proxy at 5.

171.    On May 10, 2007, the Company's 2007 first quarter financial statements were filed on Form 10-Q with the SEC (the "2007 1Q-10Q").  The 2007 1Q-10Q was signed by defendant Ranganathan and provided further information on the sales and use tax issue and informed the market that the Company was in violation of its loan covenants and had to obtain a waiver from the bank in connection therewith.

In December 2005, the Company identified potential state sales and use tax liabilities relating to prior year product sales to its customers outside of California. At December 30, 2006, the Company estimated the gross tax liability to the states was $7.2 million which is shown above in accrued sales and use tax. Also included in accrued sales and use tax as of December 30, 2006 is $4.2 million related to current sales and use tax payable. The Company also quantified the exposure relating to interest and estimated collection exposures and, accordingly, recorded a $0.7 million charge to general and administrative expense in the fiscal years ended December 30, 2006 and December 31, 2005. For the three months ended March 31, 2007, the $7.2 million estimated gross tax liability was decreased by payments of $5.0 million, and increased by $0.8 million related to additional accruals, to $3.0 million. The increase in the estimated gross tax liability was a result of additional information received during the quarter relating to customers and their self assessment process. Accrued sales and use tax of $10.1 million includes current sales and use tax payable of $5.7 million in addition to the $3.0 million liability discussed above and accruals of $0.6 million and $0.8 million of sales and use tax related to a California and Washington sales and use tax, respectively. *The Company also recorded a $1.9 million charge to general and administrative expense in the first quarter of 2007 for additional accruals it deemed necessary related to the prior year sales and use tax liabilities, California sales and tax audit and exposures identified for Washington sales and use tax.* The Company believes

that it will recover certain sales tax from its customers, and accordingly has recorded a receivable for $6.2 million which is included in other current assets as of March 31, 2007.

[2007 1Q-10Q at 10]

\*                    \*                    \*

*General and administrative expense. . .* **[W]e also recorded an additional accrual of approximately $2.0 million primarily associated with delinquent sales and use tax filings in 17 states, a California sales and use tax audit and an exposure related to sales and use tax for other states.** The sales and use tax accrual includes estimated interest as well as our estimate of amounts that are likely not to be collectible from our customers.

\*                    \*                    \*

We expect general and administrative expenses during the three months ending June 30, 2007, to include severance charges relating to the departure of our former chief executive officer. Inclusive of these severance charges, we believe that general and administrative expenses will be lower during the three months ending June 30, 2007 primarily due to the additional accrual of approximately $1.9 million recorded in the three months ended March 31, 2007 relating to delinquent sales and use tax filings.

[2007 1Q-10Q at 21]

172.    In addition, defendants belatedly admitted that Rackable was in non-compliance with its loan agreements.  The 2007 1Q-10Q also stated that the Company obtained a waiver from the bank for non-compliance with its covenants:  "At March 31, 2007, the Company was not in compliance with the minimum quarterly profitability covenant. The Bank provided a waiver of the covenant on May 8, 2007."  [2007 1Q-10Q at 17]

173.    On May 23, 2007, the Company filed a Form 8-K signed by Garvey.  The 8-K reported that Ford's employment had been terminated by the Company on May 23, 2007.

174.    In or about June 2007, Rackable implemented Oracle's "CRM on Demand" systems software and used the Oracle Applications Integrated Architecture ("AIA") to link it to the Company's ERP system, which had been put in place almost a year earlier in or about August 2006, also an Oracle application.  These critical enhancements were to correct the systems' deficiencies responsible, at least in part, for the operations management deficiencies

resulting from a lack of "pipe-line visibility."  In contrast to the impression left by defendants at the beginning of the Class Period and shortly thereafter, these improvements were necessary to accurately forecast product costs, as well as specific customer sales revenues, and included the following:

> Rackable deployed the Oracle E-Business Suite 11i to support its business operations [in August 2006] ***but didn't have an effective CRM tool for managing leads, opportunities and forecasts.***  In 2007, Rackable looked for a CRM solution that would offer tight integration between data and workflows. . . Although [Rackable] was using its current on-demand CRM application for service and support, ***the lack of integration between the system [and] the E-Business Suite hampered user adoption for sales.***

*                    *                    *

> ***[T]he [new] application allows managers to save time in monitoring and measuring pipeline activity, something that was impossible before the deployment. . .***

> [T]he integration means there is one master customer record without duplications in the system.  The single source of truth means the data can be trusted and doesn't need to be verified manually.  ***It also means improved sales pipeline activity estimates.***

*                    *                    *

> [T]he largest direct benefits quantified were increased sales.  ***Indirect benefits included improved sales personnel and management productivity, and better data quality and visibility. . .***

[June 2008, Nucleus Research Inc., "ROI Case Study, Oracle CRM on Demand and AIA, Rackable Systems"]; *see also* Tony Kontzer, May 2008, Oracle, "Building Bridges, Process integration packs help Rackable systems connect the pieces:"

> [E]ight weeks after selecting Siebel CRM On Demand, Rackable Systems had its global sales force up and running on the new application with full end-user adoption within a quarter.  It wasn't long before [Dominic] Martineli [vice president of information technology at Rackable] identified the processes that would be aided by the planned integration with Oracle E-Business Suite.  Chief among these was the sales and marketing teams' desire for an improved ability to track leads and manage opportunities, ***as well as to achieve that sought after link with Oracle E-Business Suite's quoting and configuration tools.***

---

\*                  \*                  \*

The benefits to Rackable Systems were apparent as soon as the integration was in place.  Customer information began flowing seamlessly between Oracle CRM on Demand and Oracle E-Business Suite, and the sales staff was able to manage and access all required information through a Web interface.

"They're getting the visibility that they've been demanding, but in a format that's very simple for them," says Martinell. "In the past, they had to jump through a few hoops to get to it, so it would result in a lot of extra work tracking down the data our sales professionals needed."

The impact of Rackable Systems' integration is visible in a number of optimized processes.  For example, the system used by salespeople to manage accounts, leads, contacts, and opportunities **connects to Oracle E-Business Suite to check against existing account information to prevent duplication of data.** Salespeople can also launch the Oracle E-Business Suite quoting too form with Oracle CRM on Demand, and any quotes created flow into the Oracle E-Business Suite in real time.

Additionally, **customer, product, and pricing data [are] synchronized between Oracle E-Business Suite and Oracle CRM On Demand,** with changes made in Oracle E-Business Suite updating the on-demand system instantly.

175.   On July 26, 2007, Rackable filed on Form 8-K its press release announcing its earnings for the quarter ended June 30, 2007.   The 8-K was signed by Garvey and the attached press release contained the following statements:

Total revenue for the second quarter of 2007 was $82.2 million, up 14% from $72.0 million in the first quarter of 2007, and down 7% from $88.6 million in the second quarter of 2006. Total revenue for the first six months of 2007 was $154.3 million, down 11% from $173.0 million for the first six months of 2006.

**GAAP gross margin (loss) for the second quarter of 2007 was (8.4%), compared to GAAP gross margin of 22.8% in the same period a year ago. Non-GAAP gross margin for the second quarter of 2007 was 17.5%,** compared to non-GAAP gross margin of 23.7% in the same period a year ago.

**Excluded from the second quarter 2007 non-GAAP gross margin are $20.6 million of excess and obsolete inventory charges associated with next-generation technology shifts** and $0.7 million of stock-based compensation. Excluded from the second quarter 2006 non-GAAP gross margin is $0.8 million of stock-based compensation. **The excess and obsolete charges in the second quarter of 2007 resulted primarily from the company over procuring certain components late in the components' technology life cycle.**

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS
No. 09-0222-CW
109

GAAP net loss for the second quarter of 2007 was ($40.4) million or ($1.42) per share, compared to GAAP net income of $5.3 million or $0.18 per diluted share in the same period a year ago. GAAP net loss for the first half of 2007 was ($50.6) million or ($1.78) per share compared to GAAP net income of $11.3 million or $0.41 per diluted share in the same period a year ago.

