1  MEREDITH N. LANDY (S.B. #136489)
   PETER T. SNOW (S.B. #222117)
2  O'MELVENY & MYERS LLP
   2765 Sand Hill Road
3  Menlo Park, California  94025
   Telephone:      (650) 473-2600
4  Facsimile:      (650) 473-2601
   Email:      mlandy@omm.com
5             psnow@omm.com

6  Attorneys for Defendants
   Rackable Systems, Inc., Thomas K. Barton, Madhu
7  Ranganathan and Todd R. Ford

8

9              **UNITED STATES DISTRICT COURT**

10             **NORTHERN DISTRICT OF CALIFORNIA**

11  IN RE RACKABLE SYSTEMS, INC.        )  Case No. C-09-0222-CW
    SECURITIES LITIGATION               )
12                                      )  <u>CLASS ACTION</u>
                                        )
13  THIS DOCUMENT RELATES TO:           )  **NOTICE OF MOTION AND MOTION**
    ALL ACTIONS.                        )  **TO DISMISS SUPPLEMENTAL**
14                                      )  **SECOND AMENDED COMPLAINT**
                                        )  **FOR VIOLATIONS OF THE FEDERAL**
15                                      )  **SECURITIES LAWS; MEMORANDUM**
                                        )  **OF POINTS AND AUTHORITIES IN**
16                                      )  **SUPPORT THEREOF**
                                        )
17                                      )  Date:   June 3, 2010
                                        )  Time:  2:00 p.m.
18  _____      )  Courtroom:  2, 4th Floor

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

NOTICE OF MOTION AND MOTION ................................................................................ iv

STATEMENT OF ISSUES TO BE DECIDED ..................................................................... iv

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ......................................................................................................................... 2

ARGUMENT .............................................................................................................................. 8

I.      THE PSLRA'S SAFE HARBOR REQUIRES DISMISSAL OF THE
        SECOND AMENDED COMPLAINT .................................................................. 8

II.     THE SECOND AMENDED COMPLAINT DOES NOT ALLEGE FALSE
        OR MISLEADING STATEMENTS WITH THE PARTICULARITY
        REQUIRED BY THE PSLRA AND RULE 9 ...................................................... 9

        A.      The Second Amended Complaint Fails to Demonstrate That
                Defendants' Gross Margin and EPS Projections Were False or
                Misleading When Made ............................................................................. 9

        B.      The Second Amended Complaint Fails to Demonstrate That
                Defendants' Statements Regarding Sales and Use Taxes Were False
                or Misleading ........................................................................................... 11

        C.      The Second Amended Complaint Fails to Demonstrate That
                Defendants' Statements Regarding Rackable's Inventory
                Procurement System Were False or Misleading ..................................... 13

        D.      The Second Amended Complaint Fails to Demonstrate That
                Defendants' Statements Regarding Rackable's ERP System Were
                False or Misleading ................................................................................. 15

        E.      The Second Amended Complaint Fails to Demonstrate That
                Defendants' Statements Regarding Rackable's Top Three
                Customers Were False or Misleading ...................................................... 16

        F.      The Second Amended Complaint Fails to Demonstrate That
                Defendants' Statements Regarding Rackable's Projected Sales of
                RapidScale Products Were False or Misleading ..................................... 17

III.    THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF
        SCIENTER ........................................................................................................... 18

        A.      The Complaint Does Not Allege with Particularity Facts
                Demonstrating That Any of the Defendants Had Fraudulent Intent ......... 19

        B.      The Individual Defendants' Departures from Rackable Do Not
                Support Any Inference of Scienter ........................................................... 22

        C.      The Individual Defendants' Compensation and Stock Sales Do Not
                Support Any Inference of Scienter ........................................................... 22

        D.      The Core Operations Inference Does Not Apply .................................... 23

IV.     THE COMPLAINT DOES NOT PLEAD LOSS CAUSATION ........................ 24

V.      THE COMPLAINT FAILS TO PLEAD CONTROL PERSON
        LIABILITY .......................................................................................................... 24

CONCLUSION ......................................................................................................................... 25

# TABLE OF AUTHORITIES

Page

## CASES

*Berger v. Ludwick*,
No. C 97-0728 CAL, 2000 WL 1262646 (N.D. Cal. Aug. 17, 2000)......................................... 1

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008)...................................................................................................... 23

*Brodsky v. Yahoo!, Inc.*,
630 F. Supp. 2d 1104 (N.D. Cal. 2009) ..................................................................................... 18

*Cal. Public Employees' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004)....................................................................................................... 18

*Dura Pharms., Inc. v. Broudo*,
125 S. Ct. 1627 (2005) ................................................................................................................. 2

*Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*,
353 F.3d 1125 (9th Cir. 2004)...................................................................................................... 8

*Harris v. Ivax Corp.*,
182 F.3d 799 (11th Cir. 1999)...................................................................................................... 8

*In re Apple Computer Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989)................................................................................................... 22

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
355 F. Supp. 2d 1069 (N.D. Cal. 2005) .................................................................................... 22

*In re Cylink Sec. Litig.*,
 178 F. Supp. 2d 1077 (N.D. Cal. 2001) .................................................................................... 24

*In re Downey Sec. Litig.*,
No. CV 08-3261 JRW(RZx), 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009.................... 2, 10

*In re Impac Mortgage Holdings, Inc. Sec. Litig.*,
554 F. Supp. 2d 1083 (C.D. Cal. 2008) ...................................................................................... 9

*In re Merck & Co. Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005)....................................................................................................... 24

*In re Omnicom Group, Inc. Sec. Litig.*,
No. 08-06122010 WL 774311 (2d Cir. Mar. 9, 2010)............................................................. 24

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999)...................................................................................................... 10

*In re Silicon Storage Tech., Inc. Sec. Litig.*,
No. C 05-0295 PJH, 2006 WL 648683 (N.D. Cal. Mar. 10, 2006) ......................................... 18

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*In re Stac Elecs. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996) ................................................................. 13

4

*In re Syntex Corp. Sec. Litig.*,
95 F.3d 922 (9th Cir. 1996) ................................................................. 1

5

6

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ........................................................ 19, 22

7

*In re VeriFone Sec. Litig.*,
784 F. Supp. 1471 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993) .............................. 16

8

9

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ............................................................. 24

10

*South Ferry LP, #2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) .............................................................. 23

11

12

*Teacher's Ret. Sys. of La. v. Hunter*,
477 F.3d 162 (4th Cir. 2007) .............................................................. 24

13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
127 S. Ct. 2499 (2007) ............................................................ 2, 18, 19

14

15

*Thornton v. Micrografx, Inc.*,
878 F. Supp. 931 (N.D. Tex. 1995) ....................................................... 23

16

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ........................................................ 10, 18

17

18

**STATUTES**

19

15 U.S.C. § 78u-4(b)(2) ..................................................................... 2

20

15 U.S.C. § 78u-5(c)(1)(A)(i) .............................................................. 18

21

15 U.S.C. § 78u-5(i)(l) ..................................................................... 8

22

23

24

25

26

27

28

MOTION TO DISMISS
CASE NO. C-09-0222-CW

1

## NOTICE OF MOTION AND MOTION

2

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

3       PLEASE TAKE NOTICE that, on June 3, 2010, at 2:00 p.m. or as soon thereafter as the

4   matter may be heard, in the courtroom of the Honorable Claudia Wilken of the above-entitled

5   Court, located at 1301 Clay Street, Oakland, California, defendants Rackable Systems, Inc.,

6   Thomas K. Barton, Madhu Ranganathan and Todd R. Ford shall and hereby do move the Court

7   for an order dismissing without leave to amend plaintiffs' Supplemental Second Amended

8   Complaint for Violations of the Federal Securities Laws (the "SAC").

9       This Motion is brought pursuant to the Private Securities Litigation Reform Act of 1995

10  ("PSLRA"), and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds

11  that the SAC fails to plead fraud with particularity and to state a claim upon which relief may be

12  granted.  This Motion will be based upon this Notice of Motion and Motion, the following

13  Memorandum of Points and Authorities, and the Request for Judicial Notice ("RJN") filed

14  herewith, all files and records in this action and such additional matters as may be judicially

15  noticed by the Court or may come before the Court prior to or at the hearing on this matter.

