1   GLANCY BINKOW & GOLDBERG LLP
2   LIONEL Z. GLANCY (S.B.#134180)
    MICHAEL GOLDBERG (S.B.#196382)
3   1801 Avenue of the Stars, Suite 311
    Los Angeles, California 90067
4   Telephone: (310) 201-9150
    Facsimile:  (310) 201-9160
5   E-mail: info@glancylaw.com

6   *Lead Counsel for Lead Plaintiff*
7   [*Additional Counsel Appear on Signature Page*]

8                **UNITED STATES DISTRICT COURT**
9                **NORTHERN DISTRICT CALIFORNIA**

10

     _____
11                                          )        Case No.  C-09-0222-CW
     IN RE RACKABLE SYSTEMS, INC.           )
12   SECURITIES LITIGATION                  )        <u>CLASS ACTION</u>
     _____)
13                                          )        DATE:        July 1, 2010
                                            )        TIME:        2:00 p.m.
14   THIS DOCUMENT RELATES TO:              )        COURTROOM:  2, 4ᵗʰ Floor
     ALL ACTIONS                            )
15   _____)

16

17   **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION**
                 **TO DEFENDANTS' MOTION TO DISMISS**
18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................. 1

II.  INTRODUCTION ................................................................................. 2

     A.   Rackable's Stated Business Model and Its Undisclosed Competitive Edge ......... 2

     B.   The Class Period Begins With Defendants Explaining Away Q3 2006 Results as a Hiccup and Brashly Confirming and Raising Q4 2006 Guidance Due to Increased Visibility and Revenues Already "In the Bag" ..................................... 3

     C.   The "Perfect Storm:" Charging Sales Tax and Weak Internal Controls Over Planning, Purchasing and Inventory Caused Big Margin Misses ......................... 4

III. PLAINTIFFS ADEQUATELY PLEAD SECURITIES FRAUD ...................... 5

     A.   Legal Standard ............................................................................. 5

     B.   The Complaint Adequately Pleads Falsity .......................................... 6

          1.   Defendants Misrepresented the Company's Sales Tax Issues ................. 6

               a.   Omissions Concerning the Failure to Charge Sales Tax .............. 7

               b.   Misstatements and Omissions Concerning Past Taxes ................. 9

               c.   Uncharged Sales Taxes Were Not Properly Reserved For ......... 11

          2.   Long-Time Lack of Internal Controls Over Procurement and Disastrous Implementation of the ERP System Precluded Visibility, Left Rackable With Overpriced Obsolete Inventory and Resulted in Last-Minute Costs ....................................................................... 12

          3.   RapidScale Sales Were Nonexistent ....................................... 14

          4.   False present-tense Q4 2006 Backlog Statements ...................... 14

     C.   The SAC Adequately Pleads Scienter .............................................. 15

          1.   Facts Provided By 22 Witnesses Supports a Inference of Scienter ........ 16

          2.   Defendants' Admissions Support a Strong Inference of Scienter .......... 17

3. Rackable's Small Size Supports a Strong Inference of Scienter ............ 17

4. Defendants Were Highly Motivated to Conceal Adverse Facts ............. 18

  a. Massive Insider Selling Supports an Inference of Scienter ........ 18

  b. Extraordinary Compensation Packages Support Scienter ........... 18

5. Touted Upgrades to Internal Controls and Signed SOX Certifications Support a Strong Inference of Scienter .................................................. 19

6. Violations of GAAP Support a Strong Inference of Scienter ................ 19

D. The PSLRA's Safe Harbor Provision Does Not Protect Defendants' Knowingly False Statements ............................................................................................... 21

E. Fact-Based Disputes Concerning Causation are Improper at this Stage ............ 23

IV. CONCLUSION ............................................................................................................ 25

1

## TABLE OF AUTHORITIES

2

3
**Cases**

4
*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006)...................................................................................7

5

6
*Alaska Elect. Pens. Fund v. Flowserve Corp.*,
   572 F.3d 221 (5th Cir. 2009) ...................................................................24

7
*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009)...............................................................................5

8

9
*Asher v. Baxter Int'l, Inc.*,
   2006 WL 299068 (N.D. Ill. Feb. 7, 2006) ...............................................23

10

11
*Atlas v. Accredited Home Lenders Holding Co.*,
   556 F. Supp. 2d 1142 (S.D. Cal. 2008).....................................................21

12

13
*Backe v. Novatel Wireless Inc*,
   607 F. Supp. 2d 1145 (S.D Cal. 2009).......................................................19

14
*Backe v. Novatel Wireless, Inc.*,
   642 F. Supp. 2d 1169 (S.D. Cal. 2009)......................................................17

15

16
*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)....................................................................................5

17

18
*Belodoff v. Netlist, Inc.*,
   2009 WL 2777320 (C.D. Cal. Sept. 1, 2009) ..................................................9

19

20
*Berson v. Applied Signal Technology*,
   527 F.3d at 982 (9th Cir. 2008) ..........................9, 10, 15, 16, 17, 21, 23

21
*Bryant v. Avado Brands, Inc.*,
   100 F. Supp. 2d 1368 (M.D. Ga. 2000) ...................................................15

22

23
*City of Monroe Employee Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005) ...................................................................10

24

25
*City of Sterling Heights Police & Fire Retirement Sys. v. Vodafone Group PLC*,
   655 F. Supp. 2d 262 (S.D.N.Y. 2009).......................................................7

26
*City of Westland Police & Fire Ret. Sys. v. Sonic Solutions*,
   2009 WL 942182 (N.D. Cal. Apr. 6, 2009) ..............................................15

27

28

*Cornwell v. Credit Suisse Group*,
    2010 WL 537593 (S.D.N.Y. Feb. 11, 2010) ............................................................... 8

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ................................................................................................... 23

*Eminence Capital, LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ................................................................................... 25

*Fla. St. Bd. of Admin. v. Gree Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) .............................................................................. 11, 18

*Gord v. Comm. of Internal Rev.*,
    93 T.C. 103 (U.S.T.C. 1989) ....................................................................................... 7

*Grossman v. Novell, Inc.*,
    120 F.3d 1122 (10th Cir. 1997) ................................................................................. 22

*Huddleston v. Herman & MacLean*,
    640 F.2d 534(5th Cir. 1981) ...................................................................................... 22

*Hodges v. Akeena Solar, Inc.*,
    No. C 09-0214 (N.D. Cal. May 20, 2010) ................................................................. 23

*In re 21st Century Holding Co. Sec. Litig.*,
    2008 WL 5749572 (S.D. Fla. Nov. 7, 2008) .............................................................. 22

*In re Adams Golf, Inc. Sec. Litig.*,
    618 F. Supp. 2d 343 (D. Del. 2009) ............................................................................. 9

*In re Adaptive Broadband Sec. Litig.*,
    2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ............................................................... 20

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002) ........................................................................................ 16

*In re Charles Schwab Corp. Sec. Litig.*,
    257 F.R.D. 534 (N.D. Cal. 2009) ............................................................................... 25

*In re Daou Sys., Inc. Sec. Litig.*,
    411 F.3d 1006 (9th Cir. 2005) ....................................................................... 16, 20, 23

*In re Digimarc Corp. Deriv. Litig.*,
    549 F.3d 1223 (9th Cir. 2008) ................................................................................... 15

*In re Dura Pharms., Inc. Sec. Litig.*,
    548 F. Supp. 2d 1126 (S.D. Cal. 2008) ............................................................... 21, 22

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
    258 F. Supp. 2d 576 (S.D. Tex. 2003) ........................................................ 18

*In re Gilead Sciences Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ................................................................ 23

*In re IAC/InterActiveCorp. Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007) ...................................................... 10

*In re Impax Laboratories, Inc. Sec. Litig.*,
    2007 WL 7022753 (N.D. Cal. July 18, 2007) ........................................... 17

*In re IPO Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003) ...................................................... 15

*In re JDS Uniphase Corp. Sec. Litig.*,
    2005 WL 1705766 (N.D. Cal. July 21, 2005) ........................................... 23

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d 1230 (N.D. Cal. 2008) .................................. 11, 12, 21, 24

*In re Lyondell Petrochem Sec. Litig.*,
    984 F. 2d 1050 (9th Cir. 1993) .................................................................. 9

*In re OCA, Inc. Sec. & Deriv. Litig.*,
    2006 WL 3747560 (E.D. La. Dec. 14, 2006) ............................................ 16

*In re Peoplesoft, Inc.*,
    2000 WL 1737936 (N.D. Cal. May 25, 2000) ........................................... 15

*In re PMA Capital Corp. Sec. Litig.*,
    2005 WL 1806503 (E.D. Pa. July 27, 2005) ........................................ 19, 21

*In re PMI Group, Inc. Sec. Litig.*,
    2009 WL 1916934 (N.D. Cal. July 1, 2009) ............................................. 23

*In re Rackable Sys. Inc. Sec. Litig.*,
    2010 WL 199703 (N.D. Cal. Jan. 13, 2010) ............................................... 1

*In re Read-Rite Corp. Sec. Litig.*,
    335 F.3d 843 (9th Cir. 2003) ................................................................ 17

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) ...................................................... 21

*In re Secure Computing Corp. Sec. Litig.*,
    120 F. Supp. 2d 810 (N.D. Cal. 2000) ...................................................... 15

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

–v–

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
    604 F. Supp. 2d 332 (D. Mass. 2009) ........................................................................ 21

*In re Surebeam Corp. Sec. Litig.*,
    2005 WL 5036360 (S.D. Cal. Jan. 3, 2005) ................................................................ 6

*In re Winstar Comm'ns.*,
    2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ................................................................ 24

