1
2
3
4
5
6              IN THE UNITED STATES DISTRICT COURT
7           FOR THE NORTHERN DISTRICT OF CALIFORNIA
8
                                    No. C 09-0222 CW
9  IN RE RACKABLE SYSTEMS, INC.
   SECURITIES LITIGATION            ORDER GRANTING
10                                  DEFENDANTS' MOTION
                                    TO DISMISS
11 _____/
12
13      This is a securities fraud class action brought on behalf of

14 purchasers of Rackable Systems, Inc.'s securities between

15 October 30, 2006 and April 4, 2007.  Defendants Rackable, Thomas

16 Barton, Madhu Ranganathan and Todd Ford are alleged to have

17 defrauded investors by failing to disclose materially adverse

18 conditions of the company.  Defendants have filed a motion to

19 dismiss Plaintiffs' Supplemental Second Amended Complaint (2AC).

20 Lead Plaintiffs Gerald Dull and Vincent Fusco oppose the motion.

21 The motion was heard on July 15, 2010.  Having considered all of

22 the parties' papers and oral argument on the motion, the Court

23 grants Defendants' motion.

24                          BACKGROUND[1]

25      Defendant Rackable designs, manufactures and implements

26 computer servers and storage systems.  Its customers include over

27      [1]All facts are taken from Lead Plaintiffs' 2AC and from
   judicially noticeable documents and are assumed to be true for
28 purposes of this motion.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

300 companies worldwide in the internet, semiconductor design, enterprise software, entertainment, financial services, oil and gas exploration and biotechnology industries and the federal government.  Rackable was founded in 1999 and conducted its initial public offering in June, 2005.  In May, 2009, Rackable acquired Silicon Graphics, Inc.  The combined entity now carries the name of the newly acquired company.  Defendant Barton is the former Chief Executive Officer; Defendant Ranganathan is the former Chief Financial Officer and Principal Finance and Accounting Officer; and Defendant Ford is the former Executive President of Operations.

Lead Plaintiffs Gerald Dull and Vincent Fusco purport to represent a class of persons and entities that bought common stock of Rackable between October 30, 2006 and April 4, 2007 (Class Period).

In Rackable's first annual report as a public company, it noted several factors that could affect its ability to stay profitable.  It stated that it relies on a relatively small number of customers for a significant portion of its revenue.  In 2005, Microsoft, Yahoo! and Amazon accounted for fourteen percent, twenty-two percent and twenty-four percent of Rackable's revenue respectively.

Rackable maintains a build-to-order business model, which, as it disclosed to its investors, requires it to purchase components and materials for its products in spot markets.  Thus, it noted that its costs are sensitive to market price volatility.  Rackable

United States District Court
For the Northern District of California

also specifically disclosed that historically prices for DRAM[2] have been volatile and it was becoming an increasingly larger percentage of Rackable's bill of materials.

On February 22, 2006, Rackable disclosed that in December, 2005 it had identified "potential state sales and use tax liabilities relating to certain of our product sales to customers outside of California," which it estimated to be $1.2 million. Request for Judicial Notice (RJN), Exh. 2 at 27.  Rackable stated that, if it could not recover the sales tax from its customers, it would have to record an additional charge to its operating results and pay the sales tax out of its own funds.  Id.

On October 30, 2006, Rackable announced that its total revenue for the first three quarters was $254.5 million, up ninety-two percent from $131.9 million for the same period in 2005. Rackable's non-GAAP[3] gross margin of 22.6 percent for the third quarter was within its projection of twenty-two to twenty-four percent.  Rackable projected that its 2006 fourth quarter revenue would be between $100 and $110 million, non-GAAP gross margins

_____

[2]DRAM is a type of computer memory used in Rackable's products.

[3]SEC Regulation G regulates the use of financial measures that are not prepared in accordance with generally accepted accounting principles (GAAP).  These are commonly referred to as "non-GAAP financial measures."  The non-GAAP gross margin and net income excludes stock-based compensation expenses.  Rackable excludes from its non-GAAP gross margin and non-GAAP net income "certain nonrecurring items to facilitate its review of the comparability of the company's core operating performance on a period to period basis because such times are not related to the company's ongoing core operating performance as viewed by management."  RJN, Exh. 10. Rackable notes that "these non-GAAP financial measures have limitations as an analytical tool, and are not intended to be an alternative to financial measures prepared in accordance with GAAP."  Id.

would be between twenty-three and twenty-four percent, and non-GAAP net income would be between $0.25 and $0.75 per share.