"In my first 90 days, I have immersed myself in the operational aspects of the company and our supply chain and I believe there is clear opportunity to improve our market position and operating performance," said Mark J. Barrenechea, President and Chief Executive Officer of Rackable Systems. "We made progress on our fundamental economic performance in Q2, with sequential revenue growth of 14% and an increase in our non-GAAP gross margin over last quarter."

[Emphasis added]

176.   On the same day, the Company conducted a conference call with analysts concerning the results announced in the July 26, 2007 press release.  Defendant Ranganathan and Mark Barrenechea, the Company's new CEO and President conducted the conference call. The following statements, among others, were made at the conference call:

Barrenechea:   [N]ext I would like to speak about the distribution and supply chain strategies. . .

[A]s for the supply chain, I value deep relationships.  This means not just relationships with our suppliers for best quality, availability, and price, this also means having relationships with those who supply to our suppliers in order to make the best business decisions. *I would say I spent over 20% of my first 90 days in the Rackable supply chain.*

                *               *               *

[Defendant] Ranganathan:   [O]ur historical top three customers were 62% of revenues.  Both Microsoft and Yahoo were each greater than 10% of revenues approximately 81% of our revenues came from top 10 customers. . .

                *               *               *

[F]or Q2, key components of the $20.6 million charge were the following. DDR[1] inventory. At the end of Q4, we noted the potentially large inventory exposures that related to DDR memory. . .

                *               *               *

[O]ur excess [and obsolete] charges included motherboard and CPUs.   And finally with respect to tale [sic] of supplies, we had purchased excess quantities in Q4, 2006 of DC and AC power supplies. . . While I presented here the size, the magnitude, the timing and the reasons behind excess and obsolete charges, *it is extremely important for Mark and I to share with you the operational measures that have already been put in place to mitigate a similar situation in the future. Our engineering and product focus and involvement on component level decisions have been significantly increased. . .*

Internal process and policies have been tightened to allow highest visibility to purchase commitment. *While our visibility into pipeline and full co]st a[re] by no means perfect we believe that our sales management will make continuous improvements in this area in order that procurement and operations can engage in effective materials and production planning as we integrate CRM functions into ERP applications.* And now with respect to valuation allowance. The charges for excess and obsolete inventory resulted in a pre tax [loss] position for the year. Hence we remain obligated to review the reasonability of deferred tax asset.

Following such review we recorded a valuation allowance of 13.2 million against a deferred tax asset.

*          *          *

Kevin Hunt, Thomas Weisel Partners:  *Okay and one other follow up you didn't mention anything about the [R]apid[S]cale you talked about in the last conference call that would be still 20 million for the year and 5 million plus for this quarter was sort of what was being said, so what was that this quarter and what's the outlook on that?*

Barrenechea: Lets - maybe we will provide a little more detail behind Rapid Scale. *There is no doubt that the integration took longer than expected. We needed a second release of the product which we accelerated Rapid Scale 2.2 which is now a GA. We think that product is at parity with our competition.* When we looked at how we were selling, we added subject matter experts this quarter as an overlay organization, helped the general sales force sell, and looking at this in my first 90 days I support the product and I am optimistic. *But when you look at the $20 million earlier projection, the execution wasn't there to support those projections and not in alignment. And whereas we are not going to break out specifically the new rapid scale projections, I remain optimistic that we will do well this year. But at the end of the day, the $20 million projection -- the execution wasn't there to support the projection.*

[July 26, 2007 Bloomberg Tr.]

177.    On August 8, 2007, Rackable filed on Form 10-Q its quarterly report for the period ended June 30, 2007 (the "2007 2Q 10Q").   The 2007 2Q 10Q was signed by defendant Ramganathan and contained the following statements, among others:

> In December 2005, the Company identified potential state sales and use tax liabilities relating to previous years product sales to customers outside of California. At December 30, 2006, the Company estimated the gross tax liability to the states was $7.2 million which is shown above in accrued sales and use tax. Also included in accrued sales and use tax as of December 30, 2006 is $4.2 million related to current sales and use tax payable. The Company also quantified the exposure relating to interest and estimated collection exposures and, accordingly, recorded a $0.7 million charge to general and administrative expense in the fiscal year ended December 30, 2006. For the six months ended June 30, 2007, the $7.2 million estimated gross tax liability was decreased by payments of $6.5 million, and increased by $0.7 million related to net accruals, to $1.4 million which was recorded in accrued sales and use tax. The increase in the estimated gross tax liability was a result of additional information received during the quarter relating to customers and their self assessment process. Accrued sales and use tax of $9.3 million includes current sales and use tax payable of $6.9 million in addition to the $1.4 million liability discussed above and accruals of $0.7 million and $0.3 million of sales and use tax related to a California and Washington sales and use tax, respectively. **The Company received an initial estimated assessment in the six month ended June 30, 2007 related to its California Sales Tax audit. The Company also recorded a $1.9 million charge to general and administrative expense in the first half of 2007 related to additional accruals related to the prior year sales and use tax liabilities, California sales and tax audit and a reserve for Washington sales tax.** The Company believes that it will recover certain sales tax from its customers, and accordingly has recorded a receivable for $5.0 million which is included in other current assets as of June 30, 2007.

[2007 2ndQ 10Q at 10]

            *                    *                    *

> [G&A Expense increased because, *inter alia*], [A]n accrual of approximately $2.1 million **primarily associated with delinquent sales and use tax filings in 17 states,** a California sales and use tax audit and an exposure related to sales and use tax for other states;

            *                    *                    *

> An increase of $0.9 million for audit and professional services fees;

[2007 2ndQ 10Q at 23; emphasis added]

---

178.   In or about August or September 2007, the Company's General Counsel, Garvey, was replaced.  At the October 25, 2007 conference call, Barrenechea stated that: "Our new General Counsel and Corporate Secretary, Maurice Leibenstern[,] had a strong background in . . . corporate governance experience . . . He served as Senior Vice President and Chief Legal Counsel for Computer Associates prior to joining Rackable." [Bloomberg Tr. at 3.]

179.   On November 7, 2007, the Company filed its Form 10-Q for the 2007 third quarter with the SEC (the "2007 3Q-10Q").  The 10-Q stated the following:

> In December 2005, the Company identified potential state sales tax and use tax liabilities relating to prior year product sales to customers outside of California. *In fiscal year 2006, the Company was notified by the State of California* of their intent to conduct a routine sales and use tax audit. *At December 31, 2006 the gross tax liability for these two items* was estimated at $7.2 million.

[2007 3Q-10Q at 10]

180.   On February 6, 2008, at the 2007 Q4 conference call, Barrenechea announced that defendant Ranganathan "decided to leave Rackable."   However, before leaving, Ranganthan subverted SOX controls over figures reported to the SEC, causing the Company to later have to restate its results for Q1 2008.

181.   On or about March 12, 2008, the Company's auditors belatedly issued a material weakness in internal controls report for 2007:

> A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weaknesses have been identified and included in management's assessment:
>
> *The Company's controls over accounting for inventory did not operate effectively as of December 29, 2007.* In particular, errors were detected in the inventory accounting in the interim and annual financial statements resulting from *(1) inaccurate record preparation relating to purchase price variances, variance capitalization, physical count, obsolescence reserve computations and inventory purchase cutoff, and (2) reviews of inventory calculations not being performed with sufficient precision.* Due to the number and magnitude of the errors identified resulting from these internal control deficiencies and the absence of mitigating controls, *there is a reasonable possibility that a material*

*misstatement of the interim and annual financial statements would not have been prevented or detected on a timely basis by the Company's controls.*

\*                \*                \*

/s/ DELOITTE & TOUCHE, LLP
San Jose, California
March 12, 2008

[2007 10-K at 86.]

182. CW5, an outside consultant employed specifically to assess SOX compliance and inventory analysis from 2006 through 2008 stated that he\she observed weaknesses in internal controls over inventory accounting when reconciling 2006 inventory as part of his\her assignment.

183. On August 4, 2008, at a conference call to discuss the Company's financial results for 2Q 2008, Barrenechea acknowledged management "believe[s] that Rapid Scale is no longer core to our strategy." Indeed, Barrenechea further explained:

[Alex Kurtz - Merriman Curhan Ford & Co., Analyst:] Can you talk about the decision to get out of the Rapid Scale business and why now and how you came to this decision? Was there just a certain lack of interest from customers or is it just draining too many resources from your core business?