16

## STATEMENT OF ISSUES TO BE DECIDED

17      The issues to be decided on this Motion are: (1) whether the PSLRA's statutory safe

18  harbor and the bespeaks caution doctrine protect defendants' forward-looking statements from

19  any liability for plaintiffs' claims; (2) whether the SAC fails to plead with the particularity

20  required by the PSLRA and Federal Rule of Civil Procedure 9(b) that defendants misstated or

21  omitted any material fact during the putative class period in violation of Section 10(b) of the

22  Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5; (3) whether the SAC fails to

23  plead "in great detail" facts that, if true, would support a "strong inference" of scienter as to the

24  alleged false or misleading statements when those statements were made; (4) whether the SAC

25  fails to plead facts that, if true, would show that plaintiffs' alleged damages were proximately

26  caused by defendants' purported fraudulent scheme; and (5) whether the SAC fails to plead facts

27  that, if true, would state a claim for "control person liability" under Section 20(a) of the Exchange

28  Act.

MOTION TO DISMISS
CASE NO. C-09-0222-CW

**INTRODUCTION**

The SAC does not cure any of the fatal defects of the First Amended Complaint (the "FAC"), which, as this Court held, failed to allege even one of the required elements to plead securities fraud. The SAC, like its predecessor, is premised on fraud-by-hindsight allegations that Rackable must have made fraudulent gross margin and earnings per share ("EPS") projections because Rackable ultimately failed to achieve them. *See In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 934 (9th Cir. 1996) ("Because Defendants' predictions proved to be wrong in hindsight does not render the statements untrue when made."). Plaintiffs try to mask the SAC's insurmountable deficiencies with voluminous excerpts from Rackable's SEC filings and CW statements of marginal relevance. But the "verbose addition of more words" does not meet the heightened standard for pleading fraud under Rule 9(b) and the PSLRA. *Berger v. Ludwick*, No. C 97-0728 CAL, 2000 WL 1262646, at *2 (N.D. Cal. Aug. 17, 2000).

Four independent bases require dismissal of the SAC. First, the statements alleged to be false or misleading in the SAC are identical to the statements that this Court held "easily meet" the PSLRA's statutory definition of a forward-looking statement. *See* Order Granting Motion to Dismiss, Docket No. 46 (the "Order") at 14:17-25. The Court concluded that these statements were "consistently accompanied" by meaningful cautionary language and are therefore fully protected by the PSLRA's safe harbor as a matter of law. *Id.* Plaintiffs cannot cure this defect by further amendment. Defendants' statements and the cautionary language that accompanied them are immutable and no new allegations can change them. The PSLRA safe harbor is therefore a complete bar to plaintiffs' claims and requires their dismissal with prejudice. Because the PSLRA safe harbor is dispositive of all plaintiffs' claims, the Court need not address any of the SAC's other deficiencies.

Second, the SAC fails to plead particularized facts showing that any statement by defendants was false or misleading ***when made***. The SAC's vague CW statements and its allegations quoting analysts who were critical of Rackable's financial results do not obscure the absence of any contemporaneous, particularized facts contradicting any statement by defendants.

Third, the SAC falls far short of pleading facts giving rise to a "cogent and compelling"

MOTION TO DISMISS
CASE NO. C-09-0222-CW

1    inference that any defendant acted with fraudulent intent.  *See* 15 U.S.C. § 78u-4(b)(2); *Tellabs,*

2    *Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2505 (2007).  The SAC's new CW

3    statements, many of which are makeweight, do not suggest that any defendant was aware that any

4    statement was false or misleading when made.  To the contrary, several CW statements support a

5    non-culpable inference that defendants reasonably believed that Rackable would achieve its

6    projections, but that aggressive competition and increased DRAM memory costs, among other

7    factors, caused Rackable to struggle during the Class Period.  The SAC's motive and insider

8    trading allegations -- unchanged from those that this Court found deficient in the FAC -- fail to

9    support any inference of scienter and Barton's and Ranganathan's lack of any sales during the

10   Class Period negates any inference of scienter.

11       Fourth, the SAC fails to plead loss causation under *Dura Pharmaceuticals, Inc. v. Broudo*,

12   125 S. Ct. 1627 (2005).  The SAC alleges that the "truth" was revealed through the same four

13   purported "corrective" disclosures alleged in the FAC, none of which demonstrate a causal

14   connection between defendants' alleged misrepresentations, the revelation of any alleged fraud,

15   and a drop in Rackable's stock price.  Order at 20:22-24.

16       Because plaintiffs cannot cure the SAC's defects by further amendment, it should be

17   dismissed with prejudice.  *See In re Downey Sec. Litig.*, No. CV 08-3261 JRW(RZx), 2009 WL

18   2767670, at *16 (C.D. Cal. Aug. 21, 2009 ) (dismissing second amended complaint with

19   prejudice where Court "has no reason to believe that Plaintiff would be able to remedy [the

20   complaint's] material defects if it was given yet another opportunity to do so").

21                                    **BACKGROUND**

22       Based in Milpitas, California, Rackable designs and sells servers and storage products for

23   large-scale data center deployments.[1]  RJN Ex. 7.  Rackable's customers include over 300

24   companies worldwide in the Internet, semiconductor design, enterprise software, federal

25   government, entertainment, financial services, oil and gas exploration and biotechnology

26   industries.  *See id.*, Ex. 12 at 2.

---

[1] On May 11, 2009, Rackable completed its acquisition of the operating assets of the former
Silicon Graphics, Inc. and on May 18, 2009, changed its name to Silicon Graphics International
Corp. and its NASDAQ stock ticker symbol to "SGI."

MOTION TO DISMISS
CASE NO. C-09-0222-CW

1    In December 2002, defendants Thomas K. Barton and Todd R. Ford joined Rackable as its

2    Chief Executive Officer and Chief Financial Officer, respectively.  Ford transitioned to Executive

3    Vice President of Operations in December 2003.  From 2002 to 2005, Rackable grew under

4    Barton's direction from 31 employees and annual revenue of $20.4 million to 174 employees and

5    annual revenue of $215 million.  RJN Ex. 2 at 35.  In June 2005, Rackable completed its initial

6    public offering, raising aggregate net proceeds of $67.4 million.  *Id.*  Six months later, defendant

7    Madhu Ranganathan joined Rackable as Vice President of Finance.  *Id.* at 19.

8    In Rackable's first annual report as a public company, it disclosed the substantial

9    challenges to its business.  Rackable disclosed that the market for its products is "highly

10   competitive, rapidly evolving and subject to changing technology, customer needs and new

11   product introductions."  RJN Ex. 2 at 17.  Rackable identified as its competitors large vendors

12   such as Dell Inc., Hewlett-Packard Company, International Business Machines Corporation and

13   Sun Microsystems, Inc. *Id.*  Rackable warned investors that it relies on a small number of

14   customers for a significant portion of its revenue, a trend which Rackable expected to continue.

15   *Id.* at 37.  In 2005, Microsoft, Yahoo! and Amazon.com accounted for 14%, 22% and 24% of

16   Rackable's revenue, respectively.  *Id.*

17   Because Rackable's build-to-order business model requires it to obtain the materials for

18   its products in spot markets, its cost structure and ability to respond to customer demand are

19   sensitive to market price volatility for those materials.  RJN Ex. 2.  Rackable cautioned investors

20   that historical prices for DRAM, already a large component of its costs, had been volatile in

21   response to market supply and demand and that DRAM was becoming a larger percentage of its

22   bill of materials.  *Id.* at 38.

23   Rackable also disclosed that in December 2005 it had identified "potential state sales and

24   use tax liabilities relating to certain of our product sales to customers outside of California,"

25   which it estimated to be $1.2 million.  RJN Ex. 2 at 27.  Rackable advised investors that if it was

26   not able to recover the sales tax from its customers, it would have to record an additional charge

27   to its operating results and pay the sales tax out of its own funds.  *Id.*

28   Despite these challenges, Rackable continued to build its business in 2006.  In September

3

1    2006, Rackable acquired Terrascale Technologies, Inc., a Canadian storage technology company.

2    RJN Ex. 24.  This acquisition increased the "scalability and manageability" of Rackable's

3    products and added "RapidScale" storage appliances to its product line.  *Id.* Ex. 12 at 2, Ex. 24.