*Institutional Investors Group v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ........................................................................................ 8

*Kreek v. Wells Fargo & Co.*,
    652 F. Supp. 2d 1053 (N.D. Cal. 2009) ...................................................................... 23

*Lattice Semiconductor Corp. Sec. Litig.*,
    2006 WL 538756 (D. Or. Jan. 3, 2006) ...................................................................... 20

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ...................................................................................... 22

*Los Angeles v. Santa Monica Baykeeper*,
    254 F.3d 882 (9th Cir. 2001) ...................................................................................... 19

*McMahan & Co. v. Wherehouse Entertainment*,
    900 F.2d 576 (2d Cir. 1990) ........................................................................................ 11

*Middlesex Retirement Sys. v. Quest Software Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ...................................................................... 17

*Miss. Pub. Emp'ees Ret. Sys. v. Boston Scientific Corp.*,
    523 F.3d 75 (1st Cir. 2008) ........................................................................................ 16

*N.J. & Its Div. of Inv. v. Sprint Corp.*,
    314 F. Supp. 2d 1119 (D. Kan. 2004) ........................................................................ 10

*No. 84 Employer-Teamster Jt. Council Pension Trust-Fund v. Am. West Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ...................................................................................... 18

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ........................................................................................ 20

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) .................................................................................... 17

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ........................................................................................ 21

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) ........................................................20

*SEC v. Lucent Tech., Inc.*,
    363 F. Supp. 2d 708 (D.N.J. 2005) ...........................................20

*SEC v. Santos*,
    355 F. Supp. 2d 917 (N.D. Ill. 2003) ...........................................9

*Simon v. Am. Power Conversion Corp.*,
    945 F. Supp. 416 (D.R.I. 1996) ...................................................9

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009) .................................................5, 9

*South Ferry LP, #2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ................................................6, 16

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) .....................................................8

*Stocke v. Shuffle Master, Inc.*,
    615 F. Supp. 2d 1180 (D. Nev. 2009) .......................................19

*Takara Trust v. Molex Inc.*,
    429 F. Supp. 2d 960 (N.D. Ill. 2006) ...........................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308; 127 S.Ct. 2499 .............................6, 15, 16, 18, 19

*Twinde v. Threshhold Pharms., Inc.*,
    2009 WL 928132 (N.D. Cal. Apr. 3, 2009) ...............................23

*U.S. v. Houser*,
    804 F.2d 565 (9th Cir. 1986) .....................................................19

*U.S. v. Smith*,
    389 F.3d 944 (9th Cir. 2004) .....................................................19

*Wallace v. Systems & Computer Tech. Corp.*,
    1997 WL 602808 (E.D. Pa. Sept. 23, 1997) ................................9

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .....................................................16

## RULES AND STATUTES

15 U.S.C. §78u-4(b)(1)(B) .................................................................6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17 C.F.R. §229.303 ...................................................................................................................8

Lead Plaintiffs Gerald Dull and Vincent Fusco oppose Defendants' Motion to Dismiss the Supplemental Second Amended Complaint for Violations of the Federal Securities Laws ("Def. Br."). The Second Amended Complaint for Violations of the Federal Securities Laws ("SAC") states claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.[1]

## I.    PRELIMINARY STATEMENT

Plaintiffs have cured the deficiencies that the Court identified in its previous Order[2] regarding plaintiffs' Amended Complaint for Violations of the Securities Laws ("FAC"). The SAC includes information from 16 new former Company employees and contractors, identified as confidential witnesses ("CWs"), and new facts that demonstrate that Defendants had no reasonable basis, one month into Q4 2006, for confirming the upper end of Rackable's earlier-forecasted gross margins for the quarter and 2007. Realizing the strength of the new allegations, Defendants' factual recitation studiously avoids referencing the SAC and instead references public information concerning the Company, some of which is not included in the SAC. *See* Def. Br. at 2-7 & Exhs. 1-53 filed in support thereof. The SAC demonstrates that Rackable was riddled with costly inefficiencies and an untenable business model, and was grasping to gain and retain customers while being undercut by larger competitors. Before the day of reckoning, insiders made hundreds of millions of dollars in the IPO and offerings in 2005 and early 2006.

By Q4 2006, Defendants were so desperate to hit revenue targets that they privately decided to sacrifice profit margins. Publicly, however, one month into a highly-challenging quarter – one in which Rackable started charging sales tax – they *raised* revenue guidance and

---

[1] Plaintiffs bring these claims against Rackable Systems, Inc. ("Rackable" or the "Company"), its former CEO Thomas K. Barton, its former Executive VP of Operations, Todd R. Ford, and its former CFO Madhu Ranganathan (collectively "Defendants") on behalf of purchasers of Rackable securities from October 30, 2006 through April 4, 2007 ("Class Period"). All "¶__" are references to the SAC.

[2] *See In re Rackable Sys. Inc. Sec. Litig.*, 2010 WL 199703 (N.D. Cal. Jan. 13, 2010) ("Order").

1    confirmed margins at the *upper* end of prior guidance, declaring that they could do so with

2    "confidence," based on sales "in the bag."  Newly-pled facts show they had no basis to do so.

3          When, on January 16, 2007, Defendants pre-announced a gross margin miss for Q4

4    2006, blaming items they had earlier claimed would work to the Company's advantage, *e.g.,*

5    memory prices and ERP system implementation, analysts were dubious: "Something does not

6    compute;" "management is not talking, which is cause for concern, and the stated reasons for

7    the miss do not add up;" and "[w]e are now much more concerned about Rackable's story."

8    SAC ¶¶16, 114 and 116.  Rackable's shares plummeted $12.44 on the news.  ¶18.  Known

9    undisclosed trends and risks further materialized between January 17 and April 5, 2007,

10   causing a number of price declines.  Defendants' motion should be denied.

11   **II.     INTRODUCTION**

12          **A.        Rackable's Stated Business Model and Its Undisclosed Competitive Edge**

13          During the Class Period, Rackable designed, manufactured and installed computer

14   servers and storage systems.  The Company carved out a niche of "built to order," open-

15   architecture, high-density systems which took up less space and generated less heat.  ¶2.  From

16   its founding in 1999, Rackable grew to serve over 200 customers by 2006.  ¶¶51-52.

17   Amazon.com, Microsoft and Yahoo!, accounted for at least 60% of Rackable's revenues. ¶52.

18   However, due to its relatively small size, Rackable always faced stiff price competition from its

19   much larger industry competitors.  ¶¶2, 9.  To "control and monitor quality and inventory

20   levels," Rackable's stated policy before and during the Class Period was to obtain "core

21   components" and "sub-assemblies" using a "just-in-time procurement strategy," relying on

22   "multiple vendors . . . to obtain competitive pricing."  ¶53.  Under this model, Rackable

23   purported to "maintain a low inventory," acquiring materials and components only after it

24   received a customer's purchase order containing configuration metrics and specifying parts.

25   ¶¶53-4; Def.'s RJN, Ex. 2 at 20.  Unbeknownst to investors, Rackable also competed against

26   larger rivals by not charging sales tax to its customers.  ¶26.  Although the Company first

27   indicated in February 2006 that it could owe $1.2M on "past sales to several of our customers,"

28

this statement disclosed issues that appeared limited in scope – it did not reveal that sales taxes had never been charged or that they were still not being charged.  ¶3 & n.4.[3]

**B.    The Class Period Begins With Defendants Explaining Away Q3 2006 Results as a Hiccup and Brashly Confirming and Raising Q4 2006 Guidance Due to Increased Visibility and Revenues Already "In the Bag"**

After lowered guidance for Q3 2006 caused Rackable's stock price to fall in August 2006, investors were relieved when Q3 2006 financial results met the lowered forecasts.  ¶8. Thus, while non-GAAP gross margins declined year-over-year, the dip, from 24.2% to 22.6%, was within the 22-24% predicted range.  ¶¶78, 81.  Defendants attributed Q3 2006 results to conditions that would not recur in Q4 2006: (1) increased component prices, *e.g.*, memory ("DDR"); (2) competitive pricing pressure; and (3) failure to track and control costs of sales, as more than 70% of revenues were recognized in the last month of the quarter.  ¶¶6, 81, 84.

On October 30, 2006, one month into Q4 2006, Defendants upwardly adjusted Q4 revenue guidance, confirmed an earlier Q4 2006 non-GAAP margin forecast – fine-tuning it from 22-24% to 23-24% -- and projected the same for FY 2007.  ¶81.  Touting information systems and controls upgrades, Ranganathan said there would be "operating leverage," going forward, from "one-time" fees incurred "relating to first-year Sarbanes-Oxley compliance as well as ERP [Enterprise Resource Planning] implementation."  ¶¶86, 88.  With "confidence," Defendants increased projected revenues, from $85-95M to $100-110M, and confirmed margins.  ¶¶81, 98.  "Despite increasing competitive intensity," which was "factor[ed] in," they did so because of: (1) the increased size of a Q3 2006 order that was ultimately booked in Q4 2006; (2) "very strong general bookings momentum in the last 60 days;" (3) "a very solid revenue and backlog position;" (4) a "high degree of visibility;" (5) "the DRAM markets . . . softening;" and (6) "successfully transition[ing] to Oracle as our ERP system."  ¶¶78, 81, 84.