Rackable missed these projections. On January 16, 2007, Rackable announced that its revenue for the fourth quarter would be between $105.5 and $106.8 million, non-GAAP gross margins would be between 19.2 and 19.7 percent and non-GAAP net income would be between $0.17 and $0.18 per share. It stated that the "primary factors" for the miscalculation were (1) DRAM pricing higher than anticipated, (2) intense competitive conditions that caused the company to price contracts more aggressively in order to maintain and expand its customer base and (3) lower than expected sales of a new product, "RapidScale." RJN, Exh. 10. The next day, Rackable's stock price fell from $32.42 per share to $19.98 per share.

On February 1, 2007, Rackable announced its final financial results for the fourth quarter and full year of 2006. The final figures announced for the fourth quarter of 2006 were total revenue of $106.9 million, non-GAAP gross margins of 19.8% and non-GAAP net income of $0.19 per share. Defendant Barton explained that this shortfall was due to (1) unexpectedly high prices of DRAM, (2) intentional business decisions to maintain market share and win business in the face of aggressive competition, (3) lower than anticipated sales of RapidScale products and (4) revenue production that was "backend loaded" for the quarter. Id., Exh. 24. The next day, Rackable's stock fell to $16.60 per share.

On February 28, 2007, Rackable disclosed that it had increased its reserve for potential sales and use tax liability to $6.5 million. On April 4, 2007, Rackable announced that it expected revenue for the first quarter to fall within previous projections

4

of $70 to $75 million, but that its GAAP and non-GAAP gross margins would be thirty percent lower than expected. Barton stated, "Intense competitive conditions for business at our largest customers continued throughout the first quarter of 2007, which negatively impacted our gross margin and bottom line." After this announcement, Rackable's stock price fell to $14.25 per share.

On April 26, 2007, Rackable released its final results for the first quarter of 2007. Its total revenue was within the projected range, but it experienced a GAAP net loss of $10.2 million. Defendant Barton announced that, to address the increased competition, "we have also come to the conclusion that we need to accelerate a shift in our overall business model, specifically to increase the level of standardization in our product line, and to move from a pure build-to-order model to a configure-to-order model." Id., Ex. 31 at 3. The next day, Rackable's stock price fell to $11.27 per share.

On January 16, 2009, Plaintiffs filed this shareholder class action, alleging that Defendants engaged in a fraudulent scheme to inflate Rackable's value by misrepresenting its true financial condition. Specifically, Plaintiffs assert that Rackable's 2006 fourth quarter projections were false when made and that Rackable's stock price fell from January 16, 2007 to April 26, 2007 as a result of the "truth" regarding Defendants' alleged misrepresentations reaching the market.

On June 15, 2009, Plaintiffs filed the First Amended Complaint (1AC), which Defendants moved to dismiss on August 13, 2009. On January 13, 2010, the Court granted Defendants' motion and granted Plaintiffs leave to file an amended complaint. Plaintiffs filed

5

United States District Court
For the Northern District of California

the 2AC on February 3, 2010.  On April 5, 2010, the Court granted Plaintiffs leave to file a Supplemental 2AC, which changed only the names of the lead Plaintiffs in the action.[4]  While it is slightly longer and contains allegations from more confidential witnesses than the 1AC, the 2AC suffers from the same faults as the earlier complaint.

LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff.  NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).  However, this principle is inapplicable to legal conclusions; "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not taken as true.  Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 1949-50 (2009) (citing Twombly, 550 U.S. at 555).

REQUESTS FOR JUDICIAL NOTICE

Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute in that it is

---

[4]For convenience, the Court refers to the "Supplemental 2AC" as the "2AC."

. . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Even where judicial notice is not appropriate, courts may also properly consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleadings."  <u>Branch v. Tunnell</u>, 14 F.3d 449, 454 (9th Cir. 1994).

The Court grants Defendants' request for judicial notice of Exhibits 1 through 23 of the request because SEC filings may be judicially noticed.  <u>See Dreiling v. American Exp. Co.</u>, 458 F.3d 942, 946 (9th Cir. 2006).  The Court also grants Defendants' requests as to Exhibits 24 through 53 -- conference call statements, Rackable's press releases, analyst reports and news articles -- but not for the truth of their contents.