[Barrenechea:] I would say it's a fine product. It's a good market. But we've concluded it's not a good fit for Rackable and thus the strategical alternative. *The most attractive alternative would be a sale of the asset to a partner who can invest in the technology because it's going to take investment, a partner who has an expert sales and service force to deploy complex software, and hopefully we'll be able to maintain a strong relationship with any prospective buyer. So at the end of the day we think it's a fine product, a good team, a good market, but it's going to take a significant amount of investment that I think can be better applied internally and it's going to require a company that is expert in complex software and services.*

184. Rackable's 2008 10-K filed with the SEC on March 18, 2009, provided for Rapid Scale under "discontinued operations." As such, Rackable provided information about Rapid Scale's financial performance since Rackable acquired the Company roughly two years earlier. Therein, the 10-K states that far from its projected $20 million for 2007, Rapid Scale

did a mere $2.471 million.  Moreover, it indicates that Rapid Scale spent nearly $12.5 million on Research and Development in 2008, and approximately $4.5 million in 2006.

## VII.   ADDITIONAL MATERIALLY FALSE AND/OR MISLEADING STATEMENTS REGARDING STATE SALES AND USE TAXES

### A.   General

185.   In or about January 2005, around the time the Company was preparing for its IPO, it filed a registration with the Washington State Department of Revenue. The registration indicated that the account was "opened" with the Department on January 24, 2005.

186.   Defendants were responsible for collection and remittance of sales and use tax on products sold, regardless of where the purchaser placed the product for use, provided that state imposed sales and\or use tax and the Company had a "nexus" with the subject state. Nexus is defined as the minimum connection or physical presence in a taxing jurisdiction that gives rise to a tax payment or tax collection duty.  Defendants admitted that they had "nexus" with the at least 17 states to which they owed delinquent sales and use tax as detailed below.

187.   "Vendors are agents of the state or other taxing jurisdiction in collecting sales tax and have fiduciary duties arising from that agency relationship.  Officers and directors of corporations required to collect sales tax are personally liable for uncollected taxes and those that have not been paid to the taxing jurisdiction." 14A FLETCHER CYC. CORP. § 6927.50 (West 2009) (citing *State Board of Equalization v. Wirick,* 93 Cal. App. 4th 411, 112 Cal. Rptr. 2d 919 (2001); *see also* Cal. Rev. & T. Code, §§6203 - 07 (West 2009).

188.   Moreover, "In order to insure that sales taxes are paid by consumers and are assessed on a uniform basis, vendors are generally prohibited from absorbing sales taxes.  The tax must be an addition to the price of the goods being sold and must be separately stated in most states." [14A FLETCHER CYC. CORP. §6927.50 (West 2009) (citing ALL STATES TAX GUIDE (RIA) ¶258)]; *see also* Cal. Rev. & T. Code §6205 (West 2009).

### B.   Despite Warning in 2005 About Potential Exposure For Not Charging Sales Tax on "*Past Sales*" to "*Limited* Customers" In February 2007 Rackable Admits That It *Did Not Charge Sales* Tax Until Q4 2006

189.   In or about June 2005, the Company conducted its IPO.  Sometime after the Company's registration with Washington and its IPO, California commenced an audit for purposes of compliance with the collection of sales and use tax by Rackable.

190.   The Company first reported in the 2005 Form 10-K, the following concerning state sales and use taxes it was responsible for collecting on products sold to its customers:

> In December 2005, we identified potential state sales and use tax liabilities relating to certain of our product sales to customers outside of California. We estimate the tax liability to the states identified to be $1.2 million. ***We quantified the exposure relating to interest and estimated collection exposures and, accordingly, recorded a $426,000 charge to general and administrative expense*** in the year ended December 31, 2005. Although we believe that we have the right to recover the sales tax from these customers, and accordingly have recorded a receivable for $1.2 million (included in other current assets), ***if we are not able to recover these sales taxes from these customers, we will record an additional charge to our operating results and need to pay these taxes out of our funds.***

[2005 10-K at 27, 79]

191.   The foregoing disclosures were repeated throughout 2006, with modifications in language to report periodic increases in liabilities to the states, receivables from customers and accruals charged to G&A expense for "exposure relating to interest and estimated collection exposures."   In substance, it appeared that Rackable's "accrual" was a reserve for uncollectability and any interest or fees assessed by the state(s).

192.   Despite the Company's explicit portrayal of events as related to "past sales," in reality, the Company was nevertheless still not collecting sales and use tax nor did it ever warn of the risks attendant by not doing so.  For the first time, on February 28, 2007, in its 2006 Form 10-K, Rackable disclosed that it had only commenced "billing" its customers for sales and use taxes in the fourth quarter of 2006, implicit in defendants' pre-Class Period disclosures was that the Company had been compliant in "billing" and collecting sales and use taxes on a going forward basis since December 2005.

193.   The fact of the California sales tax audit, which was at least noticed in or about 2006, was not fully disclosed until the filing of Rackable's 2007 first quarter Form 10-Q on

May 10, 2007. Theretofore, as explained below, defendants gave the false impressions that the Company had an epiphany in December 2005 and both the Company and its customers were voluntarily "self-assessing" their liabilities to states outside of California.

194. As much later revealed, the Company admitted that, where it had not collected sales and use tax on products sold to customers since 2003 in at least 17 states, certain states suspended the Company's license and/or registration. The states where the Company appeared to owe the most state sales and use taxes were California and\or Washington.[16] California sales and use tax rates, when including local sales and use tax, are at a minimum 7.25% and could range up to 8.75%. Washington's state sales and use tax was 6.5%, but when combined with local sales and use taxes, the rate ran as high as 9%. [2008 CCH U.S. Master Sales and Use Tax Guide].

## C. Defendants Misrepresent the Status of Sales and Use Tax Collections

195. As particularized below, during the Class Period, defendants left the impression that they were diligent and were voluntarily "self-assessing" together with their customers, in order to collect and remit delinquent sales and use taxes. However, defendants failed to disclose that they had not begun seeking to collect sales and use taxes until Q4 2006. Indeed, the disclosures during the Class Period, for example, stated: "[w]e believe that we will recover the sales tax from these customers, and accordingly have recorded a receivable of $4.4 million which is included in other current assets as of September 30, 2006." [2006 3Q-10Q at 17-8] (emphasis added).

196. By September 30, 2006, the Company recorded an additional $3.3 million in state sales and use taxes payable to the states on top of the $1.15 million reported for 2005, bringing the amount owed for delinquent taxes reported to $4.4 million. Not included in that balance was an additional $0.9 million owed for "current" sales and use taxes for 2005. [*Cf.* 2006 Form 10-K at 75 *and* 2006 Q3-10Q at 17-8 *with* 2005 10-K at 79].

---

[16] California, as the state where Rackable resided and likely was deemed the point of sale, also was the "collection agent" for the State of Washington for the latter's sales and use taxes owed.

197.    However, not until Q1 2007, did the Company belatedly "accrue" or reserve an additional $2.0 million for same, as explained as follows:

> We also recorded an additional accrual of approximately $2.0 million primarily associated with delinquent sales and use tax filings in 17 states, a California sales and use tax audit and an exposure related to sales and use tax for other states. The sales and use tax accrual includes estimated interest as well as our estimate of amounts that are likely not to be collectible from our customers.

[2007 1Q-10Q at 21].   By year end December 31, 2007 this amount had increased to $3.6 million, belatedly charged to G&A expense in 2007 alone.  [2007 3Q-10Q at 24-5; 2007 10-K at 39].   Thus, when adding the 2007 $3.3 million "accruals" to amounts accrued in 2005 of $426,000 and 2006 of $300,000, defendants' "accruals" and charges for "interest and estimated collection exposures" totaled at least $4,026,000 for the years 2005, 2006 and 2007.

## D.    Defendants' Deficient Accruals for Failure to Collect Sales Taxes

198.    At December 31, 2005, the Company's ratio of "accruals" or reserves to amounts receivable from customers and interest for delinquent sales and use tax was $426,000 ÷ $1,150,000 or 37%.