4            On October 30, 2006, Rackable announced that its total revenue for the first three quarters

5    of 2006 was $253.5 million, up 92% from $131.9 million for the same period in 2005.  RJN

6    Ex. 7.  Rackable's non-GAAP gross margin of 22.6% for the third quarter was within its

7    projections of 22% to 24%.  *Id.* Ex. 28 at 2.  Rackable announced that it was increasing its

8    financial projections for the fourth quarter, projecting revenue in the range of $100 - $110

9    million, non-GAAP gross margins from 23% to 24%, and non-GAAP net income from $0.25 -

10   $0.27 per share.  *Id.* Ex. 7.  In its Form 10-Q, Rackable increased its gross tax liability for unpaid

11   state sales and use tax to $4.4 million.  *Id.* Ex. 8 at 18.  On the earnings call, Barton explained that

12   Rackable's increased projections were based on revenues produced quarter-to-date, the current

13   backlog of business, and "to some extent, due to our belief that the DRAM markets are

14   softening."  RJN Ex. 28 at 9.  Barton noted that Rackable had implemented an Oracle Enterprise

15   Resource Planning system ("ERP System"), which was designed to improve its disclosure

16   processes and internal controls over financial reporting.  *Id.* Ex. 28 at 2.

17           A combination of unexpected events, however, caused Rackable to miss its increased

18   gross margin and EPS projections for the fourth quarter.  RJN Ex. 10.  Already intense

19   competition in the server market became even more aggressive, which forced Rackable to

20   strategically discount certain contracts to maintain and expand customer relationships.  *Id.*  At the

21   same time, a price spike in the DRAM markets increased Rackable's costs.  *Id.*  Rackable was

22   unable to make up for the lower margins earned on its products due to lower-than-expected sales

23   of the RapidScale products that it recently acquired from Terrascale.  *Id.*  In addition, because

24   most of Rackable's revenue came in at the end of the quarter, the full impact of these events was

25   not known until after the quarter closed.  RJN Ex. 11.

26           On January 16, 2007, Rackable preliminarily announced that revenue for the fourth

27   quarter 2006 was expected to be toward the high-end of its projection ($105.5 - $106.8 million),

28   but that it would not achieve its gross margin and EPS projections.  RJN Ex. 10.  The next day,

4

Rackable's stock price fell from $32.42 per share to close at $19.98 per share.  SAC ¶ 6.

On February 1, 2007, Rackable announced its final financial results for the fourth quarter and full year 2006.  RJN Ex. 11.  Although Rackable reported record annual revenue of $360.4 million for the full year, up 67.6% from 2005, it confirmed that its gross margin for the fourth quarter fell below its previously projected range.  *Id.* Ex. 29 at 3.  Barton explained that a $3.9 million shortfall caused Rackable to miss its gross margin projections: (i) $1.8 million was due to "having to procure DDR memory at unexpectedly high prices," (ii) $1.2 million was due to "intentional business decisions we made to maintain market share and win business in the face of extremely aggressive competition," (iii) $600,000 was due to lower-than-anticipated sales of RapidScale products, and (iv) $300,000 was due to the fact that revenue production was "backend loaded" for the quarter.  *Id.*  To better manage Rackable's costs, Ford stated that the company had "taken immediate action to improve the visibility in our new ERP system and are in the process of up leveling our procurement and materials planning organization."  *Id.* at 5.

Barton stated:  "[T]he competitive intensity is escalating more rapidly than we had anticipated.  For example, we have seen some instances where we believe our competitors have taken deals at a significant loss to win or maintain a footprint within a specific account."  RJN Ex. 29 at 4.  Rackable revised down its annual revenue projection for 2007 to $450-$525 million (from $475-$525 million) and its non-GAAP gross margin to 18% - 22%.  *Id.* at 6.  Due to expected quarter-to-quarter volatility and Rackable's uneven revenue stream, Barton announced that Rackable would no longer be providing specific quantitative quarterly projections.  *Id.* at 7.

On the day following the earnings call, Rackable's stock price fell from $20.34 per share to $16.60 per share.  Complaint ¶ 17.  Analysts did not question the basis for Rackable's previous projections, but stated that increased competition had placed greater pressure on Rackable's gross margins.  *See* RJN Ex. 39 ("Pricing pressure . . . has increased noticeably, and RACK has decided to maintain share and sacrifice margins and profitability to protect its share.  This is a strategy fraught with risk . . . ."), Ex. 40 ("Given the significant resources of key competitors such as Dell and HP, and their clear intention to take market share back from Rackable using pricing power, we believe the company is in a very difficult competitive position.").

5

1      On February 28, 2007, Rackable released its Form 10-K for 2006.  In addition to the

2   financial results discussed above, the Form 10-K disclosed that Rackable increased its reserve for

3   potential sales and use tax liability to $6.5 million based on additional information received from

4   its customers.  RJN Ex. 12 at 20.

5      In the first quarter of 2007, aggressive competition continued to cause Rackable's

6   profitability to suffer.  On April 4, 2007, Rackable announced that it expected revenue for the first

7   quarter to fall within previous projections of $70 - $75 million, but that its GAAP and non-GAAP

8   gross margins would be 30% lower than expected.  RJN Ex. 13.  Barton stated:  "Intense

9   competitive conditions for business at our largest customers continued throughout the first quarter

10   of 2007, which negatively impacted our gross margin and bottom line."  *Id.*  Barton outlined three

11   initiatives to address the increased competition.  *Id.* Ex. 30 at 2.  First, Rackable would stabilize

12   gross margins in its largest accounts.  *Id.*  Second, it would cultivate a broader base of business to

13   reduce its dependence on those largest accounts for revenue.  *Id.*  Third, Rackable would expand

14   its efforts to market and develop "higher value, higher margin" products using its RapidScale

15   technology and high-performance computing capabilities.  *Id.* at 3.

16      After this announcement, Rackable's stock price fell to $14.24 per share.  Complaint ¶ 22.

17   Again, however, analysts cited increased competition with companies such as Hewlett Packard,

18   Dell, IBM and Sun Microsystems as responsible for the decline in Rackable's gross margins --

19   not that the Company had concealed any information from the market.  *See* RJN Ex. 43 ("We

20   remain cautious on Rack's shares as it's tough going in the land of giants."), Ex. 42 ("Given

21   [management's comments during Rackable's December investor conference call], we believe

22   management has been extremely clear as to its dire competitive position.").

23      Rackable released its final financial results for 1Q07 on April 26, 2007.  RJN Ex. 15.

24   Total revenue was $72 million, within the projected range, but GAAP gross margin was 12.5%,

25   compared to 23.1% for the first quarter 2006.  *Id.*  The decline in Rackable's gross margin caused

26   a GAAP net loss of $10.2 million for the first quarter.  *Id.*  On the same day, Barton announced

27   that to address the increased competition, "we have also come to the conclusion that we need to

28   accelerate a shift in our overall business model, specifically to increase the level of

6

1   standardization in our product line, and to move from a pure build-to-order model to a configure-

2   to-order model." *Id.* Ex. 31 at 3. "This has profound implications for how we manage the

3   Company going forward, and I expect it to deliver very significant improvements in our operating

4   model over time." *Id.*

5          Analysts acknowledged Rackable's move towards more "standardized" configurations of

6   its products, but remained concerned due to expectations that "[i]ntense pricing pressure" would

7   continue "for the foreseeable future."  RJN Ex. 46; *see also* Ex. 45 ("We believe the large miss in

8   Q1 was driven by continued intense competitive pricing by Dell at the Company's largest

9   customers . . . ."), Ex. 44 ("We continue to recommend that investors sell their shares in RACK as

10  the company is facing strong competition from HP and Dell and the company will likely not

11  achieve profitability in the immediate future.").  On April 27, 2007, Rackable's stock price fell to

12  $11.27 per share, down from the previous day's close of $12.58 per share.  Complaint ¶ 185.

13         It was not until nearly two years later, on January 16, 2009, that plaintiffs filed this

14  purported shareholder class action alleging that beginning on October 30, 2006, defendants

15  engaged in a fraudulent scheme to inflate Rackable's stock price by misrepresenting Rackable's

16  true financial condition and future prospects.  On June 15, 2009, plaintiffs filed the FAC, which

17  defendants moved to dismiss on August 13, 2009.  On January 13, 2010, this Court entered its

18  Order granting defendants' motion to dismiss.  Order at 21-22.  Plaintiffs Second Amended

19  Complaint, filed on February 3, 2010, repeats virtually unchanged the allegations from the FAC

20  that defendants made false or misleading statements regarding Rackable's (1) gross margin and

21  EPS projections for the fourth quarter of 2006, (2) collection of sales and use taxes from its

22  customers, (3) inventory procurement system, (4) ERP System, (5) relationship with its top three

23  customers, and (6) projected sales of RapidScale products.  *See, e.g.*, SAC ¶ 79(a)-(b).  On April

24  5, 2010, this Court granted plaintiffs leave to file the Supplemental Second Amended Complaint

25  (the "SAC"), which changed only the names of the lead plaintiffs in the action.