Other than the decline in DRAM (DDR) prices, none of this was true.  CWs recalled that sales in Q4 2006 were slumping – so much so that Rackable fired the VP of Sales mid-

---

[3]In stark contrast, Amazon.com, a Rackable customer, made these very points in its risk disclosure, adding that having to charge tax would "decrease our ability to compete."  ¶3  n.3.

quarter. Defendants made deals, contrary to stated policy, to pull in future sales at discounted prices – resulting in low or negative margins.  ¶¶12(a), 59(j), 64(a), 70(d).  Rackable also sold to its top three customers at or near cost, granting them price concessions, such that Rackable needed to achieve higher margins from sales to others.  ¶¶59(c), 68(a), 69(a), 72(f), 73.  CWs also indicated that adoption of the ERP system had been intentionally rushed by Ranganathan; it was incomplete, untested, used an incorrect accounting model, and completely lacked oversight, particularly with respect to obtaining quotes and ordering parts.  ¶¶12(c), 59(a), 62(a), 63(c), 64(c), 67(b), 68(c), 71(c), 72(d)&(e).[4]  Thus, rather than adhering to a "just-in-time procurement" policy, Rackable's inventory bloated by $20 million in Q4 2006, from $47.3M to $68.1M.  ¶12(c).  CWs recalled purchases of unneeded inventory in Q4 2006.  ¶¶64(c), 66(b), 71(d)(DDR1); ¶¶62(c), 65, 76(c)(AC power supplies).  Additionally, even though DDR prices declined as predicted (¶¶107-10 and charts), Defendants failed to reveal on October 30, 2006 that they had already made a very costly purchase early in the quarter that detrimentally affected margins.  *See* Def. Br. at 19 (citing ¶140).[5]  Finally, as CWs confirm, Q4 2006 sales were not "in the bag" as Ford claimed (¶90), because most occurred at the end of the quarter, causing the cost of sales to balloon (¶¶122, 125).  Contrary to Defendants' claim that these costs – overtime, expedited shipping, assembly floor time -- were unexpected, Rackable often incurred such excess costs because it promised build out and delivery in half the time it actually took.  ¶¶12(d), 56(d), 57(a), 58(a), 59(f)&(g), 61(b),(c), (f)&(g), and 70(a)&(f).

### C.     The "Perfect Storm:" Charging Sales Tax and Weak Internal Controls Over Planning, Purchasing and Inventory Caused Big Margin Misses

---

[4] The deployment had been so bungled that CW5 reconciled inventory from 2006-2009. ¶60(d). A published case study explained that during the Class Period, Rackable lacked an "effective CRM tool for managing leads, opportunities and forecasts" and system "integration." ¶174.

[5] While Defendants contend they were obligated to do so to fill requests for DDR1, *see* Def. Br. at 19-20, a salesperson did not recall customers requesting DDR1 memory for their products at the time of transition from DDR1 to DDR2.  ¶59(e).  Rather, witnesses claimed it was common for Rackable to purchase unneeded parts and/or parts because they were at the end of their technology life cycle (¶¶62(c), 66(b), 65), parts that either remained on the shelves for years (¶¶56(e), 57(d), 76(b)) or that Rackable tried to substitute for customer-specified parts.  ¶59(h).

1        The effects of these adverse undisclosed conditions materialized during the Class

2   Period, as: (1) Rackable started charging sales tax in Q4 2006, adding to competitive pressures

3   and resulting in a 10% drop in average sales price (*see* ¶12(b); Def. RJN, Ex. 21 at 30); and (2)

4   the cost of sales eroded margins once the dreadful ERP implementation exacerbated Rackable's

5   poor purchasing and inventory tracking practice.  This negative synergy drove down margins

6   and earnings per share ("EPS") for Q4 2006 and Q1 2007, causing Rackable's stock price to

7   decline upon the announcement of these severe misses, from $32.42 on January 16th to $14.24

8   on April 5th.  ¶¶15-27; 114-16 (analysts questioning management's reasons for the Q4 2006

9   margin miss);[6] ¶144 (Form 10-K admits taxes only charged for first time in Q4 2006); ¶¶155,

10  158, 161 (30% Q1 2007 margin miss and further revelations concerning exposure for

11  uncollected sales tax).  Soon thereafter, Rackable ousted Barton, Ford and the general counsel,

12  and later forced out Ranganathan and the Cost Accounting Manager, Raj Patil.  ¶¶63(d), 271.

13  After Q2 2007, new management and Rackable's accountants reviewed inventory reporting,

14  new CEO Mark Barrenechea immediately wrote of $20 million in excess and obsolete

15  inventory, and Rackable's auditors reported a material weakness in internal controls over

16  inventory reporting as of December 31, 2007.  ¶¶63(d), 71(d), 72(e), 74, 76(b), 175 and 181.

17  **III.   PLAINTIFFS ADEQUATELY PLEAD SECURITIES FRAUD**

18       **A.   Legal Standard**

19       To survive a motion to dismiss, a plaintiff's request for relief need only be "plausible."

20  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "[A] claim has facial plausibility when

21  the plaintiff pleads factual content that allows the court to draw the reasonable inference that

22  the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949

23  (2009).   In assessing the sufficiency of a complaint, courts must "accept the plaintiffs'

24  allegations as true and construe them in the light most favorable to the plaintiffs."  *Siracusano*

25  *v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1177 (9th Cir. 2009).  To state a claim under §10(b)

26

27  ────────────────

   [6] For example, Defendants blamed lower than expected sales of its newly-acquired RapidScale

28  storage products ¶111.  However, because Barton had refused to estimate any RapidScale sales
   for Q4 2006 (¶88), analysts questioned the basis for blaming RapidScale after the fact.  ¶114.

1   plaintiffs must allege: "(1) a material misrepresentation or omission of fact; (2) scienter; (3) a

2   connection with the purchase or sale of a security; (4) transaction and loss causation; and (5)

3   economic loss." *Id.* at 1177.  Here, Defendants only challenge the elements of falsity, scienter

4   and loss causation.  Under the PSLRA, a plaintiff adequately pleads falsity by "specify[ing]

5   each statement alleged to have been misleading" and "the reason or reasons why the statement

6   is misleading." 15 U.S.C. §78u-4(b)(1)(B).  For scienter, the relevant inquiry "is whether *all* of

7   the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any

8   individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor*

9   *Issues & Rights, Ltd.*, 551 U.S. 308, 322-23.  (Emphasis in original).[7]

10          **B.      The Complaint Adequately Pleads Falsity**

11          The Court held that the FAC did not show why the alleged statements were false when

12   made.  Order at *5-*7.  The SAC cures this deficiency.  ¶¶78-157.  By October 2006,

13   Rackable's sales were slowing – Q3 2006 revenues were nearly a 10% quarter-over-quarter

14   reduction from Q2 2006 and at the lower end of downwardly-revised guidance ¶¶6, 8.  With

15   competition increasing, Defendants needed a strong quarter to show that Rackable's business

16   model was viable.  However, sales were evaporating and ERP implementation was a nightmare.

17   Mismanagement is actionable when defendants misrepresent the true state of corporate affairs.

18   *In re Surebeam Corp. Sec. Litig.*, 2005 WL 5036360, at *13 (S.D. Cal. Jan. 3, 2005).

19          **1.      Defendants Misrepresented the Company's Sales Tax Issues**

20          Two distinct issues exist with respect to sales taxes – the competitive edge achieved by

21   not charging taxes prior to Q4 2006 and the understatement of liability for past due uncollected

22   taxes.  The Court held that the FAC was deficient because Plaintiffs failed to allege: (1) that

---

[7] Although the Court's order correctly recognizes that the Ninth Circuit has limited the instances in which the core-operations inference, without more, can support a strong inference of scienter (Order at *9), plaintiffs do not rely solely upon the core operations inference to establish scienter.  When coupled with other facts, "facts critical to a business' core operations or an important transaction are known to a Company's key officers." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008).  Thus, because the allegations relate to the viability of Rackable's business model, when coupled with the new facts alleged, they add to the inference of scienter alleged.  ¶¶ 56(f), 58(b), 60, 63(c), 64(a)-(c), 68(a), 69(a), 70(e), 71(c), 72(d)-(e), 230-234.

charging sales taxes impacted Class Period gross margins (Order at *5);[8] (2) why Rackable's disclosure of its sales tax liability and the prospects for recovering the money from customers was materially misleading (*id.*); and (3) that uncharged sales taxes were not accounted for in reserves. *Id.* The SAC addresses the Court's concerns.

### a.   Omissions Concerning the Failure to Charge Sales Tax

The failure to collect sales tax provided Rackable with a competitive advantage in a market where larger companies were aggressively undercutting its prices. Plaintiffs earlier pled that salespersons were instructed not to include sales tax in quotes or to recover it from customers after the fact – contrary to what Rackable claimed it would do once it disclosed the liability in February 2006. ¶¶59(d) and 190. The SAC explains that Defendants consciously chose not to charge sales tax – later giving a false reason for why they had not done so. "False and misleading statements concerning a company's tax obligations may provide a basis for a securities fraud claim." *City of Sterling Heights Police & Fire Retirement Sys. v. Vodafone Group PLC*, 655 F. Supp. 2d 262, 273 (S.D.N.Y. 2009).

A Cost Accounting and Financial Operations Manager employed from 2004-2008 (CW9), who was regularly in meetings with Barton and Ford, stated that sales and use taxes were not on anyone's mind prior to the IPO in 2005. ¶64(b). But as sales quickly grew in volume, the amount owed (but not collected) grew rapidly. *Id.* CW9 stated that Rackable obtained a competitive advantage by not charging sales tax, enabling the Company to achieve better gross margins.[9] *Id.* A Senior Director of Accounting and External Reporting (CW17)

---

[8] Defendants recognize this is not the gravamen of the claim; GAAP precludes Plaintiffs from so alleging because sales taxes are not part of the cost of goods sold. *See* Def. Br. at 11:21-27; ¶¶186-88. Rather, Plaintiffs allege that prices were lowered to compensate for adding tax.