I.   Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b); <u>see also</u> 17 C.F.R. § 240.10b-5 (Rule 10b-5).  To state a claim under § 10(b), a plaintiff must allege: "(1) a misrepresentation or omission of material fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss."  <u>In re Gilead Sciences Securities Litig.</u>, 536 F.3d 1049, 1055 (9th Cir. 2008).

Some forms of recklessness are sufficient to satisfy the element of scienter in a § 10(b) action.  <u>See Nelson v. Serwold</u>,

7

576 F.2d 1332, 1337 (9th Cir. 1978).  Within the context of § 10(b)

claims, the Ninth Circuit defines "recklessness" as

> a highly unreasonable omission [or misrepresentation],
> involving not merely simple, or even inexcusable
> negligence, but an extreme departure from the standards
> of ordinary care, and which presents a danger of
> misleading buyers or sellers that is either known to the
> defendant or is so obvious that the actor must have been
> aware of it.

Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (9th Cir.

1990) (en banc) (quoting Sundstrand Corp. v. Sun Chem. Corp., 553

F.2d 1033, 1045 (7th Cir. 1977)).  As explained by the Ninth

Circuit in In re Silicon Graphics Inc. Securities Litig., 183 F.3d

970 (9th Cir. 1999), recklessness, as defined by Hollinger, is a

form of intentional conduct, not merely an extreme form of

negligence.  See Silicon Graphics, 183 F.3d at 976-77.  Thus,

although § 10(b) claims can be based on reckless conduct, the

recklessness must "reflect[] some degree of intentional or

conscious misconduct."  See id. at 977.  The Silicon Graphics court

refers to this subspecies of recklessness as "deliberate

recklessness."  See id. at 977.

Plaintiffs must plead any allegations of fraud with

particularity, pursuant to Rule 9(b) of the Federal Rules of Civil

Procedure.  In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1543

(9th Cir. 1994) (en banc).  Pursuant to the requirements of the

Private Securities Litigation Reform Act (PSLRA), the complaint

must "specify each statement alleged to have been misleading, the

reason or reasons why the statement is misleading, and, if an

allegation regarding the statement or omission is made on

information and belief, the complaint shall state with

particularity all facts on which that belief is formed."  15 U.S.C.

8

United States District Court
For the Northern District of California

1   § 78u-4(b)(1).

2       Further, pursuant to the requirements of the PSLRA, a

3   complaint must "state with particularity facts giving rise to a

4   strong inference that the defendant acted with the required state

5   of mind."  15 U.S.C. § 78u-4(b)(2).  The PSLRA thus requires that a

6   plaintiff plead with particularity "facts giving rise to a strong

7   inference that the defendant acted with," at a minimum, deliberate

8   recklessness.  See 15 U.S.C. § 78u-4(b)(2); Silicon Graphics, 183

9   F.3d at 977.  Facts that establish a motive and opportunity, or

10  circumstantial evidence of "simple recklessness," are not

11  sufficient to create a strong inference of deliberate recklessness.

12  See Silicon Graphics, 183 F.3d at 979.  To satisfy the heightened

13  pleading requirement of the PSLRA for scienter, plaintiffs "must

14  state specific facts indicating no less than a degree of

15  recklessness that strongly suggests actual intent."  Id.

16      A.   Misrepresentation or Omission of a Material Fact

17      To state a claim pursuant to § 10(b) of the Exchange Act,

18  Plaintiffs must allege, among other things, a misrepresentation or

19  omission of a material fact.  In the 2AC, just as in the 1AC,

20  Plaintiffs assert that Defendants made false and misleading

21  statements about Rackable's (1) gross margin and earnings per share

22  (EPS) projections for the fourth quarter of 2006 (4Q06),

23  (2) collection of sales and use taxes from its customers,

24  (3) inventory procurement system, (4) ERP system,[5] (5) relationship

25  with its top three customers and (6) projected sales of RapidScale

26  products.  The Court addresses each of these allegations in turn.

27  ─────────────

28      [5]ERP is an electronic resource planning system designed by
    Oracle better to track Rackable's costs and revenues.