199.    Despite not billing customers for sales and use tax until the Q4 2006 and significantly increasing the amounts recoverable from customers to $4.4 million by the beginning of the Class Period, defendants *decreased* the "accruals" to receivables ratio by almost three times.  The Company reported that its receivables from customers for delinquent sales and use taxes (as of September 30, 2006) was $4.4 million, with a meager accrual of $551,000 (*i.e.,* $426,000 FY2005 accrual + $125,000 FY2006 increase to accruals by Sept. 30, 2006) or only 12.5% of the total amount expected to be recovered, plus interest for delinquent sales and use taxes.  [2006 3Q-10-Q at 17-18].

200.    During Q4 2006, the receivable from customers for delinquent sales and use taxes climbed to $6.5 million and defendants increased the "accrual" and related charge to earnings by a meager $175,000, increasing total accruals or reserves to $726,000. Thus, by December 31, 2006, the percentage of accruals or reserves to delinquent taxes collectible from customers declined even further to 11.2% (*i.e.,* $726,000 ÷ $6,500,000). [2006 10-K at 75].

The $6.5 million receivable from customers for delinquent sales and use taxes never increased after December 31, 2006.

201.    Inexplicably, defendants then significantly increased the accrual for collection exposure in the Q1 2007 by approximately another $2.0 million, which was charged to G&A expense "for additional accruals it deemed necessary related to the ***prior year sales and use tax liabilities***, California sales and tax audit exposures identified for Washington sales and use tax." [2007 1Q-10Q at 10 (Emphasis added)].   Accordingly, the ratio of accruals to customer receivables for delinquent sales and use taxes was now $2,726,000 ÷ $6,500,000 or 41%, a level slightly higher than the 37% reported December 31, 2005.

202.    By Q3 2007, the receivable declined to $4.4 million.  However, Rackable failed to discuss anywhere in the Q3 Form 10-Q whether indeed any amounts were ever received. The Q3 2007 Form 10-Q also omitted much of the earlier discussions concerning sales and use taxes receivables from customers, added the word "portion" and now stated that amounts written directly off to G&A expense were for uncollectible taxes from customers:

> The Company believes that it will recover a ***portion*** of the sales tax paid to the various states ***and California*** from their customers. Accordingly, a current asset was recorded at December 31, 2006 of $6.5 million. As of September 29, 2007, the balance of the current asset was $4.4 million. ***All amounts which the Company believes were not recoverable were charged directly to general and administrative expenses.***

[3Q-10Q at 10 (emphasis added)].

203.    Finally, the 2007 Q3-10Q was the last SEC filing that contained the following warning concerning collection of sales and use tax from customers:

> If we are not able to recover sales and use taxes from past sales to several of our customers, we may have to pay those taxes out of our funds and record an additional charge to our operating results.

[3Q-10Q at 37].

204.    Only three months later, in the Form 10-K for the year ended December 31, 2007 (the "2007 Form 10-K"), the Company omitted all discussion in the notes to the audited

financial statements concerning amounts receivable from customers for sales and use taxes. *Id.* at 67.

205. The Company reported the amounts paid to the state taxing authorities for current and delinquent sales and use taxes payable of $11.2 million in FY 2007. However, the Company never reported that it had collected any amounts owed it from customers for sales and/or use taxes since December 2005.

## VIII. RECKLESS DISREGARD OF GAAP AND SEC REPORTING REQUIRMENTS

### A. Manipulation of Inventory and Inventory Reserves to Inflate Gross Margins

206. Rackable artificially inflated its gross margins and profitability by improperly valuing inventories for the December 31, 2006 quarter and year end, and the March 31, 2007 quarter by at least $20 million and the related $13.2 million deferred tax credit write-off, as alleged above.

207. Defendants' SEC filings, including those made during the Class Period, consistently stated that:

> Inventories, consisting primarily of server chasses, hard drives, microprocessors, memory chips, cooling fans and other equipment used in the manufacture of networking services, are stated at the lower of first-in, first-out cost or market. Cost components include materials, labor and manufacturing overhead costs.

[2005 10-K at 69; 2006 10-K at 61]; *see also* 2006 Third Quarter 10-Q at 6, incorporating by reference, *inter alia,* the above quoted language from the 2005 10-K:

> The accompanying unaudited condensed consolidated financial statements included herein have been prepared by the Company in accordance with the published rules and regulations of the U.S. Securities and Exchange Commission ("SEC") applicable to interim financial information. ***Certain information and footnote disclosures included in financial statements prepared in accordance with the generally accepted accounting principles in the United States of America have been omitted in these interim statements*** as allowed by such SEC rules and regulations. However, management believes that the disclosures herein are adequate to make the information presented not misleading. ***The accompanying unaudited condensed consolidated financial statements should be read in conjunction with the audited consolidated financial statements of the Company for the fiscal year ended December 31, 2005, which are included***

*in the Company's Annual Report on Form 10-K filed with the SEC on February 22, 2006.*

Emphasis added.

208.    GAAP and SEC rules require companies to carry their inventories at the lower of cost or market.  The primary basis of accounting for inventories is cost, which has been defined generally as the price paid or consideration given to acquire an asset.  Accounting for inventory under GAAP is set forth in Accounting Research Bulletin No. 43 ("ARB 43"), Chapter 4, Inventory Pricing.[17]  ARB 43, Chapter 4, Statement 3 explains that "[t]he primary basis of accounting for inventories is cost, which has been defined generally as the price paid or consideration given to acquire an asset.  As applied to inventories, cost means in principle the sum of the applicable expenditures and charges directly or indirectly incurred in bringing an article to its existing conditions and locations."  ARB 43, Ch. 4, ¶5 further defines cost as "[t]he definition of cost as applied to inventories is understood to mean acquisition and production cost."  Further, inventory cannot be recorded for more than "net realizable value," the amount expected to be received in cash or cash equivalents.  ARB 43, Ch.4, Statement 6.

209.    "The term market means current replacement cost (by purchase or by reproduction, as the case may be) except that:

> a.  Market shall not exceed the net realizable value (*i.e.,* estimated selling price in the ordinary course of business less reasonably predictable costs of completion and disposal); and
>
> b. Market shall not be less than net realizable value reduced by an allowance for an approximately normal profit margin.

ARB 43, Ch.4, ¶9

210.    GAAP also requires companies to immediately record inventory losses whenever the value of the inventory is less than cost, regardless of the cause of the loss in value.  Accounting for inventory losses under GAAP as set forth in ARB 43, Ch.4, Discussion

---

[17]    ARB 43 was amended by Statement of Financial Accounting Standards ("FAS") No. 151, Inventory Costs, effective for inventory costs incurred during fiscal years beginning June 15, 2005.  Such amendment does not impact references to ARB 43, Chapter 4, herein.

to Statement 5, informs as follows: "[I]n accounting for inventories, a loss should be recognized whenever the utility of goods is impaired by damage, deterioration, obsolescence, *changes in price levels, or other causes . . . recognized and accounted for in the current period.*"

211. Specifically, ARB 43, Ch. 4, Statement 5 states in part that:

A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as its costs. *Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical obsolescence, changes in price levels,* or other causes, the difference should be recognized as a loss in the current period. This is generally accomplished by stating such goods at a lower level commonly designated as market.

212. Ordinarily, market is defined as replacement cost or net realizable value at the balance sheet date. ARB 43, Ch. 4, Statement 6. "Furthermore, [only] [if] the evidence indicates that cost will be recovered with an approximately normal profit upon sale in the ordinary course of business, [should] no loss be recognized even though replacement or reproduction costs are lower." ARB 43, Ch.4, ¶9.

213. The purpose of reducing inventory to the lower of cost or market is to reflect fairly the income of the period. Material write-downs of inventory to market must be reported separately in the income statement. ARB 43, Ch.4, ¶14.

214. Further, GAAP requires unallocated overhead expenditures to be recognized as an expense in the period in which they are incurred. Other items such as abnormal freights, handling costs, and amounts of wasted materials (spoilage) require treatment as current period charges rather than as a portion of the inventory costs.

215. The same principles and methods for inventory accounting and reporting are used to value inventory for interim financial statements as are used for annual reports. Reg. S-X, article 10, ARB 43, and APB 28.