26

27

28

MOTION TO DISMISS
CASE NO. C-09-0222-CW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARGUMENT**

I.   **THE PSLRA'S SAFE HARBOR REQUIRES DISMISSAL OF THE SECOND AMENDED COMPLAINT**

The SAC must be dismissed in its entirety because every statement alleged to be false or misleading is protected by the PSLRA's safe harbor. *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1133-34 (9th Cir. 2004) (forward-looking statements accompanied by meaningful cautionary language are inactionable as a matter of law).

All the SAC's allegations are described in terms of their impact on Rackable's financial projections, which this Court has already held "easily meet the definition of a forward-looking statement." Order at 14:17-23.[2]  The SAC alleges that Rackable understated its sales and use tax liability to improve its profitability, and that Rackable failed to meet its projections because its margins fell when it began billing sales tax in 4Q06.  *See* SAC ¶ 80(a).  Rackable is alleged to have been incapable of predicting its inventory costs, one of the components of its projections, due to inherent flaws in its inventory procurement system.  *Id.* ¶ 80(b).  The SAC alleges that Rackable did not have visibility into its future revenues because the ERP system was poorly implemented and required significant upgrades.  *Id.* ¶ 79(b)(vii).  Rackable's practice of discounting its products for its largest customers allegedly depressed Rackable's margins so severely that Rackable could not make up the difference on sales of its other products.  *Id.* ¶ 79(b)(iii).  Finally, the SAC alleges that Rackable "had no basis to rely upon sales of its newly-acquired RapidScale products to buoy the Company's gross margins in Q4 2006."  *Id.* ¶ 80(c).

Because plaintiffs explicitly allege that each of these factors caused Rackable's projections to be false or misleading, defendants' statements about these factors are within the PSLRA's safe harbor. *See Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999) ("[W]hen the factors underlying a projection or economic forecast include both assumptions and statements of known fact, and a plaintiff alleges a material factor is missing, the entire list of factors is treated

---

[2] Citing 15 U.S.C. § 78u-5(i)(l) (A forward-looking statement includes statements "containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items," statements of "the plans and objectives of management for future operations," and statements of "future economic performance.").

MOTION TO DISMISS
CASE NO. C-09-0222-CW

1    as a forward-looking statement."). Defendants' forward-looking statements are fully immunized

2    from liability because, as this Court also held, they were "consistently accompanied" by

3    meaningful cautionary language. *See* Order at 14:23-25; RJN Exs. 5, 7, 10, 11,-13, 28, 29.

4          The PSLRA safe harbor is an insurmountable bar to plaintiffs' claims. No additional

5    allegations, no matter how particularized, can change this Court's determination that defendants'

6    statements were forward-looking and accompanied by meaningful cautionary language. The

7    PSLRA safe harbor therefore requires dismissal of this lawsuit in its entirety and with prejudice.

8    *See In re Impac Mortgage Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1102 (C.D. Cal. 2008)

9    (dismissing first amended complaint with prejudice where the court "has no reason to believe that

10    Plaintiffs would be able to remedy these material defects if they were given a third bite at the

11    apple.").

12 **II.    THE SECOND AMENDED COMPLAINT DOES NOT ALLEGE FALSE OR**
       **MISLEADING STATEMENTS WITH THE PARTICULARITY REQUIRED BY**
13        **THE PSLRA AND RULE 9**

14        **A.    The Second Amended Complaint Fails to Demonstrate That Defendants'**
               **Gross Margin and EPS Projections Were False or Misleading When Made**
15

16          The SAC fails to add any allegations showing that Rackable's gross margin and EPS

17    projections were false or misleading when made. Noting the lack of specificity of these

18    allegations in the FAC, this Court stated that plaintiffs' amended complaint "must plead specific

19    facts from which a reasonable inference can be made that Defendants knew their projections

20    about their gross margin and EPS were false at the time that they made them." Order at 10.

21          The SAC repeats, sometimes verbatim, the allegations from the FAC that Rackable sold

22    products to its largest customers at low or negative margins to compete with larger companies

23    like Dell. *See* FAC, ¶ 263(e); SAC ¶ 59(c), 64(a). The only "new" fact the SAC adds is that

24    Rackable hired an outside auditor "to investigate the costs associated with manufacturing

25    products," but there are no allegations describing the results of these outside auditors'

26    investigation. SAC ¶ 56(f). The SAC further alleges that CW1 "believes" an audit report was

27    provided to senior management, but CW1 never saw any such report and does not describe its

28    contents. *Id.* Without such information, there is no basis to infer anything about what Rackable's

management knew or did not know when it made Rackable's projections for 4Q06. *See In re*

*Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999) (allowing a plaintiff "to go

forward with a case based on general allegations of 'negative internal reports' would expose all

those companies to securities litigation whenever their stock prices dropped").

Moreover, the SAC acknowledges that management's strategy was to offset the lower

margins on sales to its largest customers "by achieving higher margin sales with the RapidScale

product line and by establishing a stable, worldwide sales force to expand the customer base."

*See* SAC ¶ 64(a). That Rackable struggled to execute this strategy in 4Q06 does not mean that

management had no reasonable basis to believe it could be effective. To the contrary, the SAC

suggests that this strategy had been effective for Rackable, at least prior to 4Q06. CW13, an

inside sales manager from 2003 to 2009, is alleged to have "delivered good gross margins" on her

customers, none of which were Rackable's largest customers. SAC ¶ 68(a); *see In re Downey*,

2009 WL 2767670, at *10 (contradictions among CW statements "severely undermine the

reliability of the confidential witnesses").

Plaintiffs have also added allegations asserting that 4Q06 was a difficult quarter for

Rackable -- something that defendants do not dispute. CW4, for example, is now alleged to have

said that Rackable's management made a "huge push" during 4Q06 to get sales to meet

Rackable's revenue target and "appeared desperate." SAC ¶ 59(j). Similarly, CW15 is alleged to

have overheard at some unspecified point during 4Q06 that Rackable was "having bad quarter."

SAC ¶ 70(d). These vague allegations, based largely on rumors, overheard conversations, and

hearsay, do not shed any light on the validity of Rackable's projections at the beginning of the

quarter. *In re Downey*, 2009 WL 2767670, at *10 (dismissing CW statements regarding company

practices and board's knowledge of market trends because they were "based on mere rumor and

speculation"); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 n.4 (9th Cir. 2009)

("[A] hearsay statement, while not automatically precluded from consideration to support

allegations of scienter, may indicate that a confidential witnesses' report is not sufficiently

reliable, plausible, or coherent to warrant further consideration under *Daou*.").

The SAC also adds allegations regarding management's decision in 4Q06 to authorize the

MOTION TO DISMISS
CASE NO. C-09-0222-CW

1    pre-build of a customer order to ensure its shipment before the end of the quarter.  *See* SAC

2    ¶ 59(j).  CW4 speculated that Rackable might have given the customer a 10% discount or an

3    extended payment plan in exchange for its purchase of the product in 4Q06, rather than early

4    2007.  *Id.*  But, even if true, there is nothing improper or unusual about offering a customer a

5    discount or special financing to incentivize the purchase of a product.  Nor does this alleged

6    impromptu decision in the middle of 4Q06 reveal anything about the basis for Rackable's

7    projections at the beginning of the quarter.

8            The SAC also relies on analyst reports following Rackable's pre-announcement of its

9    4Q06 results that are critical of Rackable's performance.  Some of these analyst reports speculate

10   that Rackable should have had better margins because, for example, the analysts "heard that

11   memory price declines picked up later in the quarter."  *See* SAC p. 14 n.10.  The SAC fails to

12   couple these analysts' speculation with any facts regarding the timing and pricing of Rackable's

13   actual purchase of memory during 4Q06.  Without such facts, the analysts' speculation is just

14   that, and insufficient to plead falsity or scienter under the securities laws.

15        **B.      The Second Amended Complaint Fails to Demonstrate That Defendants'**
16        **Statements Regarding Sales and Use Taxes Were False or Misleading**

17           The SAC repeats the claim that Rackable's projections and financial statements were false

18   or misleading because Rackable allegedly understated its sales and use tax liability.  The Court

19   found these allegations insufficient in the FAC and, like its predecessor, the SAC "does not

20   contain any allegations demonstrating that sales tax charges impacted Rackable's gross margins

21   at any time during the Class Period."  *See* Order at 11:12-15.  In fact, Rackable's sales and use tax

22   liability could not have had any impact on its gross margin because, in accord with standard

23   accounting practice, Rackable's unpaid sales and use tax was recorded as a "general and

24   administrative" expense or "accrued expense," not a "cost of revenue."  *See* RJN Ex. 12 at 40

25   (calculating gross margin as revenue less cost of revenue), Ex. 12 at 31 (defining cost of revenue),

26   Ex. 12 at 20 (charging accrued sales and use tax as general and administrative expense), Ex. 12 at

27   75 (including accrued sales and use tax as component of accrued expense).