[9] This statement is not technically accurate as taxes are not a cost of goods sold. But not charging taxes enabled Rackable to charge less and retain more of the overall price. *See Gord v. Comm. of Internal Rev.*, 93 T.C. 103, 107 (U.S.T.C. 1989) ("Because she did not have to charge sales tax, she was able to sell tobacco products at a much lower price than any other retail store[.]"); *cf. Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 487 (2006) (by not charging sales tax, defendants "have in effect cut the price of the item by the amount of the sales tax and

1    agreed with CW9 that not charging sales tax had provided a huge competitive advantage which

2    (indirectly) resulted in higher margins.  ¶72(b)&(c).  Although it arose prior to CW17's tenure,

3    CW17 knew the facts surrounding the tax problem because the Company was still cleaning up

4    the mess until 2008.  *Id.*[10]  CW17 indicated that CEO Barton and CFO Ranganathan had

5    approved of the position (taken by Jony Hartono) that taxes need not be charged when the

6    invoice went to one state but the equipment was shipped to another.  *Id.*  Rackable's Controller

7    from March 2006 until July 2007, (CW16), confirmed that the problem existed because

8    invoices had not been flagged to charge state taxes.  ¶71(b).

9        Defendants later hid their decision not to charge taxes when Ranganathan claimed that

10   systems limitations prior to August 2006 had prevented Rackable from doing so.  ¶161.  This

11   was not true.  Not only were state tax calculation (add-on) products readily available and

12   updated by Vertex (¶68(a)),[11] but when CW4 forwarded a customer's inquiry regarding a

13   quote's omission of sales taxes, CW4 was told that Rackable did not charge them – not that

14   they were incapable of calculation, either automatically or manually.

15       Item 303 to SEC Reg. S-K required Rackable to discuss in its Class Period SEC filings

16   any known trend or uncertainty "reasonably likely to have material effects on the registrant's

17   financial condition or results of operation."  *Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293,

18   1297 (9th Cir. 1998) (quoting 17 C.F.R. §229.303).  Whereas they failed to charge sales tax for

---

19   then kept the money instead of passing it onto the State. . . .") (Breyer, J., *concurring in part*

20   *and dissenting in part*).

21   [10] Defendants argue that for CWs that were not at Rackable during the Class Period, it is

22   "***impossible*** for them to have direct knowledge of any defendant's contemporaneous state of

23   mind."  Def. Br. at 18 (emphasis added).  Neither this Court's previous Order nor the cases

     defendants cite stand for such a proposition.  On the contrary, courts recognize that "both post-

24   class-period data and pre-class data could be used to 'confirm what a defendant should have

25   known during the class period' because '[a]ny information that sheds light on whether class

     period statements were false or materially misleading is relevant.'"  *Institutional Investors*

26   *Group v. Avaya, Inc*., 564 F.3d 242, 249 n.13 (3d Cir. 2009); *Cornwell v. Credit Suisse Group*,

     No. 08 Civ. 3758(VM), 2010 WL 537593, at *7 (S.D.N.Y. Feb. 11, 2010).

27   [11] The suggestion that Rackable had no obligation to correctly calculate and charge sales taxes

28   until CW8 told them about Vertex products (Def. Br. at 12:15-19) is not plausible.

1    years (although they knew it was required) *and* they publicly acknowledged increased

2    competition, Defendants clearly knew that charging sales tax, as high as 9% (¶12(b)), was

3    "reasonably likely" to have an "unfavorable impact" on financial results.  *In re Lyondell*

4    *Petrochem. Sec. Litig.*, 984 F. 2d 1050, 1052-53, n.6 (9th Cir. 1993); *In re Adams Golf, Inc.*

5    *Sec. Litig.*, 618 F. Supp. 2d 343, 349 (D. Del. 2009) (disclosure is required if a jury could

6    reasonably conclude risk was a known trend or uncertainty likely to have a material impact on

7    future revenues).[12]

8                         **b.  Misstatements and Omissions Concerning Past Taxes**

9            As a matter of law, vendors are agents of the state who are required to collect sales

10   taxes.  To ensure collection, corporations' officers and directors are held personally liable for

11   uncollected taxes.  Moreover, sellers are prohibited from absorbing sales taxes.  ¶¶187-88

12   (citing authorities).  "Investors are presumed to know the law under which companies operate."

13   *Berson,* 527 F.3d at 987 (citation omitted).  Thus, investors reasonably believed that Rackable

14   routinely collected sales taxes.  *See U.S. SEC v. Santos*, 355 F. Supp. 2d 917, 920 (N.D. Ill.

15   2003) ("[P]articipants in the securities market are entitled to presume that all of the actors are

16   behaving legally; silence that conceals illegal activity is therefore intrinsically misleading and

17

18   ───────────────

18   [12] A disclosure relating to taxes and interest owed on *past* sales to *certain* customers fails to
     warn of the negative impact of prospectively charging sales tax to all customers.  Authority
19   previously cited by Defendants supports plaintiffs' position.  *E.g.*, *Belodoff v. Netlist, Inc.*, 2009
20   WL 2777320, at *3 (C.D. Cal. Sept. 1, 2009)("if Defendants knew that customer demand was
     in fact dwindling and that a known sharp decline in customer demand was not disclosed, such
21   nondisclosure would likely constitute a material omission"); *see also Matrixx*, 585 F.3d at 1181
     (failure to disclose known adverse facts in cautionary language is actionable).  Item 303 applies
22   to quarterly reports.  *See Takara Trust v. Molex Inc.,* 429 F. Supp. 2d 960, 974, n.7 (N.D. Ill.
23   2006); *Simon v. Am. Power Conversion Corp.*, 945 F. Supp. 416, 431 & n. 19 (D.R.I. 1996);
     *Wallace v. Systems & Computer Tech. Corp.*, 1997 WL 602808, at *21-*22 (E.D. Pa. Sept. 23,
24   1997).  Finally, disclosure of the negative impact of charging taxes on pricing was not optional:
25   "If … disclosure in … earlier reports does not adequately foreshadow subsequent events, or if
     new information that impacts known trends and uncertainties becomes apparent in a quarterly
26   period, additional disclosure should be considered and may be required."  *Comm'n. Guidance*
     *Regarding Management's Discussion and Analysis of Financial Condition and Results of*
27   *Operations*, Exchange Act Rel. No. 34-48960, 2003 WL 22996757, at *10 (Dec. 19, 2003).

28

1    … is always violative of Rule 10b-5(b)."). [13]

2          For this reason, Defendants' partial disclosures of and expense accruals for past due

3    state taxes, interest and collection expenses – and the growing receivable for the full amount of

4    the taxes – were materially misleading.  In particular, until February 28, 2007, discussions of

5    past due taxes and interest misled investors by implying that sales taxes had always been

6    charged on a current basis; Defendants failed to warn investors of the difficulty in attempting to

7    recoup, so long after the fact, taxes that had never been charged for the period from 2003-2005.

8    ¶¶100, 101(a).  Even worse, although the State of California notified Rackable of a sales and

9    use tax audit in 2006, Defendants improperly concealed this fact until May 2007.  ¶¶171 and

10   179. [14]  Defendants cannot deal in half-truths.  *Berson*, *supra, id.* (even if disclosure of stop

11   work orders is not required, once defendant included projects on which they had been in issued

12   in its backlog, not doing so was actionable); *City of Monroe Employee Ret. Sys. v. Bridgestone

13   Corp.*, 399 F.3d 651, 673 (6th Cir. 2005) ("The law requires an actor to provide complete and

14   non-misleading information with respect to the subjects on which he undertakes to speak.").

15         Rackable's risk disclosure about past taxes for certain of its customers is deficient when

16   compared to Amazon.com's, one of Rackable's largest customers, and one held to be adequate

17   in *In re IAC/InterActiveCorp. Sec. Litig.*, 478 F. Supp. 2d 574, 593 (S.D.N.Y. 2007). [15]

18

19   [13] Defendants disingenuously argue that the failure to disclose non-collection of sales taxes
20   prior to February 28, 2007, did not render earlier Class Period statements false or materially
     misleading unless they knew their position was improper.  Def. Br. at 12:23-25.  In any event,
21   they did know.  Prior to the Class Period, SEC filings reported that sales taxes needed to be
     remitted to state authorities.  ¶190.  By early 2006, Ranganathan had hired a state tax expert to
22   rectify the situation.  ¶71(b).

23   [14] The Court held that Rackable could not record the expense until the matter settled.  Order at
     11:2-6.  However, the audit's existence should have been reported under SEC Reg. S-K, Item
24   103.  *See N.J. & Its Div. of Inv. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1136 (D. Kan. 2004).

25   [15] "Some tax authorities may assert that in some circumstances USA … should collect and
26   remit taxes … The amount of any tax liability … would depend on the number of jurisdictions
     that prevail … Expedia and Hotels.com have not paid nor agreed to pay such taxes and intend
27   to defend their positions vigorously.  Should a jurisdiction prevail … USA's subsidiaries may
28   consider limiting liability … by passing on such taxes to the consumer."

1  Amazon.com and IAC both stated they contested charging taxes and did not charge them.

2  Amazon.com added that having to charge taxes would decrease its ability to compete; IAC

3  implied as much, indicating it would have to pass such charges on to customers.  Rackable,

4  however, never disclosed a dispute over the collection of sales taxes or revealed it did not

5  collect them.   *Compare* ¶190 (Rackable's 2005 Form 10-K disclosure) *with* ¶3 n.3

6  (Amazon.com's 2005 Form 10-K disclosure).  *See McMahan & Co. v. Wherehouse*

7  *Entertainment*, 900 F.2d 576, 579 (2d Cir. 1990) ("[w]here method of presentation . . . obscures

8  or distorts significance of material facts, it is misleading").