1.   Gross Margin and EPS Projections

Plaintiffs' 2AC continues to allege that Rackable's gross margin and EPS projections for 4Q06 were false when made because Defendants knew that Rackable's profitability during the quarter would be negatively affected by the billing of sales and use tax to its customers, increased inventory costs and the discounting of a contract with one of its customers.  However, Plaintiffs fail to allege contemporaneous facts that show that Defendants did not have a reasonable basis for these projections when they were made. Plaintiffs assert that, because risks materialized later in the quarter, risks which caused Rackable to fall short of its projections, Defendants must have known that the projections were false at the time that they made them.  As with the 1AC, Plaintiffs cannot simply rely on a "fraud by hindsight" theory to demonstrate falsity.  In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1084-85 (9th Cir. 2002) ("The purpose of [the PSLRA's] heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading 'fraud by hindsight.'"); In re Sytex Corp. Sec. Litig., 95 F.3d 922, 934 (9th Cir. 1996) ("Because Defendants' predictions proved to be wrong in hindsight does not render the statements untrue when made.").

The new facts Plaintiffs allege in their 2AC do not remedy these problems.  The 2AC alleges that Rackable hired an outside auditor to investigate the costs associated with manufacturing products.  However, Plaintiffs do not describe the results of the auditor's investigation and there is no basis to infer that the results of the investigation somehow made any of Defendants' 4Q06

10

**United States District Court**
For the Northern District of California

projections false or misleading.  <u>See</u> <u>Silicon Graphics</u>, 183 F.3d at 988 (allowing plaintiffs "to go forward with a case based on general allegations of 'negative internal reports' would expose all those companies to securities litigation whenever their stock prices dropped.").

Plaintiffs also add new allegations that 4Q06 was a difficult quarter for Rackable.  Plaintiffs allege that Rackable's strategy was to offset lower margins on sales to its largest customers "by achieving higher margin sales with the RapidScale product line and by establishing a stable, worldwide sales force to expand the customer base."  2AC ¶ 64(a).  The shortcomings in the execution of this strategy do not mean that, at the time the strategy was made, Rackable had no reason to believe that it could be effective.  In fact, this strategy had been effective for Rackable in the past.  In a business as large and complex as Rackable, "problems and difficulties are the daily work of business people.  That they exist does not make a lie out of any alleged false statement."  <u>Ronconi v. Larkin</u>, 253 F.3d 423, 434 (9th Cir. 2001).

In sum, Plaintiffs have not plead specific facts from which a reasonable inference can be made that Defendants knew their projections about their gross margin and EPS were false at the time that they made them.

    2.   Sales and Use Tax

Plaintiffs claim that Rackable's financial statements and projections were false and misleading because Defendants should have disclosed, in advance, the impact that charging sales tax might have on Rackable's competitive position.  Specifically, Plaintiffs argue that Defendants should have disclosed in the June,

11

2005 Initial Public Offering that Rackable was not charging its customers sales tax.  Plaintiffs argue that when Rackable decided to charge sales tax it was no longer able to price its products competitively and that failing to disclose this information misled investors.  However, Rackable notified the market of its potential sales and use tax liability in February, 2006, which is months before the Class Period.  At that time, Rackable disclosed that it had recorded a charge for amounts owed from its customers, but that "if we are not able to recover these sales taxes from these customers, we will record an additional charge to our operating results and need to pay these taxes out of our funds."  RJN, Exh. 2 at 27.  Throughout the class period, Rackable continued to increase its reserve for unpaid taxes and notify shareholders of the issue. See e.g., RJN, Exh. 8 at 18; Id., Exh. 12 at 20.

Plaintiffs also claim that Rackable's financial statements and projections were false and misleading because Defendants understated its sales and use tax liability.  However, Rackable's sales and use tax liability could not have had any direct impact on its gross margin because Rackable's unpaid sales and use tax was recorded as a "general and administrative" expense or "accrued expense," not as a "cost of revenue."  See RJN, Exh. 12 at 20 (charging accrued sales and use tax as general and administrative expense), 31 (defining cost of revenue), 40 (calculating gross margin as revenue less cost of revenue), 75 (including accrued sales and use tax as component of accrued expense).  Plaintiffs assert that Rackable should not have accounted for unpaid sales tax in this manner and that it should have had a separate "reserve for non-payment" of sales tax.  However, the 2AC does not allege that

such accounting treatment was required under GAAP or that Rackable had enough information about the amounts it could not collect to create such a reserve. Moreover, creating such a reserve would not have communicated any additional information to investors because Rackable had already disclosed that it would have to pay all unpaid sales tax that it was unable to collect from its customers.