216. Here, defendants failed to properly adjust for inventory overvaluations at December 31, 2006 and March 31, 2006 for the reasons alleged above.

**B.    Material Weakness In Internal Controls and Duties Under SOX**

217.    Section 13(b)(2)(B) of the Exchange Act requires every issuer that has securities registered pursuant to Section 12 of the Exchange Act, such as Rackable, to devise and maintain a system of internal accounting controls sufficient to reasonably assure, among other things, that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.  Defendants violated Section 13(b)(2)(B) of the Exchange Act by, among other things, failing to maintain the required internal accounting controls necessary to reflect the true cash position and investment risk profile of Rackable and to prepare Rackable's financial statements in accordance with GAAP.

218.    AICPA's Generally Accepted Auditing Standards ("GAAS") provides the following definition of "Material Weakness" in internal controls:

> A material weakness is a condition that precludes the entity's
> internal control from providing reasonable assurance that material
> misstatements in the financial statements in the financial
> statements will be prevented or detected on a timely basis.

AT § 501.55.

219.    As alleged herein, defendants knew or were reckless in not knowing that Rackable had material weaknesses in its internal controls over inventory procurement and valuation during the Class Period.

220.    Further, in an effort to protect investors from corporate wrongdoing by improving the accuracy and reliability of corporate disclosures made pursuant to the securities laws, § 302 of the Sarbanes–Oxley Act of 2002, 15 U.S.C.A. § 7241, entitled "Corporate responsibility for financial reports," directs that the SEC shall promulgate regulations requiring that, in relevant part, "for each company filing periodic reports under section 13(a) or 15(d) of the Securities Exchange Act of 1934 . . . the principal executive officer or officers and the principal financial officer or officers, or persons performing similar functions, certify in each annual or quarterly report filed or submitted under either such section of such Act that—

(1) the signing officer has reviewed the report;

(2) based on the officer's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to

make the statements made, in light of the circumstances under which such statements were made, not misleading;

(3) based on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report;

(4) the signing officers—

(A) are responsible for establishing and maintaining internal controls;

(B) have designed such internal controls to ensure that material information relating to the issuer and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the periodic reports are being prepared;

(C) have evaluated the effectiveness of the issuer's internal controls as of a date within 90 days prior to the report; and

(D) have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date;

(5) the signing officers have disclosed to the issuer's auditors and the audit committee of the board of directors (or persons fulfilling the equivalent function)—

(A) all significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize, and report financial data and have identified for the issuer's auditors any material weaknesses in internal controls;  and

(B) any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal controls; and

(6) the signing officers have indicated in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

221.   Likewise, section 906 of the Sarbanes–Oxley Act of 2002, 18 U.S.C.A. § 1350, entitled, "Failure of corporate officers to certify financial reports," requires, in relevant part, that:

(a)   Certification of periodic financial reports.--Each periodic report containing financial statement—filed by an issuer with the Securities Exchange Commission pursuant to section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a) or 78o(d)) shall be accompanied by a written statement by the chief executive officer and chief financial officer (or equivalent thereof) of the issuer.

(b) Content.--The statement required under subsection (a) shall certify that the periodic report containing the financial statements fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of . . . 1934 (15 U.S.C. 78m or 78o(d)) and that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the issuer.

222.   Pursuant to ¶404 of the Sarbanes-Oxley Act of 2002, on June 5, 2003, the SEC issued a final rule and amended Item 307 of Regulations S-K and S-B.  *See* Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, 2003 WL 21294970, at *11 (S.E.C. Release No. 8238) (June 5, 2003).  Specifically, as part of a company's corporate governance obligations, management is required "to include an internal control report of management that contains" the following in its annual report:

a.   A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the company;

b.   A statement identifying the framework used by management to conduct the required evaluation of the effectiveness of the company's internal control over financial reporting;

c.   Management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year, including a statement as to whether or not the company's internal control over financial reporting is effective.  The assessment must include disclosure of any 'material weaknesses' in the company's internal control over financial reporting identified by management.  Management is not permitted to conclude that the company's internal control over financial reporting is effective if there are one or more material weaknesses in the company's internal control over financial reporting; and

d.   A statement that the registered public accounting firm that audited the financial statements included in the annual report has issued an attestation

report on management's assessment of the registrant's internal control over financial reporting.

Id.

223.    The PCAOB adopted the long-standing auditing provision that a company has a control deficiency "when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis." Notice of Filing of Proposed Rule on Auditing Standard No. 2, An Audit of Internal Control Over Financial Reporting Performed In Conjunction With an Audit of Financial Statements, File No. PCAOB-2004-03 (Apr. 8, 2004). Further, the PCAOB believes that a "deficiency in operation exists when a properly designed control does not operate as designed, or when the person performing the control does not possess the necessary authority or qualifications to perform the control effectively." *Id.*

224.    Defendants falsely reported during the Class Period in connection with the submission of interim and annual reports filed on Form 10-K and Forms 10-Q that the Company was in compliance with SOX and there were no material weaknesses in internal controls.

225.    Specifically, the Company reported at the beginning of the Class Period the following at the beginning of the Class Period on November 14, 2006. These statements were made in exhibits to the 2006 3Q-10Q:

**Exhibit 31.1**
**CERTIFICATION**

I, Thomas K. Barton, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Rackable Systems, Inc.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ Thomas K. Barton
**Thomas K. Barton**
**Chief Executive Officer**

Date: November 13, 2006

**Exhibit 32.1**
**CERTIFICATIONS PURSUANT TO**
**18 U.S.C. §1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q of Rackable Systems, Inc. (the "Company") for the quarter ended September 30, 2006, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Thomas K. Barton, Chief Executive Officer of the Company, and Madhu Ranganathan, Chief Financial Officer of the Company, each hereby certifies, to the best of his

or her knowledge, pursuant to 18 U.S.C. §1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report, to which this Certification is attached as Exhibit 32.1, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition of the Company at the end of the period covered by the Report and results of operations of the Company for the periods covered by the Report.

Dated: November 13, 2006

/s/ Thomas K. Barton

Thomas K. Barton

Chief Executive Officer

/s/ Madhu Ranganathan

Madhu Ranganathan

Chief Financial Officer

This certification accompanies the Form 10-Q to which it relates, is not deemed filed with the SEC and is not to be incorporated by reference into any filing of the Company under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934 (whether made before or after the date of the Form 10-Q), irrespective of any general incorporation language contained in such filing.

226.    Defendant Ranganathan signed substantially identical false and misleading reports also attached as exhibits to the 2006 3Q-10Q.  Substantially identical false and misleading certificates were attached by defendants Barton and Ranganathan to the 2006 10-K and 1Q 2007 10-Q.

227.    The statements made by defendants Barton and Ranganathan contained in the certifications were knowingly or deliberately reckless when made for at least the following reasons:

(a) as ultimately admitted, defendants' forecasting procedures, particularly those concerning cost of sales, and thus, gross margins, were woefully inadequate for the reasons stated in the Deloitte & Touche LLP material weakness letter of March 12, 2008. A SOX consultant (CW5) confirmed that he\she had to reconcile inventory back to 2006, and in connection therewith, observed many inventory accounting internal control weaknesses;

(b) defendants admitted that the forecasting of gross margins, net income and earnings per share, and other interim or quarterly figures could not be reasonably forecasted, and thus ceased providing such forecasts after the fourth quarter of 2006;

(c) defendants could not reasonably accurately predict inventory excess and obsolescence, and thus cost of sales as concealed minimum purchase commitments by vendors caused or could cause inventory purchases that were not required by customers and\or at prices higher than market, because of the Company's general stated policy of not procuring required raw materials in the open market until "just-in-time," and;

(d) finally, defendants tacitly or expressly admitted that the Company's touted new ERP system was not effective at forecasting sales and related configuration quantity and cost requirements until after it was linked with the Oracle CRM system not implemented until in or about July 2007.

(e) Defendants knew or were deliberately reckless in not knowing this gross deficiency, since, as alleged above as, *inter alia,* the Company's "consultant," board member and later CEO and President, Barrencechea, was a former senior product developer and executive at Oracle and Computer Associates as well as the technology "consultant" for Rackable immediately before the Class Period. The "new" Oracle ERP system was installed in August 2006.