28           The SAC adds little to the allegation that CW4 was aware of purchase orders for which

                                                                      11

1    Rackable did not charge sales tax; the only new details are the amounts of the purchase orders and

2    the locations of the customers who made them.  *See* SAC ¶ 59(d).  There are no allegations

3    suggesting that Rackable did not take into account the taxes owed on these purchase orders when

4    calculating its accrual for unpaid sales tax.  CW13's and CW14's vague allegations that certain

5    customers were not charged sales tax are deficient for this same reason.  *See* SAC ¶¶ 68(b), 69(b).

6          According to CW16, Rackable's controller from March 2006 to July 2007, Rackable had

7    to bring in outside auditors to address the sales tax issue because CW16 was unable to reconcile

8    the books.  *See* SAC ¶ 71(b).  This allegation, however, suggests non-culpable conduct:  the fact

9    that Rackable proactively brought in outside auditors to address the "sales tax issue" is

10    inconsistent with any intent to fraudulently understate Rackable's sales and use tax liability.

11    Moreover, the SAC contains no allegations describing outside auditors' conclusions or

12    Rackable's response to any guidance they may have provided.

13          CW8, an accounting manager, stated that Ranganathan believed that a limitation on the

14    Oracle ERP system prevented it from calculating state taxes, but CW8 knew of an "add-on Vertex

15    product" that would have enabled the system to do so.  *See* SAC ¶ 63(a).  Because CW8 was not

16    employed by Rackable until May 2007, these allegations at most suggest that CW8 may have

17    alerted Rackable to a product that could improve the ERP system sometime after the Class

18    Period.  Even this would be a generous interpretation, however, given that the SAC does not

19    allege that CW8 ever told Ranganathan or anyone else about the Vertex product.  *Id.*

20          Similarly, CW17 did not arrive at Rackable until late 2007, months after the Class Period.

21    As a result, CW17's claim that Ranganathan "knew" that $5 million to $6 million in sales tax was

22    due "from one of Rackable's three largest customers, which refused to pay" does not shed any

23    light on what defendants knew during the Class Period.  CW17 also allegedly said that Barton and

24    Ranganathan "approved" Rackable's previous accounting positions; but there are no allegations

25    that those accounting positions were improper.  *See* SAC ¶ 72(c).

26          The SAC alleges CW6, Rackable's supply chain manager, was told by a supervisor (at

27    least a year after the Class Period) that Rackable "would not pay sales tax" on materials that it

28    purchased from its suppliers.  SAC ¶ 61(d).  Although this allegation uses the term "sales tax," it

MOTION TO DISMISS
CASE NO. C-09-0222-CW

1    remains a mystery how Rackable's refusal to pay sales tax to its suppliers had any impact on the

2    amount of sales tax that Rackable was owed by its customers.

3          Plaintiffs also continue to assert that Rackable should have disclosed, in advance, that it

4    would begin charging sales and use taxes to its California customers in 4Q06.  The SAC,

5    however, relies on allegations identical to those that this Court rejected in the FAC.  *Cf.* SAC

6    ¶ 64(b) (alleging CW9 believed not charging sales tax gave Rackable a competitive advantage)

7    and FAC ¶ 11 (alleging that not "billing" sales and use tax was an undisclosed competitive

8    advantage).  Desperate to show that the market cared about the fact that Rackable began charging

9    sales tax, the SAC alleges that the "sales tax issue did not go unnoticed" based on a

10   Businessweek.com article dated April 4, 2007 -- over a month after Rackable disclosed that it

11   began charging sales tax in its Form 10-K.  SAC ¶ 267.  Moreover, the article clearly refers to

12   "tax exposures from past sales to various customers," not the effect of charging sales tax going

13   forward.  *Id.*  As this Court noted, Rackable first disclosed to the market its potential sales and use

14   tax liability in February 2006 and continued to update the market leading up to and throughout

15   the Class Period.  Order at 11:15-19.  The SAC does not allege that any of these disclosures were

16   improper.

17      **C.**      **The Second Amended Complaint Fails to Demonstrate That Defendants'**
                    **Statements Regarding Rackable's Inventory Procurement System Were False**
18                  **or Misleading**

19         The SAC repeats the allegations that Rackable failed to properly account for excess and

20   obsolete inventory during the Class Period, but still lacks particularized facts showing that

21   Rackable should have written off any of its inventory any earlier than it did.  To the contrary, the

22   allegations show that Defendants warned investors on several occasions that a transition from

23   DDR1 to DDR2 memory in the server market could cause Rackable to write off a substantial

24   portion of its inventory.  *See, e.g.*, RJN Ex. 5 at 28, Ex. 8 at 32, Ex. 12 at 14.  This disclosed risk

25   materialized as the server market transitioned from DDR1 to DDR2 memory chips during and

26   after the Class Period and Rackable wrote down its obsolete inventory accordingly.  RJN Ex. 11,

27   Ex. 29, Ex. 5; *see In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1409 (9th Cir. 1996) (company

28   cannot be held liable under securities laws for concealing information already known to

                                                    13

1    investors).

2          The SAC repeats the same substantive allegations regarding the costs and shortcomings of

3    Rackable's just-in-time procurement policy.  *See* SAC ¶ 56(c) (CW1 alleging that purchasing

4    inventory at the last minute result in higher fees); ¶ 57(a)-(d) (CW2 alleging that experienced

5    inventory shortages and excesses throughout CW2's employment); ¶ 58(d) (CW3 alleging that

6    materials shortages and shipment delays were recurring issues); ¶ 72(e) (CW17 alleging that there

7    was a "problem with the cost model dictating purchase volume, causing Rackable to over-order

8    parts").  But, as noted in defendants' prior motion to dismiss, Rackable regularly disclosed that it

9    used a just-in-time procurement policy along with substantial cautionary language concerning the

10   risks of that policy.  *See, e.g.*, RJN Ex. 5 at 28, Ex. 2 at 21.

11         The SAC's allegations regarding Rackable's purchase of power supplies in 4Q06 are

12   identical to allegations in the FAC.  *Cf.* FAC ¶ 263(a) (alleging Rackable ordered "excess less-

13   expensive component parts, inventory, memory (which was more expensive), and 'power

14   supply.'") and SAC ¶ 65 (CW10 alleging build up of excess power supplies); ¶ 66(b) (CW11

15   alleging Rackable purchased products at the end of their life cycle, e.g., memory, or products it

16   expected to sell but did not); ¶ 76(c) (CW21 recalling "double order" of power supplies in 4Q06).

17   The SAC fails to allege, like its predecessor, that any defendant knew in advance that Rackable

18   would purchase more power supplies than it needed.  Nor are there any allegations suggesting

19   that Rackable failed to write off its excess power supplies in an appropriate manner.  The SAC

20   contradicts itself on this point, as it does on many others.  The SAC suggests that Rackable

21   should have written off its purchase of excess power supplies in 4Q06, the same quarter that they

22   were purchased.  *See* SAC ¶ 272.  But the SAC also alleges that Rackable's sales team was

23   making efforts to sell the power supplies as late as March 2007.  *See* SAC ¶ 62(c).  It stands to

24   reason that Rackable would not write off inventory that it is actively selling.  After its sales

25   efforts failed, Rackable wrote off its excess power supplies in 2Q07.  *See* SAC ¶ 131(a).  The

26   SAC fails to allege any facts contradicting Rackable's explanation for its inventory write-down in

27   2Q07.  RJN Ex. 19 at 20-21.

28

                                                                    MOTION TO DISMISS
                                                                    CASE NO. C-09-0222-CW

1

2

**D.    The Second Amended Complaint Fails to Demonstrate That Defendants'
Statements Regarding Rackable's ERP System Were False or Misleading**

3        The SAC re-asserts that defendants misrepresented that Rackable's ERP system provided

4   sufficient visibility into inventory and other costs to support Rackable's financial statements and

5   projections.  As before, this allegation fails because the SAC does not contain allegations

6   showing that defendants "were aware of any alleged deficiencies in the ERP System when

7   financial statements and projections were made."  *See* Order at 12.