9  c.      **Uncharged Sales Taxes Were Not Properly Reserved For**

10         The Form 10-Q for Q3 2006 and the 2006 Form 10-K, which set forth gross tax

11 liabilities of $4.4M and $6.5M, respectively, and recorded as assets receivables for the entire

12 amounts, did not reserve against non-payment by customers.[16]  Disclosures after the Class

13 Period indicate, *for the first time*, that the back taxes paid may not be fully recoverable and that,

14 accordingly, the receivable was reduced and an expense taken for unrecoverable amounts.

15 ¶¶171, 197.  Having never charged sales taxes, Defendants had no reasonable basis for failing

16 to reserve against customer refusals to pay sales tax years after their purchases.  *See Fla. St. Bd.*

17 *of Admin. v. Gree Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001) (adequacy of reserves is a

18 question of fact).  In fact, Rackable devoted substantial time and effort to trying to recover the

19 tax payments – including $5-6M from a single customer – with only partial success.

20 Ranganathan even made visits to Yahoo!, which refused to pay.  ¶¶63(a), 64(b), 69(b), 71(b),

21 72(b).  Expense accruals for 2007 totaled $3.3M, with the receivable asset shrinking by $2.1M

22 by Q3 2007.  ¶¶197, 202.  Thus, the Q3 2006 Form 10-Q, the 2006 Form 10-K, and public

23 statements concerning income were materially overstated for failing to take reserves.  ¶155.[17]

24 _____

25 [16] Because Rackable's sales tax disclosures are inconsistent, impenetrable, and, eventually
disappear, *e.g.*, ¶¶171, 177, 203-04, it appears that the accrued interest and collection expense
26 did not include a reserve for non-payment until *after* the Class Period.  *Compare* SEC filings
27 cited in ¶¶197 and 202 (reserve included) *with* ¶¶100 and 102 (charge to be taken later).

28 [17] The fact that Rackable did not restate its financials does not exonerate defendants.  *In re LDK*

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
-11-

2.     **Long-Time Lack of Internal Controls Over Procurement and Disastrous Implementation of the ERP System Precluded Visibility, Left Rackable With Overpriced Obsolete Inventory and Resulted in Last-Minute Costs**

The Court found previous allegations concerning Rackable's improper carrying of "a lot of excess inventory" on the books during the Class Period to be too vague to show that the Q2 2007 $20M write down should have been made sooner.  Order at *6.  With respect to problems with the Company's new ERP system, touted as Rackable's infrastructure improvement to ensure compliance with the Sarbanes-Oxley Act of 2002 ("SOX"), the Court held that post-Class Period concessions that upgrades were needed did not show that Defendants were earlier aware of system inadequacies.  *Id.*.  The SAC details Rackable's procurement problems, how they were exacerbated by haphazard implementation of the ERP system, and how this led to purchases of expensive, unneeded parts which added to already obsolete inventories:

> **Both before and during the Class Period, Rackable acquired inventory in a very indiscriminate and costly manner**.  Witnesses in different departments described purchases made "without planning" or oversight – large quantities purchased either at a discount, *e.g.*, at the end of their product lives, or pursuant to minimum purchase requirements – inventory which sat on shelves for years because neither Rackable nor their customers had any use for it.  Conversely, there were shortages of needed parts.  ¶56(a)-(e)(CW1: supply chain manager); ¶57(d) (CW2: shipping supervisor); ¶61(c)(CW6: supply chain manager); ¶64(c)(CW9: cost accounting/ financial operations manager); ¶66(b)(CW11: account executive); 74 (accountant); 76(b)(CW21: Operations Controller).

> **Because of management's focus on revenues, too often, the cost of manufacturing some products exceeded the prices for which they were being sold.**  Due to providing deep discounts or absorbing price hikes to retain marquee customers, or customers demanding price reductions as component prices fall, or minimum purchase requirements, witnesses complained that costs of goods often exceeded sales prices.  ¶¶56(f), 61(c), 64(a)&(d), 67(a), 70(a), 73.

> **Implementation of the Oracle ERP system in Q3 2006 was incomplete, rushed and not properly tested or supervised by managers having experience with the system.**  As a result, due to manual data entry, lack of

*Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245-46 (N.D. Cal. 2008) ("To hold otherwise would shift to the accountants the responsibility that belongs to the courts.") (citation omitted).

oversight and budgeted price points setting wildly inflated quantities, no one was monitoring purchases in Q4 2006.  ¶¶64(c), 72(e) (CW9: lack of oversight of new system operations and human errors in data entry led to purchasing going "out of control"; system program (error) caused excess purchases made to obtain specified price); ¶67(b)(CW12: problems with ERP caused it not to accurately reflect prices); ¶70(b)(CW15: there was not enough staff to bring the system properly online);  ¶71(c)(CW16: Class Period Controller responsible for inputting accounting data knew financial module of system was not ready to "go live" when defendant Ranganathan decided to do so); *see also* ¶60(a)-(h)(CW5: contract employee on SOX-required inventory reconciliation project found policies and procedures so loose and records in such disarray that manual adjustments back to 2006 were required); ¶63(c)(CW8: manual entry and improper use of ERP led to poor control over orders and excess inventory); ¶72(d)(CW17: senior director of accounting and external reporting indicated that Defendants "went live" with Oracle too fast using an incorrect accounting model (fund accounting) and without first testing against results on the then-current system);  ¶77 (CW22: Oracle systems consultant worked on the inventory module; never saw aging report); ¶174 (critical system enhancements made in June 2007); ¶181 (auditors report material weakness in internal controls over inventory accounting in 2007).  Salespersons also had difficulty obtaining quotes. *See* ¶¶59(a), 62(a), 68(c).

**Specific excess purchases of parts *not specified in customer orders*, in large part, caused the Q4 2006 inventory bloat and the need for the later write off, not "sudden" shifts in technology preferences (as claimed by Defendants).**  Even though DC power supplies were less expensive for customers to employ – such that an analyst praised Rackable for achieving greater than 50% DC sales in Q3 2006 – and, thus, sold exclusively by at least one salesperson, CW7 (*see* ¶62(c) & n.15), Rackable purchased a double order of AC power in Q4 2006 which sat unused.  ¶65.  Later, the new Sales VP urged the sales force to try to sell off the excess AC power.   ¶¶62(c), 76(c).  Once DDR2 was available, customers did not specify DDR1; it was purchased at the end of its technology lifecycle.  ¶¶59(e), 64(c), 66(b).

**Promised shipment dates were unrealistic; Rackable incurred excess costs.**  Rackable told salespersons to quote a production time of several weeks when it regularly took twice as long or more.  (¶132: Barton: "typically," 1 to 3 weeks); Rackable's parts orders often were delayed due to suppliers catering to its larger competitors.  Also, express freight charges, overtime, and tens of thousands of dollars of extra assembly floor time were incurred.  The use of components not specified led to costly corrections.  ¶¶57(a), 58(a)(&(d), 59(h); 61(b)&(f); 70(f).

In light of the above, Defendants falsely confirmed margins (¶¶78, 86, 90) when in possession of contradictory facts and predicted better operating/margin leverage due to

1    infrastructure improvements (¶78, 81, 88) without any reasonable basis.

2           For the same reasons, the statements: "[o]perationally, we materially completed the

3    build out of our internal infrastructure … We successfully to Oracle as our ERP system" and

4    "[w]e completed the implementation of all financial modules of Oracle ERP during the third

5    quarter," (¶¶84, 86) are false statements of historical fact.  (Indeed, Defendants soon thereafter

6    admitted that they needed to "improve the visibility in our ERP system and … level[] up our

7    procurement and materials planning organization." ¶125.)   Finally, Defendants' public

8    statements that overstated inventory in violation of GAAP and certifications of the adequacy of

9    internal controls over financial reporting (¶¶146-52, 156, 208-227) were also false when made.

10               **3.        RapidScale Sales Were Nonexistent**

11          Rackable purchased the RapidScale technology in August 2006 for $38M to enter the

12   storage market.  ¶15(c).  Because the company was newly acquired and salespersons needed to

13   be trained, *no* sales volume was included in the Q4 2006 forecast, but sales of $20M in 2007,

14   with a 60% gross margin, were repeatedly predicted (¶¶88, 127) and reaffirmed at the end of

15   the Class Period.  ¶159.  Three months later, CEO Barrenchea retracted the FY 2007 projection

16   and admitted that the Q2 2007 $5+M projection had not been achieved, due to lack of

17   execution and a need to re-release the product.  ¶176.  (Sales were only $2.4M in 2007.  ¶184.)

18          The SAC alleges there was no reasonable basis for any sales projection because the

19   product was pricier than competitors' products, complex and difficult to pitch, and not geared

20   towards Rackable's customers.  Training and rollout was not well-executed.  ¶¶59(l), 62(d),

21   66(a), 70(c).  Although Barton expressly stated that no RapidScale sales were included the

22   forecast, Defendants blamed RapidScale shortfalls for $600,000 of the Q4 2006 margin miss.

23   ¶111.  Although they claim it is not actionable (Def. Br. at 17), the inclusion of RapidScale

24   sales in projections, while claiming the opposite, renders the latter statement false when made.