In sum, Plaintiffs have not adequately alleged with particularity that any statements regarding Rackable's sales and use tax liability were false or misleading.

3.   Inventory Procurement System

The 2AC alleges that Rackable's financial statements and projections were false and misleading because it failed to account properly for excess and obsolete supplies that it used in making its computer servers and storage systems. Specifically, Plaintiffs allege that, by December 31, 2006, Defendants knew, but failed to disclose, that Rackable's customers would not purchase its products above their listed prices, and, therefore, Rackable should have written off these supplies as a loss earlier than it did. However, Rackable regularly disclosed that its build-to-order business model carried substantial costs and risks. See e.g., RJN, Exh. 5 at 28, Exh. 2 at 21. Plaintiffs have not alleged that Defendants knew in advance that it would purchase more supplies than it needed; nor are there any allegations that Rackable failed to write off its excess supplies in an appropriate manner.

Further, when Rackable wrote down its inventory in the second quarter of 2007, it disclosed the following reasons for its decision: (1) a "significant reduction in our forecasted usage for the next twelve months," (2) a "customer driven, technology

13

platform shift from AMD to Intel" and (3) "lower than expected revenue from 2007 and a shift in customer preference to next generation power supplies created an excess in power supplies on hand." RJN, Exh. 19 at 20-21. Plaintiffs have not alleged with particularity any facts to refute these explanations.

### 4. ERP System

Plaintiffs assert that Defendants concealed that Rackable's ERP System failed adequately to track Rackable's inventory and other costs to support its financial statements and projections. However, Plaintiffs continue to fail to allege that Defendants were aware of any alleged deficiencies in the ERP System when financial statements and projections were made. Plaintiffs rely on Rackable's internal recommendations to improve the system, but these recommendations were made well after the Class Period and do not prove that Defendants misrepresented the ERP System's effectiveness. The only allegations that allude to contemporaneous information relate to difficulties in implementing the system. However, problems in implementing the system and inaccurate statements projecting when the implementation would be completed do not suggest that Rackable's financial projections were fraudulent.

### 5. Relationship with Top Customers

In Plaintiffs' 2AC, they continue to allege that Defendants Barton and Ranganthan made false and misleading statements during an October 30, 2006 earnings conference call when they stated that Rackable's relationship with its top three customers remained "solid." Complaint ¶ 86. To support their allegation, Plaintiffs rely on the fact that four months after this statement was made, Rackable provided a large discount to one of its top three

14

customers in order to prevent that customer from going to a competitor.  Giving a customer a discount does not mean that a relationship with that customer is not "solid."  Moreover, Plaintiffs have failed to allege how this statement was false or misleading at the time that it was made.  Defendants' general statements of optimism are not actionable under securities laws. See Glen Holly Entertainment, Inc. v. Tektronix, Inc., 352 F.3d 367, 379 (9th Cir. 2003); Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998) ("No matter how untrue a statement may be, it is not actionable if it is not the type of statement that would significantly alter the total mix of information available to investors.") (quotation marks and citation omitted);  In re VeriFone Sec. Litig., 784 F. Supp. 1471, 1481 (N.D. Cal. 1992), aff'd, 11 F.3d 865 (9th Cir. 1993) ("Professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives, who have a personal stake in the future success of the Company.").

> 6.   RapidScale Products

Plaintiffs allege that Defendants misled investors by projecting $20 million in sales of RapidScale products in 2007. Midway through 2007, newly appointed CEO Mark Barrenechea stated that "the execution wasn't there to support [the $20 million] projection."  However, failing to meet a projection does not make the projection a misrepresentation. As with many of the allegations above, Plaintiffs fail to allege contemporaneous facts inconsistent with the projection.