## IX.    ADDITIONAL SCIENTER ALLEGATIONS

228.    In addition to the several express or tacit admissions as alleged above, the following strong circumstantial evidence shows defendants' knowledge and\or deliberate recklessness and motive to publish the false and misleading statements, as alleged herein.

### A.    Core Business Doctrine

229.    Rackable is a relatively small company with approximately 174 employees in total as reported in the March 9, 2006 prospectus.

230.    Defendant Barton, the Company's former CEO, at the relevant time was "the Company's chief operating decision maker [and] monitor[ed] the sales of various products . . ."

2006 3Q 10-Q at 10.   Indeed, defendants Ford and Barton took over the domestic and international sales functions when the Vice President of Worldwide Sales resigned during the Class Period.

231.   According to an analyst report from December 20, 2006, authored by Kevin Hunt at Thomas Weisel Partners, in acknowledging the fact that Defendants Ford and Barton were stepping in to oversee domestic and international sales, respectively, continued by stating that Defendants Barton and Ford "have always played a critical role in sales-related efforts from the executive level."  Indeed, as previously set forth, according to CW15, George Reitz had to obtain approval from Defendant Barton to take any deal below 18%.  Moreover, according to CW4, in one occasion in Q4 2006 Defendant Ford made the decision to have one of his outstanding purchase orders pre-built and shipped to the customer during Q4 2006, despite the fact that the purchase order had not been returned and the customer did not need the order, in exchange for a discount and extended payment terms.

232.   The executive management of the Company was fairly small, consisting of approximately ten executive officers, including the three individual defendants Barton, Ford, Ranaganathan.

233.   The Company listed only one physical location, Milpitas, California, in its 2006 SEC filings and a grand total of only 19 employees in "general and administrative functions." *Id.* at 68.

234.   The Company had only three large customers, which together accounted for greater than 60% of Rackable sales on average.  A second tier of a few other large customers accounted for much of the remainder of the Company's revenues.

235.   And to repeat what CW4 reported, he\she stated that there were daily management meetings at which management discussed the status of customer orders.  CW4 would provide updates to anticipated delivery dates.  CW4 stated that "management" also had access to "ERP Reports," which provided details as to the status of customer orders, builds, and delivery dates, among other information such as delayed shipments from vendors.

### B.       Executive Compensation and Stock Awards

236.    The Individual Defendants, as other insider executives and officers, had strong motive to inflate the Company's financial results.  First, much of the Individual Defendants' total compensation was directly and positively correlated with the financial performance of the Company, particularly revenue and earnings increases.   As the Company's 2005 Proxy issued on April 14, 2006 states:

**Elements of Executive Compensation**

*Base Salary*

The Committee reviews and determines the base salaries of the Chief Executive Officer and other members of senior management. In each case, the Committee takes into account the results achieved by the executive, scope of responsibilities and experience, and competitive compensation practices.

*Performance-Based, Cash Incentives*

***Annual performance-based, cash incentives are tied to Rackable Systems' overall performance,*** as well as the performance of each executive and of his or her area of responsibility or business unit. ***For fiscal 2005, Messrs Barton and Ford's performance-based, cash incentives were based on Rackable Systems' results of operations,*** overall operational and strategic achievements and each individual's roles and contributions to Rackable Systems. Mr. Gallivan's performance-based, cash incentives were based on Rackable Systems achieving certain sales goals. Mr. Garvey and Ms. Dirgo's performance-based, cash incentives were determined based on completing certain management bonus objectives that were established on a quarterly basis.

*Equity-Based Incentive Grants*

Equity-based incentive grants encourage executives to focus on Rackable Systems' long-term goals. As noted in the "Options Granted" column of the Summary Compensation Table, in 2005, Rackable Systems provided stock option grants to certain executives under Rackable Systems' equity incentive plans. ***The value of stock options granted to executives is tied to the future performance of Rackable Systems' common stock*** and provides value to the recipient only when the price of Rackable Systems' common stock increases above the option per share exercise price.

**Compensation of the Chief Executive Officer**

***In September 2005, the Committee increased Mr. Barton's annual base salary to $340,000 and increased Mr. Barton's potential annual bonus to $175,000.*** In

addition, the Committee approved an amendment to Mr. Barton's employment agreement, such that if Mr. Barton's employment is terminated without cause or if he terminates his employment for good reason, Mr. Barton is entitled to receive severance equal to twelve months of salary and twelve months of continued medical benefits, in addition to twelve months of accelerated vesting of any outstanding options and a twelve-month period following termination to exercise those options.

The Committee's decision to amend Mr. Barton's cash-based compensation and the terms of Mr. Barton's severance if he were to be terminated without cause or if he terminates his employment for good reason, were based on a number of factors including: (i), the completion of Rackable Systems' initial public offering in June 2005, (ii) ***Rackable Systems' operational performance, including its revenue and earnings growth*** and (iii) the results of the compensation report prepared by an outside compensation consultant. The Committee also approved other compensation paid to Mr. Barton during fiscal 2005, related to reimbursement of certain legal expenses and found these amounts to be reasonable.

***In January 2006, the Committee approved a 2005 bonus payment for Mr. Barton in the amount of $175,000 bringing Mr. Barton's total annual 2005 bonus to $262,500.*** Mr. Barton's bonus was determined based on the evaluation of his performance, ***the overall performance of Rackable Systems' business, including the results of operations for the fourth quarter and full year of 2005*** and Rackable Systems' overall operational and strategic achievements during these periods including Mr. Barton's contribution to thereto.

[2005 Proxy at 20 (emphasis added).

237.    Predictably, in stark contrast to the generous cash compensation received by defendant Barton based on the Company's reported stellar 2005 performance, he received no cash bonus for the year 2006. [2006 Proxy at 23].

238.    In addition, defendants Barton and Ford received enormous proceeds from the sales of stock upon option exercises in 2006. The 2006 proceeds dwarfed those realized from the same type of transactions in 2005.

239.    The 2006 Proxy reported that defendant Barton exercised 200,000 options in 2006 and realized proceeds of over $7.2 million upon the sale of the underlying Rackable stock, as compared to 2005, when defendant Barton exercised 141,825 options to acquire the

Company's stock and upon the sale of the underlying stock, received approximately $2.5 million. [2006 Proxy at 26; 2005 Proxy at 17].

240.    Defendant Ford made out even better.   Ford exercised 238,389 options to acquire the Company's stock in 2005 and upon sale of such stock reaped $4.1 million of proceeds, as compared to receiving $12.6 million in 2006 upon the exercise of 375,000 options and sale of the underlying stock acquired.   [2005 Proxy at 17; 2006 Proxy at 26].

241.    Defendant Ranganathan had no options to acquire stock that were vested during 2006 as she commenced employment in late 2005.   However, as explained in the Proxy, defendant Ranganathan's compensation, as all other executive officers', was determined as follows by the compensation committee of the Board, and was positively correlated with revenues, earnings, and stock price:

**General Compensation Philosophy**

The Committee's philosophy is to provide a compensation package that attracts and retains executive talent by providing a mix of cash and equity-based compensation that the Committee believes appropriate to align the short- and long-term interests of Rackable Systems' executives with that of its stockholders. It is the Committee's practice to provide incentives to its executives that promote both the short- and long-term financial objectives of Rackable Systems. Achievement of short-term objectives is rewarded through base salary and performance-based, cash incentives, while equity-based incentive grants encourage executives to focus on Rackable Systems' long-term goals as well. ***These performance-based, cash incentives are based on financial objectives of importance to Rackable Systems, including revenue and earnings growth.*** Rackable Systems' compensation practices reflect a pay-for-performance philosophy, whereby ***a significant portion of executive compensation is at risk and tied to both individual and Company performance.***

[2005 Proxy at 20 (emphasis added)]

                    *                    *                    *

To achieve these objectives, the Committee implements and maintains compensation plans that tie a substantial portion of the executives' overall compensation to individual and company performance ***and the price of our stock.***

[2006 Proxy at 20 (emphasis added)]

242.    Accordingly, the Individual Defendants had strong motivation to inflate financial results and future prospects, which in turn inflated the stock price of Rackable to receive increased incentive cash and stock rewards.