8        Plaintiffs rely primarily on statements made after the Class Period by employees working

9   with or specifically tasked with improving the ERP system.  *See* FAC, ¶ 60 (alleging CW5, a

10  contract systems analyst hired in 2009, recommended re-implementing the ERP system

11  "correctly" to increase inventory visibility at month-end); ¶ 63 (alleging CW8, an accounting

12  manager hired in May 2007, noted that "Rackable was not using "'a lot' of the functionality of its

13  Oracle system"); ¶ 72 (CW17, a director of accounting hired in late 2007, opined that the

14  "implementation was too fast and the Company went live without running Oracle parallel to the

15  old system for awhile to ensure it was producing similar results").  Nothing in these statements

16  suggests that defendants were aware of any these deficiencies during the Class Period.

17       The SAC's allegations regarding implementation of the ERP system also fail to contradict

18  any of defendants' Class Period statements.  CW15's statement that implementation was an

19  "evolving process" because "there was not enough staff on board" to complete it does not mean

20  that it was not ready for service by 4Q06.  SAC ¶ 70(b).  Likewise, the allegation that CW16, a

21  controller, disagreed with Ranganathan that the implementation was "almost done" does not

22  contain sufficient particularity to infer anything about the state of the ERP system when Rackable

23  issued its projections.  SAC ¶ 71(c).

24       The SAC also includes a litany of mundane complaints about glitches in the ERP system,

25  none of which suggest anything about its ability to support Rackable's financial projections.  *See*

26  SAC ¶ 62(a) (CW7: "it took a long time to obtain a quote from the ERP system"); ¶ 67(b)

27  (CW12:  "inside sales staff" said "there were problems with the ERP system, which caused it not

28  to accurately reflect Rackable's prices"); ¶ 68(c) (CW13: it was "very difficult to obtain a quote

1   from the ERP system"); ¶ 77 (CW22 had duties that "included fixing defects in the system and

2   adding enhancements."). The SAC's vague and insignificant allegations regarding Rackable's

3   ERP system should be dismissed with prejudice.

4       E.      **The Second Amended Complaint Fails to Demonstrate That Defendants'**
                **Statements Regarding Rackable's Top Three Customers Were False or**
5               **Misleading**

6           This Court previously held that the FAC failed to plead that Rackable misrepresented its

7   relationships with its three biggest customers because "[g]iving a customer a discount does not

8   mean that a relationship with that customer is not 'pretty strong' and 'solid.'" Order at 13. The

9   SAC does not add a single new substantive allegation regarding Rackable's relationship with

10  these customers. The SAC asserts the same allegations, albeit through new CWs, that

11  competition from larger server companies, like Dell, forced Rackable to sell products to its largest

12  customers at or below cost. *See* SAC ¶ 59(c) (CW4 alleging Rackable sold products to its largest

13  customers "at cost"); ¶ 64(a) (CW9 alleging sales to largest customers were "at negative

14  margins"; ¶ 67(a) (CW12 "was aware of competition from Dell, and that Rackable had to cut its

15  price on a large deal with Yahoo! to win the project."); ¶ 69(a) (CW14 alleging Rackable's five

16  major customers had agreements with "special pricing"); ¶ 73 (CW18 alleging Rackable "had to

17  compete for every opportunity" with Microsoft and Yahoo!). These allegations do not suggest

18  that Rackable's relationships with its largest customers were not "pretty strong" or "solid," as

19  stated by Barton and Ranganathan on Rackable's October 30, 2006 conference call. Order at 13.

20          Moreover, nothing in the SAC suggests that these statements were anything more than the

21  type of general corporate optimism that is not actionable under the securities laws. *See* Order at

22  13, citing, among others, *In re VeriFone Sec. Litig.*, 784 F. Supp. 1471, 1481 (N.D. Cal. 1992)

23  ("Professional investors, and most amateur investors as well, know how to devalue the optimism

24  of corporate executives, who have a personal stake in the future success of the Company."), *aff'd*,

25  11 F.3d 865 (9th Cir. 1993). Because the SAC does not even allege actionable statements about

26  Rackable's top three customers, these allegations should be dismissed with prejudice.

27

28

MOTION TO DISMISS
CASE NO. C-09-0222-CW

1

2

F.   **The Second Amended Complaint Fails to Demonstrate That Defendants' Statements Regarding Rackable's Projected Sales of RapidScale Products Were False or Misleading**

3    The SAC alleges that Rackable had no basis to project that it would sell $20 million in

4    RapidScale products in 2007.  In the FAC, plaintiffs based this allegation exclusively on newly

5    appointed CEO Mark Barrenechea's statement that "the execution wasn't there" to support the

6    projection.  SAC ¶ 160.  As this Court noted, however, Barrenechea's judgment long after the

7    Class Period that Rackable could not meet its sales projection does not make that projection a

8    misrepresentation.  Order at 14:7-8.

9    Plaintiffs now allege a new theory of liability based on Rackable's explanation that it

10   missed its 4Q06 projections in part due to lower than expected sales of RapidScale products.  *See*

11   RJN, Ex. 10, 11.  Plaintiffs claim that this explanation implies that Rackable's 4Q06 projections

12   included expected sales of RapidScale products, which defendants allegedly had no reasonable

13   basis to expect.  This theory also fails because it is not supported by particularized allegations

14   showing that defendants knew, when the projections were made, that Rackable would not achieve

15   them.  The minimal allegations added to the SAC show just the opposite, *i.e.*, that Rackable's

16   management expected sales of RapidScale products to improve Rackable's overall gross margins.

17   In fiscal 2006, Rackable actually sold about $800,000 worth of RapidScale products.  *See* SAC

18   ¶ 79(b)(iv).  Rackable trained its sales force "to sell RapidScale storage products on three separate

19   occasions before management realized that it did not know what to do with the product."  *See*

20   SAC ¶ 59(l); *see also* SAC ¶ 62(d) (CW7 was given training and worked with engineers on sales

21   teams for RapidScale products), ¶ 66(a)(CW11 "received training on the RapidScale product").

22   The SAC acknowledges that management did not come to this realization until August 2008, well

23   over a year after the Class Period, when Rackable announced that it would "sell off this segment

24   of the business."  *Id.*; *see also* SAC ¶ 72(g) (alleging CW17 "pushed for an impairment charge"

25   for fiscal year 2007, but "Barrenechea wanted to wait").

26   The SAC also adds CW comments criticizing the RapidScale product line.  *See* SAC

27   ¶ 62(d) (calling RapidScale a "joke"), ¶ 70(c) (alleging RapidScale "could not compete with more

28   mature products already in the market"), ¶ 66(a) (Rackable's customers were not the "correct

17

1    market" for the product.)  These CWs were all employed at Rackable when it discontinued its

2    RapidScale operations in 2008.  It is not surprising that they would have concluded that the

3    RapidScale products were a bad fit for Rackable, just as Rackable did itself.

4    **III.    THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER**

5         The SAC falls far short of pleading particularized facts giving rise to the "cogent and

6    compelling" inference of scienter required by the PSLRA.  *Tellabs*, 127 S. Ct. at 2505.  Plaintiffs

7    attempt to mask this defect by piling as many allegations into the SAC as possible, no matter how

8    deficient and duplicative.  Courts confronted with similar complaints have properly rejected this

9    tactic because "[c]obbling together a litany of inadequate allegations does not render those

10   allegations particularized in accordance with Rule 9(b) or the PSLRA."  *See, e.g.*, *Cal. Public

11   Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004).

12        Moreover, this Court need not consider defendants' state of mind because their forward-

13   looking statements were accompanied by meaningful cautionary language, rendering them

14   immune from liability under the PSLRA's safe harbor.  Order at 14:23-25; RJN Exs. 5, 7, 10, 11-

15   13, 28, 29.  Even if they had not been accompanied by meaningful cautionary language, the

16   PSLRA's safe harbor would still immunize defendants' statements "unless they are made with

17   actual knowledge of their falsity."  *See* Order at 14:26-15:1; 15 U.S.C. § 78u-5(c)(1)(A)(i).  As

18   discussed below, the SAC fails to plead that defendants acted with scienter as to any alleged

19   statement, much less that they had actual knowledge that any statement was false or misleading

20   when made.