25   Analysts noted the inconsistency (¶115) and that at only 4-5% of sales, RapidScale could not

26   have had that big an impact on margins.  ¶¶114, 116 (Q4 2006 miss); 266 (Q1 2007 miss).

27               **4.        False present-tense Q4 2006 Backlog Statements**

28

1    "[B]acklog is ... a snapshot of how much work the company has under contract right

2    now, and descriptions of the present aren't forward-looking."   *Berson*, 527 F.3d at 990.

3    Statements that "[w]e currently have a very solid revenue and backlog position," attributable to

4    "high October booking ... very strong bookings in the early part of the quarter" and that

5    "linearity is going to moderate ... [because] some quarters are front-end loaded, some are back-

6    end loaded," (¶¶81, 89, 92) were not projections.   They also were untrue.   As Defendants later

7    admitted, 74% of Rackable's Q4 revenues came in December 2006.   ¶125.[18]

8         **C.      The SAC Adequately Pleads Scienter**

9         A strong inference of "[s]cienter may be proven and pled by reference to circumstantial

10   evidence, for it is rare that perpetrators of a fraud would confess outright."   *In re Peoplesoft,*

11   *Inc.*, 2000 WL 1737936, at *3 (N.D. Cal. May 25, 2000).   The inference need not be irrefutable

12   or even the most plausible of competing inferences.   Rather, "a reasonable person [must only]

13   deem the inference of scienter cogent and at least as compelling as any opposing inference one

14   could draw from the facts alleged."   *Tellabs*, 551 U.S. at 324.

15        With respect to SOX certifications, financial reporting, backlog statements, completion

16   of ERP implementation, and omissions concerning the impact of new sales tax charges,

17   pleading "deliberate recklessness" is sufficient to allege scienter.   *City of Westland Police &*

18   *Fire Ret. Sys. v. Sonic Solutions*, 2009 WL 942182, at *4 (N.D. Cal. Apr. 6, 2009).   While

19   forecasts are forward-looking and actual knowledge of falsity is required by the PSLRA, here,

20   one month into Q4 2006, earlier-made projections were fine-tuned from 22-24% to 23-24%.

21   This implies Rackable was "on track" to hit its mark.   Such Statements of current business

22   conditions are not forward-looking.   *See Secure Computing*, 120 F. Supp. 2d at 817 (so

23   holding); *Bryant v. Avado Brands, Inc.*, 100 F. Supp. 2d 1368, 1382 (M.D. Ga. 2000) (same).[19]

24   _____

25   [18] Defendants blamed a power supply shortage for that.   ¶125.   However, the CWs stated the
     shortage was of sales (until deals were made), not power supplies.   *Supra* at 4 and 13.

26

27   [19] To raise the pleading bar, Defendants may not rewrite the SAC to convert a case predicated
     primarily upon present-tense misrepresentations and omissions into a "projections case."   *In re*
28   *Digimarc Corp. Deriv. Litig.*, 549 F.3d 1223, 1234 (9th Cir. 2008); *In re IPO Sec. Litig.*, 241 F.

That Defendants gave reasons other than a *mea culpa* to explain the margin misses does not mean that plaintiffs allege "fraud-by-hindsight." Def. Br. at 1.   Under *Tellabs,* "all allegations" must be considered, including admissions and subsequent revelations.  *Miss. Pub. Emp'ees Ret. Sys. v. Boston Scientific Corp.,* 523 F.3d 75, 89-93 (1st Cir. 2008) (*Tellabs* limits fraud-by-hindsight doctrine); *South Ferry,* 542 F.3d at 785 & n.3 (same).

## 1.   Facts Provided By 22 Witnesses Supports a Inference of Scienter

Allegations supporting scienter may be based upon witnesses with personal knowledge of the information provided. *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1015-16 (9th Cir. 2005).   Specifically, the "personal sources of information relied upon in a complaint should be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Id.* (citation omitted).   Thus, neither names, *id.*, or precise job titles are required.  *Zucco,* 552 F.3d at 996 n.3. The SAC satisfies the Ninth Circuit's standard with respect to the 22 CWs.  ¶¶56-77.

To measure reliability, courts look to "'the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged … the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.'" *Zucco*, 552 F.3d at 995 (citing *Daou*, 411 F.3d at 1015, quoting *In re Cabletron Sys., Inc.*, 311 F.3d 11, 29-30 (1st Cir. 2002)).   Here, 22 witnesses described the same or similar conditions in existence before, during and after the Class Period (¶¶56-77), "reinforce[ing] one another and undermin[ing] any argument that the complaint relies unduly on the stories of just one or two former employees." *Cabletron*, 311 F.3d at 30.   The CWs knew about inventory shortages and excesses, minimum purchase requirements, and severe ERP implementation problems.   CWs also knew about Rackable's sales tax issues, and salespersons and field engineers knew about the status of Q4 2006 sales.[20]   Thus, the CWs allegations support a strong inference of scienter.

---

Supp. 2d 281, 332 (S.D.N.Y. 2003).
[20] *See In re OCA, Inc. Sec. & Deriv. Litig.*, 2006 WL 3747560, at *18 (E.D. La. Dec. 14, 2006)

### 2.   Defendants' Admissions Support a Strong Inference of Scienter

Defendants' admissions constitute powerful evidence of defendants' scienter.  A "later statement may suggest that a defendant had a contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement."  *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003); *Middlesex Retirement Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232-33 (9th Cir. 2004). Here, during Rackable's February 1, 2007 conference call, defendants admitted that "we should have realized the impact of these issues [pricing for memory, cost of goods sold, competitive intensity, and other issues affecting gross margin] earlier in the quarter."  ¶125.  New CEO Barrenechea also admitted that with respect to RapidScale, "the $20 million projection – the execution wasn't there to support the projection."  ¶176.[21]  These admissions add to the strong inference of scienter alleged because defendants acknowledged that information existed at the time the Company made its statements that undermined the veracity of such statements – information known to defendants that made their statements false and misleading.   Thus, Defendants' admissions add to the strong inference of scienter alleged.

### 3.   Rackable's Small Size Supports a Strong Inference of Scienter

Numerous courts have held that a company's small size is a factor that adds to a strong inference of scienter.  *See, e.g., Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1173, 1186 (S.D. Cal. 2009) (only 300 employees); *In re Impax Laboratories, Inc. Sec. Litig.*, 2007 WL 7022753, at *10 (N.D. Cal. July 18, 2007) (453 employees).  Here, Rackable was a small company – with 174 and 286 employees as of year-end 2005 and 2006, respectively (¶40), and only 10 executive officers and a general and administrative staff of 19 at the Milpitas headquarters.  ¶¶232-33.  Rackable's small size adds to the strong inference of scienter alleged.

---

(small size of management and accounting relevant to CW's statements); *Berson,* 527 F.3d at 985 ("it is entirely plausible that 'engineering or technical editors' would know, or could reasonably deduce, that the company had suffered such setbacks.").

[21]  Plaintiffs also alleged inconsistent contemporaneous facts.  *See, e.g.*, ¶¶62(d), 66(a), 70(c).

### 4.  Defendants Were Highly Motivated to Conceal Adverse Facts

Motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference.  *Tellabs*, 127 S.Ct. at 2511.

#### a.  Massive Insider Selling Supports an Inference of Scienter

In 2007, Defendants admitted Rackable had not collected sales tax since at least 2003, two years before the Company's IPO (¶12(b)), which had given Racakble a competitive edge. ¶64(b). Starting in 2005, this began to result in fines and the suspension/revocation of licenses in at least 17 states, and a tax bill that grew to $11.2M by 2007.  ¶¶194, 205.[22]  Defendants knew what would happen once sales taxes were billed in Q4 2006 – the average sales price of Rackable's products fell by nearly 10% and gross margins were in a free-fall. ¶¶12(b), 111, 155.  Barton and Ford sold large amounts of stock after Rackable went public (¶¶3, 238-240), selling more shares in 2006 than in 2005, *id.*, when the sales tax issue and competitive pressures began to squeeze Rackable.  They sold shares from the IPO forward while concealing the same facts hidden during the Class Period; focusing on comparative trading history is thus meaningless.  Def. Br. at 22-23.[23]  Sales need only be consistent with the theory of the case. *Boston Scientific*, 523 F.3d at 92.

#### b.  Extraordinary Compensation Packages Support Scienter

"[T]he magnitude of [] compensation package, together with the timing coincidence of an overstatement of earnings at just the right time to benefit [the individual defendants], provides an unusual, heightened showing of motive to commit fraud." *Green Tree*, 270 F.3d at 661; *Am. West*, 320 F.3d at 944 (options and bonuses based upon performance provide strong

---

[22] *See No. 84 Employer-Teamster Jt. Council Pension Trust-Fund v. Am. West Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003) ("It is absurd to suggest that the Board of Directors would not discuss … the FAA investigations or negotiations, especially considering the fact that the FAA had indicated that it was considering penalties of up to $11 million.").

[23] *Cf. In re Enron Corp. Sec., Deriv. & ERISA Litig.,* 258 F. Supp. 2d 576, 643 n.69 (S.D. Tex. 2003) ("Class Period was determined by the three-year statute of repose … The [Texas Securities Act], in contrast has a … five year statute of repose. . . Therefore, the TSA reaches claims based on misrepresentations prior to the commencement of the federal Class Period.").

1   evidence of scienter).  Here, Defendants' compensation was tied to share price and earnings.