> B.   Forward-Looking Statements

Defendants' projections and forward-looking statements are

15

inactionable under the PSLRA's safe harbor and the "bespeaks caution" doctrine.  Forward-looking statements are not actionable if they are accompanied by meaningful cautionary language.  <u>Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.</u>, 353 F.3d 1125, 1133-34 (9th Cir. 2004).  Defendants' projections about the fourth quarter of 2006 and the 2007 fiscal year easily meet the definition of a forward-looking statement because they are statements containing a "projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items."  15 U.S.C. § 78-u5i(i)(1)(A).  And, these forward-looking statements were consistently accompanied by such cautionary language.  <u>See</u> RJN Exs. 5, 7, 11-13, 28-29.

Even if unaccompanied by cautionary language, forward-looking statements cannot support liability unless they are made with actual knowledge of their falsity.  <u>See</u> 15 U.S.C. § 78u-5(c)(1)(A)(i).  As described below, Plaintiffs have not plead with particularity Defendants' actual knowledge of falsity.

C.   Requisite Mental State

A complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  When evaluating the strength of an inference, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."  <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 325 (2007).  "The inference of scienter must be more than merely 'reasonable' or 'permissible' -- it must be cogent and compelling, thus strong in light of other explanations."  <u>Id.</u> at

16

324.  A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Id. However, "the inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  Id.

Plaintiffs allege that there is a strong inference that Defendants acted with scienter because of Defendants' (1) interactions with CWs, (2) motive to commit fraud, (3) admissions, (4) involvement in Rackable's core operations, (5) documents filed with the SEC and (6) violations of GAAP.

        1.   Confidential Witnesses

The twenty-two confidential witnesses described in the complaint fail to support an inference of scienter.  Seven of the confidential witnesses -- CW1, CW3, CW5, CW6, CW 8, CW 17 and CW 21 -- were not employed at Rackable during the Class Period, which makes it unlikely that they had personal knowledge of Defendants' relevant state of mind.  See Zucco Partners v. Digimarc, 552 F.3d 981, 996 (9th Cir. 2009); Brodsky v. Yahoo!, Inc., 2009 WL 176002, at *10 (N.D. Cal.).  The remaining CWs who were employed by Rackable during the Class Period are not alleged "to have had any interaction or communication with any of the defendants, or to have provided any defendant with information, or to have heard or read any statement by any defendant, that contradicted or even cast doubt on a public statement made during the class period." McCasland v. FormFactor, Inc., 2008 WL 2951275, at *8 (N.D. Cal.).

Further, the CWs only provide vague assertions about the financial conditions at Rackable.  The CWs allege general knowledge

17

about inventory shortages and excesses, minimum purchase requirements, ERP implementation problems and sales tax issues. However, the CWs do not provide the level of particularity from which to infer that Rackable knew that it would miss its gross margin and EPS projections or that any statement by Defendants was made with fraudulent intent.  The CWs do not "allege contemporaneous facts in sufficient detail and in a manner that would create a strong inference that the alleged adverse facts were known at the time of the challenged statements." In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1085 (9th Cir. 2002).

        2.   Motive

        Plaintiffs allege that Defendants were highly motivated to conceal adverse facts about Rackable from the public. Specifically, Plaintiffs allege that Defendants' insider sales of stocks since the IPO support an inference of scienter.  However, only one Defendant, Ford, is alleged to have sold any stock during the Class Period; and he sold more stock before the Class Period than during the Class Period. In re Apple Computer Sec. Litig., 886 F.2d 1109, 1117 (9th Cir. 1989) ("Large sales of stock before the class period are inconsistent with plaintiffs' theory that defendants attempted to drive up the price of Apple stock during the class period.") (emphasis in original).  Insider stock sales become suspicious "only when the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." Vantive, 283 F.3d at 1092.  Ford sold 55,000 shares between October 30, 2006 and January 16, 2007 at $33.85 to $34.50 per share.  This is when Plaintiffs allege that the fraud began to be revealed to

18

United States District Court
For the Northern District of California

the market.  However, Defendant Ford sold almost as many shares, 52,000, from January 17, 2007 through the end of the Class Period, at prices ranging from $18.20 to $13.00.  These sales do not reflect an intention to maximize profits from an artificially inflated stock price.  Further, the fact that Defendants Barton and Ranganathan did not sell any stock during the Class Period further undermines any inference of scienter from stock sales.

Plaintiffs also argue that Defendants' compensation packages support an inference of scienter because they were "extraordinary by any measure."  Opposition at 14.  Plaintiffs allege that Defendants were motivated to commit fraud to obtain additional compensation from Rackable and to sell their company stock at inflated prices.  Compared to the industry norms, the type or amount of compensation paid to Defendants is not remarkable.