## C.    Insider Stock Sales

243.    Insiders apparently aware of the Company's longstanding but undisclosed: (a) practice of not collecting state sales and use tax from its customers to keep product prices at a competitive level and\or (b) inabilities to forecast product pricing and costing due to material weaknesses in the Company's internal controls over its inventory accounting and reporting and "just-in-time" inventory procurement subject to vendor minimum purchase requirements, unloaded all of their shares of Rackable stock as quickly as they could after the Company's IPO, as one financial report observed:

> Stock based compensation charges in 2006 totaled $20.8MM as management continued to be lavished with $0 cost stock, exercise pre-IPO options and dump their shares.  It seems like more than adequate compensation for the worst performing stock in the Russell 3000.  In its short life as a public company, insiders and management have sold over $450 million worth of stock.  When you include IPO proceeds that made direct payments and preferred stock redemptions, the total is about $500MM, more than today's entire market cap. The Investment Bankers facilitated most of these sales (thus avoiding Rule 144 restrictions) and collected some very handsome fees.  Following the $12 IPO in June 2005 where insiders received about 35% of the proceeds, bankers allowed insiders to sell 5.4MM shares (or 68%) of the December 2005 secondary at $19. They followed up in March 2006 allowing sales of 4.2 million shares (or 56%) at $38.  Now, CEO Barton won't even take their calls.
>
> Since the [February 2, 2007] conference call, RACK has seen two additional downgrades.  The stock could see continued pressure back to the $12 IPO price as frustrated analysts and investors throw in the towel.
>
> Rackable Systems brings to mind the "One Hit Wonder" the Baha Men, and their aptly titled tune: Who Let the Dogs Out?

[February 7, Trey Wasser, "Rackable Systems: A One Hit Wonder?"]

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

244.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Rackable between October 30, 2006 through April 4, 2007 (the "Class Period"), and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

245.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Rackable's securities were actively traded on the NASDAQ market.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

246.   Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

247.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

248.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)   whether statements made by defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the business, operations

and management of Rackable; and,

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

249.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### APPLICABILITY OF PRESUMPTION OF
### <u>RELIANCE FRAUD-ON-THE-MARKET DOCTRINE</u>

250.    At all relevant times, the market for Rackable securities was an efficient market for the following reasons, among others:

(a) Rackable securities met the requirements for listing, and was listed and actively traded on the NASDAQ market, a highly efficient market;

(b) As a regulated issuer, Rackable filed periodic public reports with the SEC and the NASD;

(c) Rackable regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and,

(d) Rackable was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

251.    As a result of the foregoing, the market for Rackable securities promptly digested current information regarding the Company from all publicly-available sources and

reflected such information in Rackable common stock price.  Under these circumstances, all purchasers of Rackable securities during the Class Period suffered similar injury through their purchase of Rackable securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

252.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements plead in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements: (a) there were no meaningful cautionary statements identifying important factors which could cause actual results to differ materially from those in the purportedly forward-looking statements; or (b) the particular speakers of such forward-looking statements knew that the particular statements were false or misleading the particular speaker knew that the particular statements were false or misleading, and/or the forward-looking statements were authorized and/or approved by an executive officer of Rackable, who knew that those statements were false when made.

253.    Further, statements contained in financial statements are not shielded by the Exchange Act's statutory safe harbor.

254.    Defendants had a duty to update the risk warnings throughout the Class Period and did not.  By not updating and\or providing specific instead of no or boiler-plate risk warnings, defendants further concealed and misrepresented the true state of affairs at Rackable.

## LOSS CAUSATION

255.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's common stock and misled the purchasers of Rackable's common stock.

256.    During the Class Period, as alleged herein, defendants made false statements or failed to disclose several adverse facts, and\or material risks to the Company's ability to

forecast gross margins, net income and earnings per share such as the failure to collect and bill sales and use taxes, the prospects for and integration of its Rapid Scale acquisition, the Company's inadequate internal controls over inventory, cost accounting, and procurement, vendor minimum purchase requirements, and misrepresented the Company's financial condition, results of operations and future prospects thereby.

257.    Defendants' false and/or misleading statements had their intended effect, causing Rackable's stock to trade at artificially inflated prices throughout the Class Period and thereafter until 2008, when the artificial inflation was more fully dissipated.

258.    As alleged herein, as the truth was gradually revealed and\or concealed risks materialized on or about January 16, 2007, February 2, 2007, April 4, 2007, and April 24, 2007 the price of the Company's stock fell precipitously on heavy trading volume, as alleged above.

259.    On January  16, 2007, the relevant truth began to be partially disclosed when defendants announced that revenues "broke the $100 million quarterly revenue mark" for Q4 2006, but both preliminary estimates of gross margins and earnings goals were not "achieved for the quarter." The Company issued a press release announcing its Q4 2006 preliminary results of $105.5 million to $106.8 million in revenues, "non-GAAP" gross margins of between 19.2% and 19.7% and Generally Accepted Accounting Principles ("GAAP") net income (loss) of between $(683,000) to $194,000 or $(0.2) - $0.01 per share.  Defendants stated the reasons for the adverse gross margin impact were:  (a) higher costs associated with component computer memory pricing for the Company's products; (b) "intense competitive conditions that caused the Company to price contracts more aggressively;" and (c) lower than expected sales from the Company's "Rapid Scale products."  Following the announcement, securities analysts questioned the Company's credibility indicating that the stated reasons from the Company didn't add up.  The analyst from Thomas Weisel Partners cast severe doubt on the veracity of defendants' excuse for the margin miss.  In a report issued the same day, Kevin Hunt wrote:

> **Something does not compute**:  Management is not talking, which is cause for concern, and the stated reasons do not add up. The company is citing (1) lower storage revenue, but storage is too small to have a big

margin impact; (2) *higher DRAM pricing, which is not consistent with our checks that indicate declining DRAM; and (3) aggressive pricing, which is also not consistent with our checks or management's commentary throughout the quarter.*

\*      \*      \*

We maintain an Overweight rating on Rackable Systems, despite a negative EPS preannouncement that is likely to cause investors to question management's credibility for some time. The EPS miss was all gross margin related, and we do not have a lot of credible answers as to why the miss may have occurred, which is reason for some concern.

(emphasis added).

260.   On this news, which was not accompanied by a press conference to explain the matters which did not "compute" to those who followed the stock, the price of the Company's stock plummeted, falling $12.44 per share or almost 38% from its closing price on January 16, 2007 of $32.42 per share to close at $19.98 per share on January 17, 2007 on exceedingly high trading volume of greater than 30 million shares.  (However, the Company's stock would fall even further as materialization of concealed risks and\or further corrective disclosures were made on at least the following dates: February 1, 2007, February 28, 2007, April 4 and 5, 2007, and April 26, 2007. )

261.   On February 1, 2007, defendants released Q4 2006 and annual "final" results and conducted a conference call with analysts concerning same.  The "final" figures announced for the Q4 2006 were: GAAP gross margins of 18.8%; "Non-GAAP" Gross margins of 19.8%; and net income of $536,000 and EPS of $0.02 per share.   Defendants provided additional reasons for the shortfall.  Most of these reasons were precisely the ones defendants assured analysts that would not reoccur at the beginning of the Class Period – and the ones already called into question by analysts weeks earlier:

(a)   Revenue was "backend loaded" with 74% of the revenues in the last month of the quarter;

(b) "Subsequent" to the October 30, 2006 conference call, DDR1 memory prices "unexpectedly" spiked 20 to 30%. Rackable may have to take "large excess and obsolete charges in the future" for the high-priced DDR1 inventory that it is carrying on its books;

(c) "Since pricing had been locked in with most of our customers we were not able to pass the memory price increases through to our end [user] customers;"

(d) Rackable went below minimum margin contract pricing terms with at least one of its customers to meet or beat a competitor's price;

(e) "Power supplies" shortages due to "poor planning" caused increased costs of sales; and, among other things.

(f) "We have taken immediate action to improve the visibility in our new ERP system[.]"