21        Of the 22 CWs in the SAC, seven were not employed at Rackable during the Class Period,

22   making it impossible for them to have direct knowledge of any defendant's contemporaneous

23   state of mind.[3]  *See Zucco Partners*, 552 F.3d at 996; *Brodsky v. Yahoo!, Inc.*, 630 F. Supp. 2d

24   1104, 1114 (N.D. Cal. 2009); *In re Silicon Storage Tech., Inc. Sec. Litig.*, No. C 05-0295 PJH,

25   2006 WL 648683, at *10 (N.D. Cal. Mar. 10, 2006) .  The remaining CW statements lack the

26   _____
     [3] The dates of employment for CW1, CW3, CW5, CW6, CW8, CW17 and CW21 are as follows:
     CW1 (2003 through "the beginning of 2006"), CW3 (1999 through "the beginning of 2006"),
27   CW5 (January 2009 through April 2009), CW6 ("beginning of 2008" through January 2009),
     CW8 (May 2007 to May 2008); CW17 (late 2007 to fall 2008) and CW21 (May 2007 to early
28   2009).  *See* SAC ¶¶ 56, 58, 60, 63, 72, 76, respectively.

                                                           MOTION TO DISMISS
                                                           CASE NO. C-09-0222-CW

1  particularity required to infer that Rackable knew that it would miss its gross margin and EPS

2  projections or that any statement by defendants was made with fraudulent intent.  *See In re*

3  *Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002) (dismissing complaint for failure

4  to allege "contemporaneous facts in sufficient detail and in a manner that would create a strong

5  inference that the alleged adverse facts were known at the time of the challenged statements").

6  Many of the "new" allegations concerning defendants' state of mind actually support a non-

7  culpable inference that defendants believed that Rackable would meet its financial projections for

8  4Q06, but that a combination of events, including the materialization of previously disclosed

9  risks, put heavy pressure on Rackable's margins.  *See Tellabs*, 127 S. Ct. at 2504 (2007) (court

10  must consider "plausible . . . nonculpable explanations for the defendant's conduct" when

11  assessing scienter).

12        **A.**　　**The Complaint Does Not Allege with Particularity Facts Demonstrating That**
13  　　　　　**Any of the Defendants Had Fraudulent Intent**

14          The SAC attempts to create an inference of scienter based on certain analysts' skepticism

15  concerning Rackable's explanation for why it missed its 4Q06 projections.  SAC ¶ 111, ¶¶ 114-

16  116.  One analyst, Thomas Weisel Partners, stated that Rackable's assertion that it incurred

17  increased costs due to higher DDR pricing was "not consistent with our checks that indicate

18  declining DRAM" pricing in the quarter.  SAC ¶ 16.[4]  There is no inconsistency, however,

19  between Rackable's explanation and the fact that DDR pricing declined during the quarter.  On

20  Rackable's earnings conference call, Ranganathan explained that Rackable purchased its DDR

21  memory early in the quarter at higher prices than were available at quarter-end.  *See* SAC ¶ 140

22  (Ranganathan:  Rackable "did procure DDR at kind of the market price entering the fourth quarter

23  price.  And as Todd said memory prices may be flat-to-down at this point of time.").  Barton and

24  Ford explained that the market's transition from DDR1 to DDR2 -- a risk factor that Rackable

25  repeatedly disclosed -- required Rackable to purchase DDR at the beginning of the quarter to get

26  it in the quantities required for its customers.  *See* SAC ¶ 141 (Ford:  "The only thing with DDR1

27  _____

28  [4] The SAC also includes a chart tracking the decline in DDR prices during this period.  *See* SAC
¶ 108.

19

MOTION TO DISMISS
CASE NO. C-09-0222-CW

1  in the levels that our customers require, we can't get it on the spot market at least in those

2  quantities. [. . .] many of the memory suppliers have turned their supply or their production lines

3  over to DDR2 . . . ."); SAC ¶ 136 (Barton:  "[S]o with the transition of DDR to DDR2 [. . . .]

4  A lot of memory suppliers as Samsungs of the world, etc. have for the most part switched over

5  their production lines to DDR2 . . . .").  Thus, plaintiffs cannot manufacture a "contradiction"

6  based on falling DDR pricing.

7      In the alternative, plaintiffs assert that defendants must have known that Rackable could

8  not meet its projections because it was "ongoing and common knowledge" that Rackable

9  achieved low margins on sales to its largest customers.  *See* SAC ¶ 59(c) (CW4).  The SAC's

10  allegations also fail to support this theory.  To the contrary, the SAC convincingly alleges that

11  Rackable's management believed Rackable could offset the lower margin sales to its largest

12  customers in two ways, "by achieving higher margin sales with the RapidScale product line and

13  by establishing a stable, worldwide sales force to expand the customer base."  SAC ¶ 64(a)

14  (CW9).  That Rackable struggled to execute on this strategy in 4Q06 and early 2007 does not

15  mean there was not a reasonable basis to believe it could be effective.  Indeed, the SAC alleges

16  that CW13, an inside sales manager, "delivered good gross margins" on her customers, none of

17  which were Rackable's largest customers.  SAC ¶ 68(a).

18      Nor does the SAC contain any allegations showing that defendants believed Rackable

19  could not achieve its sales projections for RapidScale products.  According to CW15, Barton

20  "thought the purchase [of the RapidScale product line] was an easy way to expand Rackable's

21  market into storage."  SAC ¶ 70(c).  This suggests that at least Barton believed the RapidScale

22  sales projections could be achieved.  The SAC's assertion that Rackable should not have expected

23  any sales in 4Q06 is belied by the fact that Rackable recorded RapidScale revenues of $800,000

24  in fiscal 2006.  SAC ¶ 79(b)(iv).  This is no small feat given that Rackable did not acquire the

25  product line until late August 2006.  RJN Ex. 24.  This non-culpable inference is not diminished

26  by the fact that, with the benefit of hindsight, Barton's assessment of the RapidScale product line

27  was overly optimistic.  As discussed above in Section I.F., the CW statements commenting that

28  RapidScale was a "joke" or not the right fit for Rackable lack sufficient particularity to show that

MOTION TO DISMISS
CASE NO. C-09-0222-CW

1    anyone understood that RapidScale would not be successful until after the Class Period.

2         The SAC also regurgitates the same allegations that defendants purportedly knew that

3    Rackable's newly implemented ERP system did not provide sufficient visibility to support the

4    company's projections.  Plaintiffs cite to numerous CW complaints about the ERP system, all of

5    which are ambiguous as to timing or clearly from outside the Class Period.  *See ante* Section I.D.

6    CW8 is alleged to have had "disagreements" with Ranganathan concerning the Oracle system.

7    SAC ¶ 63(c).  Whatever disagreements CW8 might have had, they did not take place until at least

8    a month after the Class Period -- when CW8 first joined Rackable.  *Id.* ¶ 63.  CW16 states that

9    one of the reasons that Rackable transitioned to the ERP system was that "there were a lot of

10   internal control problems with the prior system because everyone had access to the data."  SAC

11   ¶ 71(c).  As a result, Ranganathan "made the decision to make the live transition to Oracle

12   because Rackable would not have otherwise been SOX compliant."  *Id.*  Ranganathan's desire to

13   comply with the Sarbanes-Oxley Act of 2002 does not suggest that she believed the ERP system

14   was unable support Rackable's financial guidance.  Other CWs suggest that simple human error

15   and lack of experience -- not any intent to defraud -- was behind the ERP's system's visibility

16   issues.  According to CW9, "a big problem occurred right after the implementation of the Oracle

17   system in Q3 2006.  Data entry was manual and, as explained by CW8, mistakes were easily

18   made. . . . As a result, human error in data entry, lack of experience in operating Oracle's ERP,

19   and lack of senior executive oversight over procurement led to 'a lot of out of control

20   purchases.'"  SAC ¶ 64(c); *see also* SAC ¶ 72(e) (CW17 said that excess inventory was caused by

21   "a problem with the cost model dictating purchase volume").

22        The SAC also includes an allegation that, in early 2008, Ranganathan allegedly

23   "circumvented SOX procedure" by personally changing a figure relating to inventory valuation in

24   an SEC filing going to the printer.  SAC ¶ 72(a).  The SAC alleges that Ranganathan should have

25   run the change through CW17, the SOX designee, and that Ranganathan's change was corrected

26   in Rackable's later restatement of Rackable's 1Q08 financials.  *Id.*  Given that Rackable's Form

27   10-Q for 1Q08 was filed on May 8, 2008, this allegation does not denote anything about

28   Ranganathan's actions or state of mind during the Class Period (a year earlier).  Moreover,

MOTION TO DISMISS
CASE NO. C-09-0222-CW

1  Ranganathan's alleged change to the 1Q08 financials caused Rackable to take a more

2  conservative position regarding inventory (lowering its gross margin).  As a result, the

3  restatement of Rackable's 1Q08 financials increased Rackable's gross margin and decreased its

4  loss per share for the period.  *See* RJN Ex. 22.