2   ¶¶236-42.  While the Court did not find it to be "remarkable" in the industry, Order at *9[24],

3   respectfully, results should be considered.  Management was rewarded with $20.8M in stock-

4   based compensation for 2006 – even though Rackable was "the worst performing stock on the

5   Russell 3000," with GAAP net income (after tax) of only $11.5M.  ¶¶119, 243.[25]

### 5.   Touted Upgrades to Internal Controls and Signed SOX Certifications Support a Strong Inference of Scienter

8            Material misstatements regarding internal controls appearing in SOX certifications are

9   relevant to proving scienter when there is a later admission that "significant deficiencies and

10  material weaknesses in the design and operation of internal control over financial reporting" had

11  *not been* disclosed as previously certified.  *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180,

12  1190-91 (D. Nev. 2009); *Backe v. Novatel Wireless, Inc*, 607 F. Supp. 2d 1145, 1163 (S.D Cal.

13  2009); *In re PMA Capital Corp. Sec. Litig.*, 2005 WL 1806503, at *10 (E.D. Pa. July 27, 2005).

14  Here, Ranganathan and Barton knowingly executed SOX certifications of the adequacy of

15  internal controls over financial reporting, even though Rackable had long-standing, well-known

16  inventory purchase, tracking, obsolescence and valuation problems, exacerbated by the ERP

17  implementation (¶¶217-27), which resulted in the following material weakness finding (¶181):

> "[E]rrors were detected in the inventory accounting in the interim and annual financial statements resulting from: (1) inaccurate record preparation relating to purchase price variance, variance capitalization, physical count, obsolescence reserve computations and inventory purchase cutoff, and (2) reviews of inventory calculations not being performed with sufficient precision."

### 6.   Violations of GAAP Support a Strong Inference of Scienter

23           Financial statements filed with the SEC not prepared in accordance with GAAP are

---

[24]  A district court may reconsider its prior rulings as long as it has jurisdiction over the case. *U.S. v. Smith*, 389 F.3d 944, 948 (9th Cir. 2004); *Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 888 (9th Cir. 2001).  Trial court rulings are subject to revision at any time before the entry of judgment.  *Smith*, 389 F.3d at 949; *U.S.  v. Houser*, 804 F.2d 565, 567 (9th Cir. 1986).

[25]           In any event, "the absence of a motive allegation is not fatal."  *Tellabs*, 551 U.S. at 325.

1    presumptively misleading and inaccurate, *In re Adaptive Broadband Sec. Litig.*, 2002 WL

2    989478, at *12 (N.D. Cal. Apr. 2, 2002), and evidence scienter. *Daou,* 411 F.3d at 1016.

3    Additionally, a significant write-off of inventory directly following the Class Period tends to

4    support allegations that inventory was seriously overvalued when the misleading statements

5    were made. *Novak v. Kasaks*, 216 F.3d 300, 312-13 (2d Cir. 2000). Here, Defendants'

6    deceptive inventory and sales tax reporting violated GAAP.

7          Rackable stated that it carried inventory at the lower-of-cost or market prices, in

8    accordance with GAAP. ¶207. However, CWs discussed long-known obsolescence arising

9    from varous undisclosed practices and outside auditors found controls over inventory

10   accounting were lacking.[26] Defendants' less than candid inventory disclosures also evidence

11   falsity and scienter. Through the Q3 2006 Form 10-Q, Rackable reported a reserve for

12   obsolescence – then it disappeared. ¶¶146; 156. *See Lattice Semiconductor Corp. Sec. Litig.*,

13   2006 WL 538756, at *18 (D. Or. Jan. 3, 2006) (unexplained change of standardized language in

14   SEC filing indicative of scienter, where change subtlety masked truth); *SEC v. Lucent Tech.,*

15   *Inc.*, 363 F. Supp. 2d 708, 717 (D.N.J. 2005) ("common sense" that cover-up of earlier

16   misstatement evidences scienter). Here, in light of the overwhelming witness information

17   demonstrating the widespread nature of the problems, defective disclosures combined with the

18   massive $20.6M write-off just three months after the Class Period are indicative of scienter.[27]

19         Defendants manipulated Rackable's reserves for state sales taxes that the Company had

20   not collected from customers since 2003. The warning that Rackable *might* not be able to

21   recover these monies does not cure a failure to prepare financial statements in accordance with

---

[26] *E.g.*, Higher-priced parts staying in inventory when prices declined and customers demanded use of lower-priced parts, minimum purchase requirements, over-purchases to meet budget price points, high return rate, and unneeded end-of-life-cycle parts purchases. ¶¶56(a)&(d), 57(b), 59(e), 60(d), 61(c), 63(c), 64(c), 65, 66(b), 67(b), 69(a), 70(a), 71(d), 72(e), 73-75, 76(b).

[27] *See, e.g., Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (the magnitude of the write-off evidences scienter).

GAAP. ¶¶185-206.  *Berson*, 927 F.3d at 987.[28]  Flagrant manipulation of reserves, by $13.2M to "manage earnings," is actionable.  *E.g.*, *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1156 (S.D. Cal. 2008)(when reserves should be increased, they were decreased; "[t]he sizable impact on Accredited's reported earnings of these alleged violations of GAAP also supports an inference of scienter.").

### D.   The PSLRA's Safe Harbor Provision Does Not Protect Defendants' Knowingly False Statements

The statutory safe-harbor immunizes "forward-looking statements identified as such, which are accompanied by meaningful cautionary statements." *LDK*, 584 F. Supp. 2d at 1250. However, to avoid interpreting the safe-harbor as a broad "license to defraud," it is necessary to apply a "narrow reading" of its language.  *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 340 (D. Mass. 2009).  The first prong does not immunize presently-known or recklessly-disregarded existing but concealed or misrepresented facts.[29]  Thus, present-tense statements regarding past conduct and its possible effects on the corporation are not forward-looking statements.  *Am. West*, 320 F.3d at 937.  "Cautionary language" that falsely implies an adverse event has not yet occurred is actionable.  *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).  The only forward-looking statement at issue here, Rackable's Q1 2007 projection, is not immunized, because Defendants knew: (a) Rackable had just started charging sales tax in Q4 2006; (b) prices would have to be lowered to remain competitive; and (c) margins would be decimated.  Defendants also concealed ERP implementation problems, an expensive DDR1 purchase, and that obsolete inventory needed to be written off.

If the Court reaches the second prong, the projection was not accompanied by sufficient

---

[28] *See PMA Capital*, 2005 WL 1806503, at *16 ("Misleading statements regarding GAAP procedures are actionable."); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 656 (S.D.N.Y. 2007)(false assertions that financial statements comply with GAAP are actionable).

[29] "The Ninth Circuit in *America West* held that 'a person may be held liable if the 'forward looking statement' is made with 'actual knowledge...that the statement was false or misleading." *LDK*, 584 F. Supp. 2d at 1250 (quoting *Am. West*); *In re Dura Pharms., Inc. Sec. Litig.*, 548 F. Supp. 2d 1126, 1143 (S.D. Cal. 2008) (same).

cautionary language.[30]  For example, Rackable warned that because it kept *low* inventories, profit margins could be affected by having to purchase parts at the last minute at higher spot market prices.  ¶5.  However, Rackable did not warn that end-of-life-cycle buys and minimum purchase requirements saddled Rackable with *excess* unneeded inventory (*e.g.*, ¶¶56(d), 61(c), 66(b)) or that inventory would be overvalued as Rackable kept higher-priced parts in inventory to satisfy demands for cheaper parts when prices fall (¶70(a)).[31]  Moreover, as shown above, it was not true that parts were purchased "just-in-time," after purchase orders were received.

Similarly, Rackable warned about costs arising from delays due to parts shortages, *e.g.*, RJN, Ex. 2 at 21-22.  But other known risks existed: (1) delays due to larger competitors having orders filled ahead of Rackable's (¶58(a)); (2) promised shorter-than-reasonable delivery dates (¶12(d)(i)&(ii)) resulted in extra shipping and assembly floor costs, build and test team

_____

[30]Defendants fail to identify ***any*** specific meaningful cautionary language, and even attempt to rely upon a press release (RJN Ex. 13) that ends the Class Period.  In its Order, at *7, the Court adopted Defendants' initial string citation to Exs. 5, 6, 9-12, and 23-24 (now 5, 7, 10-13, 28-29) – also without quotation of cautionary language – as sufficient to invoke the safe harbor.  Respectfully, these exhibits do not contain meaningful cautionary language.  Exhibits 10 and 13 (January 16, 2007, and April 4, 2007, press releases) only state that "[a]ctual results may differ materially due to a number of risks and uncertainties, including that the company has not fully completed the process of preparing its financial statements … and unexpected adjustments may cause its financial results to vary from those results as reported in this press release."  These disclaimers are too generic to be meaningful.  *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244 (5th Cir. 2009).  Similarly, Ex. 7, the October 30, 2006 press release, merely states that actual results may differ because of generic reasons that apply to any company.  *Lormand*, 565 F.3d at 244-45.  The disclaimers contained in Exs. 5, 11 and 12 (Form 10-Q for the quarter ended July 1, 2006, the February 1, 2007, press release and  2006 Form 10-K) are insufficient because they fail to warn investors that certain risks had already materialized and were of greater magnitude than portrayed.  *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), *aff'd*, 459 U.S. 375 (1983); *In re 21st Century Holding Co. Sec. Litig.*, 2008 WL 5749572, at *13 (S.D. Fla. Nov. 7, 2008)(cautionary language not meaningful if it warns of risks that have already materialized).  The inadequacy of disclaimers at the outset of conference calls (Exs. 28-29) is not cured by references to SEC filings.  *Dura*, 548 F. Supp. 2d at 1143-44.  Even if could be, "[r]emote cautions are less likely effective[] to qualify predications contained in separate statements."  *Grossman v. Novell, Inc.*, 120 F.3d 1122, 1123 (10th Cir. 1997).