    3.   Admissions

A "later statement may suggest that a defendant had a contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement."  In re Read-Rite Corp. Sec. Litig., 335 F.3d 843, 846 (9th Cir. 2003).  However, "[i]t is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood."  Yourish v. Cal. Amplifier, 191 F.3d 983, 997 (9th Cir. 1999).  Plaintiffs rely on the following statement, which was made by Ford in a February, 1, 2007 conference call in response to $300,000 in higher than anticipated overhead costs: "Admittedly, we should have realized the impact of these issues earlier in the quarter."  2AC ¶ 125. Plaintiffs also rely on the statement that, with respect to the $20

19

million forecast for RapidScale, "the execution wasn't there to support the projection." Id. at ¶ 176. These statements do not show that Defendants possessed contemporaneous knowledge of any facts contradicting an earlier statement. Specifically, they do not show that Defendants knew that their revenue projections were false and misleading when made. These statements are merely acknowledgments that the company could have been run better in the past.

        4.   Defendants' Involvement in Rackable's core
           Operations

Plaintiffs argue that Rackable's small size supports a strong inference of scienter. Allegations regarding management's role in a company "may be used in any form along with other allegations that, when read together, raise an inference that is 'cogent and compelling, thus strong in light of other explanations.'" South Ferry LP v. Killinger, 542 F.3d 776, 785 (9th Cir. 2008) (quoting Tellabs, 551 U.S. at 324); Zucco, 522 F.3d at 1001, 1007. These allegations may conceivably satisfy the PSLRA standard "without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." South Ferry, 542 F.3d at 786.

The Ninth Circuit described such a "rare circumstance" in Berson v. Applied Signal Technology, Inc., 527 F.3d 982 (9th Cir. 2008). There, the plaintiffs alleged facts which contradicted the defendants' statements about the company's revenue stream. The company had received four stop-work orders that had a "devastating effect" on the company's revenue. Id. at 987. The court drew an

20

inference of scienter from the defendants' involvement in the company's core operations because these facts were of such prominence "that it would be 'absurd to suggest' that top management was unaware of them." Id. at 989.

Here, Plaintiffs fail to plead any similar facts of such magnitude that it would be absurd to suggest that Defendants were unaware of them. Plaintiffs merely suggest that the facts that Rackable had 174 and 286 employees as of year-end 2005 and 2006, respectively, and only ten executive officers supports an inference of scienter. Even combined with the other scienter allegations, Plaintiffs' allegations about Rackable's size are not specific enough to allege scienter. 2AC ¶¶ 40, 232-33.

> 5.   Filing of False Documents with the SEC

Plaintiffs also allege that Defendants' signing of SEC certificates creates a strong inference of scienter. Under the Sarbanes-Oxley Act of 2002, Defendant Barton as CEO and Defendant Ranganathan as CFO were required to certify certain aspects of Rackable's 10-Q and 10-K Forms. See 15 U.S.C. § 7241. These Defendants certified that, based on their knowledge, each quarterly and annual report to the SEC and investors did not contain untrue statements of a material fact or omit to state a material fact. CAC ¶ 225. Plaintiffs allege that this certificate is evidence that Defendants Barton and Ranganathan knew or recklessly disregarded information about the adequacy of the internal controls over Rackable's financial reporting. This argument is not persuasive. Without any supporting allegations that Defendants made false accounting entries or inflated revenues, Defendants' signatures on the SEC certificates do not create a strong inference

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

of scienter.  <u>See</u> <u>In re Intelligroup Securities Litig.</u>, 527 F.
Supp. 2d 262, 289-90 (D. N.J. 2007) ("[W]hile the issue of what
impact a Sarbanes-Oxley certification has on a 10b-5 claim is a
relatively novel question, the above-discussed holdings indicate
that--as with allegations that defendants violated GAAP--
allegations based on defendants' erroneous SOX certification cannot
establish the requisite strong inference of scienter unless the
complaint asserts facts indicating that, at the time of
certification, defendants knew or consciously avoided any
meaningful exposure to the information that was rendering their SOX
certification erroneous.").