262.    On February 2, 2007, Caris & Co. downgraded Rackable because of "structural issues":  Due to pricing pressure from H-P and Dell, "RACK has decided to maintain its share and sacrifice margins and profitability to protect its share … the company appears to be losing visibility …"  On this news, the price of the Company's stock fell further.  On February 2, 2007, the price fell from its previous day's close of $20.34 per share by $3.65 or 17%, to close at $16.60 per share on unusually high trading volume of over 19 million shares traded.

263.    On February 28, 2007, Rackable's Form 10-K for the year ended December 31, 2006 was filed with the SEC [the "2006 10-K"].  Therein, it was disclosed for the first time that "[i]n the last quarter, the Company started billing sales tax to its customers" and that the receivable from customers for uncollected sales and use taxes was up to $6.5 million.  However, the "accruals" (or "reserves") for "interest and uncollectiblity" were only at 11.2% of the receivable, whereas at year ended December 31, 2005, the "accrual" was at 37% of the only $1.2 million receivable.  Noticeably, despite having discussed potential write offs for obsolete inventory, there was no discussion of reserves as there had been in the 2005 Form 10-K.

264.    Shortly after the filing of the 2007 10-K, the price of the Company's stock fell once again. Between February 28, 2007 and March 2, 2007, the price declined to close at $16.50 per share on March 2, 2007 from its close of $17.41 per share on February 28, 2007.

265.    On April 4, 2007, the Company issued an "update" to Q1 2007 results forecasts. The release stated, among other things, that "[t]he company now expects GAAP and non-GAAP gross margins for the [2007] first quarter to be approximately 30% lower than previously communicated expectations. The primary factor reported impacting gross margin in the first quarter was "the intensity of competition in the company's largest accounts." The Company also reported that it expected G&A or operating expenses to be higher "than expected" because of "additional charges relating to sales and use tax exposures from past sales to various customers." Finally, the Company reported that because of the foregoing and other items, it would report a loss for the quarter.

266.    On the following day, April 5, 2007, defendants conducted a conference call with analysts. After the call, at least one analyst concluded in a report that competitors could sell products at lower prices than Rackable as they carried less expensive DRAM inventory, because DRAM prices fell "roughly 40%" and Rackable could not pass the more expensive inventory it was holding onto its customers by increasing product prices. The same analyst stated that Rackable's "business model" was "flawed." Another analyst at the conference call implied that it was misleading for defendants to keep touting $20 million in projected Rapid Scale revenues for 2007 with its purported 60% gross margins as a significant factor to increase overall margins, as such amount was only "4-5%" of the Company's quarterly revenues. As the analyst pointed out, "You are not going to be attaining your 20% or higher levels anytime soon with that analysis."

267.    Defendants also discussed on the April 4, 2007 call that "the Company had [nexus] in several states where we were required to charge sales taxes going back to years 2003, 2004 and 2005 and we had not charged sales taxes appropriately in those states . . . We did have an ERP system limitation." However, witnesses indicated that defendants had consciously chosen not to charge sales tax (CW17) and only blamed non-existent computer

programming limitations on Rackable's earlier failure to do so (CW8).  The sales tax issue did not go unnoticed as even a *BusinessWeek.com* article pointed out, "Rackable Systems also expects to take hits on sales and 'use tax exposures from past sales to various customers.'"

268.     Between April 4, 2007 and April 9, 2007, the first trading day after the April 5, 2007 conference call, the price of the Company's stock plummeted once again.  From its April 4, 2007 close of $16.88 per share, the stock fell to close at $14.24 per share on trading volume of greater than $18.3 million shares.  On April 9, 2007, the stock price drifted lower on heavy trading volume to close even lower at $13.35 per share.

269.     On April 26, 2007, the Company announced final 2007 first quarter figures. Gross margin was a dismal 12.5%.  Net loss for the quarter was $10.2 million or ($0.13) per share.  The Company also conducted a conference call on the same day.  Therein, it was reported that competitive "intensity in our largest account" continued and it also was announced that the $1.0 million charge discussed at the April 5, 2007 conference call was now doubled to approximately $2.0 million "related to prior year's sales and use tax exposures."

270.     In addition, defendants reported that "professional service fees relating to the assessment of sales and use tax exposures" would be "higher."   The market apparently could read between the lines concerning the sales tax and professional fee increased expenses.  And sure enough, disclosed in the 2007 Form 10-Q for the quarter ended March 31, 2007 (the "2007 1Q-10Q"), the Company reported that it had received a notice of sales and use tax audit from the State of California "in 2006." Not until much later revealed, the Company's additional accruals for year-end December 31, 2006 were for "two items" as opposed to one, as originally reported in the 2006 10-K: (a) "potential state sales and use tax liability relating to prior years product sales to customers outside California" "identified" "in December 2005"; *and* (b) the 2006 State of California "sales and use tax audit." [2007 3Q-10Q at 10].  The gross tax liability for these two items as of December 31, 2006, was $7.2 million.  The Company "settled" with California shortly after Q2 2007.[18]   In the first nine months of 2007, charged

_____

[18] While a "settlement" with California may have been for less than was owed (including interest and penalties), participation in 18 voluntary, self-reporting programs during 2007 required Rackable to provide three years of data and pay the taxes owed.  (CW8)  Therefore,

general and administrative expenses $2.3 million for amounts deemed unrecoverable since December 31, 2006. These figures dwarf the paltry $300,000 charged in 2006 and $426,000 charged in 2005. CW8 and CW16 indicated that Yahoo owed a huge amount of sales and use taxes and refused to pay them. The 2007 Form 10-K ceased reporting on the status of the customer receivables for collection of delinquent sales and use taxes.

271. Shortly after the April 26, 2007 conference call, two of the three individual defendants, CEO Barton and EVP Ford, left Rackable. Shortly after the settlement with California, the general counsel of the Company left. At the Q4 2007 conference call, it was announced that defendant CFO Ranganathan was leaving Rackable.

272. Finally and belatedly, the Company wrote off its "excess and obsolete" memory and other inventory in Q2 2007 resulting in "negative" gross margins of approximately 8.4% for that quarter. The charge was approximately $20.6 million or almost equal to the increase in the reported inventory in Q4 2006. Inventory at September 30, 2006 was reported at $47.3 million. At December 31, 2006, it was up to $68.1 million. After the 2007 second quarter write-off, inventory was back down to $43.3 million.

273. The steep declines in the market price of the Company's stock were the direct result of the loss of credibility by analysts and other market participants in defendants' statements and their ability to make reasonable forecasts. As a result of the foregoing, plaintiffs and members of the Class suffered economic loss, *i.e.,* damages under the federal securities laws.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act Against And Rule l0b-5 Promulgated Thereunder Against All Defendants

274. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

from the time of the initial notification in December 2005, these amounts were known or knowable from a review of Rackable's invoices for the purpose of recording liabilities and taking proper reserves.

275.   During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Rackable securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

276.   Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Rackable securities in violation of Section 10(b) of the Exchange Act and Rule l0b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

277.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Rackable as specified herein.

278.   These defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Rackable's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Rackable and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Rackable securities during the Class Period.

279.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

280.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Rackable's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

281.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Rackable securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Rackable's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or

upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class acquired Rackable securities during the Class Period at artificially high prices and were damaged when the true facts were revealed and the price of Rackable's common stock plunged.

282.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Rackable was experiencing, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their Rackable securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

283.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule l0b-5 promulgated thereunder.

284.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM

**Violation of Section 20(a) of The Exchange
Act Against The Individual Defendants**

285.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

286.    The Individual Defendants acted as controlling persons of Rackable within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants

had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

287.   In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

288.   As set forth above, Rackable and the Individual Defendants each violated Section 10(b) and Rule l0b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiffs prays for relief and judgment, as follows:

(a)   Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiffs as a class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as Lead Counsel;

(b)   Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury.

February 3, 2010

### GLANCY BINKOW & GOLDBERG LLP

<u>*/S/Michael Goldberg*</u>
Michael Goldberg (SB#188669)
Lionel Z. Glancy (SB#134180)
1801 Ave. of the Stars, Suite 311
Los Angeles, CA, 90067
Tel: (310) 201-9150
Fax: (310) 201-9160
E-mail: info@glancylaw.com


*Lead Counsel for Plaintiff and the Class*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28