5          **B.      The Individual Defendants' Departures from Rackable Do Not Support Any**
           **Inference of Scienter**
6

7          Plaintiffs repeat the allegations from the FAC regarding the departures of Barton, Ford

8  and Ranganathan.  *See, e.g.*, SAC ¶ 271.  As before, these allegations do not support any

9  inference of scienter because the SAC does not add any allegations showing that the resignations

10  were related to any findings of misconduct.  *See* Order at 18, citing, among others, *In re*

11  *Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1093 (N.D. Cal. 2005).

12          **C.      The Individual Defendants' Compensation and Stock Sales Do Not Support**
           **Any Inference of Scienter**
13

14          The SAC's allegations that defendants were motivated to commit fraud by their

15  compensation packages and the sale of stock at fraudulently-inflated prices are identical to those

16  which this Court held did not support any inference of scienter in the FAC.[5]  As this Court noted,

17  Ford is the only individual defendant alleged to have sold any stock during the Class Period.

18  Order at 16-17.  But even Ford's "sales do not reflect an intention to maximize profits from an

19  artificially inflated stock price" because he sold just as much stock at the "inflated" stock prices

20  as he did later in the Class Period.  *See* Order at 16-17, citing *In re Vantive Corp.*, 283 F.3d at

21  1092 ("Insider stock sales become suspicious 'only when the level of trading is dramatically out

22  of line with prior trading practices ***at times calculated to maximize the personal benefit from***

23  ***undisclosed inside information***.'").  Ford also sold more stock before the Class Period than

24  during the Class Period, which is also inconsistent with an inference of scienter.  *See In re Apple*

25  *Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989) ("Large sales of stock ***before*** the class

26  period are inconsistent with plaintiffs' theory that defendants attempted to drive up the price of

27  ─────────────
   [5]  The only difference is that plaintiffs ***deleted*** the allegations concerning stock sales by
28  Rackable's former general counsel, which did not impute scienter to any defendant.  *See* Order at
   17:20-24.

MOTION TO DISMISS
CASE NO. C-09-0222-CW

1    Apple stock *during* the class period.").

2          The lack of sales by Barton and Ranganathan during the Class period further undermines

3    any inference of scienter.  *See* Order at 17; *see also Thornton v. Micrografx, Inc.*, 878 F. Supp.

4    931, 938 (N.D. Tex. 1995).  The SAC's allegations regarding defendants' compensation packages

5    are unchanged, and therefore still fail to show anything remarkable about the type or amount of

6    compensation paid to defendants that would support an inference of scienter.  *See* Order at 18.

7          Because the facts underlying the SAC's insider trading and compensation allegations are

8    immutable, any amendment of these allegations would be futile.

9                    **D.        The Core Operations Inference Does Not Apply**

10          The SAC fails to allege any facts showing the "rare circumstances" where allegations

11   regarding the individual defendants' roles at Rackable alone would be sufficient to create the

12   strong inference of scienter required by the PSLRA.  *South Ferry LP, #2 v. Killinger*, 542 F.3d

13   776, 786 (9th Cir. 2008) (citing *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir.

14   2008)).  The SAC's allegations regarding the individual defendants' roles are nearly identical to

15   the allegations in the FAC, which this Court explicitly rejected.  *See* SAC  ¶¶ 229-235; Order at

16   19:23-28.  The only addition is the allegation that Barton and Ford "always played a critical role

17   in sales-related efforts from the executive level."  SAC ¶ 231 (citing analyst report).  As

18   examples, the SAC alleges that Barton's approval was required for any sale at less than 18%

19   gross margin and that Ford ordered an outstanding purchase order to be pre-built in 4Q06.  *Id.*

20   Neither of these allegations describe an event that would have had such a catastrophic impact on

21   Rackable's financials that it would be "absurd to suggest" that defendants were unaware of it.

22   *Berson*, 527 F.3d at 987.  Indeed, Barton could not have approved too many sales at less that 18%

23   gross margin since Rackable's non-GAAP gross margin for 4Q06 was 19.8% (only 4% below the

24   projections of 23% - 24%).  Moreover, Ford's authorization of the pre-build in 4Q06 resulted in

25   increased revenue for the quarter.  By contrast, in *Berson*, the company received four stop-work

26   orders that had a "devastating effect" on the company's revenue, including one that halted $10 to

27   $15 million of work on the company's largest contract with one of its most important customers.

28   *Berson*, 527 F.3d at 987.  Because the SAC fails to allege such extraordinary facts, it cannot plead

                                                     23

1    scienter under the core operations inference.

2    IV.    **THE COMPLAINT DOES NOT PLEAD LOSS CAUSATION**

3            The SAC alleges that defendants' purported misrepresentations came to light through the

4    identical partial corrective disclosures alleged in the FAC, on January 16, 2007, February 2, 2007,

5    April 4, 2007 and April 24, 2007.[6]  *See* SAC ¶ 258; FAC ¶ 301.  As this Court previously held,

6    none of these statements "reveal the necessary causal link between the alleged fraud and the drop

7    in Rackable's stock price."  Order at 20:22-24.  Plaintiffs now assert that these statements must

8    have been corrective disclosures because analysts and industry journalists reacted negatively to

9    them.  *See* SAC ¶¶ 113-116, 158.  Analyst and media commentary, however, is nothing more than

10   a "negative characterization of already public information" and does not transform disappointing

11   financial results into "corrective" disclosures.  *See In re Omnicom Group, Inc. Sec. Litig.*, No. 08-

12   0612, 2010 WL 774311 at *9 (2d Cir. Mar. 9, 2010) (citing *Teacher's Ret. Sys. of La. v. Hunter*,

13   477 F.3d 162, 187-88 (4th Cir. 2007); *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 269-70 (3d

14   Cir. 2005)).  Accordingly, the SAC's allegations combining Rackable's financial results with

15   analyst and media commentary do not create the causal connection between any alleged fraud and

16   the drops in Rackable's stock price.  Order at 20:24-26 (Plaintiffs merely "rely on a correlation

17   between Rackable's announcement of financial results and a decrease and stock price.  Such

18   allegations do not plead loss causation . . . .");  *see also Metzler Inv. GMBH v. Corinthian Colls.,*

19   *Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008) ("[T]he complaint must allege that the practices that the

20   plaintiff contends are fraudulent . . . caused the resulting losses.").

21   V.    **THE COMPLAINT FAILS TO PLEAD CONTROL PERSON LIABILITY**

22           Because the SAC fails to plead a primary violation of Section 10(b), it also fails to state a

23   claim for "control person" liability under Section 20(a).  *In re Cylink Sec. Litig.*, 178 F. Supp. 2d

24   1077, 1089 (N.D. Cal. 2001).

25

26

27   _____
     [6] Plaintiffs specifically identify these four dates as the alleged corrective disclosures.  SAC ¶ 258.
28   Even considering Rackable's other statements, however, the SAC fails to plead a nexus between
     any drop in Rackable's stock price and revelation of the alleged fraud.

MOTION TO DISMISS
CASE NO. C-09-0222-CW

1

## <u>CONCLUSION</u>

2            Plaintiffs have had three attempts and nearly three years to file a complaint meeting the

3    heightened pleading standards for securities fraud under Rule 9(b) and the PSLRA, but have

4    failed to do so.  For the reasons stated above, plaintiffs cannot overcome any of the SAC's four

5    independently fatal deficiencies by further amendment, and the Court should dismiss the SAC

6    with prejudice.  *See In re Downey Sec. Litig.*, 2009 WL 2767670, at *16 (dismissing second

7    amended complaint with prejudice); *In re Impac Mortgage Holdings, Inc. Sec. Litig.*, 554 F.

8    Supp. 2d 1083 at 1102 (dismissing first amended complaint with prejudice).

9

10

11   Dated:  April 9, 2010                                    O'MELVENY & MYERS LLP

12
                                                             By:  _____
13                                                                         /s/
                                                                   Meredith N. Landy
14
                                                             Attorneys for Defendants Rackable Systems, Inc.,
15                                                           Thomas K. Barton, Madhu Ranganathan and Todd
                                                             R. Ford
16

17

18   MP1:1191743.6

19

20

21

22

23

24

25

26

27

28

MOTION TO DISMISS
CASE NO. C-09-0222-CW