[31] CW21 indicated Defendants were "protecting" margins in 2006 by using an incorrect method to report excess and obsolete inventory at cost rather than writing them down.  ¶76(b).

1    overtime, on-site repairs of items hastily constructed or built with the wrong parts, and excess

2    parts associated with cancelled orders (¶¶56(c), 57(a), 59(g), 59(h)); and (3) sales at low or

3    negative margin because customers demanded price concessions after-the-fact.  ¶¶56(f), 59(f).[32]

4           **E.     Fact-Based Disputes[33] Concerning Causation are Improper at this Stage**

5           "Loss causation 'is a matter of proof at trial and not to be decided on a Rule 12(b)(6)

6    motion to dismiss.'"  *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008);

7    *Daou*, 411 F.3d at 1026; *PMI*, 2009 WL 1916934, at *11 (plausible facts sufficient).

8    "[A]ssertions of a steep drop in … stock price following the revelation of [the Company's] true

9    financial situation are sufficient to enable the complaint to survive a motion to dismiss …"

10   *Daou*, 411 F.3d at 1027.[34]  Indeed, as Judge Ware recently held in *Hodges v. Akeena Solar,*

11   *Inc.*, No. C 09-0214 (N.D. Cal. May 20, 2010), in denying a motion to dismiss where

12   defendants  asserted  inadequately  pleading  of  loss  causation,  "[a]llegations  that  an

13   announcement or press release by a defendant promptly caused a change in the price of the

14   defendant's stock are sufficient to survive a motion to dismiss."[35]  Here, the risks posed by

15
     _____

16   [32] Similarly, as stated above, any warnings about possibly not recovering past sales taxes do not
     inform investors of the competitive edge to be lost by charging them for the first time.

17
18   [33] Defendants submit analyst reports that were not referenced in the SAC to urge the Court
     make a factual determination as to falsity and loss causation.  The contents of analyst reports
19   not referenced in the SAC cannot be taken as true.  *In re PMI Group, Inc. Sec. Litig.*, 2009 WL
     1916934, at *11 (N.D. Cal. July 1, 2009); *Twinde v. Threshhold Pharms., Inc.*, 2009 WL
20   928132, at *4-*5 (N.D. Cal. Apr. 3, 2009).

21   [34] *In re JDS Uniphase Corp. Sec. Litig.*, 2005 WL 1705766, at *4 (N.D. Cal. July 21, 2005);
22   *see also Berson*, 527 F.3d 984, 989-90 (only disclosure was 25% revenue reduction caused by
     still- concealed practices; *Asher v. Baxter Int'l, Inc.*, 2006 WL 299068, at *2 (N.D. Ill. Feb. 7,
23   2006) (loss causation adequately pled where earnings miss allegedly was the result of
     undisclosed plant closures and a supply glut in blood-plasma causing price declines and
24   decreased demand).  An admission of both falsity and fraud is not required by *Dura Pharm.,*
25   *Inc. v. Broudo*, 544 U.S. 336, 346 (2005); *see Kreek v. Wells Fargo & Co.*, 652 F. Supp. 2d
     1053, 1064 (N.D. Cal. 2009) (revelation of "the truth" is "only one way to plead loss causation,
26   not the only way.").

27   [35] *See* Declaration of Michael Goldberg in Support of Plaintiffs' Opposition to Defendants'
28   Motion to Dismiss, etc., filed herewith, at Ex. 1, at 6-7.

1  defendants' misconduct materialized in big margins misses.

2      Moreover, a *mea culpa* is not necessary.  Rackable cannot "defeat liability by refusing

3  to admit the falsity of its prior misstatements." *Alaska Elect. Pens. Fund v. Flowserve Corp.*,

4  572 F.3d 221, 230 (5th Cir. 2009).  Thus, "[o]ne of the ways a plaintiff can plead loss causation

5  is to allege that the market reacted negatively to a corrective disclosure regarding the falsity of

6  the defendants' representations." *In re Winstar Comm'ns.*, 2006 WL 473885, at *13 (S.D.N.Y.

7  Feb. 27, 2006); *LDK*, 584 F. Supp. 2d at 1250-51.  Here, as defendants recognize, plaintiffs

8  now allege that analysts, an industry journalist, and the market disbelieved their claimed

9  innocent reasons for margin misses.  *E.g.*, ¶¶16, 114-16; Def. Br. at 24.

10     First, on January 16, 2009, Rackable announced net income and margin figures would

11 be missed, blaming: (a) high DDR memory pricing; (b) lowering prices; and (c) low

12 RapidScale sales.  ¶111.  That day, a Thomas Weisel analyst questioned each of these excuses

13 – noting DDR prices declined (*see* ¶¶107-10, 116), aggressive pricing was inconsistent with its

14 checks *and* management Q4 commentary, and storage volume was too small to cause margin

15 impact – and noted that "management will clearly have a credibility issue."  ¶114.  The analyst

16 proffered several of actual reasons for the miss described by the CWs: costs due to shipment

17 delays, price renegotiations and higher-priced memory purchased early in the quarter.  Thus,

18 the analyst did not transform poor results or already public information into a corrective

19 disclosure; rather, the analyst revealed some of the true facts – that Defendants did not – and

20 the share price crashed by $12.44.  ¶117.

21     On February 1, 2007, the final Q4 2006 figures were announced.  ¶119.  When pressed,

22 Defendants admitted ERP and procurement and materials planning problems, an overpriced

23 purchase of unneeded DDR1, and that 74% of revenues came in the last month – despite earlier

24 claims of better margins due to systems upgrades, falling DDR prices, and level sales due to

25 revenues in hand and early bookings "in the bag."  ¶¶125, 140.  Recalling the bullish October

26

27

28

1    30th call, analysts again doubted Defendants' excuses[36] and Rackable's price fell $3.74. ¶17.

2          Next, on February 28, 2007, Rackable filed its 2006 Form 10-K, burying the fact that it

3    just started charging sales tax.  By March 2, 2007 Rackable's stock price was down from

4    $17.41 per share on February 28, 2007 to $16.50 or 5%. ¶154.  On April 4-5, 2007 the other tax

5    shoe dropped when it was revealed that: (a) tax-related expenses shot up in Q1 2007 (and

6    Rackable had to pay fines and re-register in many states), becoming a drag on margins and (b)

7    competition was such that "Rackable's business model is flawed."  ¶158.  The price fell by

8    $2.64 on heavy volume.  ¶157.  *See In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534,

9    547 (N.D. Cal. 2009) (when concealed risk materializes, no need to prove it was the sole reason

10   for the decline).

11   **IV.    CONCLUSION**

12         Defendants' motion to dismiss should be denied.[37]  Alternatively, plaintiffs respectfully

13   request leave to amend.  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003).

14

15   Dated: May 26, 2010                **GLANCY BINKOW & GOLDBERG LLP**

16

17                                      By:   */s/ Michael Goldberg*
                                        Michael Goldberg (SB#188669)
18                                      Lionel Z. Glancy (SB#134180)
                                        1801 Ave. of the Stars, Suite 311
19                                      Los Angeles, CA, 90067
                                        Tel: (310) 201-9150
20                                      Fax: (310) 201-9160
21                                      E-mail: info@glancylaw.com

22                                      *Lead Counsel for Plaintiff and the Class*

23

24

25   _____

26   [36] *E.g.*, ¶132 ("How many days or weeks were there between … the price in the POs and then
     the customer actual signing--Just trying to [understand the gap]); ¶136 (analyst: "I mean you
27   kind of went from [] saying [that DRAM prices] being flat to spiking to 30%").
     [37] The sole basis for dismissing the §20 claim against the Individual Defendants was failure to
28   plead a §10(b) violation.  Def. Br. at 24.  Plaintiffs have done so; the claim should be sustained.

1

2

3

**PROOF OF SERVICE BY ELECTRONIC POSTING**
**PURSUANT TO NORTHERN DISTRICT OF CALIFORNIA LOCAL RULES AND**
**ECF GENERAL ORDER NO. 45**
**AND BY MAIL ON ALL KNOWN NON-REGISTERED PARTIES**

4

I, the undersigned, say:

5

6

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court.  I am over the age of 18 and not a party to the within action.  My business address is 1801 Avenue of the Stars, Suite 311, Los Angeles, California  90067.

7

On May 26, 2010, I caused to be served the following document:

8

9

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

10

11

By posting these documents to the ECF Website of the United States District Court for the Northern District of California, for receipt electronically by the following parties:

12

**See Attached Service List.**

13

And  by US mail to all known non-ECF registered parties.

14

**See Attached Service List.**

15

16

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 26, 2010, at Los Angeles, California.

17

_**S/Michael Goldberg**_
Michael Goldberg

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 4:09-cv-00222-CW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Frederick William Gerkens , III**
  fgerkens@glancylaw.com

- **Lionel Z. Glancy**
  info@glancylaw.com

- **Michael M. Goldberg**
  info@glancylaw.com,fgerkens@glancylaw.com,rprongay@glancylaw.com

- **Meredith N. Landy**
  mlandy@omm.com,vtran@omm.com,sfolchi@omm.com,mpaul@omm.com,jcoakley@omm.com

- **Peter Todd Snow**
  kkirk@omm.com,psnow@omm.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Frederick W. Gerkens                                    , III
Glancy Binkow & Goldberg LLP
1430 Broadway
Suite 1603
New York, NY 10018

Dhaivat H. Shah
O'Melveny & Myers LLP
2765 Sand Hill Road
Menlo Park, CA 94025
```