        6.   GAAP Violations

     Plaintiffs claim that Defendants' "deceptive inventory and
sales tax reporting violated GAAP."  Opposition at 20.  <u>See</u> <u>In re</u>
<u>Daou Sys., Inc. Sec. Litig.</u>, 411 F.3d 1006, 1016 (9th Cir. 2005)
("Violations of GAAP standards can also provide evidence of
scienter."); <u>In re McKesson HBOC, Inc. Sec. Litig.</u>, 126 F. Supp. 2d
1248, 1273 (N.D. Cal. 2000) ("when significant GAAP violations are
described with particularity in the complaint, they may provide
powerful indirect evidence of scienter.  After all, books do not
cook themselves.").  Plaintiffs rely on the allegation that
Rackable wrote off a substantial amount of obsolete inventory three
months after the Class Period.  It is not clear how this write-off,
which occurred after the Class Period, is evidence of Defendants'
knowledge during the Class Period.  Further, because Plaintiffs
have not alleged with particularity that Rackable's financial
statements regarding its reserves for sales and use tax liability
were false, Plaintiffs' allegations regarding Defendants' GAAP

1    violations fail.

2        In sum, Plaintiffs' allegations do not create a strong

3    inference that Defendants acted with scienter.  Even when viewed

4    cumulatively, these allegations do not establish a strong inference

5    that Defendants acted with deliberate recklessness.  Therefore,

6    Plaintiffs have not adequately alleged that Defendants violated

7    § 10(b) of the Exchange Act and Rule 10b-5.

8        D.   Loss Causation

9        "Loss causation is the causal connection between the

10   [defendant's] material misrepresentation and the [plaintiff's]

11   loss."  Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342 (2005).

12   "The complaint must allege that the practices that the plaintiff

13   contends are fraudulent were revealed to the market and caused the

14   resulting losses."  Metzler Investment v. Corinthian Colleges, 540

15   F.3d 1049, 1063 (9th Cir. 2008).  The complaint must allege that

16   the company's "share price fell significantly after the truth

17   became known."  Dura Pharms, 544 U.S. at 347.  "So long as the

18   complaint alleges facts that, if taken as true, plausibly establish

19   loss causation, a Rule 12(b)(6) dismissal is inappropriate."  In re

20   Gilead Sciences Securities Litig., 536 F.3d 1049, 1057 (9th Cir.

21   2008).  The loss causation element "'simply calls for enough facts

22   to raise a reasonable expectation that discovery will reveal

23   evidence of' loss causation."  Id. (quoting Bell Atl., 550 U.S. at

24   556).

25       All of Defendants' statements that allegedly reveal the

26   "truth" of the fraud Defendants committed upon the market disclose

27   negative news about Rackable's financial condition, its future

28   prospects or the competition in the computer server industry in

United States District Court
For the Northern District of California

general.   However, these statements do not reveal the necessary causal link between the alleged fraud and the drop in Rackable's stock price.   Instead, they rely on a correlation between Rackable's announcement of financial results and a decrease in stock price.   Such allegations do not plead loss causation: "So long as there is a drop in a stock's price, a plaintiff will always be able to contend that the market 'understood' a defendant's statement precipitating a loss as a coded message revealing the fraud.   Enabling a plaintiff to proceed on such a theory would effectively resurrect what <u>Dura</u> discredited . . . ."   <u>Metzler</u>, 540 F.3d at 1064.   Accordingly, Plaintiffs have not adequately plead loss causation.

II.   Section 20(a) of the Exchange Act

Plaintiffs allege control person liability against Defendants based on Section 20(a) of the Exchange Act, which states,

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

To prove a prima facie case under Section 20(a), a plaintiff must prove: (1) "a primary violation of federal securities law" and (2) "that the defendant exercised actual power or control over the primary violator."   <u>Howard v. Everex Sys., Inc.</u>, 228 F.3d 1057, 1065 (9th Cir. 2000).   Because Plaintiffs failed to plead a primary securities violation, they have also failed to plead a violation of Section 20(a).

CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss Plaintiffs' Complaint.  Docket No. 56.  The dismissal is with prejudice because Plaintiffs have had a previous opportunity to amend their complaint and the Court concludes that further amendment would be futile.

IT IS SO ORDERED.

Dated: 08/27/10

_____
CLAUDIA WILKEN
United States District Judge